William J. Genego (Calif. Bar No. 103224)
wgenego@gmail.com
Vicki I. Podberesky (Calif. Bar No. 123220)
Vip60@aol.com
Richard G. Hirsch (Calif. Bar No. 39678)
RichardHirsch@aol.com
Nasatir, Hirsch, Podberesky & Genego
2115 Main Street
Santa Monica, California 90405
Telephone: 310-399-3259

John Burton (Calif. Bar No. 86029)
JB@JohnBurtonLaw.com
The Law Offices of John Burton
414 South Marengo Avenue
Pasadena, California 91101
Telephone: (626) 449-8300

Attorneys for Plaintiff
Bruce Lisker

**United States District Court**

**Central District of California**

Bruce E. Lisker,                      )   Case No. CV09- **CV09 09374 AHM (RCx)**
                                       )
            Plaintiff,                 )
                                       )   Complaint For Violations Of Civil
      vs.                              )   Rights (42 U.S.C. § 1983)
                                       )
City of Los Angeles,                   )   Demand For Jury Trial
Los Angeles Police Department,         )
Andrew Monsue, Howard                  )
Landgren, and Does 1 to 10,            )
                                       )
            Defendants.                )
_____)

Dorka Lisker, Plaintiff Bruce Lisker's mother, was brutally murdered inside her home on March 10, 1983. Plaintiff, then 17, was arrested for the murder that same day. He did not regain his freedom until age 44, after spending more than 26 years in prison for a crime he did not commit, when his federal habeas corpus petition was granted in August, 2009. All charges were dismissed the following month on motion of the District Attorney.

- 1 -

1   The prosecution of Plaintiff, and his resulting conviction and

2   imprisonment, were caused by Defendants' wrongful acts which violated

3   Plaintiff's federal constitutional rights, including the right not to be

4   prosecuted maliciously and based on false and fabricated evidence.  Plaintiff

5   brings this action to obtain redress for his wrongful prosecution and resulting

6   imprisonment, and the irreparable losses caused by Defendants' unlawful

7   acts.

8                    **JURISDICTION AND VENUE**

9   Plaintiff, through counsel, alleges on knowledge as to himself and his

10   conduct, and upon information and belief as to all other matters, as follows:

11   1.   This case arises under 42 U.S.C. § 1983. Accordingly, subject

12   matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and

13   1343.

14   2.   Plaintiff's claims arise out of a course of conduct involving officials

15   of the City of Los Angeles, in the County of Los Angeles, State of California,

16   and within this judicial district.

17                    **PARTIES**

18   3.   Plaintiff Bruce E. Lisker ("Plaintiff" or "Lisker") is an adult

19   competent to sue.

20   4.   Defendant City of Los Angeles is a legal and political entity

21   established under the laws of the State of California, with all the powers

22   specified and necessarily implied by the Constitution and laws of the State of

23   California and exercised by a duly elected mayor and city council, an

24   appointed police chief, and their agents and officers.  Defendant Los Angeles

25   Police Department (LAPD) is a public agency subject to suit.

26   5.   At all times relevant to this matter, defendants Andrew Monsue

27   and Howard Landgren were agents and employees of defendant City of Los

28   Angeles and LAPD, and in doing the matters alleged here acted in the scope

- 2 -

1 of that employment and under color of state law.

2     6.     The true names of defendants Does 1 through 10 are presently

3 unknown to plaintiff, who therefore sues each of these defendants by such

4 fictitious name.  Plaintiff will seek to amend this Complaint to insert the

5 actual name of any such Doe defendant upon learning his or her true identity.

6                                       **FACTS**

7 A.     Plaintiff Finds His Mother Near Death,  and Tries To Save Her Life

8     7.     Plaintiff Bruce Lisker is the son of Robert and Dorka Lisker.  As a

9 child, Plaintiff lived with his parents at 15472 Huston Street, in Sherman

10 Oaks.  Plaintiff moved out of the house to a nearby apartment in May 1982,

11 shortly before his seventeenth birthday.  Plaintiff's parents continued to

12 support him, and Plaintiff was always welcome and regularly visited his

13 parents.

14     8.     On March 10, 1983, shortly before 11:28 a.m., Plaintiff, then 17,

15 arrived at his parents' house to work on his car.  He knocked on the front

16 door, and received no response other than barking by the family dog.  Plaintiff

17 became concerned because the barking meant his mother was home but not

18 responding, as the dog was always put outside when no one was home.

19     9.     Plaintiff went to the rear of the residence, walking along the west

20 side of the house. He looked through the living room window and saw what he

21 thought might be his mother's body lying on the entryway floor, with only her

22 feet visible.  Plaintiff then moved to the sliding glass doors separating the

23 outside patio from the dining room and looking through to the entryway, saw

24 his mother's head on the floor.

25     10.     Plaintiff rushed to gain entry to the house through the kitchen

26 window, located on the east side of the house.  The screen on the window had

27 been nailed shut.  Plaintiff quickly went to his car walking north on the east

28 side of the house, retrieved a pair of pliers, and returned along the same way

1  in the opposite direction.  He pulled out the nails, removed the louvered panes
2  and climbed into the house.

3      11.  Plaintiff's mother was lying on the floor of the entryway,
4  unconscious but still breathing.  She was covered with blood, her head was
5  badly beaten, and there were two steak knives protruding from her back.
6  Plaintiff removed the knives and, in a state of hysteria, called the emergency
7  number for paramedics (911 was not yet in existence).  It was 11:28 a.m.

8      12.  Plaintiff told the operator his mother had been stabbed and needed
9  help immediately.  Plaintiff desperately pleaded with the operator to send
10  help to save his mother's life.  Plaintiff, crying and hysterical, then called his
11  father, Robert Lisker, who rushed home.

12      13.  Paramedics arrived at 11:35 a.m., but waited for the police before
13  entering the house.  Plaintiff pressed the paramedics to help his mother,
14  frantically asking them to "please help.  My mother is dying."

15      14.  As LAPD officers arrived moments later, Plaintiff was "crying to
16  God to save his mother."  Plaintiff was hysterical and attempted to re-enter
17  the house to reach his mother.  Police handcuffed Plaintiff and placed him in
18  a police vehicle so he would stay out of the way.

19      15.  The paramedics entered the house through the front door and saw
20  Dorka Lisker on the floor, stomach down.  She was between the front door,
21  and a rectangular interior planter that was parallel to the front door and
22  approximately ten feet from it.  Her head was to the left of the east corner of
23  the planter; she was unconscious and had a very weak pulse, but was still
24  alive.

25      16.  Mrs. Lisker had head trauma and stab wounds in her upper back.
26  A carpet in the entry way had discoloration from two pools of blood from the
27  stab wounds.  Two kitchen steak knives were on the floor, and a piece of nylon
28  rope was nearby.

1    17.  LAPD Officer Johnson arrived on the scene after Plaintiff was

2  handcuffed and in the police vehicle.  Plaintiff was still in a "near hysterical"

3  state.  Robert Lisker arrived shortly thereafter and Plaintiff calmed down

4  enough so that Officer Johnson was able to get a "basic" statement from him.

5  Plaintiff told Officer Johnson that after job-seeking in the morning, he had

6  come to the house to work on his car, got no response when he knocked on the

7  door, went around the back and looked through a sliding glass door and saw

8  his mother's head in the entrance hallway.  He entered the house through the

9  kitchen window, and found his mother lying in the entryway.

10    18.  Dorka Lisker was transported to the hospital at or shortly before

11  twelve noon; she was pronounced dead at 3:27 p.m. without ever re-gaining

12  consciousness.  The cause of death was determined to be blunt-force head

13  injuries and multiple stab wounds.  There were approximately ten tears or

14  lacerations on the scalp that had been caused by blunt-force trauma, and her

15  skull had been fractured.  There were three stab wounds in the upper back, at

16  chest level.  There were also bruises on both arms, and the bone of her right

17  upper arm had been fractured.

18  B.  Defendant Monsue Arrests Plaintiff At The Scene

19    19.  Defendant LAPD Detective Andrew Monsue, the investigating

20  officer, arrived at the scene shortly after Dorka Lisker had been transported

21  to the hospital.  Defendant LAPD Detective Howard Landgren, also assigned

22  to the investigation, arrived a short time after Defendant Monsue.

23    20.  Defendant Monsue spent about thirty minutes viewing the crime

24  scene.  He then had Plaintiff moved to a different police vehicle.  Plaintiff

25  pleaded to be allowed to go to the hospital where his mother was being

26  treated.  Defendant Monsue refused, and instead arrested Plaintiff by

27  transporting him in custody to the Van Nuys station.

28

1   C.    Monsue Interrogates Plaintiff Without Advising Him Of His Rights

2        21.    Upon arrival at the station, Defendant Monsue began to
3  interrogate Plaintiff. Despite subjecting Plaintiff to custodial interrogation,
4  Defendant Monsue did not advise Plaintiff of his right to have an attorney
5  present or any of his other Fifth Amendment rights before questioning him.

6        22.    Plaintiff related to Monsue in detail how he had come to discover
7  his mother's body, including explaining that he started the day applying for
8  jobs and, after changing clothes at his apartment, came to his parent's house
9  to fix a shock absorber on his car. Plaintiff then detailed the sequence of
10  events leading to his calling the paramedics, including looking through the
11  living room and then dining room windows, and gaining entry through the
12  kitchen window after retrieving a pair of pliers from his car, traveling both
13  north and south on the east side of the house.

14       23.    After Plaintiff answered Monsue's questions, and explained the
15  events and his actions, Monsue told Plaintiff there were some things that
16  were not consistent with what he observed at the crime scene, and advised
17  Plaintiff of his Fifth-Amendment rights. Plaintiff continued to answer
18  questions. Plaintiff's truthful and honest answers were summarily and
19  crudely dismissed by Defendant Monsue.

20       24.    Defendant Monsue then told Plaintiff it looked like he had killed
21  his mother, causing Plaintiff to sob, as Monsue left the room. Upon re-
22  entering, Monsue said he was going to "trade places," as if he were Plaintiff.
23  Monsue then related a scenario in which Plaintiff entered through the
24  kitchen window, and was caught by his mother in the act of taking money
25  from her purse. According to Monsue, a struggle ensued, and Plaintiff
26  bludgeoned his mother's head and stabbed her multiple times. Upon hearing
27  Monsue's scenario of how he supposedly killed his mother, Plaintiff became
28  emotionally distraught and the interrogation was terminated.

1    25.    Defendant Monsue booked Plaintiff for his mother's murder at 4:00
2 p.m. that same afternoon.

3    26.    At 7:30 p.m., Monsue, accompanied by Landgren, returned to the
4 Lisker residence and interviewed Plaintiff's father, Robert Lisker. Mr. Lisker
5 related that there had been conflict between Plaintiff and his mother, and
6 that he had moved out of the house to an apartment in May, 1982. He added,
7 however, that Plaintiff had been at the house the night before, and that over
8 the last few days Plaintiff's mother had been helping Plaintiff work on his car
9 and had given him food and money. Robert Lisker also related that he had
10 given his wife $150 for shopping the night before she was murdered.

11    27.    The blood stained rug in the entry way of the house that Dorka
12 Lisker was found laying upon, was still at the scene. Monsue and Landgren
13 did not preserve the rug, and instead assisted Mr. Lisker in disposing of it.

14    28.    Defendant Monsue prepared a "Preliminary Investigation" report
15 of the murder dated March 10, in which he identified Plaintiff as the suspect
16 and related that he had entered the residence "via the kitchen window, beat
17 and stabbed victim about the head and upper body."

18    29.    Following his arrest and booking, Plaintiff was taken to Juvenile
19 Hall.

20    D.    Defendants Initiate and Pursue Prosecution of Plaintiff

21    30.    The following morning, Friday, March 11, Defendants Landgren
22 and Monsue were advised by a Deputy District Attorney that they needed to
23 have paperwork prepared that afternoon if they wanted to have Plaintiff
24 remain in custody.

25    31.    Defendant Monsue then prepared a Juvenile Arrest Report. The
26 Report stated that Plaintiff had been arrested for the murder of his mother
27 because "[a]t the conclusion of the crime scene investigation and the
28 interview of the subject, Detectives noted numerous discrepancies in the

physical evidence and the statement subject had given Detectives regarding his discovery of his mother." The Juvenile Arrest Report did not identify or explain the supposed "discrepancies," but said they "will be contained in the Detectives' follow-up report, same DR#."

32.  That afternoon (March 11), Defendant Monsue met with a Deputy District Attorney at Juvenile Hall to discuss the case; Plaintiff remained in custody.

33.  On March 13, Defendant Monsue completed a ten-page Follow-up Report. Monsue detailed Plaintiff's interrogation, and Plaintiff's explanation as to how he had discovered his mother's body, and then noted supposed discrepancies between Plaintiff's explanation and the crime scene. In particular, Monsue's Report related that

      (a)  Plaintiff's statement explaining that the reason he broke into the house was because he had seen his mother on the floor of the entryway when he looked inside from the backyard, was contradicted by the evidence, beause according to the Monsue, glare from the sun and other obstructions would have blocked Plaintiff's view and prevented him from seeing his mother as he had reported;

      (b)  Plaintiff's statement that he had traveled in both directions along the east side of the house, first heading north away from the kitchen window to go to his car to get pliers, and then south toward the window as he returned, was contradicted by the crime scene evidence, because according to the Monsue, the shoe prints along the east side of the house that were made with the "wave-like" sole pattern of Plaintiff's Pacer brand sneakers were in one direction only, toward the kitchen window and not away; and

      (c)  Plaintiff had never said he was near the kitchen sink, and yet a bloody shoe print with the same "wave-like" sole pattern was found in the kitchen, just in front of the sink.

1    34.   Defendant Monsue prepared and signed under oath a "Juvenile
2    Court Affidavit" in support of an application seeking a petition to be filed in
3    Juvenile Court declaring Plaintiff to be subject to the jurisdiction of the
4    Court.  Monsue incorporated the Juvenile Arrest Report and the March 13
5    Follow-up Report as part of his affidavit, which he signed March 13, 1983.

6    35.   A Petition was filed against Plaintiff the following day, March 14,
7    1983, for the charge of murder and he was arraigned that same day.  Monsue
8    then updated his March 13 Follow-up Report, by adding that the Petition had
9    been filed, that Plaintiff had been arraigned on the murder charge, and that
10   the case had been "cleared."  A fitness hearing to determine whether Plaintiff
11   was amenable to treatment in Juvenile Court or whether he was not
12   amenable and would be tried as an adult was scheduled for April 8, 1983.

13   E.   Defendants Create False Evidence To Prosecute Plaintiff

14   36.   Defendant Monsue returned to the Lisker residence on March 23,
15   1983, to reconstruct and photograph the view from the rear of the house into
16   the interior.  Monsue reported he had picked March 23 because the sky cover
17   and weather conditions that day were very similar to the conditions on March
18   10, as both were very bright, sunny days.

19   37.   Monsue reported and recorded the reconstruction in the official
20   Murder Book. Monsue wrote that he had "a model [lie] on the floor [of the
21   entry way] where [the] victim was found," and had a photographer take
22   "photos of the window[s] inside and out . . ." Monsue said he had the
23   photographer check the lighting conditions at 11:15 a.m. and 11:30 a.m., and
24   that the "inside light was 265 times less than available light outside." He
25   further said that at the conclusion of reconstruction, the "[p]hotographer
26   concurred that [Plaintiff] could not have seen his mother lying on  the floor."

27   38.   On March 31, 1983, a Probation Officer Report was completed that
28   addressed, *inter alia*, whether Plaintiff was amenable to prosecution as a

- 9 -

1    juvenile or whether he should be prosecuted as an adult. Information
2    regarding the offense was provided by Defendants' Juvenile Arrest Report
3    and Follow-up Report. The Probation Report stated Plaintiff was not
4    amenable based on the "Circumstances and Gravity of the Offense."

5    39.    On April 4, 1983, a hearing was conducted in Juvenile Court to
6    determine whether the prosecution had sufficient evidence to establish a
7    prima facie case, and the fitness hearing that had been scheduled for April 8,
8    was advanced to the same date, and conducted as part of the same
9    proceeding. Defendant Monsue was the only witness who testified at the
10    hearing.

11    40.    Defendant Monsue testified, among other things, that:

12    (a)    March 10 "was a very bright sunny day, clear skies; very
13    bright, very, very bright," and that "it had been clear all day long," and that
14    because of the resulting glare, Plaintiff would not have been able the see
15    inside the house;

16    (b)    Paramedics had reported that Mrs. Lisker's head "was about
17    two and a half or three feet " west of the eastern edge of the planter, on the
18    "southwest corner of the rug" in the entryway, and that even if there had not
19    been glare from the sun, Plaintiff would not have been able to see his
20    mother's head looking in from the rear of the house;

21    (c)    Shoe prints with the "rather unique" sole pattern of
22    Plaintiff's sneakers were found on the ground on the east side of the house,
23    but contrary to Plaintiff's insistence he had walked in both directions, the
24    shoe prints were headed in only one direction, south toward the kitchen
25    window;

26    (d)    A bloody shoe print with the same sole pattern as Plaintiff's
27    footwear was found in the guest bathroom headed toward the kitchen, and in
28    the kitchen in front of the sink, which was inconsistent with Plaintiff's

- 10 -

1   statement that he never went near the sink; and

2         (e)   Other blood marked shoe prints with the "rather unique"
3   pattern of Plaintiff's footwear were found inside the house, including one in a
4   bathroom adjacent to the entryway that was headed in the direction of the
5   kitchen.

6      41.   All of this testimony was false.  Contrary to Defendant Monsue's
7   testimony:

8         (a)   March 10 was not a bright, sunny day, nor were the skies
9   clear; it was an overcast day with cloud cover, especially in the morning, and
10  the view into the house was not blocked by glare from the sun;

11        (b)   Paramedics had reported that Mrs. Lisker's head was *east* of
12  the eastern edge of the planter, by a distance of six inches to a foot-and-a-half,
13  a difference of as much as four-and-a-half feet, and in the correct location,
14  Mrs. Lisker's head was visible through the dining room glass patio doors;

15        (c)   The shoe prints on the ground on the eastern side of the
16  house identified by Monsue as heading toward the kitchen window were not
17  made by Plaintiff, but by an unidentified intruder;

18        (d)   There was a shoe print on the ground made by Plaintiff that
19  Monsue did not identify, which was headed north, away from the kitchen
20  window;

21        (e)   The bloody shoe print found in the bathroom and the one
22  found in the kitchen in front of the sink matched the shoe print of the
23  unidentified intruder, and was not made by Plaintiff; and

24        (g)   The other blood marked shoe prints in the house, including
25  the impression in the bathroom, were made by the unidentified intruder and
26  not by Plaintiff.

27     42.   Based on the foregoing false testimony of Defendant Monsue, the
28  Court found that a prima facie case had been made, and ordered that Plaintiff

- 11 -

1  continue to be detained.  The Court also found Plaintiff was not amenable
2  under the specified criteria, and ruled he be prosecuted as an adult.

3      43.    During the days and weeks following the murder, Monsue and
4  Landgren requested criminalists to examine and to test nearly all the
5  physical evidence collected.  For example, Plaintiff's clothes were tested for
6  incriminating blood spatter patterns, the pliers Plaintiff used in entering the
7  kitchen window were tested for blood, prints were lifted from the knives,
8  kitchen area and paper found in Dorka Lisker's purse, finger nail scrapings
9  taken from Plaintiff were examined, and Plaintiff's car was searched for rope
10  that would match the piece of nylon cord that had been around Mrs. Lisker's
11  neck.  All the forensic test results were consistent with and corroborated
12  Plaintiff's explanation of how he had discovered his mother and his actions
13  inside the house, and none of the forensic evidence incriminated Plaintiff.

14      44.    Despite having custody of Plaintiff's sneakers, and despite having
15  forensic photographs of the bloody shoe print found in the guest bathroom
16  and the shoe prints on the east side of the house, Defendants did not request
17  a comparison of the soles of Plaintiff's sneakers with the sole pattern depicted
18  in the photographs.

19  F.    Monsue Falsely Reports That His Investigation Convincingly Cleared
20      Michael Ryan

21      45.    Plaintiff met Michael Ryan at a drug rehabilitation program in
22  approximately September 1982. Ryan stayed at Plaintiff's apartment from
23  approximately September 1982 to early January 1983.  During that time,
24  Plaintiff and Ryan would occasionally do odd jobs for Dorka Lisker at the
25  Lisker residence to earn money.

26      46.    In or about early January 1983, Plaintiff told Ryan he could no
27  longer stay at his apartment.  Ryan became angry and threatened Plaintiff
28  with a knife, before moving.  Shortly after that, in approximately mid-

- 12 -

1  January 1983, Ryan moved to Gulfport, Mississippi where his father lived.
2  Ryan unexpectedly returned to Los Angeles in early March 1983.

3       47.    On March 23, 1983, Plaintiff's father, Robert Lisker, met with
4  Defendant Monsue and told him of his suspicion and belief that Michael Ryan
5  might be responsible for the murder.  Robert Lisker provided Defendant
6  Monsue with specific facts that were consistent with and supported his
7  suspicion, including that on the afternoon of March 9, Ryan had appeared at
8  the Lisker residence and asked Dorka Lisker if she had any work he could do
9  to earn some money, and she told him "No."

10      48.    On March 30, 1983, Plaintiff wrote Defendant Monsue a letter
11 asking that he visit him at Juvenile Hall so he could provide the Detective
12 with information about who he believed may have murdered his mother.  On
13 April 1, 1983, in response to the letter, Defendant Monsue met with Plaintiff
14 at Juvenile Hall.  Plaintiff related to Defendant Monsue his belief that Ryan
15 was responsible for his mother's murder, and the reasons for his belief.
16 Among other things, Plaintiff told Monsue that Ryan had threatened him
17 with a knife, and that Ryan had been arrested for using a knife in an
18 attempted robbery.

19      49.    On April 12, Monsue separately interviewed Ryan's mother, his
20 father John Ryan and a counselor at a drug program Ryan attended.  Ryan's
21 mother told Monsue that he had only been in Los Angeles for a few days, that
22 she had not seen him, and that when she called around to try to find him, she
23 learned he had been asking people for food and a place to stay.  Ryan's father
24 told Monsue that before leaving Mississippi in early March, Ryan had been in
25 jail, that he got him out of jail and bought him the ticket, and that Ryan had
26 $50 when he left Mississippi for Los Angeles.  Ryan's father added that Ryan
27 was now back in Mississippi, and that there was a warrant for his arrest in
28 Houston.  He said he would see if he could find out where Ryan was staying,

- 13 -

1 and that if he found out, he would notify law enforcement because he was
2 afraid of Ryan. He also asked Monsue if Ryan was wanted for the murder.

3     50. The drug counselor told Monsue that Ryan had a character for
4 violence, and related a specific instance when Ryan had pulled a knife on a
5 girl during a meeting. Monsue's notes of the interview reflect that the
6 counselor told him about Ryan having assaulted the girl with a knife, but
7 Monsue omitted any mention of the knife assault in the official narrative
8 summary of the interview he prepared.

9     51. Despite being told by Plaintiff that Ryan had been arrested for
10 robbery with a knife, and despite being told he had a warrant for his arrest in
11 Houston and had been in jail in Mississippi, Monsue did not check Ryan's
12 criminal record. Had he done so, he would have learned that on April 25,
13 1982, less than one year prior to the murder of Dorka Lisker, Ryan was
14 arrested in Ventura County, California, after he had pulled a knife on Brian
15 Simpson and placed it on his throat, threatened to kill him and demanded
16 that Simpson give him $12.00.

17     52. Monsue also contacted the County Sheriff in Gulfport, Mississippi
18 on April 12, and asked Sheriff J.W. Langford to interview Ryan if possible.

19     53. On April 18, 1983, Deputy Sheriff Langford called and advised
20 Defendants that Ryan was in custody on a burglary charge, and he had
21 interviewed him. Langford related the substance of the interview by
22 telephone, and also sent the Detectives a written report by letter dated April
23 21, 1983.

24     54. The report related that Ryan said he had $52 when he left
25 Mississippi by bus and that he arrived in Los Angeles on March 6, a Sunday.
26 He slept in the carport of an apartment building until Wednesday, March 9,
27 when someone moved his clothes and questioned him. He said he had stayed
28 up all that night, and that he checked into a motel in Hollywood the following

- 14 -

1 morning, March 10, paying $21 for the room and a $5 key deposit, and that he
2 had checked in under an alias. He said that he bought a nickel ($5) bag of
3 marijuana and tried to sell joints to make money, and that he had gotten into
4 a knife fight. The next day, March 11, he left Los Angeles by bus, and said he
5 bought a ticket to Phoenix for $21 and hitchhiked from Phoenix to
6 Mississippi.

7     55.   On April 19, the day after receiving Langford's oral report of
8 Ryan's statement, Monsue went to the Tropicana Motel in Hollywood. He
9 learned that Ryan had checked in under the alias "Mark Smith," and that he
10 had not checked in until 3 p.m. – after the attack on Dorka Lisker.

11     56.   On May 4, Monsue personally interviewed Ryan at the county jail
12 in Mississippi where he was being held. At the outset of the interview,
13 Monsue told Ryan that Plaintiff was in custody for the March 10 murder of
14 his mother and that Plaintiff "has told me he thinks that you are involved in
15 this thing, and that you might be responsible for the murder. That is the
16 reason I am here and that is the reason we are going to talk." During the
17 course of the interview, Monsue told Ryan, "I'm just trying to eliminate you
18 more than I am anything else."

19     57.   Monsue told Ryan he knew he had left Mississippi on March 6 and
20 was in California until March 11. Ryan told Monsue that he had come to
21 California to join the "Job Corps" and that he always planned to return to
22 Mississippi. Both these statements were false. Ryan had been put on a bus
23 in Mississippi to take him to California because his Mississippi parole
24 supervision had been transferred to Ventura County California, where his
25 mother lived.

26     58.   Ryan told Monsue he had been at the Lisker residence on March 9
27 to use the telephone. Ryan, however, contradicted himself several times as to
28 whether Mrs. Lisker was present at the house when he was there on March 9.

- 15 -

1   As a federal magistrate judge later observed, "the inconsistency appeared to
2   depend on how Monsue framed the question to him, *i.e.*, whether Monsue was
3   accusing Ryan of involvement in the murder."

4       59.   Even before Ryan was told that the murder likely happened at
5   about 11:00 a.m. on March 10, Ryan lied to Monsue about where he was at
6   the time. Ryan told Monsue he had checked into a motel in Hollywood at
7   10:00 a.m. Ryan also said that after checking into the hotel, he was involved
8   in a knife fight and stabbed a "colored guy."

9       60.   In fact, as Monsue knew, Ryan had checked into the motel at 3:00
10  p.m. Ryan had also checked in using a false name, "Mark Smith." Ryan's
11  explanation for why he used the alias was that he was scared because of the
12  knife fight he had been in. This of course contradicted his story that he had
13  been in the fight *after* checking into the motel.

14      61.   Ryan told Monsue he had $53 with him when he left Mississippi.
15  Ryan's expenses far exceeded $53, however. When Monsue questioned him
16  about the discrepancy, Ryan had no explanation.

17      62.   Despite the major discrepancies in Ryan's story and the
18  incriminating facts it both confirmed and revealed, Defendant Monsue
19  reported that Ryan had been "convincingly cleared."

20      63.   Despite Ryan telling Monsue he had used the telephone at the
21  Lisker residence, Monsue did not examine the Lisker residence telephone
22  records to see if there were any calls made by Ryan. Had Monsue done so, he
23  would have learned that on March 10, 1983, at 10:22 a.m. – minutes before
24  Dorka Lisker was brutally beaten, stabbed and murdered – a call was made
25  from the Lisker residence phone to a telephone number that matched Ryan's
26  mother telephone number, except the last digit was different and no area code
27  was dialed. The call was for the minimum billing time of one minute,
28  consistent with the number being dialed and the caller then hanging up.

G.  Defendants Procure and Endorse Jail House Informant False Testimony

64.  At the April 4 hearing in Juvenile Court, the Judge specifically ordered that Plaintiff was to continue to be held at the Juvenile Hall, even though he could be tried as an adult.

65.  Notwithstanding this direct order, Plaintiff was transferred on April 7, 1983, to the Los Angeles County Jail.  He was placed in the 7000 module, which housed inmates who were known as jail house informants. Such inmates would claim that another inmate had confessed to them and seek to gain benefits in return for testifying to the supposed confession.

66.  Plaintiff was placed in a cell that had Robert Hughes on one side, and Sherman Wallace and Michael Dowtu on the other side.  A sign outside Plaintiff's cell indicated he was a juvenile and was on suicide watch.

67.  Within days of Plaintiff being transferred to the County Jail and being placed in the 7000 module , Defendants Monsue and Landgren were contacted by jail officials who advised them there were inmates who reported Plaintiff had confessed to them, and who wanted to speak with the investigating detectives.

68.  On April 21, Defendants Monsue and Landgren interviewed Dowtu and Wallace.  The interviews of Dowtu and Wallace exposed that their claim Plaintiff had confessed to them was completely phony, and their information was false.  For example, Dowtu reported that Plaintiff had confessed to killing his mother with a fork.

69.  Defendants Monsue and Landgren responded to the informants' attempt to falsely incriminate Plaintiff by encouraging them to attempt to get information from Plaintiff to make their stories plausible.  Defendants sought to shield their involvement in the procurement of false evidence. As one of the detectives explained to Dowtu, "if I was to tell you to go ahead and talk to him some more, you'd be acting as my agent. . . . And you can't do that, but we will

- 17 -

1   be coming back up here to see you again."

2   70.   Robert Hughes, the inmate housed on the other side of Plaintiff's
3   cell, also claimed that Plaintiff had confessed to him.  This was the third time
4   Hughes claimed that an inmate who maintained his innocence to everyone
5   else, supposedly secretly confessed guilt to him.  Hughes used his testimony
6   to bargain for promises and concessions, including early release.

7   71.   In contrast to the Dowtu and Wallace interviews, Defendants did
8   not record the first interview with Hughes, and did not even document that it
9   occurred.  Defendants first recorded an interview with Hughes on July 6,
10   1983.  In the recorded statement, Hughes said Plaintiff had confessed to him
11   sometime in April.  As with Dowtu and Wallace, Hughes' claim that Plaintiff
12   had confessed to him was obviously false.  For example, Hughes said that
13   Plaintiff admitted that his statement about having seen his mother from the
14   rear of the house was his "alibi," and not true.  In fact, Hughes obtained the
15   information he provided from the Defendants' March 13 Follow-Up report,
16   which he coaxed Plaintiff, a 17-year-old suicidal juvenile, to let him read
17   under the guise of offering aid and empathy.  Similarly, Hughes told the
18   detectives that Plaintiff's father told him that he believed and knew Plaintiff
19   had committed the murder when in fact, as Defendants knew, Robert Lisker
20   believed Ryan had committed the murder.  Robert Lisker firmly and fully
21   believed in Plaintiff's innocence, and fought to exonerate him until his death.

22   72.   Hughes bargained for and received benefits from the prosecution
23   in return for incriminating Plaintiff by falsely claiming Plaintiff confessed to
24   him.

25   73.   Plaintiff's transfer to the County Jail and his placement in the
26   7000 module, and Defendants' use of Hughes' claim that Plaintiff supposedly
27   confessed to him, mirrored practices a Los Angeles County Grand Jury found
28   were commonplace during this time period.  The Grand Jury noted that the

- 18 -

1  practice was used by officers in weak cases and that juveniles were
2  particularly susceptible to the practice.

3  H.   Defendants Continue To Pursue Plaintiff's Prosecution

4  74.   A preliminary hearing was conducted in Superior Court in October
5  1983, to determine whether there was sufficient evidence to hold Plaintiff for
6  trial.   Defendant Landgren and Defendant Monsue both testified at the
7  hearing.

8  75.   Defendants testified that March 10 was a bright, sunny day with
9  no clouds in the sky and that glare from the sun blocked the view to the
10  inside of the house through the living room window. Defendants testified that
11  interior obstructions blocked the view from outside the dining room through
12  the glass patio doors to the entryway area where Plaintiff said he had seen
13  his mother's head.   Defendants testified that shoe prints with a distinctive
14  wavy sole pattern were found both inside the house (in blood) and in the
15  ground area on the east side of the house, that one of the shoe prints inside
16  the house was in front of the kitchen sink, and that the shoe prints on the
17  east side of the house were all in one direction, south toward the kitchen
18  window.

19  76.   Defendant Monsue testified at the Preliminary Hearing to
20  Plaintiff's statement describing and explaining his conduct, and then
21  contrasted it with the above testimony to make it appear as if Plaintiff's
22  statement could not be true, and that Plaintiff had lied.   In fact, all of the
23  above testimony by Defendants was false, just like, and for the same reasons,
24  as Defendant Monsue's testimony at the April 4 juvenile court hearing.

25  77.   The Court found probable cause and ordered that Plaintiff be held
26  for trial on the charge of murdering his mother.

27  78.   At Plaintiff's trial, the statement Defendant Monsue obtained from
28  Plaintiff in violation of *Miranda* was introduced against him.   The same false

- 19 -

1   evidence Defendants used to initiate the prosecution was presented at trial
2   and used to make it appear as if Plaintiff's truthful statements were
3   conclusive proof of his guilt.  As a result, in 1985 Plaintiff was convicted of
4   second degree murder, and sentenced to 16 years to life in prison.

5   I.      Monsue Sends False Information To The Parole Board and His Conduct
6           Is Ratified By LAPD Officials

7       79.    On April 7, 1998, after Plaintiff had been incarcerated more than
8   fifteen years, Defendant Monsue wrote a letter to the Parole Board opposing
9   Plaintiff's release. Defendant Monsue stated that several years after the
10  crime, the new owners of the house found approximately $150 hidden in the
11  attic above Plaintiff's old bedroom (which he noted was the same amount
12  missing from Dorka Lisker's purse).  Monsue went on to say that "[t]his
13  revelation confirmed our initial theory that [Plaintiff] had in fact robbed his
14  mother," which, if proved at the time, would have resulted in a conviction of
15  first degree murder.

16      80.    Defendant Monsue's letter was a complete fabrication – the new
17  owners had never found any money in the attic or elsewhere in the house, and
18  they never told Monsue any such thing.

19      81.    Plaintiff discovered Monsue's 1998 letter to parole authorities
20  when reviewing his prison file.  Plaintiff filed a complaint with the Los
21  Angeles Police Department on grounds that the letter was false, and listed
22  additional false evidence that had been used to prosecute him.  LAPD
23  Sergeant Albert J. Gavin of the Internal Affairs Division was assigned to
24  investigate Plaintiff's complaint in June 2003.

25      82.    Sgt. Gavin's investigation determined that the letter was false.
26  Sgt. Gavin then expanded his investigation to include other claims of
27  innocence by Plaintiff.  For example, Sgt. Gavin realized that the shoe prints
28  that Defendants said matched the pattern on the soles of Plaintiff's sneakers

1  had never been examined by a criminalist. He submitted them for

2  comparison. The forensic examination established that the bloody shoe prints

3  found in the inside of the house were not made by Plaintiff. It also

4  established that the shoe prints on the east side of the house were headed in

5  both directions, and not in one direction as Monsue had reported.

6      83. LAPD officials stopped Sgt. Gavin from continuing his

7  investigation of Plaintiff's claims against Monsue. When Sgt. Gavin

8  requested authorization to conduct further investigation, an LAPD captain

9  told him, "That [expletive deleted] is staying in prison, do you understand

10  me."

11      84. On July 7, 2004, LAPD Captain James Rubert sent Plaintiff a

12  letter telling him an investigation had determined his complaint against

13  Monsue for having written a false letter to the parole board was "unfounded."

14  J. The Truth Finally Comes Out

15      85. Plaintiff filed numerous appeals and petition challenging his 1985

16  conviction. All of the appeals were denied and the petitions were summarily

17  dismissed without a hearing.

18      86. In 2003, Plaintiff filed a petition for a writ of habeas corpus in

19  federal court challenging his conviction. In December 2005, the federal court

20  conducted an evidentiary hearing to determine whether Plaintiff would be

21  allowed to purse the merits of his habeas claims.

22      87. After a week-long hearing, both the United States Magistrate

23  Judge and the reviewing District Judge found, among other things, that:

24          (a) The evidence "overwhelmingly showed" that the morning of

25  March 10, 1983 in the area of the Lisker home was not bright and sunny but

26  instead was overcast, cloudy and hazy;

27          (b) Plaintiff would have been able to see his mother on the floor

28  of the entryway from the position he said he had;

- 21 -

1  (c)  The dirt path on the east side of the house contained
2  impressions from two different shoes, one of which was consistent with
3  Plaintiff's shoes and was headed north away from the kitchen window, and
4  one of which was from a different shoe with a herringbone pattern sole of an
5  un-identified person;

6  (d)  The bloody shoe print in the bathroom, and the one in front of
7  the kitchen sink that was said to have the same sole pattern, were not made
8  by Plaintiff's shoes, but instead matched the herringbone shoe impressions of
9  the unidentified person found on the ground on the east side of the house;

10  (e)  The autopsy photographs depicted a patterned impression
11  behind Dorka Lisker's right ear, the patterned impression was a shoe print,
12  and the shoe impression is similar in size and dimension to the herringbone
13  pattern shoe print found in the bathroom and is dissimilar in size and
14  dimension to Plaintiff's shoes; and

15  (f)  The evidence presented at the hearing "dismantled" the case
16  against Plaintiff, and established his "actual innocence," meaning that no
17  reasonable juror would find him guilty beyond a reasonable doubt.  See *Lisker*
18  *v. Knowles*, 463 F. Supp.2d 1008 (C.D. Cal. 2006).

19  88.  The Magistrate Judge and the District Court Judge issued a
20  separate ruling that Plaintiff had been denied his right to a constitutionally
21  fair trial, and ordered that Plaintiff be retried or released. See *Lisker v.*
22  *Knowles*, ----- F. Supp.2d ----- (C. D. Cal. 2009), 2009 WL 2460863, 2009 U.S.
23  Dist. LEXIS 69195 (C.D. Cal. 2009).

24  89.  After spending more than 26 years and five months in custody for
25  the murder of his mother, a crime he did not commit, Plaintiff was released
26  on August 13, 2009.

27  90.  The charges were terminated favorably to Plaintiff, when they
28  were dismissed by the Superior Court on motion of the prosecution as they

1  admitted that they were unable to proceed. There are no pending charges
2  now, and plaintiff is living a normal life.

3  ## DAMAGES

4  91.  As a direct and proximate result of the aforesaid acts, omissions,
5  customs, practices, policies and decisions of the Defendants, Plaintiff suffered
6  the loss of his liberty and personal freedom, and was wrongfully imprisoned
7  for over twenty-six years for the brutal murder of his own mother, which
8  caused Plaintiff to sustain damages in a sum to be determined at trial.

9  92.  As a further direct and proximate result of the aforesaid acts,
10  omissions, customs, practices, policies and decisions of the defendants,
11  Plaintiff has suffered great mental and physical pain, suffering, anguish,
12  fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment,
13  harm to reputation, and apprehension, which have caused Plaintiff to sustain
14  damages in a sum to be determined at trial.

15  93.  As a further direct and proximate result of the aforesaid acts,
16  omissions, customs, practices, policies and decisions of the defendants,
17  Plaintiff has suffered, and continues to suffer, and is likely to suffer in the
18  future, extreme and severe mental anguish as well as mental and physical
19  pain and injury.

20  94.  As a further direct and proximate result of the aforesaid acts,
21  omissions, customs, practices, policies and decisions of the defendants,
22  Plaintiff has lost past and future earnings and earning capacity in an amount
23  to be determined according to proof at trial.

24  95.  As a further direct and proximate result of the aforesaid acts,
25  omissions, customs, practices, policies and decisions of the defendants,
26  Plaintiff has been deprived of familial relationships, including not being able
27  to marry and raise a family at the age when most individuals do so.

28

1    96.   All individual defendants, excluding defendants City of Los
2  Angeles and Los Angeles Police Department, acted outside the scope of their
3  jurisdiction and without authorization of law, and, separately and in concert,
4  the aforementioned acts of the defendants, and each of them, was willful,
5  wanton, malicious and oppressive, with reckless disregard or with deliberate
6  indifference and with the intent to deprive Plaintiff of his constitutional
7  rights and privileges, and did in fact violate the aforementioned rights and
8  privileges, entitling Plaintiff to exemplary and punitive damages in an
9  amount to be proven at the trial of this matter.

10                          **CLAIMS FOR RELIEF**

11                          **First Claim for Relief**

12                   Prosecution Based On False Evidence

13                          (Individual Liability)

14    97.   The individual Defendants, while acting under color of law,
15  deprived Plaintiff of his civil rights by using evidence that they knew or
16  should have known was false, to cause Plaintiff to be subject to criminal
17  prosecution, convicted without due process of law, and wrongfully imprisoned.

18                          **Second Claim for Relief**

19                          Malicious Prosecution

20                          (Individual Liability)

21    98.   The individual Defendants, while acting under color of law, caused
22  a criminal prosecution to be initiated against Plaintiff without probable
23  cause.  They acted with malice in doing so; and did so for the purpose of
24  denying Plaintiff his constitutional rights under the Fifth and Fourteenth
25  Amendments, including his due process right not to be subject to criminal
26  charges based on false evidence, and his due process right not to be deprived
27  of his liberty for a crime absent evidence of his guilt, causing his wrongful
28  imprisonment.

1    99.    The charges were terminated favorably to Plaintiff in that they

2    were dismissed unconditionally by the prosecutor and not pursuant to any

3    compromise or agreement consistent with guilt but solely in a manner

4    demonstrating that the prosecutor knew a criminal conviction could not be

5    obtained based on the evidence.

6                              **Third Claim for Relief**

7                    Violation of Privilege Against Self-Incrimination

8                                (Individual Liability)

9        100.   The individual Defendants, while acting under color of law,

10   interrogated Plaintiff while he was in custody without advising him of his

11   Fifth Amendment rights under *Miranda v. Arizona*.

12       101.   The statement was used repeatedly in the criminal case against

13   Plaintiff and was introduced against Plaintiff at his criminal trial, which

14   resulted in his conviction and wrongful imprisonment.

15       102.   Defendants' acts and omissions, violated and denied Plaintiff his

16   right to be free from being a witness against himself, as protected by the Fifth

17   Amendment, and from the deprivation of his liberty without procedural due

18   process of law, as protected by the Fourteenth Amendment.

19                             **Fourth Claim for Relief**

20                      Non-Disclosure of Exculpatory Evidence

21                                (Individual Liability)

22       103.   The individual Defendants, while acting under color of law, failed

23   to disclose evidence that was favorable to Plaintiff, including evidence that

24   would have revealed that the evidence used against him was false and

25   fabricated.

26       104.   The favorable items of evidence, collectively as well as

27   individually, was material to Plaintiff's conviction and resulting wrongful

28   imprisonment.

1    105.  Defendants' acts and omissions in failing to disclose this favorable
2  evidence violated and denied Plaintiff his right to due process secured by the
3  Fifth and Fourteenth Amendments.

### Fifth Claim for Relief

Deprivation of Civil Rights – 42 U.S.C. § 1983

(Entity Liability)

7    106.  At all times relevant to this complaint, Defendants City of Los
8  Angeles and LAPD, with deliberate indifference, and conscious and reckless
9  disregard to the safety, security and constitutional and statutory rights of
10  plaintiff, including the right not to incriminate himself under the Fifth
11  Amendment and to due process of law under the Fourteenth Amendment,
12  maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or
13  applied, among others, the following policies, practices and customs:

14          (a) failing to adequately train, supervise, and control its officers in
15  the investigation of crimes and the interviewing of witnesses;

16          (b) failing to adequately train, supervise, and control its officers in
17  working with jailhouse informants, with such conduct resulting in the use of
18  false and fabricated testimony;

19          (d) failing to adequately discipline officers  involved in dishonesty
20  or otherwise abusing their authority;

21          (e) condoning and encouraging its officers in the belief that they
22  can violate the rights of persons such as the Plaintiff in this action with
23  impunity, and that such conduct will not adversely affect their opportunities
24  for promotion and other employment benefits;

25          (f) failing to adequately investigate incidents involving the use of
26  jailhouse informants, or other misconduct by its officers;

27          (g) conducting investigations in such a manner as to conceal the
28  misconduct of its officers;

1             (h) condoning and encouraging the fabrication of evidence,

2  including but not limited to the filing of materially false police reports, the

3  use of perjurious jailhouse informants, and/or making false statements to

4  prosecution authorities to obtain the filing of false charges and the institution

5  of false and malicious prosecutions against victims of misconduct by its

6  officers; and

7             (i) deterring diligent and ethical officers from conducting thorough

8  investigations of alleged officer misconduct, instead ratifying the misconduct

9  through patently inadequate and result oriented internal investigations.

10    107.  As a direct and proximate result of the foregoing, Plaintiff

11  sustained injury and damage as proved.

12

13                         **PRAYER**

14    WHEREFORE, Plaintiff requests relief on his own behalf as follows, and

15  according to proof, against each defendant:

16    1.    General and compensatory damages in an amount according to

17  proof;

18    2.    Special damages in an amount according to proof;

19    3.    Exemplary and Punitive damages against each defendant, except

20  the City of Los Angeles and the Los Angeles Police Department, in an amount

21  according to proof;

22    4.    Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988;

23  and,

24    5.    Such other relief as may be warranted or as is just and proper.

25

26  Dated: 12/21/09

27                      William J. Genego

28



1

## DEMAND FOR JURY TRIAL

2       Plaintiff demands trial by jury.

3

4   Dated: **13131109**



William J. Genego

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 28 -