1   **CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
    **GARY G. GEUSS**, Chief Assistant City Attorney
2   **CORY BRENTE**, Assistant City Attorney
    **AMY FIELD**, Deputy City Attorney - SBN 143827
3   **CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney -**SBN 192872**
    christian.bojorquez@lacity.org
4   amy.field@lacity.org
    200 North Main Street, 6th Floor, City Hall East
5   Los Angeles, CA 90012
    Phone No.: (213) 978-6900, Fax No.: (213) 978-8785
6
    ***Attorneys for Defendants*** CITY OF LOS ANGELES, a municipal corporation, also
7   named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW
    MONSUE and HOWARD LANDGREN
8

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11  BRUCE E. LISKER,                        )   CASE NO.: CV09-09374 AHM (AJWx)
                                            )   [*The Hon. A. Howard Matz, Courtroom 14*]
12                                          )
                                            )   **EXHIBITS 1 - 2 IN SUPPORT OF**
13              Plaintiff,                  )   **DEFENDANTS' REQUEST FOR**
                                            )   **JUDICIAL NOTICE IN SUPPORT OF**
14                                          )   **NOTICE OF MOTION AND MOTION**
                                            )   **FOR SUMMARY JUDGMENT OR IN**
15          vs.                             )   **THE ALTERNATIVE PARTIAL**
                                            )   **SUMMARY ADJUDICATION OF THE**
16                                          )   **ISSUES**
                                            )
17                                          )   [**Filed/Lodged Concurrently Herewith: (1) Notice of**
                                            )   **Motion and Motion for Summary Judgment, etc.; (2)**
18  CITY OF LOS ANGELES et al.,             )   **Statement of Uncontroverted Facts and Conclusions of**
                                            )   **Law; (3) Declarations; (4) Request for Judicial Notice;**
19                                          )   **and (5) (Proposed) Judgment/Order]**
                                            )
20              Defendants                  )   Date:        **July 25,** 2011
    _____)   Time:        10:00 a.m.
21                                              Courtroom: 14

22

23

24

25

26

27

28

EXHIBIT 1

NOT TO BE PUBLISHED

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | B020092 |
| Plaintiff and Respondent, | (Super.Ct.No. A804566) |
| v. | |
| BRUCE ELIOT LISKER, | |
| Defendant and Appellant. | |

COURT OF APPEAL ·SECOND DIST.

F I L E D

DEC 2 2 1988

ROBERT N. WILSON, Clerk.

_____ Deputy Clerk

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard Kolostian, Judge. Affirmed.

Dennis E. Mulcahy, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susan D. Martynec, Assistant Supervising Deputy Attorney General, and Robert David Breton, Deputy Attorney General, for Plaintiff and Respondent.

EXHIBIT 1                                                          9

Bruce Eliot Lisker appeals from the judgment
entered following a jury trial that resulted in his
conviction of the second degree murder of his mother (Pen.
Code, § 187), and a finding that he used a deadly weapon in
committing the offense (Pen. Code, § 12022, subd. (b)).  He
was sentenced to state prison for a term of 15 years to
life, enhanced by one year for use of a deadly weapon, for a
total term of 16 years to life.

UF# 17

## CONTENTIONS

Appellant contends the trial court erred in ruling
admissible his statements to the police and to a fellow
county jail inmate.

UF# 13 + 15

## FACTS

The evidence adduced at the hearing on appellant's
motion to suppress his statements to the police established
that Los Angeles Police Officers responding to the home of
appellant's parents at approximately 11:30 a.m. on March 10,
1983, found appellant, who was then 17 years old, outside of
the residence, hysterical and screaming, with blood on his
hands.  He told the officers his mother, who was in the
house, had been stabbed and needed help.  Entering the
residence, the officers found paramedics working on the

UF# 2

- 2 -

EXHIBIT 1                                                                10

victim, who was lying on the floor with part of her body in the entry and part in the hallway off of the entry. There were two knives and many bloodstains on the front porch.

Appellant continued to walk up and down the driveway, yelling and screaming. He made several attempts to enter the residence and was warned several times to remain outside, as he was interfering with both the paramedics' efforts and the crime scene. When he persisted, he was physically restrained by the officers, handcuffed, and placed on the driveway. While there, he told the police: "I came over to work on my car. No one answered the door. I heard the dog inside. I went to the kitchen window. Took the glass out and saw my mother on the floor bleeding."

Approximately five minutes later, appellant was placed in a police vehicle in accordance with departmental policy with respect to witnesses. Officer Douglas Johnson was instructed to complete a field identification card and obtain a statement as to appellant's observations upon his arrival at the residence. Appellant was still hysterical and when his father arrived, Officer Johnson requested his assistance in calming his son. The officer, who had no authority to release appellant, did not accede to Mr. Lisker's request to take appellant with him to the hospital.

VF #3

- 3 -

EXHIBIT 1                                                                11

After speaking with his father, who told appellant he was going to the hospital and that appellant was to "stay there and do what he was told and that [his father] would talk to him later,"1/ appellant told the officer he had arrived at his parents' residence for the purpose of repairing his car at approximately 10 a.m., and knocked on the door. Receiving no answer, he went around the side of the house. Unable to see anything, he proceeded to the back of the house, looked through a window and saw "a head or something" on the floor. He then entered the residence through the kitchen window, as he had on prior occasions, and found his mother on the floor, covered with blood. He removed two knives from her body and tried to help her. He looked through the house for the perpetrator, then called his father and the paramedics. He also stated he had looked through his mother's purse and discovered there was no money in it, and speculated that the crime was motivated by robbery.

Detective Andrew Monsue arrived on the scene at around noon, after the victim had been removed to the hospital. He observed the knives, bloody footprints and a

VF#4

---

1/   At trial, appellant's father testified that in response to this request, "I asked Bruce to calm down. I told him I was going to see his mother and find out what was happening and, please, try to help the officer to find out what had happened at the scene and I would see him as soon as I could."

EXHIBIT 1

12

telephone on the front porch. He later determined the
telephone had been taken from the den. Entering the
residence, he followed a trail of bloody footprints from the
entry, where the victim was found, to the bedroom area. The
appearance of the master bedroom indicated a struggle had
occurred in that room. There was a broken, bloody trophy
lying on the floor. Bloody footprints also led through a
bathroom next to the entry into the kitchen and to the sink,
above which a window was open. All of the other doors and
windows were secured. The detective observed a woman's purse
lying open on the living room sofa.

While walking around the exterior of the residence,
Detective Monsue looked through some of the windows. He
found it difficult to see into the house through the rear,
or southerly, windows; he couldn't see the place where the
victim had been through the sewing room window; and the
window in the front door was frosted. However, the
detective, who had been told that defendant claimed to have
seen his mother through the windows before he entered the
house, did not then ascertain that it was impossible to see
the victim from any window.

In the garage, Detective Monsue found a locked
Cadillac that did not appear to have been driven recently.
The keys to this car, which belonged to the victim, were
found in a bedroom formerly occupied and still used by

EXHIBIT 1                                                        13

defendant, although he lived elsewhere at the time of the
events herein.

After examining the crime scene and speaking with
some neighbors who told him, among other things, that
appellant and his mother did not get along, Detective Monsue
transferred appellant to another police vehicle and
transported him to the police station. Appellant was not at
that time a suspect or under arrest. In fact, he asked
whether he was under arrest, the detective responded, "No."
He was, however, kept in the handcuffs because of his
earlier hysterical conduct. On the way to the station,
appellant volunteered that the attack upon his mother
resembled the "helter-skelter" crimes.

UF# 5

The handcuffs were removed from appellant in the
parking lot of the police station. He was not checked for
weapons and, according to Detective Monsue, was free to
leave, although he was not so advised. Taken to the
detective's office, appellant was given a soft drink and a
cigarette. Detective Monsue stated he needed to find out as
much as he could about what had happened, and took appellant
to an interview room, where he commenced interviewing him as
a witness. With respect to appellant's custodial status,
the detective stated he would have attempted to stop
appellant had he attempted to leave, because he was a
"material witness in a very serious crime." However, if

UF# 6

EXHIBIT 1                                                   14

appellant had persisted in leaving, he could not have been stopped, as he was not a suspect.

Officer Johnson testified he stood guard outside of the interview room for a while, and that he would not have allowed appellant to leave absent clearance from Detective Monsue.

Appellant's interview was taped, as are all interviews with witnesses in homicide cases, and the tape was transcribed for use at the hearing.

UF#14, 10

After appellant described the scene of the crime and his conduct there, Detective Monsue interrupted the interview 24 pages into the 52 page transcript to advise him of his constitutional rights. (Miranda v. Arizona (1966) 384 U.S. 436.) Appellant waived his rights, and the interview continued until he declined to speak further, whereupon it was discontinued.

UF#7, 8

UF#9

Appellant's motion to suppress evidence of his statements to fellow county jail inmate Robert Hughes was submitted on the transcript of Hughes' testimony at the preliminary examination. According to Hughes, appellant confessed his commission of the murder during conversations the two held through a hole in the common wall of their adjoining county jail rooms. Hughes, a state prisoner at the time of his appearance, stated he had testified in two prior cases in exchange for promises that the police

-- 7 --

EXHIBIT 1                                                    15

authorities would ask the Department of Corrections to
prepare a "1170(d) form" recommending recall of his sentence
and that he be resentenced for a lesser term. (Pen. Code, §
1170, subd. (d).) In each instance, the request was
denied. When he learned of the second denial during the
course of his testimony, Hughes called the prosecutor and
reported that he had decided not to testify further. The
prosecutor informed Hughes his refusal to continue would
cause all of his testimony to be stricken, but that the
prosecutor would continue to work on his behalf whether or
not he gave further testimony.

Hughes also testified that two other prisoners had
attempted to obtain information concerning appellant from
him, to use in bargaining their own cases, and that he had
offered to so testify on appellant's behalf.

## DISCUSSION

### The Statement to Detective Monsue

The Attorney General's position is, essentially,
that the police were not required to advise appellant of his
constitutional rights to remain silent and to have an
attorney present during any questioning until such time as
he became a suspect or the focus of the investigation.

It is settled that "'the vital question is custody,
not whether the investigation has focused on the person

EXHIBIT 1                                                                16

interrogated [citations] . . . . [Citations.]' (In re
James M. (1977) 72 Cal.App.3d 133, 136-137 . . . .) . . .
'[T]he vice requiring the prophylaxis of the notice of
rights is the inherently coercive atmosphere pervading
custodial interrogation. [Citation.]' [Citation.]"
(People v. Taylor (1986) 178 Cal.App.3d 217, 224-225;
emphasis in original.)

"The rule is that Miranda warnings are required
before questioning where a citizen has been taken into
custody or otherwise deprived of his freedom in any
significant way or is led to believe, as a reasonable
person, that he is so deprived. [Citations.] 'Although the
circumstances of each case must certainly influence a
determination of whether a suspect is "in custody" for
purposes of receiving Miranda protection, the ultimate
inquiry is simply whether there is a "formal arrest or
restraint on freedom of movement" of the degree associated
with a formal arrest.' [Citations.]" (People v. Taylor,
supra, at p. 225; emphasis in original.) "[T]he relevance
of any given circumstance bearing on the need for Miranda
warnings is ultimately determined by asking whether it tends
to show that a reasonable person would, or would not,
believe that his freedom had been restricted to a degree
associated with a formal arrest." (Id. at p. 228; see also
People v. Lopez (1985) 163 Cal.App.3d 602, 606 and cases

- 9 -

EXHIBIT 1                                                    17

there cited.)  The Lopez court observed that "[t]he United States Supreme Court has . . . given unequivocal approval to the objective test of custody, stating: '[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. [Fn. omitted.]' [Berkemer v. McCarty (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 336, 104 S.Ct. 3138].]" (People v. Lopez, supra, at p. 606.)

The Lopez court dealt with the Attorney General's present position, explaining that "[a] line of cases . . . accepts as a ground for determining the existence of custody either that the arresting officer had probable cause to arrest or more generally that the police investigation had focused on the suspect. [Citations.]  To the extent that these cases have taken the officer's information or state of mind as the ground for determining the existence of custody, we find them at odds with the more recent holdings of the United States Supreme Court. (Berkemer v. McCarty, supra, [486] U.S. [420], [435], fn. 22 [82 L.Ed.2d 317, 331, 104 S.Ct. 3138, 3148] (probable cause to arrest does not determine custody) and Beckwith v. United States (1976) 425 U.S. 341, 346-347 [48 L.Ed.2d 1, 7-8, 96 S.Ct. 1612] (focus of the investigation does not determine custody).) '"'It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions

– 10 –

EXHIBIT 1                                                                          18

at the time the questioning was conducted, which led the
Court to impose the Miranda requirements with regard to
custodial questioning.'"' (Ibid.)" (People v. Lopez,
supra, 163 Cal.App.3d at p. 606.)

"While questioning at a police station by a police
officer may be viewed as presumptively coercive, such
interviews may not constitute custodial interrogation where
the objective indicia of restraint or compulsion are
lacking." (People v. Mazza (1985) 175 Cal.App.3d 836, 841.)

In California v. Beheler (1983) 463 U.S. 1121 [77
L.Ed.2d 1275, 103 S.Ct. 3517], the defendant, who was
specifically told he was not under arrest, agreed to
accompany officers to the police station, and was permitted
to leave after a 30 minute interview. The United States
Supreme Court found the case indistinguishable from Oregon
v. Mathiason (1977) 429 U.S. 492 [50 L.Ed.2d 714, 97 S.Ct.
711], where the court held the defendant, who agreed to come
to the police station for an interview, and was informed
that he was not under arrest, although he was suspected of
committing a burglary, and that his statements would be
evaluated by the district attorney, was not in custody
within the meaning of Miranda when he admitted his
participation in the burglary.

In Green v. Superior Court (1985) 40 Cal.3d 126,
the defendant, who was considered by the police to be a very

- 11 -

EXHIBIT 1                                                                    19

important witness to a homicide, though not a suspect, was
asked to come to the police station for an interview, and
promised a ride back to his place of employment at any time
he wished.   The interview took place in a locked room;
however, the record did not reveal whether the defendant
realized the room was locked.   The interviewing officer
testified he would have released the defendant had he so
desired.   Our Supreme Court characterized the question as
"close," but concluded the defendant had not been the
subject of a "custodial interrogation" within the meaning of
Miranda, Beheler and Mathiason.   (Green v. Superior Court,
supra, at p. 136.)

   In the present case, appellant was not asked to
accompany the officers to the police station, but instead
was taken there in handcuffs after his father was refused
permission to take him to the hospital.   He was advised that
he was not under arrest, but was not told that he could
leave at will.   The People have failed to sustain their
burden of proving that appellant was not in custody in a
constitutional sense, as he could reasonably have believed
he was deprived of his freedom of action.   He should have
been advised of his constitutional rights at the outset of
the interview.

   This, however, does not end our inquiry.
Appellant's statements were in the nature of admissions,

- 12 -

"'recital[s] of facts tending to establish guilt when considered with the remaining evidence in the case,' and not confessions which are 'declaration[s] of defendant's intentional participation in a criminal act.' (People v. McClary (1977) 20 Cal.3d 218, 230 . . . .) The erroneous introduction of an admission is deemed prejudicial unless the People show beyond a reasonable doubt that the error did not contribute to the verdict. (Chapman v. California (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824 . . .].)" (People v. Engert (1987) 193 Cal.App.3d 1518, 1527.)

Here, excluding appellant's statement to the police, the evidence established that he did not get along with his parents, who objected to his use of drugs, forced him to move from their home, and then took his house key and nailed their windows shut. However, appellant was present in the home on the evening prior to the murder when Mr. Lisker gave his wife $150 for shopping, and she placed the money in her purse or dresser.

After the murder, the police found no signs of forced entry except through a kitchen window. The screen for this window was on the ground, and three glass louvers were neatly lined up on top of the screen. A pair of pliers and some nails were also on the ground. Appellant's fingerprints were on the kitchen window sill and the panes

- 13 -

EXHIBIT 1

of glass.   Several footprints were found leading toward the
outside of the window.

The money was missing from Mrs. Lisker's purse.
Appellant's fingerprints were found on one of two knives
found on the front porch, although there was no blood on the
blade of this knife.

More compellingly, an expert in forensic serology
and bloodstain pattern interpretation determined, based on
his examination of appellant's clothing and photographs of
the murder scene, that the blood on appellant's clothing,
which was of his mother's type, spattered onto it at the
moment when his mother suffered a blunt force injury.

Finally, appellant fully confessed the murder in
his conversations with Robert Hughes, _infra_.

The challenged statements pale in significance when
considered with the remaining, overwhelming evidence
connecting appellant with the murder.   We conclude the error
in admitting the statements was harmless beyond a reasonable
doubt.   (_People v Engert_, _supra_, 193 Cal.App.3d 1518, 1527,
and cases there cited.)

UF #18

In a supplemental brief, filed in propria persona,
appellant contends he requested the presence of his father,
an attorney, immediately after he was advised of his right
to counsel, and, as he was then a minor, the police were
obliged to cease their interrogation at that point.   We have

– 14 –

EXHIBIT 1                                                                22

listened to the tape recording of the interview, which
reveals that Detective Monsue stated: "You have the right
to remain silent. If you give up the right to remain silent
anything you say can and will be used against you in a court
of law. You have the right to have an attorney present here
today while I talk to you . . . ," whereupon appellant
murmured, "my father," just before the detective continued,
" . . . if you want one. And if you can't afford one, one
will be appointed for you without charge." Appellant was
then asked if he understood his right to remain silent, and
responded that he did, and that he wished to give up this
right. He indicated he did not understand his right to have
an attorney present, inquiring whether he could have one
later in the day. The detective responded, "You can have
one at any time that you want one. . . . Any time that you
tell me you want an attorney, I will stop asking you
questions." Appellant stated he understood his right to
counsel, and, after inquiring when he would be released, and
whether he could wash his hands, stated, "I don't need an
attorney."

We are satisfied appellant's brief reference to his
father, as described above, cannot reasonably be construed
as a request to have his parent present during the
interview, and that he did not thereby invoke his Fifth
Amendment privilege against self-incrimination. (Cf. <u>People</u>

- 15 -

EXHIBIT 1                                                        23

v. Burton (1971) 6 Cal.3d 375.)

### The Statements to Hughes

Appellant contends his confession to fellow county
jail inmate Robert Hughes should have been suppressed
because appellant was illegally detained in county jail,
rather than a juvenile facility, and was permitted to remain
in contact with adult inmates. (Welf. & Inst. Code,
§§ 707.1, subd. (b), 208, subd. (a).)2/

We agree with the Attorney General, who concedes
impropriety in this regard, but argues that the remedy for
improper housing or contacts lies in a writ proceeding to
effect removal from the adult facility or prohibit contact
with adult inmates, and/or an action for damages, rather

---

2/  At the time of the events herein, Welfare and
Institutions Code section 707.1 provided, in part, "that
unless the juvenile court specifically orders the individual
minor delivered to the custody of the sheriff upon a finding
that the presence of the minor in the juvenile hall would
endanger the safety of the public or be detrimental to the
other inmates detained in juvenile hall, the minor, if
detained, shall remain in the juvenile hall pending final
disposition by the criminal court. . . .  When a person
under 18 years of age is detained pursuant to this section
in a facility in which adults are confined, it shall be
unlawful to permit that person to come or remain in contact
with such adults."

Section 208 provides, in part: "(a)  When any
person under 18 years of age is detained in or sentenced to
any institution in which adults are confined, it shall be
unlawful to permit such person to come or remain in contact
with such adults."

EXHIBIT 1                                                    24

than suppression of statements made to adult inmates. The
record shows that in this case, appellant sought and
obtained an order of the court directing that he be returned
to a juvenile facility. His improper housing did not
constitute an illegal detention.

"Once the right to counsel has attached and been
asserted, the State must of course honor it." (Maine v.
Moulton (1985) 474 U.S. 159, 170 [88 L.Ed.2d 481, 492, 106
S.Ct. 477].) "[A]t the very least, the prosecutor and
police have an affirmative obligation not to act in a manner
that circumvents and thereby dilutes the protection afforded
by the right to counsel." (Id. at p. 171 [88 L.Ed.2d at
p. 492].) "The Sixth Amendment guarantees the accused, at
least after the initiation of formal charges, the right to
rely on counsel as a 'medium' between him and the State.
. . . [K]nowing exploitation by the State of an opportunity
to confront the accused without counsel being present is as
much a breach of the State's obligation not to circumvent
the right to the assistance of counsel as is the intentional
creation of such an opportunity." (Id., at p. 176 [88
L.Ed.2d at p 496].)

Conversely, "[a] defendant's right to counsel is
not implicated where an accused voluntarily makes statements
to a cellmate, who is not acting as a government agent or
informant. [Citation.]" (People v. Miranda (1987) 44

- 17 -

EXHIBIT 1                                                          25

Cal.3d 57, 86; emphasis in original.)  This is true even
where an informant interrogates an accused, but acts on his
own initiative rather than at the behest of the government.
(People v. Whitt (1984) 36 Cal.3d 724, 742.)

Here, Hughes commenced speaking with appellant, on
his own initiative, through the hole in the common wall of
their cells after observing that appellant's cell was tagged
as that of a suicidal juvenile, and that appellant appeared
to be depressed.  In an effort to comfort appellant, Hughes
spoke with him of religious matters, and appellant
ultimately confided that he had killed his mother,
describing the surrounding events in considerable detail.
Hughes then reported the confession to the prosecuting
authorities, who promised only to follow up on an earlier
promise, made by other authorities in connection with
another case, to seek a reduction in Hughes's sentence.
Hughes did not speak with appellant after reporting his
confession to the authorities.

Although Hughes had supplied information to the
authorities in connection with other cases, he was not asked
to do so by the police.

When informed during the preliminary hearing that
the effort to reduce his sentence had been unavailing,
Hughes decided not to testify further, and the prosecutor
stated he would continue to seek the sentence reduction even

EXHIBIT 1                                                                      26

though Hughes's testimony would have to be stricken. Upset by appellant's apparent pleasure with his decision not to testify, Hughes changed his mind. Although Hughes did ultimately obtain a sentence reduction, for a time it appeared that he would be penalized for testifying against appellant, in that he lost conduct credits against his term while absent from state prison for that purpose.

Although the informant's contacts with the police may have arisen from his expectation that he would receive a return for his information, our Supreme Court concluded in White, supra, "that where there was no prior arrangement with the informant, 'the mere acceptance of his information, even with the promise to talk to the prosecutor, is not sufficient encouragement to hold the police accountable for [the informant's] subsequent actions. Furthermore, the promise to speak to the prosecutor was in no way conditioned on [the informant] providing any further information." (People v. Howard (1988) 44 Cal.3d 375, 402.) Here, appellant confessed the murder to Hughes before Hughes ever spoke of him to the authorities. There is nothing in the record to suggest Hughes was acting as an agent of the police when he heard the confession, and the trial court properly denied appellant's motion to suppress the complained of testimony.

EXHIBIT 1

## DECISION

The judgment is affirmed.

NOT TO BE PUBLISHED


DANIELSON, J.


We concur:



KLEIN, P.J.



ARABIAN, J.



- 20 -

EXHIBIT 1                                                                                    28

EXHIBIT 2

SUPREME COURT MINUTES
TUESDAY, APRIL 25, 1989
SAN FRANCISCO, CALIFORNIA

S008870   Messih, Petitioner,                                                )
                v.                                                            )
          Court of Appeal, Second Appellate District, Respondent;            )
          Lee Drug, Inc., Real Party in Interest.                            )
            Petition for writ of mandate DENIED.

          Orders were filed in the following matters denying petitions for
writs of habeas corpus:

S007536 – In re Ras Adisa Gamba Oluwa on Habeas Corpus.

S008282 – In re James Michael Thurman on Habeas Corpus.

S008608 – In re James Hightower on Habeas Corpus.

S009173 – In re Sammy L. Page on Habeas Corpus. (In re Miller (1941)
          17 Cal.2d 734, 735.)

S009180 – In re Joseph Sylvester Hall on Habeas Corpus.

S009375 – In re Jeffrey Anthony Franklyn on Habeas Corpus.

S009387 – In re Alton Bea Whatley on Habeas Corpus. (In re Miller (1941)
          17 Cal.2d 734, 735.)

S009450 – In re Alvin L. Harrell on Habeas Corpus.

S009508 – In re Sammy L. Page on Habeas Corpus. (In re Miller (1941)
          17 Cal.2d 734, 735.)

S009532 – In re Douglas R. Haines on Habeas Corpus.

S009584 – In re Bruce Eliot Lisker on Habeas Corpus.  Petition for writ of
          habeas corpus DENIED for failure to allege sufficient facts.
          (See In re Swain (1949) 34 Cal.2d 300, 304.)

S009603 – In re Alton Bea Whatley on Habeas Corpus.

S009610 – In re Craig Chereek on Habeas Corpus.

1 Dist.   People          )
A036831       v.           )
Div. 2    James Hix        )
S009082     Appellant's petition for review DENIED.

EXHIBIT 2                                                                          29