1  **CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
   **GARY G. GEUSS**, Chief Assistant City Attorney
2  **CORY BRENTE**, Assistant City Attorney
   **AMY FIELD**, Deputy City Attorney - SBN 143827
3  **CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney **-SBN 192872**
   christian.bojorquez@lacity.org
4  amy.field@lacity.org
   200 North Main Street, 6th Floor, City Hall East
5  Los Angeles, CA  90012
   Phone No.: (213) 978-6900, Fax No.: (213) 978-8785
6
7  *Attorneys for Defendants* CITY OF LOS ANGELES, a municipal corporation, also
   named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW
8  MONSUE and HOWARD LANDGREN

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11  BRUCE E. LISKER,                    ) CASE NO.: CV09-09374 AHM (AJWx)
                                        ) *[The Hon. A. Howard Matz, Courtroom 14]*
12                                      )
                                        ) **EXHIBIT 3 A IN SUPPORT OF**
13              Plaintiff,              ) **DEFENDANTS' REQUEST FOR**
                                        ) **JUDICIAL NOTICE IN SUPPORT OF**
14                                      ) **NOTICE OF MOTION AND MOTION**
                                        ) **FOR SUMMARY JUDGMENT OR IN**
15      vs.                             ) **THE ALTERNATIVE PARTIAL**
                                        ) **SUMMARY ADJUDICATION OF THE**
16                                      ) **ISSUES**
                                        )
17                                      ) **[Filed/Lodged Concurrently Herewith: (1) Notice of**
                                        ) **Motion and Motion for Summary Judgment, etc.; (2)**
18  CITY OF LOS ANGELES et al.,         ) **Statement of Uncontrovered Facts and Conclusions of**
                                        ) **Law; (3) Declarations; (4) Request for Judicial Notice;**
19                                      ) **and (5) (Proposed) Judgment/Order]**
                                        )
20              Defendants             ) Date:        **July 25,** 2011
    _____) Time:        10:00 a.m.
21                                        Courtroom:   14
22
23
24
25
26
27
28

                                        1

UF# 22

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

### DIVISION ____

BRUCE E. LISKER

Petitioner,

In re: Bruce E. Lisker, Petitioner, on Writ of *Habeas Corpus*

Los Angeles Superior Court Case No. A804566
Former Court of Appeal Case No. B020092

## PETITION FOR WRIT OF *HABEAS CORPUS*

**BRUCE E. LISKER, D-22678**
CG-104-L
P.O. Box 409000
Ione, CA 95640-9000

In *Propria Persona*

| | |
|---|---|
| Robert B. Amidon, Esq. (SBN 103865)<br>**ROBERT B. AMIDON, A LAW CORPORATION**<br>2550 No. Hollywood Way, Suite 502<br>Burbank, California 91505-1055<br>(818) 558-4444 | David L. Bernstein, Esq. (SBN 183502)<br>11012 Ventura Blvd., # 350<br>Studio City, CA 91604<br>(818) 980-5476 |

As Advisory Counsel to Petitioner

EXHIBIT 3

30

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**SECOND APPELLATE DISTRICT**

**DIVISION ____**

---

BRUCE E. LISKER

Petitioner,

vs.

In re: Bruce E. Lisker, Petitioner, on Writ of *Habeas Corpus*

---

Court of Appeal Case No. B020092
Los Angeles Superior Court Case No. A804566

---

PETITION FOR *WRIT OF HABEAS CORPUS*

---

TO THE CLERK OF THE ABOVE-ENTITLED APPEALS COURT:

TO THE CLERK OF THE ABOVE-ENTITLED APPEALS COURT:

Petitioner, Bruce E. Lisker, hereby submits this petition for *writ of habeas corpus*.

1

EXHIBIT 3                                                                                          31

## TABLE OF CONTENTS

PETITION FOR *WRIT OF HABEAS CORPUS* .............................. 1

TABLE OF CONTENTS .................................................... i

TABLE OF AUTHORITIES ................................................. iv

STATEMENT OF EXHIBITS FILED ......................................... ix

CLAIMS ............................................................... 1

THESE CLAIMS HAVE BEEN PRESENTED TO THE SUPERIOR COURT ........ 2

PETITION FOR WRIT OF *HABEAS CORPUS* ............................. 3

ARGUMENT ........................................................... 40

I.    PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH
      AMENDMENTS TO ASSISTANCE OF COUNSEL WERE VIOLATED BY
      LAW ENFORCEMENT'S DELIBERATE AND ILLEGAL PLACEMENT OF
      HIM IN AN ENVIRONMENT -- MODULE 7000 -- WHERE THEY EXPECTED
      A JAILHOUSE "CONFESSION" TO ENSUE, .................... 41

      A.    Applicable Law: The Post-Charge Right to Counsel Forbids the
            Government to Deliberately Elicit Incriminating Statements
            From a Defendant Represented By Counsel. ......... 41

      B.    Under the Circumstances, Robert Hughes Was a Government
            Agent at the Time He Elicited Petitioner's "Confession." . 51

      C.    The Error In Admitting Hughes' Testimony Is Not Harmless
            Beyond a Reasonable Doubt. ..................... 53

      D.    Applicable Law: Requirements For *Habeas Corpus* Relief.
            ........................................... 54

            1.    The Present Petition Presents a *Prima Facie*
                  Case For Relief on Claim I. ........... 55

            2.    Claim I could not have been brought on direct
                  appeal. ........................... 56

i

EXHIBIT 3                                                              32

3.    Claim I was not raised, and could not have been, on petitioner's previous *habeas corpus* application. . . . . . . . . . . . . . . . . . . . . . . . . 57

4.    The delay in filing a petition containing Claim I is justified by the fact that petitioner was unable to obtain counsel prior to 1996, and thereafter successively retained two attorneys who promised they would prepare a *habeas corpus* petition for him, strung him along, then failed to produce any petition. . . . . . . . . . . . . . . `. . 58

5.    Exception to *Clark* timeliness standards in cases involving a "fundamental miscarriage of justice." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

II.    PETITIONER RECEIVED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL BY REASON OF HIS COUNSEL'S FAILURE TO PRESENT EVIDENCE GIVEN HIM BY THE POLICE THAT DEMONSTRATED A HIGH PROBABILITY THAT A KNOWN THIRD PARTY MURDERED DORKA LISKER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

A.    Petition (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

B.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

C.    Trial Counsel's Performance Was Deficient. . . . . . . . . . . 78

1.    The prosecution's preemptive motion . . . . 78

2.    Defense counsel's performance was deficient. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

3.    Counsel's deficient performance prejudiced petitioner within the meaning of *Strickland*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

D.    Petitioner's Counsel Was Also Ineffective in His Appellate Representation of Petitioner. . . . . . . . . . . . . . . . . . . . . . . 90

E.    Claim II Presents a *Prima Facie* Case for Relief and is Not Procedurally Barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

1.    Under the circumstances, Claim II could not have been raised on direct appeal. . . . . . . 93

ii

EXHIBIT 3                                                                                      33

2.    Claim II was not raised in petitioner's previous
      *habeas corpus* application. . . . . . . . . . . . . . 93

3.    The delay in filing a petition containing Claim II is
      justified by the fact that petitioner was unable to
      obtain counsel prior to 1996, and thereafter
      successively retained two attorneys who
      promised they would prepare a *habeas corpus*
      petition for him, strung him along, and then failed
      to produce any petition. . . . . . . . . . . . . . . 94

4.    *Clark's* fundamental miscarriage of justice
      exception. . . . . . . . . . . . . . . . . . . . . . . . 94

III.    CERTAIN SUBSEQUENT PERJURIOUS CONDUCT BY HUGHES
        STRONGLY SUGGESTS THAT HIS TESTIMONY AGAINST PETITIONER
        WAS FALSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

        A.    Petition (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

        B.    Hughes' False Declarations in His Bankruptcy Petition Were
              Perjurious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

        C.    Applicable Law: Penal Code §1473, subd. (b)(1). . . . . . . 96

        D.    Hughes' Fraudulent Bankruptcy Petition and Demonstrated
              Willingness to Commit Perjury Strongly Suggest That He Was
              Also Committing Perjury When He Testified That Petitioner
              "Confessed" to Him. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

        E.    Claim III Presents a *Prima Facie* Case for Relief and is Not
              Procedurally Barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

              1.    Claim III could not have been brought in
                    petitioner's first *habeas corpus* application.
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

              2.    The delay in filing a petition containing Claim III
                    is justified by the fact that petitioner was unable
                    to obtain counsel prior to 1996, and thereafter
                    successively retained two attorneys who
                    promised they would prepare a *habeas corpus*
                    petition for him, strung him along, and then failed
                    to produce any petition. . . . . . . . . . . . . . . . 98

iii

EXHIBIT 3                                                                34

3.    *Clark*'s fundamental miscarriage of justice
exception. . . . . . . . . . . . . . . . . . . . . . . . . . 99

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

VERIFICATION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

iv

EXHIBIT 3                                                                    35

## TABLE OF AUTHORITIES

### UNITED STATES CONSTITUTION

Fifth Amendment ................................................... 99

Sixth Amendment ................................. 1, 40, 45, 46, 49, 51, 76

Fourteenth Amendment ................................. 1, 40, 49, 99

### CALIFORNIA CONSTITUTION

art. I, §11. ...................................................... 54

art. I, §15 ...................................................... 76

### U.S. SUPREME COURT DECISIONS

Chapman v. California
386 U.S. 18 (1967) ................................................ 54

Evitts v. Lucey
469 U.S. 387 (1985) ........................................... 77, 90

Harris v. Reed
489 U.S. 255 (1989) .............................................. 92

Kuhlmann v. Wilson
477 U.S. 436 (1986) .......................................... 46, 50

Maine v. Moulton
474 U.S. 159 (1985) ................................ 41, 44, 46, 49, 51

Massiah v. United States
377 U.S. 201 (1964) ............................... 41, 42, 45, 49, 60

Strickland v. Washington
466 U.S. 668 (1949) ........................... 76-78, 86, 89, 90, 93

United States v. Henry
447 U.S. 264 (1980) ................... 20, 41, 42, 44, 49, 51, 56, 60

EXHIBIT 3                                                    36

## CALIFORNIA DECISIONS

*Daryl K. v. Superior Court*
73 Cal.App.3d 813 (1977) ............................................... 4

*In re Avena*
12 Cal.4th 694 (1996) ................................................. 78

*In re Clark*
5 Cal.4th 750 (1993) ........................... 3, 54, 56, 59-61, 93, 94, 99

*In re Cordero*
46 Cal.3d 161 (1988) ................................................. 78

*In re Fields*
51 Cal.3d 1063 (1990) ................................................ 77

*In re Fountain*
74 Cal.App.3d 715 (1977) ............................................. 91

*In re Harris*
5 Cal.4th 813 (1993) ................................................. 92

*In re Hochberg*
2 Cal.3d 870 (1970) .................................................. 54

*In re Jones*
13 Cal.4th 552 (1996) ................................................ 78

*In re Lawler*
23 Cal.3d 190 (1979) ................................................. 55

*In re Marquez*
1 Cal.4th 584 (1992) ................................................. 78

*In re Sassounian*
9 Cal.4th 535 (1995) ................................................. 21

*In re Smith*
3 Cal.3d 192 (1970) ............................................... 90, 92

*In re Swain*
34 Cal.2d 300 (1949) ................................................. 56

EXHIBIT 3

*In re Waltreus*
  62 Cal.2d 218 (1965) .................................................. 56

*In re Wright*
  78 Cal.App.3d 788 (1978) ............................................. 97

*Maxwell v. Superior Court*
  30 Cal.3d 606 (1982) ................................................. 91

*People v. Arline*
  13 Cal.App.3d 200 (1970) ......................................... 80, 87

*People v. Bailey*
  9 Cal.App.4th 1252 (1992) ........................................... 91

*People v. Barboza*
  29 Cal.3d 375 (1981) ................................................. 91

*People v. Dixon*
  41 Cal.2d 756 (1953) ................................................. 56

*People v. Duvall*
  9 Cal.4th 464 (1995) ............................................. 54, 55

*People v. Hall*
  41 Cal.3d 826 (1986) ................................................. 87

*People v. Harris*
  19 Cal.App.4th 709 (1970) ........................................ 77, 90

*People v. Ledesma*
  43 Cal.3d 171 (1987) ............................................. 77, 78

*People v. Mendez*
  193 Cal. 39 (1923) ................................................... 86

*People v. Pacini*
  120 Cal.App.3d 877 (1981) ........................................... 55

*People v. Pensinger*
  52 Cal.3d 1210 (1991) ........................................ 48, 49, 51

*People v. Perry*
  104 Cal.App.3d 268 (1970) ..................................... 80, 87, 88

EXHIBIT 3                                                      38

*People v. Pitts*
223 Cal.App.3d 616 (1990) ........................................... 50, 51

*People v. Pope*
23 Cal.3d 412 (1979) ..................................................... 76

*People v. Reeder*
82 Cal.App.3d 543 (1978) ............................................... 88

*People v. Romero*
8 Cal.4th 728 (1994) ...................................................... 54

*People v. Smith*
3 Cal.3d 192 (1970) ....................................................... 77

*People v. Whitt*
36 Cal.3d 724 (1984) ..................................... 46-48, 50, 51, 56

## LOWER FEDERAL COURT DECISIONS

*Henry v. United States,*
590 F.2d 544 (4th Cir. 1978) ............................... 42, 45, 50, 51

*United States v. Sampol,*
636 F.2d 621 (D.C. Cir. 1980) ................................... 50, 56

## CALIFORNIA STATUTES

Evidence Code §352 ...................................................... 80, 88

Evidence Code §452 subdivision (c) ..................................... 21

Evidence Code §452 subdivision (d) ..................................... 21

Penal Code §1118.1 ......................................................... 5

Penal Code §1473 ........................................................... 99

Penal Code §1473, subdivision (b)(1) .............................. 2, 96, 98

Penal Code §1476 ........................................................... 54

viii

EXHIBIT 3

39

Welfare and Institutions Code §707.1 ........................... 1, 4, 19, 40, 55

## FEDERAL STATUTES

§11 U.S.C. §727 (d)(1) ..................................................... 97

§11 U.S.C. §727 (d)(2) ..................................................... 97

ix

EXHIBIT 3                                                                    40

## STATEMENT OF EXHIBITS FILED

Petitioner has filed 64 exhibits in support of this petition. These exhibits consist of 854 pages, numbered consecutively with the prefix "E." In an effort to make the exhibits more easily readable, petitioner has separated them into five volumes. The contents of each volume are given below.

### Exhibits – Table of Contents

**Volume 1 – Exhibits 1-11**

| | |
|---|---|
| Exhibit 1 | Information filed December 21, 1983 (E3) |
| Exhibit 2 | Minute order for December 4, 1984 (E5) |
| Exhibit 3 | Minute Order for May 9, 1985 (E7) |
| Exhibit 4 | Minute Order for November 12, 1985 (E9) |
| Exhibit 5 | Court of Appeal opinion in *People v. Lisker,* B020092 (12-22-88) (E11) |
| Exhibit 6 | Petition for habeas corpus filed March 31, 1989 (E32) |
| Exhibit 7 | Order denying petition for habeas corpus (4-25-89) (E68) |
| Exhibit 8 | Interview of B. Lisker by A. Monsue (3-10-83) (E70) |
| Exhibit 9 | Motion to exclude Robert Hughes' testimony (10-5-83) (E124) |
| Exhibit 10 | Argument on motion to exclude Robert Hughes' testimony (12-7-83) (E151) |
| Exhibit 11 | Los Angeles Times, *Jailhouse Informants: The D.A.'s Ethical Bind* (11-13-88) (E176) |

x

EXHIBIT 3

## Volume 2 – Exhibit 12

Exhibit 12            Los Angeles County Grand Jury Report: Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County (6-26-90) (E178)

## Volume 3 – Exhibits 13-42

Exhibit 13            Letter from Gregory Thompson, Chief Deputy D.A. to Dennis Mulcahy (1-17-89) (E342)

Exhibit 14            Memo from Dep. D.A. Rabichow to Head Dep. D.A. Disco (11-4-88) (E345)

Exhibit 15            Letter from Otto M. Kaus to Dennis Mulcahy (8-11-89) (E348)

Exhibit 16            Declaration (1) of Paul Ingels (11-18-02) (E351)

Exhibit 17            Declaration (4) of Bruce E. Lisker (10-7-02) (E356)

Exhibit 18            Det. Monsue's summary of his interview of Sherman Wallace (4-21-83) (E364)

Exhibit 19            Det. Landgren's summary of his interview of Michael Dowtu (4-21-83) (E366)

Exhibit 20            Transcript of Dowtu Interview (4-21-83) (E369)

Exhibit 21            Transcript of Wallace interview (4-21-83) (E382)

Exhibit 22            Transcript of Robert Hughes Interview (7-6-83) (E391)

Exhibit 23            Declaration (2) of Bruce E. Lisker (9-20-02) (E400)

Exhibit 24            Declaration (3) of Paul Ingels (11-18-02) (E405)

Exhibit 25            Declaration of John Michael Ryan, Sr. (5-16-00); attachments A-B (E413)

Exhibit 26            Declaration of Linda Clelland (2-7-02) (E426)

Exhibit 27            Letter from Bruce Lisker to Andrew Monsue (3-30-83) (E429)

Exhibit 28            Notes of Det. Monsue's interview of Bruce Lisker (4-1-83) (E432)

EXHIBIT 3                                                                    42

Exhibit 29      Notes of Det. Monsue's's interview of Linda Cohen (4-12-83) (E439)

Exhibit 30      LAPD office memorandum (undated) (E442)

Exhibit 31      Memorandum from Det. Monsue (undated) (E444)

Exhibit 32      Memorandum from Det. Landgren (4-19-83) (E447)

Exhibit 33      Memorandum report by Harrison County (Mississippi) Deputy Sheriff J.W. Langford (4-18-83) (E450)

Exhibit 34      Transcript of interview of Mike Ryan by Det. Monsue (5-4-83) (E453)

Exhibit 35      Mike Ryan's *Miranda* waiver (5-4-83) (E497)

Exhibit 36      Motel registration form for "Mark Smith" (Mike Ryan) (E499)

Exhibit 37      *People v. Lisker,* (RT Aug. 389-399) (E501)

Exhibit 38      *People v. Lisker,* (RT 12-13) (E515)

Exhibit 39      Minute order for October 23, 1985 (E519)

Exhibit 40      LAPD analyzed evidence report (3-14-83) (E521)

Exhibit 41      LAPD (SID) analyzed evidence report (3-14-83) (E523)

Exhibit 42      Page from LAPD murder book, Dorka Lisker homicide (E525)

Volume 4 – Exhibit 43

Exhibit 43      Certified copy of court file in Robert Hughes' bankruptcy petition (E529)

Volume 5 – Exhibits 44-64

Exhibit 44      Superior Court memorandum from supervising judge of criminal division to supervising judges of all districts (3-2-89) (E615)

Exhibit 45      Declaration (3) of Bruce E. Lisker (10-7-02); attachments A-U (E619)

Exhibit 46      Notice of parole hearing (11-4-91); attachment A (E720)

Exhibit 47      Letter from A. Monsue to Board of Prison Terms (4-7-98) (E724)

EXHIBIT 3                                                                                    43

Exhibit 48      Declaration of Morton P. Borenstein (11-12-01) (E726)

Exhibit 49      Letter from Adina Aloni to Paul Ingels (6-13-01) (E729)

Exhibit 50      Declaration (2) of Paul Ingels (11-18-02) (E732)

Exhibit 51      Declaration of David L. Bernstein (2-7-03); attachments A-B (E737)

Exhibit 52      Los Angeles Superior Court Minute Order (3-6-03) (E744)

Exhibit 53      LAPD preliminary investigation report (3-10-83) (E747)

Exhibit 54      Declaration (1) of Bruce E. Lisker (10-7-02); attachments A-B (E759)

Exhibit 55      Declaration of Randall Robinson (9-26-02) (E777)

Exhibit 56      Declaration (1) of Kenneth Swank (11-18-02) (E786)

Exhibit 57      Declaration (2) of Kenneth Swank (11-18-02) (E789)

Exhibit 58      *People v. Millberger*, A561270, reporter's transcript on appeal, pages 688-694, 715-716 (E793)

Exhibit 59      Ronald Linhart's file from *People v. Lisker* (E805)

Exhibit 60      Probation officer's report (3-31-83) (E819)

Exhibit 61      Declaration (3) of Kenneth Swank (11-18-02) (E832)

Exhibit 62      Certified copies of proceedings in *People v. Ryan* (E836)

Exhibit 63      Declaration of Shirley Glade (12-12-02) (E851)

Exhibit 64      Lisker telephone bill for March 10, 1983 (E854)

EXHIBIT 3                      44

## CLAIMS

This petition for writ of *habeas corpus* states three claims:

I.    Petitioner's confinement is unlawful because the prosecution deliberately elicited
incriminating statements from petitioner in violation of his Sixth Amendment and
Fourteenth Amendment right to the assistance of counsel.    This violation of
petitioner's right to counsel was accomplished by illegally (in violation of Welfare &
Institutions Code §707.1) housing him in the 7000 Module of the Los Angeles
County Jail at a time (1983) when police were aware that the informant-inmates who
were assigned to that module would routinely claim -- often falsely -- that another
inmate in the module had "confessed" his guilt of the crime with which the inmate
had been charged.  The informant-inmates were encouraged in this process by
members of the Los Angeles County District Attorney's Office, who would offer
significant inducements for such "confession" testimony. Within a short time of
petitioner's placement in the 7000 Module, the prosecution had its choice of at least
three different inmates willing to testify that petitioner had "confessed" his guilt to
them while housed there.

II.   Petitioner's confinement is unlawful because he received constitutionally ineffective
assistance of counsel at his trial, in violation of his rights under the Sixth and
Fourteenth Amendments to effective assistance of counsel.    This ineffective
assistance resulted from counsel's failure to present evidence in his possession that
strongly suggested that another person committed the crime for which petitioner
was on trial. Although trial counsel was expressly asked, for the purposes of this

1

EXHIBIT 3                                                                             45

petition why he had not presented this evidence to the court, he refused to offer any explanation.

III.     Petitioner's confinement is unlawful because his conviction was procured through the presentation of false evidence that was substantially material on the issue of guilt, a violation of Penal Code §1473, subdivision (b)(1). The false evidence was presented through the testimony of the jailhouse informant who claimed that petitioner "confessed" his guilt while housed next to the informant in the 7000 Module of the Los Angeles County Jail.

THESE CLAIMS HAVE BEEN PRESENTED TO THE SUPERIOR COURT

A petition raising the same three claims described above was filed in Los Angeles Superior Court on February 24, 2003. On March 6, 2003, the Court summarily denied the petition. A copy of the order of denial is attached to the instant petition as exhibit 52. (E744.)

2

EXHIBIT 3                  46

## PETITION FOR WRIT OF *HABEAS CORPUS*

TO THE HONORABLE PRESIDING JUDGE OF THE CRIMINAL DIVISION OF THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES:

Petitioner, Bruce E. Lisker, in *propria persona*, and with the aid of counsel,
respectfully petitions this court for a writ of *habeas corpus* vacating his conviction in Los
Angeles Superior Court case No. A804566. By separate motion filed concurrently
herewith, petitioner requests that advisory counsel be appointed for him if this petition
results in the issuance of an order to show cause, as is required by *In re Clark* (1993) 5
Cal.4th 750, 780. By his verified petition, petitioner alleges the following:

1.    Petitioner is unlawfully incarcerated at the California State Prison in Mule
Creek, California, by Warden Michael Knowles, pursuant to a judgment of the Superior
Court of California, County of Los Angeles, in case number A804566. The judgment
issued on February 7, 1986. The presiding judicial officer was the Honorable Richard
Kolostian.

2.    The judgment followed petitioner's conviction by a jury for the second-degree
murder of Dorka Lisker, petitioner's adoptive mother. A one-count information charging
petitioner with the murder was issued by the Los Angeles County District Attorney on
December 21, 1983. The murder occurred on March 10, 1983. A copy of the information
is attached as exhibit 1 (page E3) to this petition.

3.    Because petitioner was 17 years old at the time of the crime, a juvenile court
fitness hearing was held. On April 4, 1983, petitioner was adjudged fit for trial in adult
court. However, pursuant to the probation department's evaluation, the juvenile court

3

EXHIBIT 3                                                                                    47

ordered that petitioner continue to be housed at juvenile hall. A copy of this probation
report is attached to this petition as exhibit 60 (E819.) Nevertheless, three days later,
petitioner was transferred to the 7000 module at the Los Angeles County Jail in violation
of the juvenile court order and of the provisions of Welfare & Institutions Code §707.1.[1]
(*See, e.g., Daryl K. v. Superior Court* (1977) 73 Cal.App.3d 813, 817 ["before a juvenile
court may order a minor in the situation of petitioner to be transferred from juvenile hall to
county jail, it must first find that the safety of the public or the inmates at juvenile hall
cannot otherwise be protected"].

    4.    Petitioner was tried twice for the crime. On December 4, 1984, petitioner's
first trial came to an end when he agreed to plead guilty to second-degree murder,
conditioned upon his being accepted for treatment by the California Youth Authority, where,
by then-existing statute, he would be guaranteed his release by age 25. (CT 229, court
minute order for December 4, 1983, is attached as exhibit 2) (E5.)

    5.    Following staff evaluation by the Youth Authority, petitioner was found to be
not amenable to the treatment programs offered. Petitioner then withdrew his guilty plea.

---

[1]    As it read in 1983, Welf & Instit. Code §707.1 provided, in pertinent part, as
follows: "If the minor is declared not a fit and proper subject to be dealt with under the
juvenile court law, the district attorney or other appropriate prosecuting officer shall acquire
the authority to file an accusatory pleading against the minor in a court of criminal
jurisdiction. The case shall proceed from that point according to the laws applicable to a
criminal case provided, that unless the juvenile court specifically orders the individual minor
delivered to the custody of the sheriff upon a finding that the presence of the minor in the
juvenile hall would endanger the safety of the public or be detrimental to the other inmates
detained in juvenile hall, **the minor, if detained, shall remain in the juvenile hall
pending final disposition by the criminal court** . . . When a person under 18 years of
age is detained pursuant to this section in a facility in which adults are confined, it shall
be unlawful to permit such person to come or remain in contact with such
adults."(Emphasis added.)

4

EXHIBIT 3

(CT 234, court minute order for May 9, 1985, is attached as exhibit 3) (E7.) See also Declaration (1) of Bruce E. Lisker, dated October 7, 2002, explaining the circumstances of his plea. This declaration is attached to this petition as exhibit 54 (E759.)

6.   At the conclusion of the prosecution's case in petitioner's second trial, petitioner's motion for acquittal of first-degree murder was granted, pursuant to Penal Code §1118.1. (CT 262, court minute order for November 12, 1985, is attached as exhibit 4) (E9.) Following the trial, petitioner was convicted of second-degree murder.

7.   On December 22, 1988, petitioner's conviction was affirmed by the Court of Appeal in an unpublished opinion entitled *People v. Lisker*, B020092. A copy of that opinion is attached as exhibit 5. (E11.) Petitioner's trial counsel, Dennis Mulcahy of Encino, California, also represented petitioner on his direct appeal.

8.   On March 31, 1989, petitioner, in *propria persona*, filed a petition for *habeas corpus* in the California Supreme Court (Case No. S009584.) A copy of that petition is attached as exhibit 6. (E32.) On April 25, 1989, the petition was denied, by "postcard," for "failure to allege sufficient facts." A copy of the denial order is attached as exhibit 7 (E68.)

9.   The evidence presented at petitioner's trials consisted principally of the testimony of an adult jailhouse informant, Robert Donald Hughes. Hughes testified that he occupied a cell next to petitioner's in module 7000 of the Los Angeles County Jail during the month of April, 1983. (RT 548.)[2] There was a four-to-six inch hole in the wall between the cells of Hughes and petitioner which Hughes utilized to initiate a conversation with

---

[2] Hughes also testified against petitioner at the preliminary hearing, approximately two years prior to trial. (CT 148-203.) The transcript references given above, except when otherwise stated, refer to Hughes' (and other witness's) testimony at petitioner's second trial, the one resulting in his conviction.

5

EXHIBIT 3                                                                                    49

petitioner. (RT 548-549, 569-570, 578, 646.) Hughes befriended petitioner, who seemed

"upset about something." Hughes professed to petitioner, then 17 years old, that Hughes

was a "born-again Christian." He tried to get close to petitioner through conversations

about religion (RT 549.) He did this to "minister" to petitioner in order to "help" him. (RT

550, 579-580.)

10.    Hughes remained in the cell next to petitioner for approximately two weeks.

(RT 576.) According to Hughes, in his first conversation ever with petitioner, petitioner

confided in Hughes that he was guilty of murdering his mother, Dorka Lisker, and wanted

to confess the details of the crime to Hughes. (RT 550, 578, 581, 587-588, 638-639, 646-

647.) This was the only conversation with Hughes in which petitioner talked about his

case. (RT 646-647.) According to Hughes, petitioner allegedly related the following:

Petitioner, who no longer lived in his parents' home, came over to the home to ask Dorka

for money. Dorka refused to give him any. Petitioner then found Dorka's purse and was

going through it when she confronted him. (RT 550-552, 607.) Dorka attempted to strike

petitioner, and tore his shirt. (RT 602.) Petitioner obtained two knives from a kitchen

drawer and stabbed Dorka with both knives. (RT 602, 634.) He then got a trophy from

elsewhere in the house and beat Dorka over the head with it. (RT 552-553, 601.)

Following this, according to Hughes, petitioner grabbed an exercise bar and continued to

beat Dorka with the bar. (RT 554, 601.) Afterwards, he called his father at work,

paramedics, and police. (RT 554, 610.)

11.    Hughes testified further that during this conversation, petitioner confessed

to concocting a false "alibi," one in which he claimed to have come to his parents' house

to work on his car, looked through a window of the house and saw Dorka laying on the

6

EXHIBIT 3                                                                                50

floor, bleeding. Since all the doors were locked, petitioner crawled into the house through a kitchen window and discovered his mother, near death. Petitioner then related this "false story" to police, according to Hughes. (RT 554-556, 617-618, 620.) Hughes claimed that petitioner spontaneously made these admissions to him. (RT 594.)

12.    At petitioner's preliminary hearing, Hughes testified that he was "quite familiar" with the fact that he stood to benefit personally if he could obtain information about a "serious case." (CT 224.) At trial, Hughes acknowledged that he had offered jailhouse informant testimony in two previous cases, one in Orange County and the other in Los Angeles County. (RT 560-562, 574, 584-585, 640, 659-663.) In February of 1983, he was transferred from a state prison facility to module 7000 of the Los Angeles County Jail in order to give testimony in the Los Angeles case. (RT 599, 662-663.) This is when he met petitioner. Hughes stated that he gave testimony in the other cases in exchange for a promise by prosecutors to seek a reduction in his sentence for a burglary conviction. (RT 560-561, 572.)[3] Because the other prosecutors had been unsuccessful in getting Hughes' sentence reduced, Hughes approached the trial prosecutor in petitioner's case, Deputy District Attorney Phillip Rabichow, and asked for help in getting the burglary sentence reduced. (RT 561, 573-574, 663, 666, 673-675.) He spoke to Rabichow after calling several police officers from the county jail to inform them that he had information concerning petitioner. (RT 558-559, 633.) These officers put Hughes in touch with LAPD homicide investigators Andrew Monsue and Howard Landgren, the investigating officers

---

[3]  Hughes had an extensive criminal record, including felony convictions for robbery, attempted robbery, possession of stolen property, first-degree burglary, and grand theft auto. (RT 560.)

7

EXHIBIT 3                                                                      51

in the Dorka Lisker murder case. (RT 559.) As a result of Rabichow's help, Hughes got out of prison ten months early. (RT 572-573, 691.)

13.     The LAPD followup investigation report of the murder is attached to this petition as exhibit 53 (E747.) The order of the events described by Hughes (ripped shirt, steak knives, trophy, and exercise bar -- see ¶ 10, *ante*) reflected exactly the order in which the LAPD followup report described the discovery of these items of evidence. Nevertheless, Hughes denied that petitioner had ever supplied him with the police investigative reports regarding the murder of Dorka Lisker. (RT 608.) He admitted that Deputy District Attorney Rabichow had supplied him with a copy of his preliminary hearing testimony to review prior to testifying at trial, and that this transcript included lengthy arguments by the prosecutor and defense counsel as to the admissibility of his testimony. (RT 649-650.)

14.     On the other side of petitioner's cell, while he was housed in the 7000 module of the County Jail, was a cell housing two inmates named Michael Dowtu and Sherman Wallace. (CT 190.) As with Hughes, there also was a hole in the wall between petitioner's cell and that of Dowtu and Wallace. (See Declaration (4) of Bruce Lisker, dated October 7, 2002, ¶¶ 15-17, attached hereto as exhibit 17) (E356.) Petitioner spoke to Dowtu and Wallace through the hole between their cells. He told them what he had been charged with and how the police thought he did it. He also told them that he believed that a man named Michael Ryan was the man who killed his mother. These inmates began to press petitioner for "details" of the crime. They became abusive, and petitioner, frightened, stopped speaking to them as much as possible. (exhibit 17, ¶¶ 16 --18) (E357 - E358.)

15.     It was about this time that Robert Hughes introduced himself to petitioner

8

EXHIBIT 3                                                                52

through the hole in the opposite wall. Hughes won petitioner's confidence through his claim that he was a "born-again Christian," and through his seemingly benevolent demeanor. Eventually Hughes asked petitioner about the crime for which petitioner was incarcerated. Petitioner explained that he was mistakenly accused of killing his mother. He related in detail his observations the day his mother was killed, his interview by Detective Monsue, and the proceedings at his fitness hearing in juvenile court. Petitioner told Hughes that he had given Monsue the truth, but Monsue did not believe him. He also told Hughes that he had the police reports from his case in his cell with him. Hughes asked to see them, saying he could better help petitioner beat the false charge if he could see how the police had constructed the charge. Petitioner handed the police reports to Hughes through the hole between their cells. Later, Hughes returned the reports. Petitioner had never supplied the police reports to either Dowtu or Wallace. (exhibit 17, ¶¶ 6-14, 19–25) (E356 - E359.)

16.    Dowtu and Wallace engaged in a competitive enterprise against Robert Hughes, and against each other, to see who could first convince police that he was the one to whom petitioner "confessed." Both Dowtu and Wallace were interviewed by detectives Monsue and Landgren regarding the "confession" they claimed to have gotten from petitioner. These interviews took place on April 21, 1983, about two weeks after petitioner was placed in the 7000 module. The officers' reports concerning these interviews are attached to this petition as exhibits 18 (interview of Wallace) (E364) and 19 (interview of Dowtu) (E366.) A transcript of the police interview of Michael Dowtu is attached to this petition as exhibit 20 (E369.) A transcript of the police interview of Sherman Wallace is attached as exhibit 21 (E382.) These transcripts reveal that Dowtu and Wallace, like

9

EXHIBIT 3                                                                                         53

Hughes, claimed to initiate conversations with petitioner through the hole in the wall in order to comfort him and introduce him to religion. Dowtu and Wallace, like Hughes, claimed that petitioner confessed his guilt to them. The transcripts indicate that Wallace, while being interviewed by Detective Monsue regarding petitioner's "confession," knew that Dowtu had just been interviewed by Monsue on the same subject. The transcripts reflect a keen competition between Dowtu and Wallace for police favor in exchange for their purported "information" regarding petitioner's case.

17.     Hughes acknowledged this competition as well. He testified that Dowtu and Wallace approached him one day regarding petitioner's case. (RT 577, 631, CT 254.) According to Hughes, Dowtu "tried to get information from me and wanted to go like a partnership, because he knew that Bruce was talking to me." (RT 592-593.) Hughes refused to share any information, and later informed petitioner that Dowtu and Wallace were attempting to manufacture a "confession" by petitioner in order to help them with their own cases. (CT 211-212, 255.) Hughes told petitioner that he knew Dowtu and Wallace were lying when they claimed petitioner had confessed to them. (CT 212, 254.) He told petitioner not to worry, that he would testify for petitioner that Dowtu and Wallace were lying. (CT 254.) Petitioner, quite worried about what Hughes had said, told his father Robert, an attorney,[4] about the danger that Dowtu and Wallace would testify falsely that petitioner had confessed to the murder. Petitioner arranged for Hughes to talk to Robert during a jailhouse visit. (exhibit 17, ¶ 30) (E360.)

18.     Robert Lisker testified that he visited Hughes "in the visiting area of the 7000

_____

[4] Robert Lisker, a civil attorney now deceased, never served as attorney of record for his son.

10

EXHIBIT 3                                                                                      54

unit." (RT 933.)[5] Hughes told Robert that "people I talk to, Dowtu and Wallace, were trying

to put together a frame on Bruce and wanted me (Hughes) to participate." (RT 935.)

Hughes explained to Robert that after he "talked to Bruce about what happened on March

10th and got him to explain it to me in detail," Hughes knew that Dowtu and Wallace were

lying. He told Robert that he would not let them "get away with it." (RT 935, 961-962.)

Hughes then asked Robert for money to take care of his "personal needs." (RT 937.)

19.    Following his discussion with Dowtu and Wallace, Hughes became

concerned that petitioner might "confess" to other module 7000 inmates. He wrote a note

to petitioner, introduced at trial as defense exhibit G, which stated: "Bruce . . . Praise God.

Love always in Jesus, Bobby, and keep your mouth shut about your case totally." (RT 620-

621.) Although Hughes professed no memory of ever telling petitioner not to discuss his

case with anybody (RT 619-620), the prosecution stipulated that Hughes was the author

of trial exhibit G. (RT 658.)

20.    Hughes' careful cultivation of petitioner paid off. Because he had been

permitted to read the police reports in the case, Hughes was able to sound far more

credible to Officers Monsue and Landgren than Dowtu or Wallace had. On July 6, 1983,

about two weeks after petitioner was moved back to juvenile hall on motion of his attorney,

Hughes was interviewed, first by Landgren, and subsequently by Monsue. (RT 559.) The

interview with Landgren was not recorded. (RT 559.) The interview with Monsue was

recorded, and the 8-page transcript of that interview is attached to this petition as exhibit

22 (E391.) During the interview, Hughes claimed that petitioner told him that he went to

---

[5]    Robert believed that the 7000 module was the jail "infirmary."

11

EXHIBIT 3                                                                55

his parents' house to ask his mother for money for drugs, but that his mother would not give him money when he told her it was for drugs. Hughes also claimed that petitioner's father, Robert, admitted to Hughes that Robert knew petitioner murdered his mother, but seemed unconcerned. Finally, Hughes took the opportunity to denigrate "the competition," stating no less than three times that he knew Dowtu and Wallace were lying about what they had told Monsue and Landgren.

21.    A deputy medical examiner testified that Dorka Lisker's death was caused by blunt-force head injuries and multiple stab wounds. (RT 47.) A paramedic testified that he and his partner received the call to respond to an emergency at the Lisker house at 11:28 a.m. and arrived there at 11:36 a.m. (RT 176, 191.) They found petitioner in the front yard. He was running around and yelling that someone had killed his mother. (RT 176.) The police arrived at almost the same time. (RT 177.) Once inside the house, the paramedics found Dorka Lisker unconscious on the floor, lying in a pool of blood with stab wounds and head trauma. (RT 196-199.) She was alive, but her pulse was very weak. (RT 179-180.) There were two small knives under her body. (RT 182.) According to the paramedic, petitioner was hysterical and was interfering with the attempts to treat Dorka. Finally, the police were asked to physically restrain petitioner so that the paramedics could complete their work. The paramedics transported Dorka to the hospital. (RT 182.)

22.    Dorka Lisker died a few hours after arriving at the hospital. She never regained consciousness. (RT from first trial, pp. 140-141.)

23.    Robert Lisker, petitioner's father and Dorka's husband, testified that he had given Dorka $150.00 in cash the afternoon before she was killed. (RT 223, 225.) At about 11:30 a.m. the next morning, Robert, an attorney, received a call at his office from

12

EXHIBIT 3                                                                          56

petitioner, who was hysterical. (RT 230-231.) Petitioner stated that Dorka had "been hurt. She's stabbed," and that petitioner had called for an ambulance. (RT 232.) Petitioner told his father to "hurry, hurry, hurry" home, and Robert left his office immediately. (RT 232-233.)

24.     LAPD Homicide Detective Andrew Monsue, the case's investigating officer, testified that he arrived at the Lisker home shortly after Dorka had been removed to the hospital. He observed petitioner sitting in a police car, handcuffed. (RT 244, 438.) Monsue went through the house and observed that all doors except the front door were locked from the inside. (RT 248-249.) He saw a trophy and an exercise bar on the floor, both with bloodstains. (RT 295, 299, 312-313.) He also saw two knives on the floor near where Dorka's body had been (RT 313.), and several shoe prints on the floor; the shoeprints seemed to have the same sole pattern as Monsue observed on the shoes petitioner was wearing. (RT 326.)  Monsue walked around the exterior of the house and observed that the kitchen window panes had been removed and were lying on the ground. (RT 274.) He saw several shoeprints outside the house. Inside, he saw a purse sitting on a couch in the living room. (RT 317.) He found no money in the purse, or anywhere else in the residence. (RT 411, 442, 473.) When asked if he found any money on petitioner, Monsue stated he had no memory of finding any. (RT 412.)

25.     Monsue transported petitioner to the police station and interviewed him regarding his activities that day. (RT 246.) The interview was tape-recorded and played for the jury. (RT 321.) A transcript of that interview is attached to this petition as exhibit 8 (E70.) In the interview, petitioner stated that he had come to his parents' house that morning to work on his car. (RT 480.) Prior to doing so, he had been applying for jobs at

13

EXHIBIT 3                                                                                        57