1   **CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
    **GARY G. GEUSS**, Chief Assistant City Attorney
2   **CORY BRENTE**, Assistant City Attorney
    **AMY FIELD**, Deputy City Attorney - SBN 143827
3   **CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney **-SBN 192872**
    christian.bojorquez@lacity.org
4   amy.field@lacity.org
    200 North Main Street, 6th Floor, City Hall East
5   Los Angeles, CA  90012
    Phone No.: (213) 978-6900, Fax No.: (213) 978-8785
6
7   *Attorneys for Defendants* CITY OF LOS ANGELES, a municipal corporation, also
    named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW
    MONSUE and HOWARD LANDGREN
8

9                        **UNITED STATES DISTRICT COURT**

10                       **CENTRAL DISTRICT OF CALIFORNIA**

11  BRUCE E. LISKER,                     )   CASE NO.: CV09-09374 AHM (AJWx)
                                         )   *[The Hon. A. Howard Matz, Courtroom 14]*
12                                       )
                                         )   **EXHIBIT 3 A-2 IN SUPPORT OF**
13              Plaintiff,               )   **DEFENDANTS' REQUEST FOR**
                                         )   **JUDICIAL NOTICE IN SUPPORT OF**
14                                       )   **NOTICE OF MOTION AND MOTION**
                                         )   **FOR SUMMARY JUDGMENT OR IN**
15      vs.                              )   **THE ALTERNATIVE PARTIAL**
                                         )   **SUMMARY ADJUDICATION OF THE**
16                                       )   **ISSUES**
                                         )
17                                       )   **[Filed/Lodged Concurrently Herewith: (1) Notice of**
                                         )   **Motion and Motion for Summary Judgment, etc.; (2)**
18  CITY OF LOS ANGELES et al.,          )   **Statement of Uncontrovered Facts and Conclusions of**
                                         )   **Law; (3) Declarations; (4) Request for Judicial**
19                                       )   **Notice;  and (5) (Proposed) Judgment/Order]**
                                         )
20              Defendants               )   Date:        **July 25,** 2011
    _____)   Time: 10:00 a.m.
21  ___                                      Courtroom:  14

22

23

24

25

26

27

28

                                         1

several local businesses, including Bob's Big Boy and Mark C. Bloome. After knocking at the front door and receiving no answer, petitioner thought something might be wrong because he could hear the family dog barking inside the house. His mother never left the house without putting the dog in the rear yard. Petitioner walked around the house, peering into various windows. Through one of the windows, he saw what appeared to be his mother's feet. From the position of the feet, it appeared to petitioner that his mother was lying prone on the floor near the front door, though most of her body was obscured by a planter. Petitioner then moved to the dining room window, where he was able to see his mother's head protruding from the other end of the planter. Petitioner then panicked and ran to a pool supplies cabinet in the backyard, where he knew his parents kept a spare house key in a metal case. The case was empty, so petitioner decided to get into the house through the kitchen window, a method he had used occasionally when he lived there. He removed the louvered window panes and crawled through the window. (RT 363.) Once inside, he discovered his mother lying unconscious on the floor. He kneeled beside her, cradling her head in his hands, "hugging, holding her." (RT 258, 345, 418, 434, 450-451; exhibit 8, p. 10) (E80.) He took her pulse. Thinking that his mother may have been injured in a robbery, he glanced into her purse, which he saw sitting open on the living room couch. (RT 327.) Afterwards he called paramedics, his father, and police. (RT 258.)

26.     Following the interview, Monsue arrested petitioner for the murder of his mother. (RT 247.) He did so, he testified, because he believed that petitioner's statement was in "total contradiction" with the shoe prints Monsue had earlier observed inside and outside the house. (RT 286.) Although two paramedics and a trainee had gone into the residence to attend to Dorka, who was lying in a pool of blood, Monsue admitted that he

14

EXHIBIT 3                                                                                              58

saw no footprints from any of these individuals. (RT 520-521.)

27.    After petitioner's arrest, Monsue returned to the Lisker residence. He looked through the window that petitioner had stated was the window through which he had seen his mother's feet several hours earlier. (RT 267, 272-273.) When asked by the prosecutor what he saw through the window, Monsue testified: "The major consideration was the reflection that was coming off of that particular window." (RT 267.)   Under cross-examination, Monsue acknowledged that the window in question had an awning, and that by cupping his hands against the glass, "I could certainly see inside the residence." (RT 446, 509-510.) Monsue also claimed that he saw no footprints on the ground outside the window, despite the fact that "although it was not raining on that day, the ground was quite moist from the amount of rain we had that year." (RT 270, 502.)

28.    Monsue searched petitioner's car, which was still parked in front of the residence. He found several job applications, nuts and washers that petitioner had brought to effect a repair of one of the car's shock absorbers, and automobile repair tools . (RT 404-405, 462, 478-479, 498-501.)

29.    Ronald Linhart, a member of the Los Angeles County Coroner's Office, testified as an expert in blood-spatter analysis. (RT 698-756.) Linhart analyzed stains on petitioner's shoes and clothing to see which, if any, were blood. He found one drop of blood on petitioner's right tennis shoe (RT 735-736, 740), one drop of blood on petitioner's left tennis shoe (RT 737-738, 740), five small droplets on the right cuff of petitioner's outer shirt, plus some smeared blood on the front of the shirt (RT 739-741), no blood on petitioner's undershirt (RT 741), and a few "light smears" of blood on the front of petitioner's pants. (RT 742-744.) Linhart offered no opinion or conclusion as to how his

15

EXHIBIT 3                                                                          59

analysis was impeaching of petitioner's explanation regarding the presence of blood on his
clothing. Further, Linhart conceded on cross-examination that his findings were entirely
consistent with the account petitioner gave to Monsue regarding his physical contact with
his mother. (RT 747-748.) Linhart also conceded that nothing in his findings could
determine whether petitioner, as opposed to someone else, had stabbed or beaten Dorka
Lisker. (RT 748.)

30.     It was stipulated that petitioner's palm and thumb prints were found on the
windowsill outside the kitchen window where petitioner told police he entered the house
after seeing his mother on the floor through the rear windows. (RT 766.) It was further
stipulated that no fingerprints were found on the bloody exercise bar. (RT 766.)

31.     Public Defender Dennis Riley represented petitioner from the time of his
arrest through the fitness hearing in juvenile court, held just prior to his transfer to the Los
Angeles County Jail. (RT 792-793, 795-796.) During the period in which he represented
petitioner, Riley supplied him with copies of the preliminary and followup police reports that
had been prepared in connection with the case. (RT 793, 796-798.) Copies of these police
reports are attached hereto as exhibit 53. (E747.)

32.     LAPD Officer Douglas Johnson was the third police officer to arrive at the
Lisker residence on March 10, 1983. (RT 809-810.) He found petitioner in a "near-
hysterical" condition but managed to get a "basic statement" from him. (RT 812.)
Johnson's notes of petitioner's statement was that petitioner, after job-seeking in the
morning, had come to the house to fix his car, got no response when he knocked on the
front door, went around back and looked in a window, and saw a head in the entrance
hallway. (RT 820.) Petitioner then entered the house through the kitchen window, found

16

EXHIBIT 3                                                                          60

his mother with two knives in her, and removed the knives. (RT 821.) Petitioner then took two other knives from the kitchen and looked through the house in case whomever had beaten his mother was still there. (RT 821.)

33.   LAPD Officer George Prado and his partner, Officer Gregory De Rousseau, were the first two officers on the scene at the Lisker residence on March 10, 1983. (RT 830, 866-867.) They observed that the garage door was open and a car was parked in the garage. (RT 834.) Another car was parked in the driveway. (RT 834-835.) Prado observed petitioner walking back and forth in front of the house, yelling that he wanted the paramedics to help his mother. (RT 835.) Officer De Rousseau heard petitioner exclaim: "Someone stabbed my mother in the head. Please help me or please help her. I am going to get the person who did this." (RT 868.) De Rousseau tried to calm petitioner down, "but it was almost impossible to do so." (RT 870.)

34.   On the day after the murder, March 11, 1983, at about 11:00 a.m., Robert Lisker, petitioner's father, and Mr. Lisker's friend, Robert Johnson, went to the Lisker family residence. Both Lisker and Johnson were attorneys. (RT 877-879, 921.) On the previous day, Lisker had been in the house with Detective Monsue and Monsue described for Lisker the position Monsue believed Dorka Lisker's body was in when police and paramedics arrived. (RT 922.)

35.   After Johnson and Lisker arrived at the Lisker house on March 11th, Lisker lay on the floor inside the house, in the position that Monsue told him was the position of Dorka when she was found the previous day. (RT 923.) While Lisker did this, Johnson walked around the outside of the house and looked through various windows, including the windows that petitioner told police were the windows through which he had glimpsed

17

EXHIBIT 3                                                                                            61

portions of his mother's body as she lay in the entrance hall. (RT 880-883.) Johnson did
not have "any difficulty seeing the lower portion of his [Robert Lisker's] body, the lower
portion of his legs and feet." (RT 884-887.)

36.    Johnson and Lisker returned to the home on March 10, 1984, exactly one
year after the killing. (RT 891.) Johnson again looked into the window with the awning;
once again, he had no difficulty seeing into the residence. (RT 892.)

37.    Robert Lisker received from petitioner's juvenile court attorney a "quite thick"
sheaf of police reports while petitioner was still confined in juvenile hall. He supplied these
reports to petitioner. (RT 928.)

38.    Robert Lisker visited Robert Hughes in the Los Angeles County Jail during
the period petitioner was inhabiting the cell next to Hughes in the 7000 module. (RT 932-
933.) Hughes told Lisker, "I know Bruce didn't do it. He is a good kid. He is going to be
out of here soon." (RT 936.) Hughes repeated this "belief" in notes he wrote to petitioner
while both were incarcerated in the 7000 module.  These notes were later admitted as
defense exhibits at petitioner's trial.  In one of the notes Hughes wrote, "I am praying for
you little bro. I feel you are going to the streets soon." (RT 625-626.) In another, he wrote,
"The Lord gives me a strong feeling you will be out of this pit soon." (RT 628-629.) In a
third, "I just want you to know that the Lord gave you a good heart." (RT 641-642.)

39.    The evening prior to the murder, petitioner had been to his parents house and
asked his father for money for gas because he intended to go job-hunting the next day.
(RT 958.) Petitioners's father gave him $10.00 (RT 958-959.)

40.    In his closing argument, the prosecutor argued that Robert Hughes should
be believed despite his history of informing on other inmates because "even a scoundrel

18

EXHIBIT 3                                                                                              62

has some values at some point. He [Hughes] hasn't been and didn't lead an honest life, but you know no one, criminal or not, goes around saying that it is okay to kill your mother. I mean there are certain things that nobody approves of and he testified." (RT 1103.)

41.    At petitioner's preliminary hearing, he moved that Hughes' testimony should be excluded. One of the grounds for the motion was that petitioner's right to counsel was violated when the police removed him from juvenile hall and, without authority, placed him in the Los Angeles County Jail, where they knew the coercive atmosphere was likely to produce incriminating responses if petitioner were to come into contact with adults. A copy of petitioner's written motion, filed October 5, 1983 (CT 81-106), is attached to this petition as exhibit 9 (E124.)

42.    The motion was argued on December 7, 1983. A 24-page transcript of that hearing is attached as exhibit 10 (the pages of the transcript are numbered 207-230) (E151.) The court held that, absent a showing that the sheriff's department "caused" petitioner to be placed in contact with adult inmates, the remedy of suppression was not available. The court stated:

> "Now, perhaps if the sheriff might possibly be considered
> negligent in not making sure those holes don't exist, but in my
> mind it doesn't seem that the sheriff's department caused the
> coming in contact. It seems to me that it's the inmates
> themselves who provided the opportunity to communicate
> rather than the sheriff being in violation, knowingly, of [Welf. &
> Inst. Code] §707.1." (exhibit 10, p. 223) (E167.)

Petitioner's counsel argued that Hughes should be regarded as a police agent within

19

EXHIBIT 3                                                                                          63

the meaning of *United States v. Henry* (1980) 447 U.S. 264. However, the court found no indication that Hughes "was sent by the police or sheriff specifically to gather information and inform. So on that ground, I would deny your motion." (exhibit 10, p. 230) (E174.) On November 13, 1984, just prior to petitioner's first trial, the court again denied the motion to exclude Robert Hughes' testimony, on the same basis as previously. (Augmented RT 333-379.)

43.    On October 23, 1985, prior to the commencement of petitioner's second trial, petitioner renewed his motion to exclude Robert Hughes' testimony. The court made the same ruling it had previously, finding that "Mr. Hughes certainly under the facts presented is not an agent of the police in any way." Petitioner was convicted on November 21, 1985. His conviction was affirmed on appeal on December 22, 1988.

44.    In November of 1988, news articles appeared chronicling the allegations by a Los Angeles County Jail inmate, Leslie White, that an organized informant's "ring" existed at the County Jail, and that the informants were skilled at fabricating confessions of other inmates. Attached to this petition as exhibit 11 (E176 - E177), as an example of these news articles, is the following: Cody, Kevin, *Jailhouse Informants: The D.A.'s Ethical Bind,* Los Angeles Times, November 13, 1988, at Part V, p. 3. The article contained the following paragraph:

> "The district attorney sits back and says he never told the snitch to get information," said veteran public defender Forrest Latiner. "But let's not kid ourselves - the circumstances are set up so the snitch can be in an adjoining cell. The district attorney knows the snitches aren't reliable because these

20

EXHIBIT 3                                                                                                    64

people will sell their souls for whatever small benefit they might

get."

45.     In response to Leslie White's allegations, the Los Angeles County District

Attorney launched an investigation, as did the Los Angeles County Grand Jury. On June

26, 1990, the Grand Jury issued a report entitled "Investigation of the Involvement of Jail

House Informants in the Criminal Justice System in Los Angeles County." A copy of the

153-page report is attached to this petition as exhibit 12 (E180.) This court is respectfully

requested to take judicial notice of the Grand Jury Report, pursuant to Evidence Code

§452, subdivisions (c) and (d). (In re Sassounian (1995) 9 Cal.4th 535, 543, fn. 4.)

46.     The Grand Jury listened to testimony from 120 witnesses, including jailhouse

informants, judges, prosecutors, defense attorneys, and members of the Los Angeles

Sheriff's Department and Los Angeles Police Department. (exhibit 12, p. 2) (E187.)

Thousands of pages of documents were received. (exhibit 12, pp. 3-4) (E188 - E189.) The

Grand Jury believed its report to be "the most comprehensive inquiry into this topic that has

ever been conducted." (exhibit 12, p. 4) (E189.)

47.     Pages 45-73 of the Grand Jury report deal with the relationship between the

jail personnel of the sheriff's department and the informants housed at the jail. The report

noted that deputies at the jail known as "Jail Liaison Deputies" were responsible for

classifying inmates. "An inmate's classification determines where and with whom the

inmate will be housed." (exhibit 12, p. 47) (E232.) The report also noted that outside law

enforcement officers could request that a particular inmate receive a particular

classification by filling out a form called an "Inmate Special Handling Request." (exhibit 12,

p. 47-48) (E232 - E233.) The report described several cases where non-informants were

21

EXHIBIT 3                                                                    65

classified as informants at the behest of police agencies or prosecutors in order to have the non-informant inmate placed among informants "in the hope the informants would obtain incriminating information from the inmate." (exhibit 12, p. 54) (E239.)

48.     Pages 47-49 of the report describe the classification procedure used at the County Jail. Insofar as is pertinent to the instant petition, a classification of "K-9" is given to informants, and a classification of K-10 is given to "inmates charged in notorious cases." (exhibit 12, p. 49) (E234.) K-9 and K-10 inmates are identified by red-colored wristbands. (exhibit 12, p. 48) (E233.)

49.     Pages 57-68 of the report are entitled "The Sheriff's Intentional Placement of Informants for the Purpose of Eliciting Incriminating Information From Jail Inmates." (Exhibit 12, p. 57) (E242.) These pages describe numerous cases where inmates were classified by Jail Liaison Deputies in such a manner that the inmates were placed among jailhouse informants. This was usually done at the request of investigating officers from outside law enforcement agencies such as the Los Angeles Police Department. Pages 25-27 of the report (E210 - E212) are entitled "Mission to Acquire Evidence." This section describes one technique used by the Jail Liaison Deputies for informant placement among non-informants:

>    "Several informants testified to having the wristbands
>    temporarily changed from a K-9 status to a K-10 while in the
>    company of a defendant classified as a K-10. One informant
>    testified that an official, while changing his wristband to a K-10
>    designation, admitted that the informant should still be labeled
>    a K-9." (exhibit 12, p.25, fn. 13) (E210.)

22

EXHIBIT 3                                                          66

50.     Pages 68-73 of the report (E253 - E258) are entitled "The Sheriff's Knowledge of the Ability of Informants to Fabricate Confessions." According to this section of the report, in early 1988 a jail deputy was contacted by an inmate who claimed that three jailhouse informants were trying to "book" him (fabricate a story that the inmate had "confessed"). The deputy interviewed the informants, "who described their technique for obtaining information by making telephone calls to the District Attorney's Office and representing themselves as members of law enforcement." (exhibit 12, p. 68) (E253.) The informants also explained how they could arrange to be placed in close proximity to a targeted inmate, either on the same bus or the same courtroom, "so there would be a record of contact with the inmate to substantiate a fabricated confession." (exhibit 12, p. 68) (E253.)

51.     The deputy described in the previous paragraph wrote a report concerning the findings of his investigation and gave it to a sheriff's department lieutenant. "No action was taken as a result of the deputy's report." (exhibit 12, p. 68) (E253.)

52.     Pages 69-73 (E254 - E258) of the report describe the "demonstration" that jailhouse informant Leslie White[6] gave of his ability to gather information about a particular inmate's case. The demonstration came about because jail deputies learned that White "was writing an article for California Magazine in which he planned to expose the fact that informants were using the telephone to acquire detailed knowledge of criminal cases and construct jailhouse confessions from inmates they had never met." (exhibit 12, p. 69) (E254.) White, given the use of a telephone, demonstrated that he was able to get

---

[6]   Neither White nor any other person is identified by name in the published portion of the Grand Jury's investigation.

23

EXHIBIT 3                                                                    67

information about a particular inmate's case, including case number, date of arrest, arresting agency, and next court date, by calling the jail's Inmate Reception Center and stating that he was an employee of a bail bond company. White then called the records section of the District Attorney's Office and claimed to be a Deputy District Attorney seeking information about the targeted inmate's case. He was given the name and phone number of the Deputy who was prosecuting the inmate, and the name of a witness in the case. White then called Sheriff's Homicide and stated that he was "Sergeant Stevens" at the Central Jail. "Sergeant Stevens" was given the name and description of the murder victim in the inmate's case. (exhibit 12, pp. 69-70) (E254 - E255.)

53.    After receiving the information described above, White called the Deputy District Attorney handling the case, identifying himself as "Sergeant Williams" of the LAPD. In response to "Sergeant Williams'" questions, the Deputy provided virtually everything White would need to fabricate the inmate's confession to the crime, including details about the victim's clothing, the location of the body, and the coroner's report concerning cause of death and drug content of the victim's blood. Near the end of the conversation, White gave his name as "Sergeant Johnson."

54.    White next demonstrated how he could arrange for contact between himself and the targeted inmate so as to support the false confession. He called the bailiff in a department of the Superior Court, identifying himself as "Deputy District Attorney Michaels" with the Organized Crime Unit. In response to "Michaels'" request, the bailiff arranged for White and the inmate to be transported to court on the same bus the following day. (exhibit 12, pp. 70-71) (E255 - E256.)

55.    White concluded his demonstration by stating that he now had "enough

24

EXHIBIT 3                                                                 68

information to put a story together that's very believable, accurate, detailed story" [sic].
(exhibit 12, p. 71) (E256.)  White continued:

> "[T]he key thing is they [police and prosecutors] want to win.
> So if I come forward with information as detailed as that they're
> gonna use it.  Because the jury not knowing the system or how
> it works, is going to believe when I get up there with all these
> details and facts, that this guy sat in the jail cell, or he sat on
> the bus, or he sat in the holding tank somewhere, or told me
> through a door or something, they're gonna believe me."
> (exhibit 12, p. 72) (E257.)

56.    In January, 1989, White, then out of custody, gave a similar demonstration
for a television crew from the program "60 Minutes." (exhibit 12, pp. 72-73) (E257 - E258.)

57.    In a letter dated January 17, 1989, from the Los Angeles County District
Attorney's Office to petitioner's trial and appellate counsel, Dennis Mulcahy, Mulcahy was
informed that the District Attorney's Office had formed a task force to look into the jailhouse
informant "problem" that had recently been made public through the revelations of Leslie
White. A copy of that letter is attached as exhibit 13 (E342.) The letter states that the task
force directed all prosecutors in the Office to inform the task force of any cases handled
in the period 1979 through 1989 in which jailhouse informant testimony was used by the
prosecution. Pursuant to that directive, the task force had been informed that petitioner's
case was among those in which jailhouse informant testimony had been employed. The
letter concluded that if Mulcahy wished "to fully explore this issue, our office will join with
you in expediting the hearing of any appropriate motion you wish to bring." (exhibit 13)

25

EXHIBIT 3                                                                    69

(E342.)

58.    Enclosed with the January 17, 1989, letter to Mulcahy was a memorandum
from trial prosecutor Phillip Rabichow. The memorandum, dated November 4, 1988, is
attached as exhibit 14 (E345.) The memorandum gives Rabichow's view of the evidence
at petitioner's trial, including the following statement: "Hughes testified to details of the
killing that only the killer knew, including which rooms different altercations took place and
the order in which they occurred." (E345.) The memorandum also asserts that petitioner's
statement to police (exhibit 8 to the instant petition) "contained major inconsistencies and
contradicted physical evidence." (E345.) The memorandum does not identify these "major
inconsistencies" or what "physical evidence" contradicted petitioner's statement. The
memorandum also asserts that petitioner "confessed" to the crime while being evaluated
at the California Youth Authority. Finally, Rabichow claimed that "the sequence of events
was corroborated by independent evidence based on blood spatters and location of
physical evidence." (E345.)

59.    On August 11, 1989, trial counsel Mulcahy was sent a letter from former
California Court of Appeal Justice Otto M. Kaus. A copy of that letter is attached as exhibit
15. (E348.) In the letter, Justice Kaus explained that he, Kaus, had been named by the
California Attorney General as special counsel to assist the Grand Jury investigation into
the use of jailhouse informants at the County Jail. The letter invited Mulcahy to submit
evidence that petitioner's murder prosecution involved willful or corrupt misconduct in
connection with the use of Robert Hughes' testimony. (E348.)

60.    Mulcahy refused to take any action in connection with the Grand Jury
investigation. He also failed to notify petitioner that, as of March 2, 1989, a Policy

26

EXHIBIT 3                                                                70

Memorandum issued by then-supervising judge of the Superior Court David Horowitz provided for the appointment of counsel for all inmates whose cases involved the use of a jailhouse informant by the prosecution. A copy of this Policy Memorandum is attached to this petition as exhibit 44. (E615.) It was left to petitioner's father, Robert B. Lisker, to communicate with the special counsel to the Grand Jury regarding petitioner's case. See Declaration (3) of Bruce E. Lisker, attached to this petition as exhibit 45, ¶¶ 1-4 (E619 - E620.)

61.    During 1989 and 1990, petitioner, unaware that he could have counsel appointed by simply requesting such an appointment from the Superior Court, futilely sought to obtain counsel on a *pro bono* basis to challenge his conviction. He contacted Bradford Battson, a San Francisco attorney petitioner's father once consulted regarding petitioner's case. Mr. Battson would not take the case. (See exhibit 45, ¶¶ 5, 7 (E620 - E621), and attachments C (E636) and D (E638) thereto.) Petitioner also contacted the Los Angeles County Bar Association's Lawyer Referral Service. More than three months later, the Referral Service responded that it had been unable to find a lawyer willing to file a *habeas corpus* petition for petitioner on a *pro bono* basis. (exhibit 45, ¶ 8 (E621), and attachment E (E640) thereto.)

62.    During 1991, petitioner corresponded with private investigator Sue Sarkis, whom he knew because Ms. Sarkis had been employed by trial counsel Dennis Mulcahy as an investigator prior to the trial of petitioner's case. Petitioner hoped Ms. Sarkis would perform investigatory tasks that would aid a lawyer, if one could be found, in bringing a *habeas corpus* petition on petitioner's behalf. Ms. Sarkis did perform some minor investigation, but informed petitioner that a full scale investigation would be "five-figure

27

EXHIBIT 3                                                                                        71

expensive." Petitioner was virtually penniless at this point. (See exhibit 45, ¶¶ 10-11 (E621 - E622), and attachments G (E646), H (E648), and I (E650) thereto.)

63.    Early in 1992, petitioner's father contacted the Office of the State Public Defender to try to obtain a lawyer for petitioner. The Public Defender responded that the Superior Court had a program in place to appoint lawyers for defendant's whose cases involved the use of a jailhouse informant by the prosecution. This was the first time petitioner became aware of this program. (See exhibit 45, ¶¶ 12-13 (E622), and attachments J (E652) and K (E654) thereto.) Petitioner obtained the name of a Santa Monica attorney, Gigi Gordon, and inquired of Ms. Gordon what the procedure was for obtaining a court-appointed attorney. Ms Gordon wrote to petitioner that the program to appoint attorneys had ended two years earlier, when a new presiding judge of the criminal division of the Superior Court was appointed. Ms. Gordon stated in a follow-up letter that "I can assure you that as the law currently stands, the court will not act to assist you in any way." (See exhibit 45 ¶¶ 14-16 (E622 -E624), and attachments L (E657) and M (E659) thereto.)

64.    On July 6, 2001, David Bernstein, one attorney helping petitioner to draft the instant petition, wrote to petitioner's trial attorney, Dennis Mulcahy, to inquire whether Mulcahy, or anyone else known to Mulcahy, had sought appointment to petitioner's case pursuant to the order of supervising judge Horowitz. Mulcahy never responded to this letter. See exhibit 51 (E737), Declaration of David L. Bernstein dated August 24, 2002.

65.    Between 1992 and 1995, petitioner, discouraged and without funds, concentrated on resuming his education. He graduated from a paralegal course of study offered by a law school in Texas called the "Blackstone School of Law, Legal

28

EXHIBIT 3                                                                72

Assistant/Paralegal Training." He also completed a computer course, with an associated apprentice program, resulting in his becoming a State-recognized computer programmer, skilled in the COBOL high-level language. He undertook to create an exhaustive written analysis and compilation of the facts in his case. This resulted in an extensive two-volume document called the "Lisker Case Analysis." These volumes are available for this Court's review, if the Court were inclined to review them. Petitioner's prison trust account statements between January 1, 1990, and October 10, 1995, show that at no point during that period did petitioner's balance exceed $290.82; indeed, the balance in the account was usually quite a bit less. (See exhibit 45, ¶ 16 (E623 - E624), and attachment N (E661 - E681) thereto.)

66.     In 1995, petitioner's father died and bequeathed him a sum of money to be used to pursue his goal of hiring an attorney to prepare a *habeas corpus* petition challenging the legality of his conviction. (See exhibit 45, ¶ 16) (E623 - E624.) Petitioner then began to seek an attorney to prosecute a *habeas corpus* action.

67.     At a parole hearing for petitioner in 1996, an attorney named Gary M. Diamond was appointed to represent him. After the hearing, petitioner asked Diamond if he could represent him in a *habeas corpus* action. Diamond said he could, for $7500.00, prepare a *habeas corpus* for petitioner and see it through to the U.S. Supreme Court, if necessary. Petitioner payed Diamond's fee, and for the next two and one-half years Diamond represented to petitioner that he was preparing a petition. Diamond also "informed" petitioner that the federal Anti-Terrorism and Effective Death Penalty Act of 1996 "did not apply" to petitioner's case. (See exhibit 45, ¶¶ 17-22 (E624 - E625), and

29

EXHIBIT 3                                                                                        73

attachments O (E683) and P (E685) thereto.)

68.     Although Diamond wrote many letters to petitioner during 1997 and 1998
regarding his supposed "progress" in preparing the petition, in fact Diamond never
prepared anything for petitioner other than a one-page summary of purported "issues"
which Diamond claimed to be considering. (See exhibit 45, ¶ 19 (E624 - E625), and
attachment P (E685.) Finally, petitioner came to doubt the representations in Diamond's
letters that a *habeas corpus* petition was actually being prepared. He sent a letter to
Diamond terminating his services and requesting a refund of the monies paid to him.
Diamond refused to return any money to petitioner. On January 25, 1999, Diamond
responded with a purported "accounting" of his services in which he claimed to have
expended 42 hours reviewing petitioner's trial transcripts between 8-4-96 and 8-14-96.
However, Diamond did not even receive these transcripts until 1997. Other spurious
charges appeared on Diamond's "accounting" as well. (See exhibit 45, ¶¶ 19-21 (E624 -
E625), 23-27 (E625 - 626), and attachment R (E702) thereto.)

69.     Diamond's "accounting" also included the completely false claim that
Diamond had "completed" the petition, but that petitioner chose not to have it filed.
Petitioner never received a "completed" petition from Diamond, and never instructed
Diamond not to file anything. (See exhibit 45, ¶ 29 (E626), and attachment R (E702.)
Petitioner initiated a small claims action in an effort to recover some of the money paid to
Diamond. Because Diamond listed as his address only a post office box, petitioner was
unable to effect service and the case was dismissed without prejudice on September 4,
2002. (exhibit 45, ¶ 30 (E626), and attachment U (E718.)

70.     Upon firing Diamond, petitioner retained a new attorney, Fred Marr, for the

30

EXHIBIT 3                                                                74

purpose of filing a *habeas corpus* petition. Petitioner's fee agreement, executed in January of 1999, called for him to pay Marr $30,000.00. Petitioner paid the money. The agreement expressly stated that the total fee would not exceed $30,000.00. Marr ostensibly worked on the *habeas corpus* petition for a year, then told petitioner that although he had expended 400 hours preparing the petition, he would need to expend at least 1,000 more hours to finish it. Marr asked for and received from a petitioner a "supplementary fee" of $20,000.00. (See exhibit 45, ¶¶ 28-29 (E626.)

71.    Although Marr frequently wrote to petitioner recounting the supposed "progress" Marr was making, on all but one occasion he refused to send drafts of the work to petitioner. On the one occasion he did send a "draft," it consisted of 12 pages filled with factual errors. Marr told petitioner he did not trust the prison mail and believed the prison authorities would forward copies of his work to the state Attorney General. In July of 2000, Marr "borrowed" $7500.00 from petitioner, telling him he was having financial difficulties. (See exhibit 45, ¶¶ 29-30) (E626 - E627.)

72.    Marr died on November 29, 2000. He never produced or filed any *habeas corpus* application for petitioner in any court. Marr's wife, also an attorney, refused to refund any money to petitioner. She suggested that Petitioner contact the Client Security Fund Commission of the California State Bar. Petitioner did so, and applied for reimbursement from the fund. In *Lisker v. Marr,* State Bar Case No. 01-F-03099, the Commission refunded $50,000.00 to petitioner, the maximum amount permitted under its rules of procedure. A copy of this four-page decision, filed on November 9, 2001, is attachment T (E707) to exhibit 45. The Commission concluded, in pertinent part:

31

EXHIBIT 3                                                                        75

> "Applicant has established that $50,000.00 in advance fees for
> the *habeas corpus* matter came into Respondent's hands, as
> required under Rule 2. The Commission concludes that the
> $50,000.00 qualifies for reimbursement under Rule 6(b) since
> no work or an insignificant portion of the work was performed."
> (See exhibit 45, attachment T, p. 3) (E714.)

73.    In January and October of 2001, petitioner entered into agreements with attorney Robert B. Amidon which resulted in the preparation and filing of the instant petition.

74.    During 2001, petitioner's investigator, Paul Ingels, learned that a Los Angeles County Sheriff's Deputy named Tom Halstead was the Jail Liaison Officer at the Los Angeles County Jail during April, 1983, the time at which petitioner was illegally transferred to the county jail from a juvenile facility. See the Declaration (2) of Paul Ingels, ¶ 6 (E733 - E734), dated November 18, 2002, attached hereto as exhibit 50. Ingels learned that Deputy Halstead was still with the Sheriff's Department, and was currently assigned to the Whittier substation. Ingels called Halstead, who agreed to an interview.

75.    Ingels interviewed Halstead on October 1, 2001. Halstead confirmed that, at the time he was Jail Liaison Officer, it was a common practice to place an inmate in a cell alone, surrounded by informants. He stated that the 7000 module consisted of "hospital rooms" used for high visibility and "special handling" cases. Every inmate assigned to the 7000 module of the County Jail had a "special handling card" filled out. Information on the card would indicate the name of the person who had requested that the inmate be assigned to that module. Halstead was certain these cards were in use during

32

EXHIBIT 3                                                                76

1983, but he did not know if the cards from that period were still in existence. Halstead confirmed that many of the cells in the 7000 module had holes in the wall of sufficient size to permit inmates to communicate with each other, and to pass documents back and forth. (See exhibit 50, ¶ 6 (E733 - E734.)

76.    Investigator Ingels, also in October of 2001, conducted several telephone interviews with Los Angeles County Sheriff's Deputy Jim Platus. Deputy Platus is currently assigned to the 7000 module of the Los Angeles County Jail. At Ingels' request, Platus consulted the "special handling" file to see what information might still exist regarding the housing arrangements for petitioner and for Robert Hughes. Platus was not able to find a special handling card for petitioner, but he found such a card for Robert Hughes. According to Platus, Hughes' card indicated that, upon Hughes' arrival in the 7000 module, he was classified as a "K-9" (informant), but that after he arrived, his classification was changed to "K-10" (inmate charged in notorious or high-profile case). (See exhibit 50, ¶ 7) (E734 - E735.)

77.    Petitioner's father testified that he had given his wife $150.00 in cash for shopping on the night before she was killed. (RT 223-227.) Andrew Monsue, the LAPD's investigating officer, testified that this money was never found. (RT 411-412, 442.)

78.    The failure to find the $150.00 apparently preyed on Detective Monsue's mind long after petitioner's trial. At petitioner's first parole eligibility hearing, held in December of 1991, Monsue wrote a letter to the Board of Prison Terms. That letter is attached as exhibit 46 (E720) to this petition. In the letter, Monsue stated that "the inmate hide [sic] approximately $140.00 he had taken from his mother's purse, and then set about to make the crime scene appears [sic] as if a burglar had broken into the residence to

33

EXHIBIT 3                                                                    77

cover his crimes . . . although the robbery allegation were [sic] not proved during the trial,
I still feel the circumstances of the case merited a first degree murder handling by the
courts." (exhibit 46) (E720.)

79.   For a subsequent parole hearing for petitioner in 1998, Andrew Monsue wrote
another letter. This letter, dated April 7, 1998, is attached to this petition as exhibit 47
(E724.) In the letter, Monsue claims to have "solved" the mystery of what happened to the
$150.00 that was never found:

> "Several years after this crime occurred, I met with the new
> owners of the house where this crime occurred. · They
> informed me they had found some money and several other
> items hidden in the attic of Bruce Lisker's old bedroom. The
> amount of cash found by the new owner was approximately
> $150, which is the amount of money that was reported missing
> from the victim's purse the day of the murder. This revelation
> confirmed our initial theory that Mr. Lisker had in fact robbed
> his mother." (Exhibit 47, ¶ 2) (E724.)

80.   Petitioner did not discover this letter in his prison file until sometime in the
year 2000. Because he believed the allegation in Monsue's letter to be completely false,
he asked his investigator, Paul Ingels, to look into the matter. Mr. Ingels began by
researching the ownership of the property in the years following the murder of Dorka
Lisker.

81.   Mr. Ingels learned that an attorney named Morton Borenstein purchased the
house from petitioner's father and took possession on April 3, 1984, about a year after the

34

EXHIBIT 3                                                                 78

murder. (See Declaration (1) of Paul Ingels, November 18, 2002, and attached as exhibit 16, ¶ 8 (E352 - E353); exhibit 48, Declaration of Morton Borenstein, dated November 12, 2001, ¶ 2) (E726.) Borenstein and his wife lived in the house until June 2, 1995, when they sold it to Doron and Adina Aloni. (See exhibit 48, ¶ 2) (E726.) The Alonis still live in the house today. (See exhibit 16, ¶¶ 5-7) (E352.)

82.   Mr. Borenstein's declaration states that in 1984, while the house was still in escrow, he was informed that there had been a murder there. He checked with the LAPD and learned that a Detective Monsue was in charge of the police investigation of that murder. He called Detective Monsue who told him about the crime and stated there was a possibility of a theft occurring during the crime. Monsue also told Borenstein that "there was some question as to whether Mr. Lisker's son committed the crime or Mr. Lisker's son's friends." Borenstein's declaration states that this phone call was the only communication he ever had with Detective Monsue, and that during it he "did not claim to have found anything at 'the property,' including cash in the attic or anywhere else." Borenstein concluded his declaration by stating that he and his wife never found "any cash or anything else in the attic of the property," and never told Monsue or anyone else that they had. (Exhibit 48, ¶¶ 3-7) (E726 - E727.)

83.   Ingels telephoned the present owners of the house, Adina and Doron Aloni. Adina told Ingels that she and her husband bought the house on August 1, 1995, and have resided there ever since. In response to Ingel's questions, Adina stated that neither she nor her husband found money or anything else in the attic, and never told any police officer that they did. (exhibit 16, ¶ 5) (E352.) The Alonis would not consent to an in-person interview; however, Adina Aloni wrote a letter to Ingels, dated June 13, 2001, in which she

35

EXHIBIT 3                                                         79

stated, "regarding money in the attic that you asked me about, as I told you, I have not found any money." This letter is attached as exhibit 49 to this petition. (See exhibit 16, ¶¶ 5-7) (E352.)

84.    An investigator working for petitioner, Kenneth Swank, interviewed Lieutenant Monsue at Monsue's office on October 9, 2002. Monsue's current assignment is Supervisor of the Detective Bureau of the LAPD's central Division. Monsue recalled the Lisker case. He stated that he has visited petitioner's website, www.freebruce.org, and finds it quite comical. Monsue told Swank that the most important evidence of guilt for him and everyone else who worked on the case was that "Lisker dummied up a fake point of entry -- the kitchen window. He said he could see his mother's body lying on the floor from a distance of seven to ten feet away from the window. This is what nailed him because there was no way you could see the body from this vantage point. The roof overhang, the sun shining on the window pane, Lisker's height versus the height of the window itself, would make it impossible for him to see his mother's body from where he said he stood." See paragraph 8 of the Declaration (2) of Kenneth Swank, attached to this petition as exhibit 57 (E789.).

85.    Swank asked Monsue about his letter to the Parole board in which he stated that subsequent owners of the house informed him that they had found money in the attic in an amount consistent with that of the money missing from Mrs. Lisker's purse. Monsue stated that about seven years after Lisker was convicted, the new owners of the house where the murder took place telephoned him and reported they had found "some money" in their attic - about the same amount that was taken from Mrs. Lisker's purse by the killer. In response to the call, Monsue drove to the house and met with the new owners, a man

36 ·

EXHIBIT 3                                                    80

and woman whose names he could not presently recall. He spoke to both the man and
the woman, who together showed him the area where the money had been found. (exhibit
57, ¶ 10) (E790 - E791.)

86.    Swank asked Monsue if he recalled Robert Hughes, the jailhouse informant
who testified that petitioner had "confessed" his guilt of the murder to Hughes. Monsue
replied that he did remember Hughes, and that Hughes' testimony should not be taken
seriously. Monsue stated that he did not give much credence to what Hughes said at
Lisker's trial, because, "After all, it was a jailhouse snitch with a questionable past, and a
jailhouse snitch is nothing but a jailhouse snitch." (exhibit 57, ¶ 5) (E789.)

87.    In July of 2002, petitioner sought expert forensic review of the blood-spatter
testimony at his trial. He did this because, even though blood-spatter expert Linhart's
testimony that the blood-spatter evidence in the case did not incriminate petitioner (see ¶
29 of this petition, *ante*), both prosecutor Phillip Rabichow, and the Court of Appeal in its
unpublished opinion affirming petitioner's conviction, maintained that the blood-spatter
evidence was a powerful indication of petitioner's guilt. Specifically, Rabichow, in his
memorandum to the district attorney's office task force regarding jail house informant
cases, claimed that Robert Hughes' "confession" testimony "was corroborated by
independent evidence based on blood-spatters and location of physical evidence." (See
exhibit 14, ¶ 7) (E345.) Even more "unsupported" than Rabichow's claim was the following
paragraph in the opinion of the Court of Appeal:

> "More compellingly, an expert in forensic serology and
> bloodstain pattern interpretation determined, based on his
> examination of appellant's clothing and photographs of the

37

EXHIBIT 3                                                                    81

> murder scene, that the blood on appellant's clothing, which
> was of his mother's type, spattered onto it at the moment when
> his mother suffered a blunt force injury."

(Unpub. Opn. in *People v. Lisker*, B020092, p. 14) (E24.) Of course, no such testimony was presented at petitioner's trial: All of the expert testimony given by Ronald Linhart was to the contrary.

88. Petitioner provided criminalist Randall Robinson, a 28-year veteran of the San Diego County Sheriff's Department's Crime Laboratory who retired as the supervising criminalist of that Laboratory, with the transcripts of his second trial, the LAPD "Murder Book," and transcripts of Ronald Linhart's testimony at petitioner's first trial and preliminary hearing. Mr. Robinson reviewed these materials and executed a declaration regarding his conclusions. That declaration is attached to this petition as exhibit 55. Mr. Robinson concluded that "the blood-spatter evidence introduced at Mr. Lisker's trial did not prove, or even suggest, that Mr. Lisker, as opposed to someone else, committed the murder." (exhibit 55, ¶ 6) (E777.) Robinson's declaration continues, "[t]he evidence described by Mr. Linhart was entirely consistent with the account of events given by Lisker to Monsue." (exhibit 55, ¶ 9) (E778.) Mr. Robinson concluded:

> "In sum, I could find no indication from Mr. Linhart's testimony
> that the blood-spatter evidence offered at Mr. Lisker's trial was
> any more consistent with the theory that Lisker committed the
> crime than it was with Lisker's own, exculpatory account to
> Detective Monsue that Lisker merely discovered his mother,
> mortally wounded, and took the actions described."

38

EXHIBIT 3                                                          82

(exhibit 55, ¶ 11) (E778.)  Robinson's declaration also notes that Linhart himself, at petitioner's trial, expressed the same opinion as to the significance of his testimony that Robinson does in his declaration. (exhibit 55, ¶ 12) (E778.)

89.     On October 9, 2002, investigator Swank interviewed Ronald Linhart regarding his testimony at petitioner's trial.  See the Declaration (1) of Kenneth Swank, dated November 18, 2002, attached to this petition as exhibit 56 (E786.)  During this interview, Mr. Linhart agreed to read the declaration executed by Randall Robinson (exhibit 55) (E777.)  After reading it, Linhart told Swank that "Mr. Robinson was correct that the blood-spatter evidence was of little significance to the guilt or innocence of the Lisker boy.  He [Linhart] recalled reading the opinion of an appellate court regarding the Lisker case and was surprised that the judges cited the blood evidence as strong indicators of Lisker's guilt.  Mr. Linhart stated that in his opinion, the appeals court gave this portion of the trial far greater significance than it merited." (exhibit 56, ¶ 6) (E787.)  Linhart told Swank that he thought he had some photos from the case in his personal files; he promised to make copies for Swank, and to provide a copy of his entire file in the Lisker matter. (exhibit 56, ¶ 8) (E787.)  About two weeks after the interview, Linhart did provide copies of his file and four photographs of the crime scene. (Exhibit 56, ¶ 9) (E787.)

90.     Attached as exhibit 59 (E805) to this petition is all of the material provided by Mr. Linhart.  This material consists of four color photographs, three of the crime scene and one of a cuff of petitioner's shirt depicting several tiny blood droplets.  The material also includes a copy of Linhart's laboratory report dated June 25, 1983, a two-page report with seven pages of attachments.  In relevant part, the report concludes: "Blood drops on the shoes and the right cuff of the plaid shirt were a result of force being applied to a source

39

EXHIBIT 3                                                                                          83

of blood and being propelled through the air to the shirt and shoes. The pattern is insufficiently distinct to identify the nature of the force." (exhibit 59, p. 1) (E805.)

91.     Exhibits 55 (E777), 56 (E786) and 59 (E805) refute any claim that the blood-spatter evidence at petitioner's trial was inculpatory of petitioner, or that such evidence renders any of petitioner's three claims "harmless error."

92.     On November 14, 2002, investigator Kenneth Swank telephonically interviewed Ms. Doris Van Norton, the Records Supervisor for the Los Angeles County Central Juvenile Hall. See the Declaration (3) of Kenneth Swank, dated November 18, 2002, attached to this petition as exhibit 61 (E832.) Ms. Norton explained that a juvenile could not be "transferred" to an adult facility without a court order. A juvenile could not have been removed from the custody of the juvenile authorities and placed in the 7000 module without such an order. (exhibit 61, ¶¶ 4-5) (E832 - E833.) No such order could be found in petitioner's juvenile court[7] or Superior Court files. Indeed, such a "transfer" would have been unlawful in the absence of a finding that petitioner posed a danger to the public or the other juvenile hall inmates. (Welf. & Instit. Code §707.1, subd. (b)(1).)[8]

## ARGUMENT

I.     **PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO ASSISTANCE OF COUNSEL WERE VIOLATED BY LAW ENFORCEMENT'S DELIBERATE AND ILLEGAL PLACEMENT OF HIM IN AN ENVIRONMENT -- MODULE 7000 -- WHERE THEY EXPECTED A JAILHOUSE "CONFESSION" TO**

---

[7]     In November of 2002, petitioner obtained a complete copy of his juvenile court file pursuant to Welfare and Institutions Code §827.9.

[8]     Because the factual allegations underlying Claims II and III are entirely different from the allegations underlying Claim I, petitioner has placed the allegations relevant to each claim under the heading for that claim. Therefore, the petition will continue with paragraphs 93-127 under Claim II, and paragraphs 128-132 under Claim III.

40

ENSUE.

A.    **Applicable Law: The Post-Charge Right to Counsel Forbids the
      Government to Deliberately Elicit Incriminating Statements From a
      Defendant Represented By Counsel.**

The Sixth and Fourteenth Amendments to the United States Constitution provide

that, once formal charges have been initiated in a criminal case, the accused has the right

to assistance of counsel. (*Massiah v. United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d

246, 84 S.Ct. 1199]). This right has been held to include, after formal charges have been

filed, "the right to rely on counsel as a 'medium' between [the defendant] and the State."

(*Maine v. Moulton* (1985) 474 U.S. 159, 176 [88 L.Ed.2d 481, 106 S.Ct. 477].)

Because a defendant's constitutional right to counsel attaches upon the formal

initiation of charges, the United States Supreme Court has held that the prosecuting

authorities may not "deliberately elicit" incriminating statements from the defendant without

the presence of counsel. (*United States v. Henry* (1980) 447 U.S. 264, 270 [65 L.Ed.2d

115, 100 S.Ct. 2183].) Several post-*Massiah* decisions of the U.S. Supreme Court further

explain the constitutional prohibition against deliberately eliciting incriminating statements

from a charged defendant in the absence of counsel. In *United States v. Henry, supra*, the

defendant was charged with bank robbery and incarcerated. Federal authorities contacted

an informant who was incarcerated in the same cellblock as the defendant and instructed

the informant to "be alert to any statements made" by the defendant, but not to initiate

questions about the charged crime. (*Henry, supra*, 447 U.S. at 266.) According to the

informant, Henry made "unsolicited" statements tying him to the charged robbery. These

statements were introduced at Henry's trial for bank robbery. (*Id.* at 266-267.)

. 41

EXHIBIT 3                                                                              85

The Supreme Court reversed Henry's conviction,[9] holding that the government informant in that case deliberately elicited incriminating statements from *Henry* while the two were incarcerated together. (*Henry, supra*, 447 U.S. at 274-275.) The circumstances were as follows: After Henry was arrested and charged with bank robbery, he was incarcerated in a local jail in Virginia. An FBI agent contacted an inmate in the jail, Nichols, who was serving a sentence on local charges. Nichols had previously served as a paid informant for the FBI. Nichols informed the agent that he was housed in the same cellblock as a number of federal prisoners awaiting trial. The record did not disclose whether the agent had contacted Nichols specifically to acquire information about *Henry*. (*Id.* at 265-266.)

The agent instructed Nichols to "be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." (*Henry, supra*, 447 U.S. at 266.) Nichols later met with the agent and told him that he (Nichols) had "conversations" with Henry during which the latter had admitted responsibility for the bank robbery. Nichols testified to these statements at Henry's trial. (*Id.* at 268-271.)

On appeal, the government argued that Henry's statements were not "elicited" by Nichols, within the meaning of *Massiah*, because Nichols had been instructed not to initiate conversations with Henry, or question him about the robbery. (*Henry, supra*, 447 U.S. at 271.) The Supreme Court rejected the argument:

---

[9]   Actually, the High Court affirmed the decision of the Fourth Circuit Court of Appeals to reverse *Henry*'s conviction on *Massiah* grounds. (*Henry v. United States*, 590 F.2d 544 (4th Cir. 1978).)

42

EXHIBIT 3                                                                                          86

"The question here is whether under the facts of this case a
Government agent 'deliberately elicited' incriminating
statements within the meaning of *Massiah*. Three factors are
important. First, Nichols was acting under instructions as a
paid informant for the Government; second, Nichols was
ostensibly no more than a fellow inmate of *Henry*; and third,
*Henry* was in custody and under indictment at the time he was
engaged in conversation by Nichols. The Court of Appeals
viewed the record as showing that Nichols deliberately used
his position to secure incriminating information from *Henry*
when counsel was not present and held that conduct
attributable to the Government. Nichols had been a paid
Government informant for more than a year; moreover, the FBI
agent was aware that Nichols had access to *Henry* and would
be able to engage him in conversations without arousing
Henry's suspicion. The arrangement between Nichols and the
agent was on a contingent-fee basis; Nichols was to be paid
only if he produced useful information [footnote omitted]. This
combination of circumstances is sufficient to support the Court
of Appeals' determination. **Even if the agent's statement that
he did not intend that Nichols would take affirmative steps
to secure incriminating information is accepted, he must**

43

EXHIBIT 3

several local businesses, including Bob's Big Boy and Mark C. Bloome. After knocking at the front door and receiving no answer, petitioner thought something might be wrong because he could hear the family dog barking inside the house. His mother never left the house without putting the dog in the rear yard. Petitioner walked around the house, peering into various windows. Through one of the windows, he saw what appeared to be his mother's feet. From the position of the feet, it appeared to petitioner that his mother was lying prone on the floor near the front door, though most of her body was obscured by a planter. Petitioner then moved to the dining room window, where he was able to see his mother's head protruding from the other end of the planter. Petitioner then panicked and ran to a pool supplies cabinet in the backyard, where he knew his parents kept a spare house key in a metal case. The case was empty, so petitioner decided to get into the house through the kitchen window, a method he had used occasionally when he lived there. He removed the louvered window panes and crawled through the window. (RT 363.) Once inside, he discovered his mother lying unconscious on the floor. He kneeled beside her, cradling her head in his hands, "hugging, holding her." (RT 258, 345, 418, 434, 450-451; exhibit 8, p. 10) (E80.) He took her pulse. Thinking that his mother may have been injured in a robbery, he glanced into her purse, which he saw sitting open on the living room couch. (RT 327.) Afterwards he called paramedics, his father, and police. (RT 258.)

26.    Following the interview, Monsue arrested petitioner for the murder of his mother. (RT 247.) He did so, he testified, because he believed that petitioner's statement was in "total contradiction" with the shoe prints Monsue had earlier observed inside and outside the house. (RT 286.) Although two paramedics and a trainee had gone into the residence to attend to Dorka, who was lying in a pool of blood, Monsue admitted that he

14

EXHIBIT 3                                                                              58

saw no footprints from any of these individuals. (RT 520-521.)

27.    After petitioner's arrest, Monsue returned to the Lisker residence. He looked through the window that petitioner had stated was the window through which he had seen his mother's feet several hours earlier. (RT 267, 272-273.) When asked by the prosecutor what he saw through the window, Monsue testified: "The major consideration was the reflection that was coming off of that particular window." (RT 267.) Under cross-examination, Monsue acknowledged that the window in question had an awning, and that by cupping his hands against the glass, "I could certainly see inside the residence." (RT 446, 509-510.) Monsue also claimed that he saw no footprints on the ground outside the window, despite the fact that "although it was not raining on that day, the ground was quite moist from the amount of rain we had that year." (RT 270, 502.)

28.    Monsue searched petitioner's car, which was still parked in front of the residence. He found several job applications, nuts and washers that petitioner had brought to effect a repair of one of the car's shock absorbers, and automobile repair tools . (RT 404-405, 462, 478-479, 498-501.)

29.    Ronald Linhart, a member of the Los Angeles County Coroner's Office, testified as an expert in blood-spatter analysis. (RT 698-756.) Linhart analyzed stains on petitioner's shoes and clothing to see which, if any, were blood. He found one drop of blood on petitioner's right tennis shoe (RT 735-736, 740), one drop of blood on petitioner's left tennis shoe (RT 737-738, 740), five small droplets on the right cuff of petitioner's outer shirt, plus some smeared blood on the front of the shirt (RT 739-741), no blood on petitioner's undershirt (RT 741), and a few "light smears" of blood on the front of petitioner's pants. (RT 742-744.) Linhart offered no opinion or conclusion as to how his

15

EXHIBIT 3                                                                    59

analysis was impeaching of petitioner's explanation regarding the presence of blood on his clothing. Further, Linhart conceded on cross-examination that his findings were entirely consistent with the account petitioner gave to Monsue regarding his physical contact with his mother. (RT 747-748.) Linhart also conceded that nothing in his findings could determine whether petitioner, as opposed to someone else, had stabbed or beaten Dorka Lisker. (RT 748.)

30.    It was stipulated that petitioner's palm and thumb prints were found on the windowsill outside the kitchen window where petitioner told police he entered the house after seeing his mother on the floor through the rear windows. (RT 766.) It was further stipulated that no fingerprints were found on the bloody exercise bar. (RT 766.)

31.    Public Defender Dennis Riley represented petitioner from the time of his arrest through the fitness hearing in juvenile court, held just prior to his transfer to the Los Angeles County Jail. (RT 792-793, 795-796.) During the period in which he represented petitioner, Riley supplied him with copies of the preliminary and followup police reports that had been prepared in connection with the case. (RT 793, 796-798.) Copies of these police reports are attached hereto as exhibit 53. (E747.)

32.    LAPD Officer Douglas Johnson was the third police officer to arrive at the Lisker residence on March 10, 1983. (RT 809-810.) He found petitioner in a "near-hysterical" condition but managed to get a "basic statement" from him. (RT 812.) Johnson's notes of petitioner's statement was that petitioner, after job-seeking in the morning, had come to the house to fix his car, got no response when he knocked on the front door, went around back and looked in a window, and saw a head in the entrance hallway. (RT 820.) Petitioner then entered the house through the kitchen window, found

16

EXHIBIT 3                                                      60

his mother with two knives in her, and removed the knives. (RT 821.) Petitioner then took two other knives from the kitchen and looked through the house in case whomever had beaten his mother was still there. (RT 821.)

33.    LAPD Officer George Prado and his partner, Officer Gregory De Rousseau, were the first two officers on the scene at the Lisker residence on March 10, 1983. (RT 830, 866-867.) They observed that the garage door was open and a car was parked in the garage. (RT 834.) Another car was parked in the driveway. (RT 834-835.) Prado observed petitioner walking back and forth in front of the house, yelling that he wanted the paramedics to help his mother. (RT 835.) Officer De Rousseau heard petitioner exclaim: "Someone stabbed my mother in the head. Please help me or please help her. I am going to get the person who did this." (RT 868.) De Rousseau tried to calm petitioner down, "but it was almost impossible to do so." (RT 870.)

34.    On the day after the murder, March 11, 1983, at about 11:00 a.m., Robert Lisker, petitioner's father, and Mr. Lisker's friend, Robert Johnson, went to the Lisker family residence. Both Lisker and Johnson were attorneys. (RT 877-879, 921.) On the previous day, Lisker had been in the house with Detective Monsue and Monsue described for Lisker the position Monsue believed Dorka Lisker's body was in when police and paramedics arrived. (RT 922.)

35.    After Johnson and Lisker arrived at the Lisker house on March 11th, Lisker lay on the floor inside the house, in the position that Monsue told him was the position of Dorka when she was found the previous day. (RT 923.) While Lisker did this, Johnson walked around the outside of the house and looked through various windows, including the windows that petitioner told police were the windows through which he had glimpsed

17

EXHIBIT 3                                                                                                    61

portions of his mother's body as she lay in the entrance hall. (RT 880-883.) Johnson did
not have "any difficulty seeing the lower portion of his [Robert Lisker's] body, the lower
portion of his legs and feet." (RT 884-887.)

36.    Johnson and Lisker returned to the home on March 10, 1984, exactly one
year after the killing. (RT 891.) Johnson again looked into the window with the awning;
once again, he had no difficulty seeing into the residence. (RT 892.)

37.    Robert Lisker received from petitioner's juvenile court attorney a "quite thick"
sheaf of police reports while petitioner was still confined in juvenile hall. He supplied these
reports to petitioner. (RT 928.)

38.    Robert Lisker visited Robert Hughes in the Los Angeles County Jail during
the period petitioner was inhabiting the cell next to Hughes in the 7000 module. (RT 932-
933.) Hughes told Lisker, "I know Bruce didn't do it. He is a good kid. He is going to be
out of here soon." (RT 936.) Hughes repeated this "belief" in notes he wrote to petitioner
while both were incarcerated in the 7000 module. These notes were later admitted as
defense exhibits at petitioner's trial. In one of the notes Hughes wrote, "I am praying for
you little bro. I feel you are going to the streets soon." (RT 625-626.) In another, he wrote,
"The Lord gives me a strong feeling you will be out of this pit soon." (RT 628-629.) In a
third, "I just want you to know that the Lord gave you a good heart." (RT 641-642.)

39.    The evening prior to the murder, petitioner had been to his parents house and
asked his father for money for gas because he intended to go job-hunting the next day.
(RT 958.) Petitioners's father gave him $10.00 (RT 958-959.)

40.    In his closing argument, the prosecutor argued that Robert Hughes should
be believed despite his history of informing on other inmates because "even a scoundrel

18

EXHIBIT 3                                                                          62

has some values at some point. He [Hughes] hasn't been and didn't lead an honest life, but you know no one, criminal or not, goes around saying that it is okay to kill your mother. I mean there are certain things that nobody approves of and he testified." (RT 1103.)

41.    At petitioner's preliminary hearing, he moved that Hughes' testimony should be excluded. One of the grounds for the motion was that petitioner's right to counsel was violated when the police removed him from juvenile hall and, without authority, placed him in the Los Angeles County Jail, where they knew the coercive atmosphere was likely to produce incriminating responses if petitioner were to come into contact with adults. A copy of petitioner's written motion, filed October 5, 1983 (CT 81-106), is attached to this petition as exhibit 9 (E124.)

42.    The motion was argued on December 7, 1983. A 24-page transcript of that hearing is attached as exhibit 10 (the pages of the transcript are numbered 207-230) (E151.) The court held that, absent a showing that the sheriff's department "caused" petitioner to be placed in contact with adult inmates, the remedy of suppression was not available. The court stated:

> "Now, perhaps if the sheriff might possibly be considered negligent in not making sure those holes don't exist, but in my mind it doesn't seem that the sheriff's department caused the coming in contact. It seems to me that it's the inmates themselves who provided the opportunity to communicate rather than the sheriff being in violation, knowingly, of [Welf. & Inst. Code] §707.1." (exhibit 10, p. 223) (E167.)

Petitioner's counsel argued that Hughes should be regarded as a police agent within

19

EXHIBIT 3                                    63

the meaning of *United States v. Henry* (1980) 447 U.S. 264. However, the court found no
indication that Hughes "was sent by the police or sheriff specifically to gather information
and inform. So on that ground, I would deny your motion." (exhibit 10, p. 230) (E174.) On
November 13, 1984, just prior to petitioner's first trial, the court again denied the motion
to exclude Robert Hughes' testimony, on the same basis as previously. (Augmented RT
333-379.)

    43.    On October 23, 1985, prior to the commencement of petitioner's second trial,
petitioner renewed his motion to exclude Robert Hughes' testimony. The court made the
same ruling it had previously, finding that "Mr. Hughes certainly under the facts presented
is not an agent of the police in any way." Petitioner was convicted on November 21, 1985.
His conviction was affirmed on appeal on December 22, 1988.

    44.    In November of 1988, news articles appeared chronicling the allegations by
a Los Angeles County Jail inmate, Leslie White, that an organized informant's "ring" existed
at the County Jail, and that the informants were skilled at fabricating confessions of other
inmates. Attached to this petition as exhibit 11 (E176 - E177), as an example of these
news articles, is the following: Cody, Kevin, *Jailhouse Informants: The D.A.'s Ethical Bind,*
Los Angeles Times, November 13, 1988, at Part V, p. 3. The article contained the following
paragraph:

> "The district attorney sits back and says he never told the
> snitch to get information," said veteran public defender Forrest
> Latiner. "But let's not kid ourselves - the circumstances are set
> up so the snitch can be in an adjoining cell. The district
> attorney knows the snitches aren't reliable because these

20

EXHIBIT 3                                                                    64

people will sell their souls for whatever small benefit they might

get."

45.     In response to Leslie White's allegations, the Los Angeles County District

Attorney launched an investigation, as did the Los Angeles County Grand Jury. On June

26, 1990, the Grand Jury issued a report entitled "Investigation of the Involvement of Jail

House Informants in the Criminal Justice System in Los Angeles County." A copy of the

153-page report is attached to this petition as exhibit 12 (E180.) This court is respectfully

requested to take judicial notice of the Grand Jury Report, pursuant to Evidence Code

§452, subdivisions (c) and (d). (*In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 4.)

46.     The Grand Jury listened to testimony from 120 witnesses, including jailhouse

informants, judges, prosecutors, defense attorneys, and members of the Los Angeles

Sheriff's Department and Los Angeles Police Department. (exhibit 12, p. 2) (E187.)

Thousands of pages of documents were received. (exhibit 12, pp. 3-4) (E188 - E189.) The

Grand Jury believed its report to be "the most comprehensive inquiry into this topic that has

ever been conducted." (exhibit 12, p. 4) (E189.)

47.     Pages 45-73 of the Grand Jury report deal with the relationship between the

jail personnel of the sheriff's department and the informants housed at the jail. The report

noted that deputies at the jail known as "Jail Liaison Deputies" were responsible for

classifying inmates. "An inmate's classification determines where and with whom the

inmate will be housed." (exhibit 12, p. 47) (E232.) The report also noted that outside law

enforcement officers could request that a particular inmate receive a particular

classification by filling out a form called an "Inmate Special Handling Request." (exhibit 12,

p. 47-48) (E232 - E233.) The report described several cases where non-informants were

21

EXHIBIT 3                                                                        65

classified as informants at the behest of police agencies or prosecutors in order to have

the non-informant inmate placed among informants "in the hope the informants would

obtain incriminating information from the inmate." (exhibit 12, p. 54) (E239.)

48.     Pages 47-49 of the report describe the classification procedure used at the

County Jail. Insofar as is pertinent to the instant petition, a classification of "K-9" is given

to informants, and a classification of K-10 is given to "inmates charged in notorious cases."

(exhibit 12, p. 49) (E234.) K-9 and K-10 inmates are identified by red-colored wristbands.

(exhibit 12, p. 48) (E233.)

49.     Pages 57-68 of the report are entitled "The Sheriff's Intentional Placement

of Informants for the Purpose of Eliciting Incriminating Information From Jail Inmates."

(Exhibit 12, p. 57) (E242.) These pages describe numerous cases where inmates were

classified by Jail Liaison Deputies in such a manner that the inmates were placed among

jailhouse informants. This was usually done at the request of investigating officers from

outside law enforcement agencies such as the Los Angeles Police Department. Pages 25-

27 of the report (E210 - E212) are entitled "Mission to Acquire Evidence." This section

describes one technique used by the Jail Liaison Deputies for informant placement among

non-informants:

> "Several informants testified to having the wristbands
> temporarily changed from a K-9 status to a K-10 while in the
> company of a defendant classified as a K-10. One informant
> testified that an official, while changing his wristband to a K-10
> designation, admitted that the informant should still be labeled
> a K-9." (exhibit 12, p.25, fn. 13) (E210.)

22

EXHIBIT 3                                                                 66

50.     Pages 68-73 of the report (E253 - E258) are entitled "The Sheriff's
Knowledge of the Ability of Informants to Fabricate Confessions." According to this section
of the report, in early 1988 a jail deputy was contacted by an inmate who claimed that three
jailhouse informants were trying to "book" him (fabricate a story that the inmate had
"confessed"). The deputy interviewed the informants, "who described their technique for
obtaining information by making telephone calls to the District Attorney's Office and
representing themselves as members of law enforcement." (exhibit 12, p. 68) (E253.) The
informants also explained how they could arrange to be placed in close proximity to a
targeted inmate, either on the same bus or the same courtroom, "so there would be a
record of contact with the inmate to substantiate a fabricated confession." (exhibit 12, p.
68) (E253.)

51.     The deputy described in the previous paragraph wrote a report concerning
the findings of his investigation and gave it to a sheriff's department lieutenant. "No action
was taken as a result of the deputy's report." (exhibit 12, p. 68) (E253.)

52.     Pages 69-73 (E254 - E258) of the report describe the "demonstration" that
jailhouse informant Leslie White[6] gave of his ability to gather information about a particular
inmate's case. The demonstration came about because jail deputies learned that White
"was writing an article for California Magazine in which he planned to expose the fact that
informants were using the telephone to acquire detailed knowledge of criminal cases and
construct jailhouse confessions from inmates they had never met." (exhibit 12, p. 69)
(E254.) White, given the use of a telephone, demonstrated that he was able to get

_____

[6]   Neither White nor any other person is identified by name in the published portion
of the Grand Jury's investigation.

23

EXHIBIT 3                                                        67

information about a particular inmate's case, including case number, date of arrest, arresting agency, and next court date, by calling the jail's Inmate Reception Center and stating that he was an employee of a bail bond company. White then called the records section of the District Attorney's Office and claimed to be a Deputy District Attorney seeking information about the targeted inmate's case. He was given the name and phone number of the Deputy who was prosecuting the inmate, and the name of a witness in the case. White then called Sheriff's Homicide and stated that he was "Sergeant Stevens" at the Central Jail. "Sergeant Stevens" was given the name and description of the murder victim in the inmate's case. (exhibit 12, pp. 69-70) (E254 - E255.)

53.   After receiving the information described above, White called the Deputy District Attorney handling the case, identifying himself as "Sergeant Williams" of the LAPD. In response to "Sergeant Williams'" questions, the Deputy provided virtually everything White would need to fabricate the inmate's confession to the crime, including details about the victim's clothing, the location of the body, and the coroner's report concerning cause of death and drug content of the victim's blood. Near the end of the conversation, White gave his name as "Sergeant Johnson."

54.   White next demonstrated how he could arrange for contact between himself and the targeted inmate so as to support the false confession. He called the bailiff in a department of the Superior Court, identifying himself as "Deputy District Attorney Michaels" with the Organized Crime Unit. In response to "Michaels'" request, the bailiff arranged for White and the inmate to be transported to court on the same bus the following day. (exhibit 12, pp. 70-71) (E255 - E256.)

55.   White concluded his demonstration by stating that he now had "enough

24

EXHIBIT 3                                                                          68

information to put a story together that's very believable, accurate, detailed story" [sic].
(exhibit 12, p. 71) (E256.) White continued:

> "[T]he key thing is they [police and prosecutors] want to win.
> So if I come forward with information as detailed as that they're
> gonna use it. Because the jury not knowing the system or how
> it works, is going to believe when I get up there with all these
> details and facts, that this guy sat in the jail cell, or he sat on
> the bus, or he sat in the holding tank somewhere, or told me
> through a door or something, they're gonna believe me."
> (exhibit 12, p. 72) (E257.)

56.    In January, 1989, White, then out of custody, gave a similar demonstration
for a television crew from the program "60 Minutes." (exhibit 12, pp. 72-73) (E257 - E258.)

57.    In a letter dated January 17, 1989, from the Los Angeles County District
Attorney's Office to petitioner's trial and appellate counsel, Dennis Mulcahy, Mulcahy was
informed that the District Attorney's Office had formed a task force to look into the jailhouse
informant "problem" that had recently been made public through the revelations of Leslie
White. A copy of that letter is attached as exhibit 13 (E342.) The letter states that the task
force directed all prosecutors in the Office to inform the task force of any cases handled
in the period 1979 through 1989 in which jailhouse informant testimony was used by the
prosecution. Pursuant to that directive, the task force had been informed that petitioner's
case was among those in which jailhouse informant testimony had been employed. The
letter concluded that if Mulcahy wished "to fully explore this issue, our office will join with
you in expediting the hearing of any appropriate motion you wish to bring." (exhibit 13)

25

EXHIBIT 3                                                    69

(E342.)

58.     Enclosed with the January 17, 1989, letter to Mulcahy was a memorandum from trial prosecutor Phillip Rabichow.  The memorandum, dated November 4, 1988, is attached as exhibit 14 (E345.)  The memorandum gives Rabichow's view of the evidence at petitioner's trial, including the following statement:  "Hughes testified to details of the killing that only the killer knew, including which rooms different altercations took place and the order in which they occurred." (E345.)  The memorandum also asserts that petitioner's statement to police (exhibit 8 to the instant petition) "contained major inconsistencies and contradicted physical evidence." (E345.)  The memorandum does not identify these "major inconsistencies" or what "physical evidence" contradicted petitioner's statement.   The memorandum also asserts that petitioner "confessed" to the crime while being evaluated at the California Youth Authority.  Finally, Rabichow claimed that "the sequence of events was corroborated by independent evidence based on blood spatters and location of physical evidence." (E345.)

59.     On August 11, 1989, trial counsel Mulcahy was sent a letter from former California Court of Appeal Justice Otto M. Kaus.  A copy of that letter is attached as exhibit 15. (E348.)  In the letter, Justice Kaus explained that he, Kaus, had been named by the California Attorney General as special counsel to assist the Grand Jury investigation into the use of jailhouse informants at the County Jail.  The letter invited Mulcahy to submit evidence that petitioner's murder prosecution involved willful or corrupt misconduct in connection with the use of Robert Hughes' testimony. (E348.)

60.     Mulcahy refused to take any action in connection with the Grand Jury investigation.  He also failed to notify petitioner that, as of March 2, 1989, a Policy

EXHIBIT 3                                                                                                          70

Memorandum issued by then-supervising judge of the Superior Court David Horowitz

provided for the appointment of counsel for all inmates whose cases involved the use of

a jailhouse informant by the prosecution. A copy of this Policy Memorandum is attached

to this petition as exhibit 44. (E615.) It was left to petitioner's father, Robert B. Lisker, to

communicate with the special counsel to the Grand Jury regarding petitioner's case. See

Declaration (3) of Bruce E. Lisker, attached to this petition as exhibit 45, ¶¶ 1-4 (E619 -

E620.)

61.    During 1989 and 1990, petitioner, unaware that he could have counsel

appointed by simply requesting such an appointment from the Superior Court, futilely

sought to obtain counsel on a *pro bono* basis to challenge his conviction. He contacted

Bradford Battson, a San Francisco attorney petitioner's father once consulted regarding

petitioner's case. Mr. Battson would not take the case. (See exhibit 45, ¶¶ 5, 7 (E620 -

E621), and attachments C (E636) and D (E638) thereto.) Petitioner also contacted the Los

Angeles County Bar Association's Lawyer Referral Service. More than three months later,

the Referral Service responded that it had been unable to find a lawyer willing to file a

*habeas corpus* petition for petitioner on a *pro bono* basis. (exhibit 45, ¶ 8 (E621), and

attachment E (E640) thereto.)

62.    During 1991, petitioner corresponded with private investigator Sue Sarkis,

whom he knew because Ms. Sarkis had been employed by trial counsel Dennis Mulcahy

as an investigator prior to the trial of petitioner's case. Petitioner hoped Ms. Sarkis would

perform investigatory tasks that would aid a lawyer, if one could be found, in bringing a

*habeas corpus* petition on petitioner's behalf. Ms. Sarkis did perform some minor

investigation, but informed petitioner that a full scale investigation would be "five-figure

27

EXHIBIT 3                                                                      71

expensive." Petitioner was virtually penniless at this point. (See exhibit 45, ¶¶ 10-11 (E621 - E622), and attachments G (E646), H (E648), and I (E650) thereto.)

63.    Early in 1992, petitioner's father contacted the Office of the State Public Defender to try to obtain a lawyer for petitioner. The Public Defender responded that the Superior Court had a program in place to appoint lawyers for defendant's whose cases involved the use of a jailhouse informant by the prosecution. This was the first time petitioner became aware of this program. (See exhibit 45, ¶¶ 12-13 (E622), and attachments J (E652) and K (E654) thereto.) Petitioner obtained the name of a Santa Monica attorney, Gigi Gordon, and inquired of Ms. Gordon what the procedure was for obtaining a court-appointed attorney. Ms Gordon wrote to petitioner that the program to appoint attorneys had ended two years earlier, when a new presiding judge of the criminal division of the Superior Court was appointed. Ms. Gordon stated in a follow-up letter that "I can assure you that as the law currently stands, the court will not act to assist you in any way." (See exhibit 45 ¶¶ 14-16 (E622 -E624), and attachments L (E657) and M (E659) thereto.)

64.    On July 6, 2001, David Bernstein, one attorney helping petitioner to draft the instant petition, wrote to petitioner's trial attorney, Dennis Mulcahy, to inquire whether Mulcahy, or anyone else known to Mulcahy, had sought appointment to petitioner's case pursuant to the order of supervising judge Horowitz. Mulcahy never responded to this letter. See exhibit 51 (E737), Declaration of David L. Bernstein dated August 24, 2002.

65.    Between 1992 and 1995, petitioner, discouraged and without funds, concentrated on resuming his education. He graduated from a paralegal course of study offered by a law school in Texas called the "Blackstone School of Law, Legal

28

EXHIBIT 3                                                72

Assistant/Paralegal Training." He also completed a computer course, with an associated apprentice program, resulting in his becoming a State-recognized computer programmer, skilled in the COBOL high-level language. He undertook to create an exhaustive written analysis and compilation of the facts in his case. This resulted in an extensive two-volume document called the "Lisker Case Analysis." These volumes are available for this Court's review, if the Court were inclined to review them. Petitioner's prison trust account statements between January 1, 1990, and October 10, 1995, show that at no point during that period did petitioner's balance exceed $290.82; indeed, the balance in the account was usually quite a bit less. (See exhibit 45, ¶ 16 (E623 - E624), and attachment N (E661 - E681) thereto.)

66.   In 1995, petitioner's father died and bequeathed him a sum of money to be used to pursue his goal of hiring an attorney to prepare a *habeas corpus* petition challenging the legality of his conviction. (See exhibit 45, ¶ 16) (E623 - E624.) Petitioner then began to seek an attorney to prosecute a *habeas corpus* action.

67.   At a parole hearing for petitioner in 1996, an attorney named Gary M. Diamond was appointed to represent him. After the hearing, petitioner asked Diamond if he could represent him in a *habeas corpus* action. Diamond said he could, for $7500.00, prepare a *habeas corpus* for petitioner and see it through to the U.S. Supreme Court, if necessary. Petitioner payed Diamond's fee, and for the next two and one-half years Diamond represented to petitioner that he was preparing a petition. Diamond also "informed" petitioner that the federal Anti-Terrorism and Effective Death Penalty Act of 1996 "did not apply" to petitioner's case. (See exhibit 45, ¶¶ 17-22 (E624 - E625), and

29

EXHIBIT 3                                                              73

attachments O (E683) and P (E685) thereto.)

68.     Although Diamond wrote many letters to petitioner during 1997 and 1998 regarding his supposed "progress" in preparing the petition, in fact Diamond never prepared anything for petitioner other than a one-page summary of purported "issues" which Diamond claimed to be considering. (See exhibit 45, ¶ 19 (E624 - E625), and attachment P (E685.) Finally, petitioner came to doubt the representations in Diamond's letters that a *habeas corpus* petition was actually being prepared. He sent a letter to Diamond terminating his services and requesting a refund of the monies paid to him. Diamond refused to return any money to petitioner. On January 25, 1999, Diamond responded with a purported "accounting" of his services in which he claimed to have expended 42 hours reviewing petitioner's trial transcripts between 8-4-96 and 8-14-96. However, Diamond did not even receive these transcripts until 1997. Other spurious charges appeared on Diamond's "accounting" as well. (See exhibit 45, ¶¶ 19-21 (E624 - E625), 23-27 (E625 - 626), and attachment R (E702) thereto.)

69.     Diamond's "accounting" also included the completely false claim that Diamond had "completed" the petition, but that petitioner chose not to have it filed. Petitioner never received a "completed" petition from Diamond, and never instructed Diamond not to file anything. (See exhibit 45, ¶ 29 (E626), and attachment R (E702.) Petitioner initiated a small claims action in an effort to recover some of the money paid to Diamond. Because Diamond listed as his address only a post office box, petitioner was unable to effect service and the case was dismissed without prejudice on September 4, 2002. (exhibit 45, ¶ 30 (E626), and attachment U (E718.)

70.     Upon firing Diamond, petitioner retained a new attorney, Fred Marr, for the

30

EXHIBIT 3                                                              74

purpose of filing a *habeas corpus* petition. Petitioner's fee agreement, executed in January of 1999, called for him to pay Marr $30,000.00. Petitioner paid the money. The agreement expressly stated that the total fee would not exceed $30,000.00. Marr ostensibly worked on the *habeas corpus* petition for a year, then told petitioner that although he had expended 400 hours preparing the petition, he would need to expend at least 1,000 more hours to finish it. Marr asked for and received from a petitioner a "supplementary fee" of $20,000.00. (See exhibit 45, ¶¶ 28-29 (E626.)

71.     Although Marr frequently wrote to petitioner recounting the supposed "progress" Marr was making, on all but one occasion he refused to send drafts of the work to petitioner. On the one occasion he did send a "draft," it consisted of 12 pages filled with factual errors. Marr told petitioner he did not trust the prison mail and believed the prison authorities would forward copies of his work to the state Attorney General. In July of 2000, Marr "borrowed" $7500.00 from petitioner, telling him he was having financial difficulties. (See exhibit 45, ¶¶ 29-30) (E626 - E627.)

72.     Marr died on November 29, 2000. He never produced or filed any *habeas corpus* application for petitioner in any court. Marr's wife, also an attorney, refused to refund any money to petitioner. She suggested that Petitioner contact the Client Security Fund Commission of the California State Bar. Petitioner did so, and applied for reimbursement from the fund. In *Lisker v. Marr,* State Bar Case No. 01-F-03099, the Commission refunded $50,000.00 to petitioner, the maximum amount permitted under its rules of procedure. A copy of this four-page decision, filed on November 9, 2001, is attachment T (E707) to exhibit 45. The Commission concluded, in pertinent part:

31

EXHIBIT 3                                                                                                75

"Applicant has established that $50,000.00 in advance fees for

the *habeas corpus* matter came into Respondent's hands, as

required under Rule 2. The Commission concludes that the

$50,000.00 qualifies for reimbursement under Rule 6(b) since

no work or an insignificant portion of the work was performed."

(See exhibit 45, attachment T, p. 3) (E714.)

73.     In January and October of 2001, petitioner entered into agreements with attorney Robert B. Amidon which resulted in the preparation and filing of the instant petition.

74.     During 2001, petitioner's investigator, Paul Ingels, learned that a Los Angeles County Sheriff's Deputy named Tom Halstead was the Jail Liaison Officer at the Los Angeles County Jail during April, 1983, the time at which petitioner was illegally transferred to the county jail from a juvenile facility. See the Declaration (2) of Paul Ingels, ¶ 6 (E733 - E734), dated November 18, 2002, attached hereto as exhibit 50. Ingels learned that Deputy Halstead was still with the Sheriff's Department, and was currently assigned to the Whittier substation. Ingels called Halstead, who agreed to an interview.

75.     Ingels interviewed Halstead on October 1, 2001. Halstead confirmed that, at the time he was Jail Liaison Officer, it was a common practice to place an inmate in a cell alone, surrounded by informants. He stated that the 7000 module consisted of "hospital rooms" used for high visibility and "special handling" cases. Every inmate assigned to the 7000 module of the County Jail had a "special handling card" filled out. Information on the card would indicate the name of the person who had requested that the inmate be assigned to that module. Halstead was certain these cards were in use during

32

EXHIBIT 3                                      76

1983, but he did not know if the cards from that period were still in existence. Halstead confirmed that many of the cells in the 7000 module had holes in the wall of sufficient size to permit inmates to communicate with each other, and to pass documents back and forth. (See exhibit 50, ¶ 6 (E733 - E734.)

76.    Investigator Ingels, also in October of 2001, conducted several telephone interviews with Los Angeles County Sheriff's Deputy Jim Platus. Deputy Platus is currently assigned to the 7000 module of the Los Angeles County Jail. At Ingels' request, Platus consulted the "special handling" file to see what information might still exist regarding the housing arrangements for petitioner and for Robert Hughes. Platus was not able to find a special handling card for petitioner, but he found such a card for Robert Hughes. According to Platus, Hughes' card indicated that, upon Hughes' arrival in the 7000 module, he was classified as a "K-9" (informant), but that after he arrived, his classification was changed to "K-10" (inmate charged in notorious or high-profile case). (See exhibit 50, ¶ 7) (E734 - E735.)

77.    Petitioner's father testified that he had given his wife $150.00 in cash for shopping on the night before she was killed. (RT 223-227.) Andrew Monsue, the LAPD's investigating officer, testified that this money was never found. (RT 411-412, 442.)

78.    The failure to find the $150.00 apparently preyed on Detective Monsue's mind long after petitioner's trial. At petitioner's first parole eligibility hearing, held in December of 1991, Monsue wrote a letter to the Board of Prison Terms. That letter is attached as exhibit 46 (E720) to this petition. In the letter, Monsue stated that "the inmate hide [sic] approximately $140.00 he had taken from his mother's purse, and then set about to make the crime scene appears [sic] as if a burglar had broken into the residence to

33

EXHIBIT 3                                                                    77

cover his crimes . . . although the robbery allegation were [sic] not proved during the trial, I still feel the circumstances of the case merited a first degree murder handling by the courts." (exhibit 46) (E720.)

79.     For a subsequent parole hearing for petitioner in 1998, Andrew Monsue wrote another letter. This letter, dated April 7, 1998, is attached to this petition as exhibit 47 (E724.) In the letter, Monsue claims to have "solved" the mystery of what happened to the $150.00 that was never found:

> "Several years after this crime occurred, I met with the new owners of the house where this crime occurred. · They informed me they had found some money and several other items hidden in the attic of Bruce Lisker's old bedroom. The amount of cash found by the new owner was approximately $150, which is the amount of money that was reported missing from the victim's purse the day of the murder. This revelation confirmed our initial theory that Mr. Lisker had in fact robbed his mother." (Exhibit 47, ¶ 2) (E724.)

80.     Petitioner did not discover this letter in his prison file until sometime in the year 2000. Because he believed the allegation in Monsue's letter to be completely false, he asked his investigator, Paul Ingels, to look into the matter. Mr. Ingels began by researching the ownership of the property in the years following the murder of Dorka Lisker.

81.     Mr. Ingels learned that an attorney named Morton Borenstein purchased the house from petitioner's father and took possession on April 3, 1984, about a year after the

34

EXHIBIT 3                                                                                    78

murder. (See Declaration (1) of Paul Ingels, November 18, 2002, and attached as exhibit
16, ¶ 8 (E352 - E353); exhibit 48, Declaration of Morton Borenstein, dated November 12,
2001, ¶ 2) (E726.) Borenstein and his wife lived in the house until June 2, 1995, when they
sold it to Doron and Adina Aloni. (See exhibit 48, ¶ 2) (E726.) The Alonis still live in the
house today. (See exhibit 16, ¶¶ 5-7) (E352.)

82.   Mr. Borenstein's declaration states that in 1984, while the house was still in
escrow, he was informed that there had been a murder there. He checked with the LAPD
and learned that a Detective Monsue was in charge of the police investigation of that
murder. He called Detective Monsue who told him about the crime and stated there was
a possibility of a theft occurring during the crime. Monsue also told Borenstein that "there
was some question as to whether Mr. Lisker's son committed the crime or Mr. Lisker's
son's friends." Borenstein's declaration states that this phone call was the only
communication he ever had with Detective Monsue, and that during it he "did not claim to
have found anything at 'the property,' including cash in the attic or anywhere else."
Borenstein concluded his declaration by stating that he and his wife never found "any cash
or anything else in the attic of the property," and never told Monsue or anyone else that
they had. (Exhibit 48, ¶¶ 3-7) (E726 - E727.)

83.   Ingels telephoned the present owners of the house, Adina and Doron Aloni.
Adina told Ingels that she and her husband bought the house on August 1, 1995, and have
resided there ever since. In response to Ingel's questions, Adina stated that neither she
nor her husband found money or anything else in the attic, and never told any police officer
that they did. (exhibit 16, ¶ 5) (E352.) The Alonis would not consent to an in-person
interview; however, Adina Aloni wrote a letter to Ingels, dated June 13, 2001, in which she

35

EXHIBIT 3                                                                     79

stated, "regarding money in the attic that you asked me about, as I told you, I have not found any money." This letter is attached as exhibit 49 to this petition. (See exhibit 16, ¶¶ 5-7) (E352.)

84.    An investigator working for petitioner, Kenneth Swank, interviewed Lieutenant Monsue at Monsue's office on October 9, 2002. Monsue's current assignment is Supervisor of the Detective Bureau of the LAPD's central Division. Monsue recalled the Lisker case. He stated that he has visited petitioner's website, www.freebruce.org, and finds it quite comical. Monsue told Swank that the most important evidence of guilt for him and everyone else who worked on the case was that "Lisker dummied up a fake point of entry -- the kitchen window. He said he could see his mother's body lying on the floor from a distance of seven to ten feet away from the window. This is what nailed him because there was no way you could see the body from this vantage point. The roof overhang, the sun shining on the window pane, Lisker's height versus the height of the window itself, would make it impossible for him to see his mother's body from where he said he stood." See paragraph 8 of the Declaration (2) of Kenneth Swank, attached to this petition as exhibit 57 (E789.).

85.    Swank asked Monsue about his letter to the Parole board in which he stated that subsequent owners of the house informed him that they had found money in the attic in an amount consistent with that of the money missing from Mrs. Lisker's purse. Monsue stated that about seven years after Lisker was convicted, the new owners of the house where the murder took place telephoned him and reported they had found "some money" in their attic - about the same amount that was taken from Mrs. Lisker's purse by the killer. In response to the call, Monsue drove to the house and met with the new owners, a man

36

EXHIBIT 3                                                                                          80

and woman whose names he could not presently recall. He spoke to both the man and
the woman, who together showed him the area where the money had been found. (exhibit
57, ¶ 10) (E790 - E791.)

86. Swank asked Monsue if he recalled Robert Hughes, the jailhouse informant
who testified that petitioner had "confessed" his guilt of the murder to Hughes. Monsue
replied that he did remember Hughes, and that Hughes' testimony should not be taken
seriously. Monsue stated that he did not give much credence to what Hughes said at
Lisker's trial, because, "After all, it was a jailhouse snitch with a questionable past, and a
jailhouse snitch is nothing but a jailhouse snitch." (exhibit 57, ¶ 5) (E789.)

87. In July of 2002, petitioner sought expert forensic review of the blood-spatter
testimony at his trial. He did this because, even though blood-spatter expert Linhart's
testimony that the blood-spatter evidence in the case did not incriminate petitioner (see ¶
29 of this petition, ante), both prosecutor Phillip Rabichow, and the Court of Appeal in its
unpublished opinion affirming petitioner's conviction, maintained that the blood-spatter
evidence was a powerful indication of petitioner's guilt. Specifically, Rabichow, in his
memorandum to the district attorney's office task force regarding jail house informant
cases, claimed that Robert Hughes' "confession" testimony "was corroborated by
independent evidence based on blood-spatters and location of physical evidence." (See
exhibit 14, ¶ 7) (E345.) Even more "unsupported" than Rabichow's claim was the following
paragraph in the opinion of the Court of Appeal:

> "More compellingly, an expert in forensic serology and
> bloodstain pattern interpretation determined, based on his
> examination of appellant's clothing and photographs of the

37

EXHIBIT 3                                          81

> murder scene, that the blood on appellant's clothing, which
>
> was of his mother's type, spattered onto it at the moment when
>
> his mother suffered a blunt force injury."

(Unpub. Opn. in *People v. Lisker*, B020092, p. 14) (E24.) Of course, no such testimony was presented at petitioner's trial: All of the expert testimony given by Ronald Linhart was to the contrary.

88.    Petitioner provided criminalist Randall Robinson, a 28-year veteran of the San Diego County Sheriff's Department's Crime Laboratory who retired as the supervising criminalist of that Laboratory, with the transcripts of his second trial, the LAPD "Murder Book," and transcripts of Ronald Linhart's testimony at petitioner's first trial and preliminary hearing. Mr. Robinson reviewed these materials and executed a declaration regarding his conclusions. That declaration is attached to this petition as exhibit 55. Mr. Robinson concluded that "the blood-spatter evidence introduced at Mr. Lisker's trial did not prove, or even suggest, that Mr. Lisker, as opposed to someone else, committed the murder." (exhibit 55, ¶ 6) (E777.) Robinson's declaration continues, "[t]he evidence described by Mr. Linhart was entirely consistent with the account of events given by Lisker to Monsue." (exhibit 55, ¶ 9) (E778.) Mr. Robinson concluded:

> "In sum, I could find no indication from Mr. Linhart's testimony
>
> that the blood-spatter evidence offered at Mr. Lisker's trial was
>
> any more consistent with the theory that Lisker committed the
>
> crime than it was with Lisker's own, exculpatory account to
>
> Detective Monsue that Lisker merely discovered his mother,
>
> mortally wounded, and took the actions described."

38

EXHIBIT 3                                                          82

(exhibit 55, ¶ 11) (E778.) Robinson's declaration also notes that Linhart himself, at petitioner's trial, expressed the same opinion as to the significance of his testimony that Robinson does in his declaration. (exhibit 55, ¶ 12) (E778.)

89. On October 9, 2002, investigator Swank interviewed Ronald Linhart regarding his testimony at petitioner's trial. See the Declaration (1) of Kenneth Swank, dated November 18, 2002, attached to this petition as exhibit 56 (E786.) During this interview, Mr. Linhart agreed to read the declaration executed by Randall Robinson (exhibit 55) (E777.) After reading it, Linhart told Swank that "Mr. Robinson was correct that the blood-spatter evidence was of little significance to the guilt or innocence of the Lisker boy. He [Linhart] recalled reading the opinion of an appellate court regarding the Lisker case and was surprised that the judges cited the blood evidence as strong indicators of Lisker's guilt. Mr. Linhart stated that in his opinion, the appeals court gave this portion of the trial far greater significance than it merited." (exhibit 56, ¶ 6) (E787.) Linhart told Swank that he thought he had some photos from the case in his personal files; he promised to make copies for Swank, and to provide a copy of his entire file in the Lisker matter. (exhibit 56, ¶ 8) (E787.) About two weeks after the interview, Linhart did provide copies of his file and four photographs of the crime scene. (Exhibit 56, ¶ 9) (E787.)

90. Attached as exhibit 59 (E805) to this petition is all of the material provided by Mr. Linhart. This material consists of four color photographs, three of the crime scene and one of a cuff of petitioner's shirt depicting several tiny blood droplets. The material also includes a copy of Linhart's laboratory report dated June 25, 1983, a two-page report with seven pages of attachments. In relevant part, the report concludes: "Blood drops on the shoes and the right cuff of the plaid shirt were a result of force being applied to a source

39

EXHIBIT 3                                                                    83

of blood and being propelled through the air to the shirt and shoes. The pattern is insufficiently distinct to identify the nature of the force." (exhibit 59, p. 1) (E805.)

91.     Exhibits 55 (E777), 56 (E786) and 59 (E805) refute any claim that the blood-spatter evidence at petitioner's trial was inculpatory of petitioner, or that such evidence renders any of petitioner's three claims "harmless error."

92.     On November 14, 2002, investigator Kenneth Swank telephonically interviewed Ms. Doris Van Norton, the Records Supervisor for the Los Angeles County Central Juvenile Hall. See the Declaration (3) of Kenneth Swank, dated November 18, 2002, attached to this petition as exhibit 61 (E832.) Ms. Norton explained that a juvenile could not be "transferred" to an adult facility without a court order. A juvenile could not have been removed from the custody of the juvenile authorities and placed in the 7000 module without such an order. (exhibit 61, ¶¶ 4-5) (E832 - E833.) No such order could be found in petitioner's juvenile court[7] or Superior Court files. Indeed, such a "transfer" would have been unlawful in the absence of a finding that petitioner posed a danger to the public or the other juvenile hall inmates. (Welf. & Instit. Code §707.1, subd. (b)(1).)[8]

### ARGUMENT

I.     PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO ASSISTANCE OF COUNSEL WERE VIOLATED BY LAW ENFORCEMENT'S DELIBERATE AND ILLEGAL PLACEMENT OF HIM IN AN ENVIRONMENT -- MODULE 7000 -- WHERE THEY EXPECTED A JAILHOUSE "CONFESSION" TO

---

[7]     In November of 2002, petitioner obtained a complete copy of his juvenile court file pursuant to Welfare and Institutions Code §827.9.

[8]     Because the factual allegations underlying Claims II and III are entirely different from the allegations underlying Claim I, petitioner has placed the allegations relevant to each claim under the heading for that claim. Therefore, the petition will continue with paragraphs 93-127 under Claim II, and paragraphs 128-132 under Claim III.

40

EXHIBIT 3                84

ENSUE.

A.      **Applicable Law: The Post-Charge Right to Counsel Forbids the
        Government to Deliberately Elicit Incriminating Statements From a
        Defendant Represented By Counsel.**

The Sixth and Fourteenth Amendments to the United States Constitution provide

that, once formal charges have been initiated in a criminal case, the accused has the right

to assistance of counsel. (*Massiah v. United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d

246, 84 S.Ct. 1199]). This right has been held to include, after formal charges have been

filed, "the right to rely on counsel as a 'medium' between [the defendant] and the State."

(*Maine v. Moulton* (1985) 474 U.S. 159, 176 [88 L.Ed.2d 481, 106 S.Ct. 477].)

Because a defendant's constitutional right to counsel attaches upon the formal

initiation of charges, the United States Supreme Court has held that the prosecuting

authorities may not "deliberately elicit" incriminating statements from the defendant without

the presence of counsel. (*United States v. Henry* (1980) 447 U.S. 264, 270 [65 L.Ed.2d

115, 100 S.Ct. 2183].) Several post-*Massiah* decisions of the U.S. Supreme Court further

explain the constitutional prohibition against deliberately eliciting incriminating statements

from a charged defendant in the absence of counsel. In *United States v. Henry, supra*, the

defendant was charged with bank robbery and incarcerated. Federal authorities contacted

an informant who was incarcerated in the same cellblock as the defendant and instructed

the informant to "be alert to any statements made" by the defendant, but not to initiate

questions about the charged crime. (*Henry, supra*, 447 U.S. at 266.) According to the

informant, Henry made "unsolicited" statements tying him to the charged robbery. These

statements were introduced at Henry's trial for bank robbery. (*Id.* at 266-267.)

. 41

EXHIBIT 3                                                                                    85

The Supreme Court reversed Henry's conviction,[9] holding that the government informant in that case deliberately elicited incriminating statements from *Henry* while the two were incarcerated together. (*Henry, supra*, 447 U.S. at 274-275.) The circumstances were as follows: After Henry was arrested and charged with bank robbery, he was incarcerated in a local jail in Virginia. An FBI agent contacted an inmate in the jail, Nichols, who was serving a sentence on local charges. Nichols had previously served as a paid informant for the FBI. Nichols informed the agent that he was housed in the same cellblock as a number of federal prisoners awaiting trial. The record did not disclose whether the agent had contacted Nichols specifically to acquire information about *Henry*. (*Id.* at 265-266.)

The agent instructed Nichols to "be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." (*Henry, supra*, 447 U.S. at 266.) Nichols later met with the agent and told him that he (Nichols) had "conversations" with Henry during which the latter had admitted responsibility for the bank robbery. Nichols testified to these statements at Henry's trial. (*Id.* at 268-271.)

On appeal, the government argued that Henry's statements were not "elicited" by Nichols, within the meaning of *Massiah*, because Nichols had been instructed not to initiate conversations with Henry, or question him about the robbery. (*Henry, supra*, 447 U.S. at 271.) The Supreme Court rejected the argument:

---

[9]    Actually, the High Court affirmed the decision of the Fourth Circuit Court of Appeals to reverse *Henry*'s conviction on *Massiah* grounds. (*Henry v. United States*, 590 F.2d 544 (4th Cir. 1978).)

42

EXHIBIT 3                                                                                                      86

"The question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements within the meaning of *Massiah*. Three factors are important. First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of *Henry*; and third, *Henry* was in custody and under indictment at the time he was engaged in conversation by Nichols. The Court of Appeals viewed the record as showing that Nichols deliberately used his position to secure incriminating information from *Henry* when counsel was not present and held that conduct attributable to the Government. Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to *Henry* and would be able to engage him in conversations without arousing Henry's suspicion. The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information [footnote omitted]. This combination of circumstances is sufficient to support the Court of Appeals' determination. **Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must**

43

EXHIBIT 3                                                                87