**CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
**GARY G. GEUSS**, Chief Assistant City Attorney
**CORY BRENTE**, Assistant City Attorney
**AMY FIELD**, Deputy City Attorney - SBN 143827
**CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney **-SBN 192872**
christian.bojorquez@lacity.org
amy.field@lacity.org
200 North Main Street, 6th Floor, City Hall East
Los Angeles, CA 90012
Phone No.: (213) 978-6900, Fax No.: (213) 978-8785

*Attorneys for Defendants* CITY OF LOS ANGELES, a municipal corporation, also named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW MONSUE and HOWARD LANDGREN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE E. LISKER, | CASE NO.: CV09-09374 AHM (AJWx) |
| | *[The Hon. A. Howard Matz, Courtroom 14]* |
| Plaintiff, | **EXHIBIT 3 B IN SUPPORT OF DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY ADJUDICATION OF THE ISSUES** |
| vs. | |
| | |
| CITY OF LOS ANGELES et al., | **[Filed/Lodged Concurrently Herewith: (1) Notice of Motion and Motion for Summary Judgment, etc.; (2) Statement of Uncontroverted Facts and Conclusions of Law; (3) Declarations; (4) Request for Judicial Notice; and (5) (Proposed) Judgment/Order]** |
| Defendants | Date:     **July 25,** 2011 |
| | Time:      10:00 a.m. |
| | Courtroom: 14 |

have known that such propinquity likely would lead to that

result."

(*United States v. Henry, supra*, 447 U.S. at 270-271) (emphasis added).

The Supreme Court further explained these principles in *Maine v. Moulton, supra*, 474 U.S. 159. In this case, Moulton's co-defendant, Colson, made a secret deal with police to gather incriminating statements from Moulton. Both defendants had been formally charged and were out on bail. Colson secretly recorded several telephone conversations with Moulton. He also agreed to Moulton's request that the two of them meet to discuss the charges and evidence against them. Then police, upon learning of the meeting from Colson, outfitted him with a body recorder, and instructed him "not to attempt to question Perley Moulton, just be himself in his conversation." (*Id.* at 163-165.)

At the meeting, Moulton, with much prompting by Colson, discussed the crimes with which both were ostensibly charged and made incriminating statements. These statements were used by the prosecution at Moulton's trial.[10] The Supreme Judicial Court of Maine reversed Moulton's conviction, holding that "[w]hen the police recommended the use of the body wire to Colson they intentionally created a situation that they knew, or should have known, was likely to result in Moulton's making incriminating statements during his meeting with Colson." (*Maine v. Moulton, supra*, 474 U.S. at 167-168.) Upon the State's petition for *certiorari*, the U.S. Supreme Court affirmed the decision. The Court rejected the State's argument that the State had not elicited Moulton's incriminating

---

[10]    As a reward for his cooperation, Colson was permitted to plead guilty to two minor charges and received a two-year prison sentence, with all but 15 days of the sentence suspended. (*Maine v. Moulton, supra*, 474 U.S. at 163, fn. 2.)

EXHIBIT 3

statements because Moulton had initiated the meeting with Colson:

> "In the first place, the identity of the party who instigated the
> meeting at which the Government obtained incriminating
> statements was not decisive or even important to our decisions
> in *Massiah* or *Henry* . . . Beyond this, the State's attempt to
> limit our holdings in *Massiah* and *Henry* fundamentally
> misunderstands the nature of the right recognized in those
> cases. The Sixth Amendment guarantees the accused, at least
> after the initiation of formal charges, the right to rely on counsel
> as a 'medium' between him and the State. As noted above,
> **this guarantee includes the State's affirmative obligation
> not to act in a manner that circumvents the protections
> accorded the accused by invoking this right.    The
> determination whether particular action by state agents
> violates the accused's right to the assistance of counsel
> must be made in light of this obligation.** Thus, the Sixth
> Amendment is not violated whenever – by luck or
> happenstance – the State obtains incriminating statements
> from the accused after the right to counsel has attached.
> [citation]. However, **knowing exploitation by the State of an
> opportunity to confront the accused without counsel being
> present is as much a breach of the State's obligation not

45

EXHIBIT 3

> to circumvent the right to assistance of counsel as is the
>
> intentional creation of such an opportunity."

(*Maine v. Moulton, supra*, 474 U.S. at 174-176) (emphasis added.)

In *Kuhlmann v. Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], the Court held that a Sixth Amendment violation does not occur "simply by showing that an informant, either through prior arrangement, or voluntarily, reported [the defendant's] incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann, supra*, 477 U.S. at 459.)[11]

The California Supreme Court has developed a parallel line of cases. In *People v. Whitt* (1984) 36 Cal.3d 724, an inmate at the County Jail in San Bernardino, DeLoach, told police detectives that his cellmate, Whitt, had made incriminating statements regarding the crime with which Whitt was charged. The police had no prior informant relationship with Whitt.[12] At the conclusion of DeLoach's meeting with police, he was told that the officers would "contact the district attorney's office" regarding DeLoach's case. As of the date of the meeting, Whitt was not yet represented by counsel, though counsel was appointed for

---

[11] The quoted passage was dictum. *Kuhlmann* was a successive federal *habeas corpus* action brought by a state prisoner. The U.S. Supreme Court was principally concerned with the propriety of the lower federal courts' entertaining Wilson's successive petition. The Court noted that the key question upon a second or successive federal *habeas corpus* is whether the petitioner has made a "colorable showing of factual innocence" of the crime for which he stands convicted. (*Kuhlmann, supra*, 477 U.S. at 454.) Given the overwhelming evidence of Wilson's guilt apart from the informant's testimony, the Court held that his successive petition should not have been entertained. (*Id.* at 455.)

[12] DeLoach had previously worked as an informant for other police agencies. This was unknown to the police detectives who talked to DeLoach about Whitt. (*Whitt, supra*, 36 Cal.3d at 737.) It was also unknown to sheriff's personnel at the jail. (*Id.*)

46

EXHIBIT 3                                                                    90

him the following day. (*Id* at 737, 739, fn. 10.)

Police concluded the meeting by warning DeLoach not to continue to solicit information from Whitt; however, he was also told that "if he happened to hear any more information from Whitt" the police would accept it. (*Whitt, supra*, 36 Cal.3d at 737-738.) Expectedly, DeLoach "happened to hear" further incriminating statements which the prosecution sought to introduce at Whitt's trial. At a pretrial hearing to suppress DeLoach's testimony, it was determined that Whitt's placement in DeLoach's cell was random happenstance: "DeLoach arrived at the jail on June 18th. Whitt was placed in DeLoach's cell on July 7th. The jail sheriff testified that cell assignments were made by a floor deputy based on the availability of space. Neither the watch commander nor the floor deputy was aware of DeLoach's prior career as an informer." (*Id.* at 737.) It was further determined that DeLoach received neither leniency nor any promises of leniency in exchange for his proffered testimony. (*Id.* at 738.)

The State Supreme Court held that "[a]lthough the question is a close one, this record supports the conclusion that the state did not deliberately elicit Whitt's statements to DeLoach." (*Whitt, supra*, 36 Cal.3d at 740.) The Court believed "the critical inquiry is whether the state has created a situation likely to provide it with incriminating statements from an accused. If it has, it may not disclaim responsibility for this information by the simple device of telling an informant to 'listen but don't ask.'" (*Id.* at 742.) The Court noted that "in deciding whether information has been 'deliberately elicited,' the courts must focus on the state's conduct as a whole, rather than on the informant's." (*Id.* at 741.) Accordingly, the Court focused on whether the state had given DeLoach "an incentive to

47

EXHIBIT 3                                                                 91

extract further statements from Whitt." Although it found the question "very close and difficult," the Whitt Court concluded that state agents had not created such an incentive by merely promising to speak to the prosecutor in DeLoach's case:

> "If the police had any working arrangements of this sort with DeLoach in the past, their acceptance of his information and their agreement to speak to the prosecutor might well have been enough to attribute DeLoach's post-July 8th activities to them. [footnote omitted]. Under those circumstances, the inference that DeLoach expected a quid pro and that the police encouraged this expectation would be compelling. However, absent such a prior relationship with DeLoach, the mere acceptance of his information, even with the promise to talk to the prosecutor, is not sufficient encouragement to hold the police accountable for DeLoach's subsequent actions."

(People v. Whitt, supra, 36 Cal.3d at 744.) Whitt made it plain that the state need not expressly direct an informant to provide information, as long as it has "created powerful inducements for him to do so - especially in a custodial setting." (Id. at 741.)

People v. Pensinger (1991) 52 Cal.3d 1210 is to similar effect. In that case, the defendant moved to suppress the testimony of a jailhouse informant named Howard, on grounds that Howard was used by the state to deliberately elicit incriminating statements from the defendant. As in Whitt, the incriminating statements were made in the San Bernardino County Jail. The evidence taken at the suppression hearing indicated that

48

EXHIBIT 3                                                             92

police made no promises of leniency to *Howard* in exchange for information, did not instruct him to ask questions of *Pensinger* or to report back to the police at all on any subject. (*Id.* at 1247-1248.) The evidence further indicated that the police had nothing to do with the fact that *Howard* and *Pensinger* were housed near each other. (*Id.* at 1247.) The California Supreme Court affirmed the trial court's denial of *Pensinger's* suppression motion:

> "The authorities repeatedly told *Howard* he was not their agent, and to expect no reward. Here, as in *Howard, supra*, 44 Cal.3d 375, 398, and *Whitt, supra*, 36 Cal.3d 724, we have a case in which none of the officers involved in securing Howard's statements knew of *Howard's* history as an informant and **Howard's housing arrangement had nothing to do with any hope of eliciting information from defendant.**"

(*People v. Pensinger, supra*, 52 Cal.3d at 1250) (emphasis added.)

To sum up: Once criminal proceedings have been formally implemented and the accused has retained or been assigned an attorney, the government may not deliberately elicit incriminating statements from the accused in the absence of counsel without violating the right to counsel provisions of the Sixth and Fourteenth Amendments. (*Massiah, supra*, 377 U.S. at 206; *Henry, supra*, 447 U.S. at 270.) This right includes the Government's affirmative obligation not to undertake actions which circumvent the right to counsel. (*Maine, supra*, 474 U.S. at 176.) Actions by the Government which create an opportunity to circumvent this right, as well as actions which knowingly exploit such an

49

EXHIBIT 3                                                                 93

**opportunity,** violate the constitutional prohibition against the deliberate elicitation of incriminating statements from a defendant in the absence of his or her attorney. (*Id.*) The critical inquiry is "whether the state has created a situation likely to provide it with incriminating statements from an accused." (*Henry, supra,* 447 U.S. at 274; *Whitt, supra,* 36 Cal.3d at 741.) In making this determination on a case-by-case basis, courts "must focus on the state's conduct as a whole, rather than on the informant's." (*Whitt, supra,* 36 Cal.3d at 741; *United States v. Sampol,* 636 F.2d 621, 635 (D.C. Cir. 1980).) The state's creation of "powerful inducements . . . particularly in a custodial setting" for an informant to bring forth incriminating statements is as much a violation of the right to counsel as direct instructions to the informant to elicit such statements. (*Whitt, supra,* 36 Cal.3d at 741.) This is true whether or not the Government has directed its agent toward any particular defendant, or has merely relied on the agent's "ability to ingratiate himself with criminals and to encourage their confidences." (*Whitt,* 36 Cal.3d at 741-742; *Sampol, supra,* 636 F.2d at 638.)

Factors which bear upon whether the government has deliberately elicited incriminating statements from a defendant in violation of the Constitution include whether or not the defendant was in custody (*Henry, supra,* 447 U.S. at 270; *Whitt, supra,* 36 Cal.3d at 742), whether the government agent was "ostensibly no more than a fellow inmate" (*Id; Sampol, supra,* 636 F.2d at 637), whether the government agent took any action "beyond merely listening" (*Kuhlmann, supra,* 477 U.S. at 459; *People v. Pitts* (1990) 223 Cal.App.3d 616, 848), and whether an in-custody defendant's housing arrangement, *viz a viz* the government agent's, was influenced by "any hope of eliciting information from

50

EXHIBIT 3

the defendant." (*Pensinger, supra*, 52 Cal.3d at 1250; *Whitt, supra*, 36 Cal.3d at 737; *Pitts, supra*, 223 Cal.App.3d at 847.)

## B. Under the Circumstances, Robert Hughes Was a Government Agent at the Time He Elicited Petitioner's "Confession."

The state, in setting up and maintaining the informant module at the Los Angeles County Jail, and providing powerful inducements for the informant-inmates to induce -- or invent -- incriminating statements by other inmates without the presence of counsel, has plainly taken advantage of an opportunity to obtain statements in violation of a represented defendant's right to effective assistance. The state has both created and knowingly exploited this opportunity, in violation of the strictures of *Henry* and *Moulton*. Although there is no evidence that the state gave any instructions to Hughes to elicit statements specifically from petitioner, there need not be any such evidence.[13] As noted in *People v. Whitt, supra*, 36 Cal.3d at 741, the state need not expressly direct an informant to target any particular inmate, so long as it has created "powerful inducements for him to do so - especially in a custodial setting." *Henry* observes that the critical inquiry is "whether the state has created a situation likely to provide it with incriminating statements from an accused." (447 U.S. at 274.) The state-created inducement for informant-inmates to target other inmates is what violates the Sixth Amendment's right to counsel, **not** whether the state has directed its agents towards any particular inmate. (*Whitt, supra*, 36 Cal.3d at 741-742.)

---

[13]    However, it must be noted that the highly suspicious change in classification of Hughes from K-9 (informant) to K-10 (defendant in a notorious case) (see ¶¶ 48, 76, *ante*) strongly suggests that the authorities were actively complicit in providing Hughes with "cover" for his activities in the 7000 module. Hughes' K-10 classification could not have been legitimate for any reason. See ¶ 49, *ante*.

51

EXHIBIT 3                                                                                            95

The Grand Jury Report (¶¶ 45-55, *ante*) establishes that local police agencies could have non-informant inmates classified as informants by jail personnel in order to put them in physical contact with informants. (¶¶ 47-48, *ante*.) There is no suggestion that the police ever had any *particular* informant in mind when such reclassifications were requested. There would be no need for this; all of the (actual) informant-inmates *understood* what sort of activity would be rewarded. The state had indeed created "powerful inducements" for the informants to elicit or manufacture "incriminating" statements by the inmates who were placed in their presence.

It is further clear that Hughes personally understood what he had to gain by taking advantage of the opportunities afforded him by his informant status. In his initial case as an informant, an Orange County murder prosecution entitled *People v. Richard Crowell*, C47061, a Deputy Clarey and an investigator for the Orange County District Attorney's Office, Wayne Harbor, informed Hughes that, even if he had already been sentenced on his own case, he could get "some time knocked off his sentence" if he were to offer testimony sufficiently favorable to the prosecution in Crowell's trial. See exhibit 58 (E793), a portion of Hughes' testimony at another case in which he served as a jailhouse informant, *People v. Bernard Milberger*, LASC No. A561270. Further, the prosecutor in the *Milberger* case, Los Angeles County Deputy District Attorney Gregory Denton, promised to "put in a good word" for Hughes if he testified that *Milberger* "confessed" his guilt to Hughes while both were incarcerated in the Los Angeles County Jail. Hughes knew that he would not receive this "good word" if he failed to testify. (exhibit 58, p. 716) (E803.) Thus, by the time Hughes was housed in the 7000 module of the Los Angeles County Jail, he was thoroughly

52

EXHIBIT 3                                                                 96

aware of the potential advantages being offered him by the state in return for "jailhouse confession" testimony.

The cynical use of such "bought" testimony is convincingly illustrated by Detective Monsue's candid admission, given to investigator Swank, that, in Monsue's opinion, no one should take Hughes' testimony seriously because "a jailhouse snitch is nothing but a jailhouse snitch." (exhibit 57, ¶ 5) (E789.) Apparently, these considerations did not enter into Monsue's calculations at the time he procured Hughes' testimony for use at petitioner's trial.

In short, there is no requirement that petitioner demonstrate that any state official expressly "instructed" Hughes to target petitioner before Hughes may properly be considered a state agent in the instant case. The state created powerful inducements for individuals in custody to violate the right to counsel of other inmates by either eliciting or fabricating "incriminating" statements. These statements would then be used at trial, regardless of whether the prosecuting authorities believed the statements to be genuine. Only the exposure of these practices by professional jailhouse informant Leslie White brought an end to this practice. By any reasonable assessment, the testimony of informant-inmates of the Los Angeles County Jail's "snitch tank" (module 7000) was a product of the state, not some private enterprise of the informants themselves. Accordingly, Robert Hughes was a state agent at the time he concocted petitioner's "confession."

C.    **The Error in Admitting Hughes' Testimony Is Not Harmless Beyond a Reasonable Doubt.**

Virtually no evidence   beyond Hughes' false testimony linked petitioner to the

53

EXHIBIT 3                                                                      97

murder of his mother. The blood-spatter testimony proved nothing, as both the prosecution criminalist and petitioner's retained criminalist have stated. Detective Monsue's claim that petitioner could "not have seen" his mother through the windows of the house is contrary both to his own testimony, and to all other trial evidence. Once Hughes' testimony is eliminated, no other evidence links him to the crime. Therefore, the error in admitting Hughes' testimony is, manifestly, not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

### D.    Applicable Law: Requirements For *Habeas Corpus* Relief.

The California Constitution provides that a person unlawfully deprived of his liberty under the laws of the State, or of the United States, has the right to petition for a writ of habeas corpus. (Cal. Const. Art. I, §11.) A petitioner for *habeas corpus* bears "a heavy burden initially to **plead** sufficient grounds for relief, and later to **prove them**." (*People v. Duvall* (1995) 9 Cal.4th 464, 474) (emphasis in original.)

When presented with a *habeas corpus* petition, the court must first determine whether the petition states a *prima facie* case for relief. A petition states a *prima facie* case for relief when its factual allegations, if proven true, would entitle the petitioner to the relief requested. (*People v. Romero* (1994) 8 Cal.4th 728, 737; *In re Hochberg* (1970) 2 Cal.3d 870, 875, fn.4.) The petition must also explain why any or all of its claims are not procedurally barred. (*People v. Romero, supra*, 8 Cal.4th at 737; *In re Clark* (1993) 5 Cal.4th 750, 769, fn. 9.) If the petition states a *prima facie* case on a claim not procedurally barred, the court is required by statute (Pen. Code §1476) to issue the writ, or an order to show cause, directed at respondent custodian, which requires a responsive pleading --

54

EXHIBIT 3                                                                                              98

called the "return" -- which justifies the confinement. (*Romero, supra*, 8 Cal.4th at 737-738; *Duvall, supra*, 9 Cal.4th at 475.) The factual allegations in the return must be responsive to the factual allegations in the petition. (*Duvall, supra*, 9 Cal.4th at 476; *People v. Pacini* (1981) 120 Cal.App.3d 877, 884-885.)

Following the filing of the return, the petitioner, in a document called a "traverse," either admits or denies the factual allegations in the return. Allegations not denied in the traverse are deemed admitted. (*In re Lawler* (1979) 23 Cal.3d 190, 194.) When, after considering the return and the traverse, the court finds material facts in dispute, it may order an evidentiary hearing to resolve the disputed facts. (*People v. Duvall, supra*, 9 Cal.4th at 478.)

        1.    The Present Petition Presents a *Prima Facie* Case For Relief on Claim I.

Petitioner alleges that the police arranged for him to be housed in the 7000 Module of the Los Angeles County Jail for the purpose of securing a "confession" from him that he killed Dorka Lisker. The investigating officers arranged for this placement despite the fact that they knew that Welfare & Institutions Code §707.1 prohibited it. In furtherance of their purpose, the investigating officers executed a "special handling" card which requested that jail personnel place petitioner in the 7000 Module. The officers knew that such placement would facilitate a claim by inmates in the Module that petitioner had "confessed" his guilt to them. The officers arranged the illegal placement for precisely this purpose. In doing so, the officers deliberately circumvented petitioner's right to counsel through their agents -- the informant --inmates of the 7000 module – and obtained statements which were introduced at petitioner's trial. Jail personnel were complicit in this scheme by allowing the

55

EXHIBIT 3                                                                99

adult informant-inmates to come into contact with petitioner, a separate violation of law.

These factual allegations, if proven true, require that petitioner's conviction be overturned (*United States v. Henry, supra; People v. Whitt, supra; United States v. Sampol, supra*), unless the introduction of the government agent's testimony was harmless beyond a reasonable doubt. Since the agent's testimony was virtually the only evidence linking petitioner to the murder, its introduction could not have been harmless beyond a reasonable doubt. Therefore, petitioner's allegations, if proven true, entitle him to relief.

Nor is Claim I procedurally barred. *In re Clark, supra*, 5 Cal.4th 750, lays out the procedural requirements for *habeas corpus* applications. A claim which could have been brought on direct appeal but was not, will not normally be considered on collateral review. (*Id.* at 765; *People v. Dixon* (1953) 41 Cal.2d 756, 759.) A claim which was adjudicated on direct appeal, or on a previous application for *habeas corpus* relief, will not normally be entertained in a subsequent *habeas corpus* application. (*Clark, supra*, 5 Cal.4th at 765; *In re Waltreus* (1965) 62 Cal.2d 218, 225.) Further, a petitioner must "explain and justify any significant delay in seeking *habeas corpus* relief." (*Clark, supra*, at 765; *In re Swain* (1949) 34 Cal.2d 300, 302.) Petitioner can meet each of these requirements with respect to Claim I.

2.      Claim I could not have been brought on direct appeal.

Claim I relies on the revelations made by Leslie White and the subsequent investigation by the Los Angeles County Grand Jury. See ¶¶ 44-55, *ante*. White's revelations were made beginning in November of 1988, and were on-going for several months. (¶¶ 37, 44-48.) The Grand Jury report was issued in June of 1990. (¶ 38.)

56

EXHIBIT 3                                                                          100

Petitioner's conviction occurred in 1985. (¶ 6.) Obviously, none of the occurrences of 1989-90 could have been a part of the record of petitioner's trial. Therefore, the occurrences could not have formed the basis of any claim cognizable on direct appeal.

> 3.    Claim I was not raised, and could not have been, on petitioner's previous *habeas corpus* application.

Petitioner's previous *habeas corpus* petition, exhibit 6 (E32) to the instant petition, was filed by petitioner's father in the California Supreme Court on March 31, 1989. This was some fifteen months prior to the issuance of the Grand Jury's report. The evidence in support of claim I did not exist prior to this report. Although its contents were hinted at in various hearsay media accounts, these, as an evidentiary matter, could not have supported a *habeas corpus* application. ·

A claim that mentioned the informant scandal did appear in the previous petition. However, that claim alleged only that petitioner's father believed Robert Hughes' testimony at petitioner's trials to be "factually impossible," and therefore false. This claim was based entirely on Robert Lisker's account of the habits of the Lisker family dog. See pages 3-4 of Exhibit 6 (E36-E37), and the Declaration of Robert B. Lisker, attached as exhibit B to the previous petition (exhibit 6) (E61.) This argument in no way related to the constitutionality of the state's maintaining an instrumentality -- the Los Angeles County Jail informant module -- for the express purpose of violating the right to counsel of selected inmates whose cases needed "help," in the view of the prosecuting authorities.

Thus, claim I was not brought in petitioner's prior petition, and could not have been brought at the time that petition was filed.

57

EXHIBIT 3                                                                    101

4.    The delay in filing a petition containing Claim I is justified by the fact that petitioner was unable to obtain counsel prior to 1996, and thereafter successively retained two attorneys who promised they would prepare a *habeas corpus* petition for him, strung him along, then failed to produce any petition.

See paragraphs 56-71, and exhibit 45 and attachments (E619 - E718), *ante.*

Petitioner's trial counsel refused to participate in the Grand Jury's investigation of the use of jailhouse informants. Thus, petitioner was unable to learn who filled out the "special handling" card that must have been filled out before petitioner could be placed in the 7000 module of the County Jail. This card may still exist. Trial counsel merely forwarded the material he received from the District Attorney to petitioner's father. Petitioner was active in seeking a *pro bono* attorney to bring a *habeas corpus* action from mid-1989 on, but his efforts to find an attorney were unsuccessful. He did not learn of the availability of court-appointed counsel at no cost for defendants in jailhouse informant cases until after this program had been terminated.

Petitioner finally obtained the financial resources to challenge his conviction when his father died and bequeathed him a sum of money for this purpose. Petitioner successively hired two attorneys who accepted his money and falsely assured him that they were preparing a *habeas corpus* petition. Neither attorney ever prepared any petition during the four and one-half years of their successive representation.

Petitioner never "sat on his rights." At all times since his conviction, petitioner diligently sought to challenge its fairness. He realized that he did not have the legal knowledge necessary to prepare a *habeas corpus* petition, but despite his efforts, he was unable to find a lawyer who would represent him on a *pro bono* basis. With no funds,

EXHIBIT 3                                                                                    102

petitioner sought to learn what he would need to bring a *habeas corpus* petition on his own. He took and completed a paralegal course while in prison. He began drafting the Lisker Case Analysis, a two-volume, exhaustive review of all the evidence in his case (see p. 28, *ante*.) When money for an attorney finally became available to petitioner, he did everything in his power to hire an attorney who would prepare a *habeas corpus* application. Two different attorneys falsely promised to prepare such an application, accepted money from petitioner, and caused him to believe for many months that a *habeas corpus* petition was in the process of preparation, before it was revealed in each case that no petition had ever been prepared. Petitioner has been diligent, within the meaning of *Clark*, in his efforts to get the constitutional fairness of conviction before the courts. *Clark* states: "If a petitioner had reason to suspect a basis for *habeas corpus* relief was available, but did nothing to promptly confirm those suspicions, that failure must be justified." (5 Cal.4th at 775.) Petitioner had a reason to suspect that the emergence of the jailhouse informant scandal could provide a basis for him to prove constitutional deprivations in his own case. Far from doing "nothing" to confirm these suspicions, petitioner did everything in his power to find an attorney who could confirm his suspicions. He was frustrated first by a lack of resources and education, and then by the actions of two dishonest attorneys who led petitioner to believe that they were preparing a *habeas corpus* application when in fact they were not. *Clark* itself points out that a petitioner represented by counsel "has a right to assume that counsel is competent." (5 Cal.4th at 780.) These circumstances should be considered justification for any undue delay in bringing the instant petition.

59

EXHIBIT 3

103

5.   Exception to *Clark* timeliness standards in cases involving a "fundamental miscarriage of justice."

Even if a *habeas corpus* petition is deemed untimely, *Clark* provides that the petition will be heard on its merits if it alleges "facts which, if proven, would establish that a fundamental miscarriage of justice occurred as a result of proceedings leading to conviction and/or sentence." (5 Cal. 4th at 797.) As is pertinent in the present case, *Clark* defined a "fundamental miscarriage of justice" to have occurred in "any proceeding in which it can be demonstrated . . . that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted petitioner." (5 Cal. 4th, at 797.)

In support of claim I, petitioner has alleged the following facts: (1) The Los Angeles County Sheriff maintained a discrete area of the Los Angeles County Jail for inmates who were designated as informants; (2) the jailhouse informants were known to the jailers, and to law enforcement generally, to be skilled at eliciting or concocting "confessions" from other inmates to whom they had access; (3) the principle purpose of the informant module was to obtain statements from inmates in cases in which the evidence already obtained was considered weak or questionable by prosecutors or police; (4) informants housed in the informant module did not need instructions from law enforcement agents regarding the targeting of specific inmates -- any inmate housed in the module was fair game -- thus, the restrictions on eliciting statements in the absence of counsel enunciated in cases like *United States v. Henry, supra*, and *Massiah v. United States, supra*, could be evaded; (5) informants housed in the informant module understood that they could receive substantial benefits in their own cases if they delivered evidence considered of value to police and

60

EXHIBIT 3                                                    104

prosecutors and were therefore highly motivated to produce such evidence; (6) to place a particular inmate in the informant module, a "special handling card" had to be filled out by a law enforcement officer requesting this particular housing arrangement; (7) a special handling card was filled out requesting that petitioner be housed in the informant module, probably by Detective Monsue; (8) Detective Monsue arranged to house petitioner in the informant module despite having specific knowledge that such housing would be unlawful because petitioner was a juvenile and a standing order had been entered by the juvenile court requiring that petitioner be "retained in juvenile hall" during the proceedings against him; (9) Detective Monsue did this in the hope of obtaining "statements" from petitioner in direct violation of petitioner's right of counsel; and, (10) the effort to obtain "statements" from petitioner through unconstitutional means succeeded when Robert Hughes came forward.

The state's complicity in this illegal scheme is underscored in the present case by the violations of law committed by the police in arranging for petitioner to be housed in Module 7000, and thereafter permitting the adults housed in the same module contact with him.

The above-stated facts, if proven, would establish a fundamental miscarriage of justice within the meaning of *Clark*.[14]   Without Robert Hughes's testimony, the case

---

[14]   Indeed, facts 1 through 6 are probably already proven from the contents of the Grand Jury report, while facts 7-10 are reasonably inferable from facts 1-6. Further, it cannot be maintained that Monsue believed the case against petitioner was strong, given his false claim to the Board of Prison Terms that he had finally "solved" the mystery of what happened to the money in Dorka Lisker's purse. Monsue's willingness to lie about the evidence in the case 12 years after petitioner was convicted reasonably gives rise to the question of what Monsue was willing to do and say about the evidence prior to petitioner's
(continued...)

EXHIBIT 3                                                                                           105

against petitioner boiled down to the non-incriminating blood-spatter evidence and the

meaningless "inconsistencies" which Detective Monsue claimed to find in petitioner's

statement to him on the day of the murder. No reasonable jury would have convicted

petitioner on this evidence. This would be doubly true for a jury that heard the evidence

of third-party guilt that is outlined in argument II, *post*.

II.    PETITIONER RECEIVED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF
       COUNSEL BY REASON OF HIS COUNSEL'S FAILURE TO PRESENT
       EVIDENCE GIVEN HIM BY THE POLICE THAT DEMONSTRATED A HIGH
       PROBABILITY THAT A KNOWN THIRD PARTY MURDERED DORKA LISKER.

   A.    Petition (continued)

   93.    Attached to this petition as exhibit 23 (E400) is the Declaration (2) of Bruce

E. Lisker, dated September 20, 2002. The declaration describes petitioner's relationship

to an individual named John (aka "Mike") Ryan.

   94.    Attached to this petition as exhibit 24 (E405) is the Declaration (2) of Paul

Ingels, dated November 18, 2002. Mr. Ingels has served as petitioner's investigator for

several years. Among other matters, this declaration details Mr. Ingels' interview of Mike

Ryan's parents in 2000 and 2002.

   95.    Attached to this petition as exhibit 25 (E413) is the Declaration of John Ryan,

dated May 16, 2000. John Ryan is Mike Ryan's father.

   96.    Attached to this petition as exhibit 26 (E426) is the Declaration of Linda

Clelland, dated February 7, 2002. Linda Clelland is Mike Ryan's mother.

   97.    Petitioner, then aged 16, moved out of his parents' house in May, 1982.

---

[14](...continued)
trial.

62

EXHIBIT 3                                                                106

Petitioner met Michael Ryan at a drug treatment program in the fall of 1982. At petitioner's invitation, Ryan moved into petitioner's apartment. For a period of several months, petitioner and Ryan were roommates, until petitioner asked Ryan to leave. (Exhibit 23, ¶¶ 3-7) (E400 - E401.)

98.    According to his father, Mike Ryan had an extensive criminal record as a juvenile and as an adult for such offenses as burglary, breaking and entering, assault with a deadly weapon, and battery on a police officer. (Exhibit 25, ¶¶ 2) (E413.) Attached to exhibit 25 is a copy of a police report from the Sheriff's Department of St. Johns County, Florida, dated August 14, 1993. (E420 - E424.) The report describes an incident wherein a now-adult Mike Ryan threatens, and then attacks and bites, a police officer.

99.    During the period in which they lived together, petitioner and Mike Ryan often did odd jobs around petitioner's parents' home to earn money. Petitioner's mother recognized Mike as a friend of petitioner's, and would have opened the door to him anytime that he came calling. (Exhibit 23, ¶¶ 10, 14) (E401 - E402.)

100.    During the period in which they lived together, petitioner was aware from what Mike Ryan would tell him that Mike was perpetrating break-ins, burglaries, and petty thefts to obtain money. (Exhibit 23, ¶ 8) (E401.) Petitioner also spoke with Mike about how "rich" petitioner believed his parents to be. In particular, he mentioned his father's stamp collection, which petitioner believed was worth many thousands of dollars. On several occasions, Mike suggested that he and petitioner should break into the parents' home and steal valuable property. Petitioner rejected these suggestions.(Exhibit 23, ¶ 8) (E401.)

101.    Petitioner became aware that Mike Ryan had a fascination with knives. Petitioner knew this because Mike spent a great deal of time throwing a certain knife he

63

EXHIBIT 3                                                    107

owned into the wall of petitioner's apartment. He even threatened petitioner with the knife on at least one occasion. (Exhibit 23, ¶¶ 7 and 9) (E400 - E401.)

102.   In late December of 1982, petitioner asked Mike Ryan to move out of petitioner's apartment. At that point, as far as petitioner was told, Mike moved back to Mississippi to live with his father. (Exhibit 23, ¶ 7) (E400 - E401.)

103.   On March 6, 1983, Mike Ryan appeared at petitioner's apartment building and told him that he had been kicked out of a drug rehabilitation program in Gulfport, Mississippi. On that day petitioner and Mike spoke briefly. Petitioner would not allow Mike to resume living at petitioner's apartment. (Exhibit 23, ¶11) (E401.)

104.   Petitioner last saw Mike Ryan at about noon on March 8,1983, two days before petitioner's mother was murdered. Petitioner was driving northbound on Orion Avenue approaching Huston Street, where his parents' house was located. He saw Mike walking on Orion, in the same direction, about half a block from Huston. Mike told petitioner that he intended to hitch a ride to his mother's house in Thousand Oaks. Petitioner gave Mike a ride to a nearby freeway on-ramp. (Exhibit 23, ¶ 12) (E401 - E402.)

105.   After he was arrested and charged with his mother's murder, petitioner was informed by his father that Mike Ryan had come to his parents' house, alone, at about noon on March 9, 1983, one day before the murder. Mrs. Lisker admitted him to the home and Mike asked her if she had any work for him around the house, as he needed money. Mrs. Lisker told Mike she had no work for him at that time. That evening, she mentioned to Mr. Lisker that Mike had been to the house that day. (Exhibit 23, ¶ 13) (E402.)

106.   Petitioner realized that Mike was a logical suspect in the killing. He then wrote a letter asking investigating officer Monsue to come to Sylmar Juvenile Hall where

64

EXHIBIT 3                                                                 108

petitioner was then incarcerated so that petitioner could inform Monsue about the evidence concerning Mike as the killer of petitioner's mother.(Exhibit 23, ¶ 14) (E402.) This letter, dated March 30, 1983, is attached to this petition as exhibit 27. (E429.)

107.    On April 1, 1983, Monsue interviewed petitioner in response to his letter. Attached to this petition as exhibit 28 (E432) is petitioner's written *Miranda* waiver and five pages of handwritten notes by Monsue (E433 - E437.) The notes reflect that petitioner told Monsue: (1) that Mike Ryan had been petitioner's roommate for two months, during which he had "robbed houses and stolen guns"; (2) that Mike was a violent person who had pulled knives on people, including petitioner; (3) the names and phone numbers of several people, including a counselor at the Palmer Drug Abuse Program, who were familiar with Mike's penchant for violent behavior; (4) that Mike was one of only two of petitioner's friends in Van Nuys who knew where his parents lived; and (5) that Mike had been to petitioner's home the day before petitioner's mother was murdered.

108.    Detective Monsue began an investigation into the activities and whereabouts of Mike Ryan at the time of the murder of Dorka Lisker. On April 12, 1983, he telephoned Mike's mother (then named Linda Cohen; now Linda Clelland). Monsue's two-page, handwritten report of his interview of Cohen is attached to this petition as exhibit 29. (E439.) Cohen told Monsue that Mike had left California in early February, 1983, to live with his father, John Ryan, in Mississippi. She received a call from Mike on April 7th in which he told her he was having problems with his father, and was going to leave him.[16]

---

[15]    Although Monsue's report states that Mrs. Cohen received this call on April 7th, an "office memorandum" with Monsue's name on it states, in Monsue's handwriting, that the call in question was received by Mrs. Cohen on March 7th, not April 7th. A copy of this
(continued...)

65

EXHIBIT 3                                                    109

After she did not hear from Mike in several days, she made several telephone calls trying to find him. One of her calls was to Robert Lisker, petitioner's father. Lisker told her about the murder of his wife and that Mike had been to his house the day before the murder and had spoken to Mrs. Lisker. Cohen also called the First Baptist Church in Van Nuys, because she had previously advised Mike to go there if he needed help. One of the ministers told her that Mike had come by the church at some point seeking food and housing, but was no longer there. Cohen told Monsue that she believed that Mike was back in Mississippi staying with friends.

109.  Monsue then called Mike's father, John Ryan, in Gulfport, Mississippi. A copy of Monsue's two-page, handwritten report of his interview of Ryan is attached to this petition as exhibit 31. (E444.) Ryan advised Monsue that Mike had left Mississippi on a Greyhound Bus for California on March 6, 1983. Ryan stated that he had gotten Mike "out of jail" and had bought his ticket to California. Mike had $50.00 cash on him when the bus left Mississippi. Ryan informed Monsue that Mike currently had a warrant for his arrest issued in Houston, Texas, for stealing his uncle's (John's brother's) car and $200. Ryan told Monsue that he would attempt to locate Mike and, if he did, he would call the County Sheriff (Harrison County, Mississippi), since he was afraid of Mike and did not want to confront him personally.

110.  On April 19, 1983, Harrison County Sheriff's Detective J.W. Langford called Monsue's partner, LAPD Detective Landgren and advised him that he had interviewed

---

[15](...continued)
office memorandum is attached to this petition as exhibit 30. (E442.) The March 7th date is almost certainly the correct one.

66

EXHIBIT 3                                                                                              110

Mike Ryan, who was in custody in Harrison County for attempted burglary. A copy of Landgren's two-page handwritten report of the phone call from Detective Langford is attached to this petition as exhibit 32 (E447.) Detective Langford's report of his interview with Mike Ryan on April 18th is attached as exhibit 33. (E450.) Mike Ryan told Langford that he left Mississippi for California by Trailways Bus on March 4, 1983. He arrived in Los Angeles on March 6th. He went to petitioner's apartment, but petitioner was not there. Petitioner arrived later on and they talked. Mike spent the night in the carport at petitioner's apartment complex, due to his familiarity with the building and location. The next day, Monday, March 7th, Mike again talked to petitioner for awhile; he then went to the Galleria and stayed there all day. On Tuesday, March 8, Mike went to the "Galvery Mall"[16] and stayed there all day. On Wednesday, March 9th, Mike went to the Lisker residence at about noon to ask if any work was available for him, to get some water, and to "use the phone." Mrs. Lisker told him that she had no work for him, and that she had to leave for an appointment. That night Mike returned to the carport at petitioner's apartment complex where he had "been staying." His clothes had been moved and he was questioned by a tenant of the building regarding his presence in the carport. Mike stayed all night on the streets.

111. On March 10th, the day of the murder, Mike left the Valley and went to Hollywood, where he checked into a motel on Hollywood Boulevard at about 10:00 a.m. The room cost $21.00 dollars a night, with a $5.00 key deposit. He registered under the name "Mark Smith." He then bought $5.00 dollars worth of marijuana and attempted to sell

---

[16] The "Galvery Mall" is probably the same as the Sherman Oaks Galleria, a mall less than three blocks from the Lisker residence.

EXHIBIT 3                                                                                    111

it on the streets. He encountered a "black guy" who was upset that Mike was selling drugs outside the guy's business. Words were exchanged and the man and Mike pulled knives on each other. Mike stabbed the man in the shoulder and then fled back to his motel room. (Exhibits 32 and 33) (E447 - E448, E450 - E452.)

112. On Friday morning, March 11th, Mike went to Trailways and purchased a ticket for Phoenix, Arizona with his last $23.00. He hitchhiked from Phoenix back to Mississippi. He stated that he had begun his latest trip to California with approximately $52.00. On the trip to California, he only spent money for a beer, a sandwich, and some cigarettes. Once in California, he spent $21.00 for the motel room, $5.00 dollars for the key deposit, $5.00 dollars for the marijuana, and $21.00 or $23.00 dollars for the bus ticket to Phoenix. (Exhibits 32 and 33) (E447 - E452.)

113. On May 4, 1983, Detective Monsue traveled to Gulfport, Mississippi and conducted a tape-recorded interview with Mike Ryan. A 42-page transcript of that interview is attached to this petition as exhibit 34 (E453.) A written *Miranda* waiver executed by Mike prior to the interview is attached as exhibit 35 (E497.) In this interview, Monsue asked Mike to account for the time he spent in California during the period from March 6th, when he arrived, and March 11th, when he left. Mike stated that he left Mississippi by bus with "$52.00 and some change." (Exhibit 34, p. 9) (E462.)   He bought some cigarettes and potato chips while en route. (Exhibit 34, pp. 11, 16) (E464, E469.) He arrived in downtown Los Angeles at about 11:00 p.m., and then took city buses -- and a taxi -- to get to petitioner's apartment building in Van Nuys. (Exhibit 34, pp. 3-5) (E456 - E458.) He smoked a marijuana cigarette with petitioner, but did not want to ask whether he could resume living in petitioner's apartment because his relationship with petitioner had soured.

EXHIBIT 3                                                                                      112

(Exhibit 34, pp. 5, 37-40) (E458, E490 - E493.) He spent the rest of that night in the carport of a nearby apartment building. (Exhibit 34, pp. 3-5) (E456 - E458.)

114.    On Tuesday, March 8th, Mike said he planned to hitchhike to Thousand Oaks to see his mother. He happened to see petitioner driving, and he "waived [sic] him down, and he picked me up and he dropped me to the on-ramp." (Exhibit 34, pp. 6, 10) (E459, E463.) After getting to the on-ramp, he changed his mind about hitchhiking to Thousand Oaks, and he spent the day at the Galleria. (Exhibit 34, p. 6) (E459.) He spent that night in the same carport. (Exhibit 34, p. 7) (E460.)

115.    On Wednesday morning, March 9th, Mike was confronted in the carport by a woman. He left the carport and spent the morning at the Galleria. (Exhibit 34, p. 7) (E460.) He then "stopped by Mrs. Lisker's house to use her phone and to see how she was." He asked her to use the bathroom, and for a drink of water. He asked if she had any work for him, but she told him she did not. They chatted for about 20 minutes before Mike left and returned to the Galleria. (Exhibit 34, pp. 7, 14) (E460, E467.) When he returned to the carport he had been sleeping in, his clothes were missing. (Exhibit 34, p. 8) (E461.) He took a bus "toward Hollywood," and wound up sleeping in the woods in either Laurel Canyon or Coldwater Canyon. (Exhibit 34, pp. 8, 21, 26, 36) (E461, E474, E479, E489.)

116.    On the morning of Thursday, March 10th, Mike got up and walked from Laurel Canyon or Coldwater Canyon to the Hollywood area, arriving "real early" on Thursday morning. (Exhibit 34, pp. 8, 26) (E461, E479.) He checked into a motel in Hollywood "about 11 o'clock in the morning." (Exhibit 34, p. 8) (E461.) He paid $21.00 for the room, plus a $5.00 key deposit. (Exhibit 34, p. 8) (E461.) He then went out and bought $5.00

69

EXHIBIT 3                                                                                          113

worth of marijuana from a "Mexican guy." (Exhibit 34, p. 8) (E461.)  He sold a couple of marijuana cigarettes, but didn't want to sell any more.  Then a "black guy" approached him wanting to buy marijuana. When Mike refused to sell him any, the man pulled out a knife and attempted to rob Mike of his money and marijuana.  Mike pulled out a knife of his own and attacked the man first, stabbing him in the right shoulder.  He then ran back to his motel room and went to sleep. (Exhibit 34, pp. 8-9) (E461 - E462.)

117.   On Friday morning, March 11th, Mike went to the Trailways bus station and, using all his remaining money, about $21.00 or $22.00, purchased a bus ticket to Phoenix, Arizona.  From Phoenix, he hitchhiked back to Mississippi. (Exhibit 34, p. 9) (E462.)

118.   After Mike finished giving Detective Monsue the above account of his activities in California, the following colloquy occurred:

> "MONSUE: See, the other problem you got here, is that you
> say you tell me you checked into the motel on Thursday
> morning around 11:00 o'clock.  Well, that's bullshit.  I went to
> the motel. You checked in at 3:00 o'clock in the afternoon.[17]
> "RYAN: Then it was somewhere around 3. I don't remember.
> "MONSUE: Yea, you see, that's what I'm saying.  You conveniently not
> remembering what's important.
> "RYAN: Well that.
> "MONSUE: You better get your story together Michael."

---

[17]    The transcript of the interview does not identify the motel.  However, the chronological record from the police "murder book" shows that the motel in question was the "Hollywood Tropica," located at 5200 Hollywood Boulevard. This page from the murder book is attached to this petition as Exhibit 42.

EXHIBIT 3                                                                                            114

(Exhibit 34, p. 13) (E466.)[18]

119.    Detective Monsue also informed Mike that he was aware that Mike had checked into the motel under a false name: "Mark Smith." (Exhibit 34, pp. 21-22, 25, 32-33) (E474 - E475, E478, E485 - E486.) He asked Mike why he used a false name:

> "MONSUE: Why did you use the name of Mark Smith when you checked in the hotel? You had to give your mother's address.
>
> "RYAN: Just after the incident. I was scared. The incident with that colored guy.
>
> "MONSUE: That happened after you checked into the motel.
>
> "RYAN: I don't know. Never give . . . Well, one, another reason is that, is that a, your not [sic], you have to be 18 to get into a motel. My ID said I was only 16. I didn't show my ID."

120.    Later in the interview, Mike admitted that he gave the false name to the motel clerk **before** he was asked for his identification. (Exhibit 34, p. 33) (E486.)[19]

121.    At various points during the interview, Monsue expressed skepticism at Mike's claim that he financed his trip to California, and then back to Mississippi, on only $52.00. (Exhibit 34, pp. 9-11, 16-17, 29-30, 33) (E462 - E464, E469 - E470, E482 - E483, E486.) One such exchange was the following:

---

[18]    Dorka Lisker was attacked at about 11:00 a.m. Petitioner's call to the paramedics was received at 11:28 a.m. (See page 5, *ante*.)

[19]    A copy of the registration form filled out by "Mark Smith" is attached to this petition as Exhibit 36 (E499.)

71

EXHIBIT 3                                              115