1  **CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
   **GARY G. GEUSS**, Chief Assistant City Attorney
2  **CORY BRENTE**, Assistant City Attorney
   **AMY FIELD**, Deputy City Attorney - SBN 143827
3  **CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney **-SBN 192872**
   christian.bojorquez@lacity.org
4  amy.field@lacity.org
   200 North Main Street, 6th Floor, City Hall East
5  Los Angeles, CA  90012
   Phone No.: (213) 978-6900, Fax No.: (213) 978-8785
6
7  *Attorneys for Defendants* CITY OF LOS ANGELES, a municipal corporation, also
   named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW
   MONSUE and HOWARD LANDGREN
8

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11  BRUCE E. LISKER,                    )  CASE NO.: CV09-09374 AHM (AJWx)
                                        )  [*The Hon. A. Howard Matz, Courtroom 14*]
12                                      )
                                        )  **EXHIBIT 3 B-2 IN SUPPORT OF**
13                 Plaintiff,           )  **DEFENDANTS' REQUEST FOR**
                                        )  **JUDICIAL NOTICE IN SUPPORT OF**
14                                      )  **NOTICE OF MOTION AND MOTION**
                                        )  **FOR SUMMARY JUDGMENT OR IN**
15          vs.                         )  **THE ALTERNATIVE PARTIAL**
                                        )  **SUMMARY ADJUDICATION OF THE**
16                                      )  **ISSUES**
                                        )
17                                      )  **[Filed/Lodged Concurrently Herewith: (1) Notice of**
                                        )  **Motion and Motion for Summary Judgment, etc.; (2)**
18  CITY OF LOS ANGELES et al.,         )  **Statement of Uncontrovered Facts and Conclusions of**
                                        )  **Law; (3) Declarations; (4) Request for Judicial**
19                                      )  **Notice;  and (5) (Proposed) Judgment/Order]**
                                        )
20                 Defendants          )  Date:        **July 25,** 2011
    _____)  Time: 10:00 a.m.
21  ___                                    Courtroom:  14
22
23
24
25
26
27
28

1

"MONSUE: The problem the other problem that you have is that your money doesn't jive. $52 does not add up. O.K. Let me tell you why. You spent $21.50 for the hotel room and you put a $5 deposit down. You say you spent $5 on marijuana. O.K. That is $41, and you bought a bus ticket that was worth $22. That is already up over $60, and you claim you only had $52.

"RYAN: Well I got $5 on my deposit plus I netted change from the pot I had and . . .

"MONSUE: Plus you ate some potato chips and bought a pack of cigarettes which accounts for about $4 or $5.

"RYAN: For a pack of cigarettes and potato chips.

"MONSUE: They are a buck and a quarter, Michael.

"RYAN: I ain't lying to you. I did not harm" [ends in mid-sentence].

(Exhibit 34, p. 11) (E464.)   In a subsequent exchange, Monsue told Mike that an explanation of his finances was crucial because the money Dorka Lisker was known to have had on the day she was killed was never found:

"MONSUE: Let's assume that the biggest problem that I have is that you have spent more money than you claim to have had. Fifty-two dollars just does not stretch that long. Cause if you only take the bus ticket, the hotel bill, and the five dollars that you paid for the marijuana, that's forty-nine dollars.

"RYAN: O.K. How much money was supposed to be ripped off

72

EXHIBIT 3                                                                                           116

from Mrs. Lisker?

"MONSUE: Well, I know that Mr. Lisker gave her on Wednesday afternoon, Wednesday night, $150 to buy groceries with on Thursday.

"RYAN: Don't you think that if I would have anything to do with that, I would have been gone that same day, and I would have, I would have.

"MONSUE: Well, that very thing entered my mind and that is why I wondered why you decided to go to Hollywood, all of a sudden. Because you don't normally go to Hollywood to buy your dope, to score or do anything of that type of stuff. You're always a Valleyite. You've been a Valleyite, as far as I know, all the time. The only reason that I can think of you leaving town like that is because you were concerned about something. That's what I think. It struck me odd that we have Mrs. Lisker being killed and you deciding that same day to end up in Hollywood in a hotel."

(Exhibit 34, p. 30) (E483.) Later in the interview, Monsue reiterates: "The money is a big inconsistency. O.K. Since I know that there was money missing at the house, O.K. The other thing is, why that particular day you decided to leave the Valley and go to Hollywood and check into a motel and the following day you leave town. Because I know that you left Mississippi because your old man was not going to put up with your bullshit any more." (Exhibit 34, p. 33) (E486.)

73

EXHIBIT 3                                                                117

122.    Monsue asked Mike about the theft of his uncle's car and money in Houston. Mike replied that after he got back from Mississippi, his father sent him to Houston to live with his uncle. One night Mike got extremely drunk and took his uncle's car and "stashed" it in Gulfport. As for the stolen money, Mike explained, "the money wasn't all my uncle's. Half of it was mine." (Exhibit 34, pp.34-35) (E487 - E488.)

123.    Near the end of the interview, Monsue questioned Mike about petitioner's allegation that while Mike lived with him, he supported himself through burglaries. Mike admitted committing one burglary ("the people that live behind us, I went into the shed and took some power tools and sold them"), but denied he had ever stolen anything else. (Exhibit 34, p. 40) (E493.)  Mike also admitted that he repeatedly threw a knife into a door in petitioner's apartment, though he sought to minimize any inference that he had a "fascination" with knives: "John came back. John found a knife. I don't know what it was, it was like a hand made knife or something like that. I went down, sitting there, and I was throwing the knife and I stuck it in the wall. And I sat there and I, not the wall, the door, and I sat there and I kept throwing it at the door and that was about it." (Exhibit 34, pp. 22-23) (E475 - E476.)

124.    In his declaration, Exhibit 25 (E413), Mike's father recalled that Mike returned to Gulfport, Mississippi from California a few days after he left Mississippi for California in early March of 1983.  John Ryan received a call from Mike asking John to pick him up at the Gulfport bus depot. When John picked up Mike at the bus depot, "Mike had a tote bag with him and about $60.00 in cash." (Exhibit 25, ¶¶ 9-10) (E414 - E415.)  John Ryan's declaration also notes that Mike had a fascination with knives, and lied about this when interviewed by Detective Monsue (Exhibit 25, ¶¶ 4, 10) (E413 - E415.)  According to John

74

EXHIBIT 3                                                    118

Ryan, "Mike first started breaking into houses to steal things when he was nine years old. He was arrested numerous times as a juvenile. Mike threatened to kill both me and my wife." (Exhibit 25, ¶¶ 2, 8) (E413 - E414.) Ryan's declaration concludes: "I read in the transcript of Detective Monsue's interview with Mike that Mike lied about his whereabouts at the time of the murder. I do not know if Mike was involved in the Dorka Lisker homicide but there is no doubt in my mind that he was absolutely capable of it." (Exhibit 25, ¶ 12) (E415.)

125.   After petitioner's arrest, the police lifted a latent fingerprint from a piece of pink paper that had been in Dorka Lisker's purse. See Los Angeles Police Department analyzed evidence report dated March 14, 1983, attached to this petition as Exhibit 40. (E521.) The print was not petitioner's, nor was it Dorka Lisker's. See LAPD Scientific Investigation Division report dated March 16, 1983, attached as Exhibit 41. (E523.) No effort was made by the prosecution to learn the identity of the person leaving this print, and defense counsel similarly failed to perform any followup investigation regarding the print.

126.   In 1983 Linda Clelland, Mike Ryan's mother, had the telephone number 805-492-8976. See Exhibit 24, ¶ 11. (E409 - E410.) She has the same telephone number today. A copy of the telephone bill for the Lisker residence for the dates March 3rd through March 14th, 1983, is attached to this petition as Exhibit 64. (E854.) The bill indicates, consistent with petitioner's statement to Detective Monsue, a call from petitioner's residence to his father's law office in Hollywood at 11:28 a.m. on March 10th, the day of the murder of petitioner's mother. The phone bill also indicates that at 10:22 a.m. of the same day, a call was placed from the Lisker residence to the following phone number: 213-492-8972. Aside from the area codes, the number dialed from the Lisker residence has only

75

EXHIBIT 3                                                                                    119

one digit which differs from the phone number of Mike Ryan's mother. The telephone bill further indicates that the 10:22 a.m. call from the Lisker's residence terminated within one minute, suggesting an immediate hangup. These facts support an inference that Mike Ryan was in the Lisker home at the time Dorka Lisker was killed, and attempted a panic-stricken telephone call to his mother's house. Linda Clelland has told petitioner's investigator that she never received a telephone call from Dorka Lisker and doesn't believe that Dorka even had her phone number. See Exhibit 24, ¶ 11. (E409 - E410.)

127. On May 7, 1986, John Michael Ryan assaulted, kidnaped and robbed a woman, Shirley Glade, in San Francisco. On August 7, 1986, Ryan pled guilty to robbery, assault with a deadly weapon (a knife), and kidnaping. Attached to this petition as Exhibit 62 (E836) are certified copies of the complaint, the plea proceeding, and the first page of Mike Ryan's probation report. The probation report establishes that the defendant's mother was Linda Clelland of Thousand Oaks. (E849.). The victim in the case, Ms. Glade, submitted a declaration to petitioner describing the crime. In essence, Mike Ryan attempted to rob Glade using a large knife. When she resisted, he chased and attacked her with the knife, pinning her to the ground and plunging down at her with the weapon. Glade believed that Ryan was trying to kill her with his knife. Ms. Glade's declaration is attached as Exhibit 63 (E851) to this petition.

## B. Applicable Law

Under both the Sixth Amendment to the United States Constitution and Article I, §15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. *Strickland v. Washington* (1984) 466 U.S. 668, 684-686; *People v. Pope* (1979)

76

EXHIBIT 3                                                                                              120

23 Cal.3d 412, 422. The purpose of this right is the protection of the defendant's fundamental entitlement to a trial that is both fair in its conduct and reliable in its result. *Strickland, supra*, at pp.684-688.

The right to assistance of counsel "entitles the defendant not to some bare assistance but rather to **effective** assistance. Specifically, it entitles him to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215) (emphasis in original; citations and internal quotation marks omitted.) Among the requirements for constitutionally effective assistance is that counsel, before undertaking to act or not to act, must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation. (*In re Fields* (1990) 51 Cal.3d 1063, 1069; *Ledesma, supra*, at p.215.)

The right to competent counsel extends to the appellate process. (*Evitts v. Lucey* (1985) 469 U.S. 387; *People v. Smith* (1970) 3 Cal.3d 192, 202-203; *People v. Harris* (1993) 19 Cal.App.4th 709, 713-714.) Appellate counsel who fails to raise crucial assignments of error on behalf of his client deprives that client of effective assistance of appellate counsel. (*Smith, supra* at pp. 202-203.)

To be entitled to reversal of a conviction on grounds of constitutionally ineffective assistance of counsel, a defendant must establish: 1) that his counsel's performance was deficient, that is, that the representation fell below an objective standard of reasonableness; and, 2) that the deficient performance prejudiced the defendant. (*Strickland v. Washington, supra*, 466 U.S. at 687-688, 693-694.) Prejudice is shown by establishing a reasonable probability that, but for counsel's deficient performance, the

77

EXHIBIT 3

121

result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. *Strickland, supra*, at pp. 693-694; *In re Marquez* (1992) 1 Cal.4th 584, 603. Such a probability does not require a showing that "counsel's conduct more likely than not altered the outcome in the case." (*Strickland, supra; In re Cordero* (1988) 46 Cal.3d 161, 180.)

In evaluating counsel's performance, reviewing courts accord a good deal of deference to counsel's tactical decisions in order to avoid second-guessing those decisions and perhaps "chilling vigorous advocacy by tempting counsel to defend himself or herself against a claim of ineffective assistance after trial rather than to defend his or her client against criminal charges at trial." (*In re Avena* (1996) 12 Cal.4th 694, 722) (citations and internal quotation marks omitted.) However, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. Deference is not abdication; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance." (*In re Jones* (1996) 13 Cal.4th 552, 561-562 (quoting *People v. Ledesma, supra,* 43 Cal.3d at 217.)

## C.    Trial Counsel's Performance Was Deficient.

### 1.    The prosecution's preemptive motion.

Prior to the start of petitioner's first trial, the prosecution moved to exclude any reference by the defense to evidence connecting Mike Ryan to the murder of petitioner's mother. Defense counsel opposed the motion. No written motions appear to have been

78

EXHIBIT 3                                                                          122

filed by either side.  The reporter's transcript (RT Augmentation, pp. 389-399) of the argument on the motion and the court's ruling is attached to this petition as Exhibit 37. (E501.) Defense counsel, Dennis Mulcahy, stated that he had been supplied a tape of the May 4, 1983, interview of Mike Ryan, which he had transcribed. (Exhibit 37, p. 390) (E504.)      '

Mulcahy described the content of the tape to the court:

> "Ryan never admitted to being involved. Never admitted having anything to do with this incident. But in reading this one is under the distinct impression that Monsue at least believes it is impossible for Ryan's story to fit that he had left the next day and how he got to where he got with just the money. He could be placed at the location.    He can be placed in the neighborhood of the location.  He can be placed having some problems with Dorka Lisker.  He can be placed the day before [sic] by his own statements."

(Exhibit 37, p. 391) (E505.)  Later in his argument, Mulcahy told the court: "There is this missing money and it is not on Bruce and Bruce is still there." (Exhibit 37, p. 393) (E507.)

The prosecutor responded as follows:

> "I just want to respond to his argument and that is, first of all, the case against Bruce Lisker is one thing which happens to have a lot more facts than counsel has just mentioned. The court heard the tape [of Detective Monsue's interview of petitioner, March 10, 1983, Exhibit 8 (E70) to the instant petition].

79

EXHIBIT 3                                                                                      123

> "There is quite a bit of evidence against Mr. Lisker. The point
> really is what evidence is there at all that would point to Ryan,
> and there is none, zero.
>
> "When he says 'opportunity' anybody in the county of Los
> Angeles theoretically had the opportunity . . . What it does, and
> I recognize why he wants to do it, is to put a red herring in it
> which puts me in the position where I might have to explain
> because the jury might start speculating, and I might have to
> explain something that I otherwise wouldn't have to bring into
> the case."

(Exhibit 37, pp. 395-396) (E509 - E510.)  The prosecutor, Phillip Rabichow, cited two
cases, *People v. Arline* (1970) 13 Cal.App.3d 200, and *People v. Perry* (1980) 104
Cal.App.3d 268, which he claimed supported his argument that the evidence regarding
Mike Ryan should be excluded. (Exhibit 37, p. 393) (E507.)

Before ruling, the trial court said to Mr. Mulcahy: "I got the impression the evidence
is the tape that the prosecution gave you.  Is there any other evidence?" (Exhibit 37, p.
397.)  Mulcahy responded: "Nothing that I can think of at this particular time.  If anything
came up subsequently, I would ask to address the court." (Exhibit 37, p. 398) (E512.)

The court then granted the prosecution's motion to exclude the Mike Ryan evidence,
citing Evidence Code §352:

> "I can remember in the 60's in the early practice of my law
> where I have seen, not in cases that I had, where the defense
> put people on the stand who were just in the neighborhood and

80

EXHIBIT 3                                                          124

> they were used as a possible alternative to the defendant
>
> being guilty. That by these cases submitted by you and Mr.
>
> Rabichow is not admissible."

(Exhibit 37, p. 398) (E512.)

Following the mistrial declared in petitioner's first trial, and the "unamenable" finding issued by the California Youth Authority, a second trial was calendared. The trial court agreed to revisit its previous rulings regarding admissibility of evidence. On October 23, 1985, the court, presented with no additional evidence, again excluded the Mike Ryan evidence:

> "As to Ryan, I reread those cases again and even though the
>
> dissent in *Perry* provides that the court should have allowed
>
> that evidence in, that evidence was certainly a lot more
>
> persuasive and a lot more important on an identity issue in
>
> *Perry* and is not admissible in this case. I think I have to keep
>
> it out."

(RT 12.) A copy of this page is attached to this petition as Exhibit 38. (E516.) The minute order for October 23, 1985, is attached as Exhibit 39. (E519.)

2.    Defense counsel's performance was deficient.

Defense counsel Mulcahy opposed the prosecutor's motion to exclude evidence concerning Mike Ryan by arguing to the court that Mike could be "placed at the scene" the day before the murder, and that the $150.00 Dorka Lisker had was never found. Mulcahy apparently never contacted John Ryan, because he made no mention of the fact that Mike arrived in Mississippi with about $60.00, something Mulcahy could have learned with a

81

EXHIBIT 3                                        125

simple phone call. Further, Mulcahy neglected to inform the court of the four most significantly incriminating pieces of evidence to come from Detective Monsue's interview of Mike Ryan:

a.    Mike **lied** to Monsue about the time he checked into the motel in Hollywood on the day of the murder. Mike claimed that he checked in at 11:00 a.m., a claim which, if believed, would have supplied him with an alibi for the timeframe in which the murder took place. This lie was highly significant; if Mike had nothing to do with the murder, how would he know that the timing of his check-in at the motel would be crucial to establishing his hoped-for alibi? The interview with Monsue established that Mike did not stay in motels under normal circumstances. He slept in carports and, on the night before the murder, in "Coldwater or Laurel Canyon." Monsue himself noted the incongruity. Yet, by his own admission, Mike not only checked into a distant motel on the same day as the murder of Dorka Lisker, he lied about his check-in time in such a way as to clear himself of any suspicion that he could have committed the murder. This lie cannot be reconciled with any claim that Mike knew nothing of the murder.

b.    Mike checked into the motel under a **false name,** "Mark Smith." When asked by Monsue why he did this, Mike gave

82

EXHIBIT 3                                                                          126

conflicting and irrational explanations.

c.  The time Mike **actually** checked into the motel, 3:00 p.m.,
would have afforded him ample time to have committed the
murder that morning and then made his way to Hollywood.

d.  Mike left the San Fernando Valley on the day of the murder.
He left California altogether on the day after the murder,
although he had been in the state for less than five days at that
point.

In addition to the above points, Mulcahy's argument to the trial court failed to explain
that the interview of Ryan established he could not have engaged in the activities he
claimed without some additional source of money beyond that which he acknowledged.
Mulcahy pointed out that the $150.00 dollars given to Dorka Lisker the day before her
death had never been accounted for; however, he never explained to the court how this
fact neatly dovetailed with Ryan's sudden ability to check into a motel on the day of the
murder, and buy a bus ticket out of town on the following day.  Further, Mulcahy's
argument never made clear that Mike's desperation for money was the **reason** he had
contacted Dorka Lisker on the day prior to the murder.  Finally, Mulcahy, as a result of his
inept or non-existent investigation, was not able to inform the court that Mike's story to
Monsue that he was only able to afford a bus ticket to Phoenix, not all the way to
Mississippi, was false.  Mike had not only ridden all the way back to Mississippi, but he had
about $60.00 **left over.**  This lie was nearly as important as the lie Mike told Monsue
regarding his whereabouts at the time of the murder of Dorka Lisker and disappearance

83

EXHIBIT 3                                                                                    127

of the $150.00 from her purse. Mike clearly understood from Monsue that the amount of money he had on the day after the murder, when he bought a bus ticket out of town, was a crucial issue. Mike lied, stating he only had enough for a ticket as far as Phoenix, and then had to hitchhike to Mississippi. The only possible reason for such a lie was to give Monsue the impression that Mike had much less money on the day of the murder than he actually had. This lie, like the lie concerning the time he checked in the motel, overwhelmingly indicated a consciousness of guilt on Mike Ryan's part. Certainly, any competent attorney opposing the prosecution's motion to exclude would have brought these facts and their obvious implications to the attention of the trial court. Mulcahy did not.

To the extent that Mulcahy was ignorant of the facts he could have learned from a phone call to Mike's father, this ignorance stems from his own failure to conduct even minimal investigation.[20] More startling is Mulcahy's inept failure to even cite any of the most incriminating evidence contained in the transcript of the Mike Ryan interview, a transcript Mulcahy states on the record was the basis of his opposition to the prosecutor's motion to exclude. This failure allowed the prosecutor to claim, successfully, that Mike was a "red herring" against whom there was no more evidence than "anybody in the County of Los Angeles." When the trial court **directly asked** Mulcahy if he had "any other evidence" Mulcahy responded that he could think of none.

Mulcahy's incompetent response to the prosecutor's motion to exclude the Mike Ryan evidence permitted the prosecutor to succeed in claiming that there was "zero

---

[20]   Mulcahy was even supplied John Ryan's telephone number by police. (See Exhibit 31, p. 1) (E444.)

84

EXHIBIT 3                                            128

evidence, none" pointing to Mike Ryan as the perpetrator of the murder. The trial court
ruled on the prosecutor's motion in the belief that nothing suggested Ryan's guilt beyond
the fact that he "was in the neighborhood the day before." (RT 10.)

After the mistrial, when an opportunity to relitigate the motion arose, Mulcahy again
allowed the court to rule without citing the incriminating lies Mike told to Detective Monsue.
The court's remarks upon again excluding the Mike Ryan evidence made it plain that the
court believed this evidence consisted of nothing more than the fact that Mike had been
in the neighborhood the day before the murder. (RT 1-10.) The court cannot be blamed
for this; the fault is entirely Mulcahy's.

Mulcahy's failure to investigate the unidentified fingerprint found on a piece of paper
in Dorka Lisker's purse is similarly baffling. A simple subpoena directed to the juvenile
detention center in Gulfport would have produced Mike Ryan's fingerprints. If the print
were not Ryan's, this would have had no effect on the defense case -- his client had been
eliminated as its source. On the other hand, if the print did originate with Ryan, this fact,
coupled with the other evidence against him, would have constituted virtual proof of his
guilt. Mulcahy could have had no tactical reason to forego investigation of the fingerprint.

Further, Mulcahy never presented evidence of the mysterious telephone call placed
from the Lisker home at about the time of the murder of Dorka Lisker. (¶ 120, *ante*.)
Considered in light of the rest of the incriminating evidence concerning Mike Ryan that
Mulcahy failed to present, this phone call was yet a further reason to strongly suspect that
Ryan was the murderer.

These egregious omissions cumulatively amount to constitutionally deficient
performance by any standard.

85

EXHIBIT 3                                                                                           129

3.   Counsel's deficient performance prejudiced petitioner within the meaning of *Strickland.*

Under the law in effect at the time of petitioner's trials, the admission of evidence of third-party culpability was subject to broad trial court discretion. The parameters of this discretion were described by the California Supreme Court in *People v. Mendez* (1923) 193 Cal. 39:

> "It is always proper to show that some other person and not the defendant committed the crime with which he is charged. The question herein is what kind and quality of evidence is essential to that end . . . It seems clear that a defendant, in order to exculpate himself, should not be required to establish the guilt of a third person with the degree of certainty requisite to sustain a conviction of the latter. On the other hand, it seems equally clear that evidence which simply affords a possible ground of possible suspicion against another person should be inadmissible."

(*People v. Mendez, supra,* 193 Cal. at 51-52) (internal quotation marks omitted.) In the years following *Mendez,* trial courts were vested with wide discretion in determining whether proffered third-party culpability evidence could go before the jury, or whether the evidence merely afforded a "possible ground of possible suspicion" that the third party was the guilty one, and should therefore be excluded.[21]

---

[21]   In the year following petitioner's second trial, the Supreme Court ended this confusion by declaring that any third party-culpability evidence sufficient to raise a
(continued...)

86

EXHIBIT 3                                                                                        130

In the cases cited by the prosecutor in the present matter, *People v. Arline, supra*, and *People v. Perry, supra*, the excluded third-party evidence was far weaker than the evidence that should have been presented to the trial court by Mr. Mulcahy. In *Arline*, the defendant was charged with robbing a gas station in Fresno using a gun and two accomplices. The defendant proffered evidence that a third party, Gordon, whose appearance was purportedly similar to Arline's, had robbed a gas station in Fresno two months after the robbery with which Arline was charged. Further, according to Arline's offer of proof, the modus operandi of this subsequent robbery was similar to the one employed in the charged crime. Finally, Gordon was present in Fresno on the date of the charged robbery, and therefore "could have" committed it. (*People v. Arline, supra*, 13 Cal.App.3d at 203.)

In the hearing to determine whether Arline's proffered third-party evidence would be admitted, the trial court concluded there was not "the slightest resemblance" between Arline and Gordon, and that the modus operandi of the uncharged robbery was entirely different from the one Arline was charged with (the uncharged robbery involved a knife, not a gun, and no accomplices). (*Arline, supra*, 13 Cal.App.3d at 203.) Thus, all that was left was that Gordon was in Fresno at the time of the charged robbery. This alone was plainly insufficient to prove anything more than "the possibility of a possibility" that Gordon had anything to do with the charged robbery, and the Court of Appeal so ruled.

In *People v. Perry, supra*, the defendant was charged with having attacked a woman

---

[21](...continued)
reasonable doubt as to the defendant's guilt must be admitted. (*People v. Hall* (1986) 41 Cal.3d 826, 834.)

EXHIBIT 3                                                                                   131

who was walking in Golden Gate Park. An eyewitness to the attack chased down the defendant and was joined by police. After the defendant was caught, the victim of the attack immediately identified him as the perpetrator of the attack. (*Perry, supra*, 104 Cal.App.3d at 269-270.)

At trial, Perry sought to introduce evidence that a person named Wolf had robbed and raped a woman in Golden Gate Park three years before the charged offense, and that Wolf had also robbed and raped a woman in the same park only an hour before Perry was arrested. The trial court viewed a photo of Wolf and decided that he did not resemble Perry. The Court of Appeal held this was a proper exercise of the trial court's discretion under Evid. Code §352. (*Perry, supra*, 104 Cal.App.3d at 270.)

In a thoughtful dissent, Justice Poche reviewed the authorities relevant to the admission of third-party culpability evidence. He concluded that the *Mendez-Arline* line of cases gave trial courts little guidance in determining "whether the proffered evidence 'simply affords a possible ground of possible suspicion' or is stronger and therefore perhaps admissible." (*Perry, supra*, 104 Cal.App.3d at 274) (dis. opn. of Poche, J.) Justice Poche also noted in his dissent that the exclusion of third-party evidence had constitutional implications in cases, such as *Perry*, where the proffered evidence was of more than the slightest relevance. (*Id.* at 275.) Justice Jefferson expressed similar concerns in his opinion for a unanimous court in *People v. Reeder* (1978) 82 Cal.App.3d 543, 551-554.

It cannot be determined today how the trial court in petitioner's case would have ruled had the actual nature of the third-party evidence been put before it. The court seemed receptive, and several times asked Mulcahy whether he had "any other evidence."

88

EXHIBIT 3                                                    132

Although Mulcahy had, **literally in his hand,** evidence that Mike Ryan tried to create a false alibi which clearly indicated his awareness of the exact time the murder took place, as well as evidence that Mike left town the day following the murder after arriving only five days earlier, and evidence that Mike's account to Monsue of his activities was impossible unless Mike got additional funds from somewhere, **Mulcahy still advised the court that he had no other evidence.** The court therefore made its ruling believing that the only evidence implicating Mike was that he had been "in the neighborhood the day before." In ruling, the court commented that it found the defense proffer in *Perry* to be "a lot more persuasive and a lot more important on an identity issue" than Mulcahy's proffer in the present case.

It may or may not be that, under the pre-*Hall* law prevailing at the time, the trial court would have been held to have the discretion to deny admission of the Mike Ryan evidence, even had Mulcahy competently handled the motion. But it is clear that the court also would have the discretion to admit this evidence, and might very well have done so had it been made aware of its full scope. Petitioner cannot, and need not, "prove" that the trial court would have denied the prosecutor's motion to exclude had defense counsel's performance in opposing that motion not been so woefully inadequate. *Strickland* prejudice requires only a reasonable probability that the outcome might have been different if not for counsel's deficient performance.

Stripped of the jailhouse "confession," the prosecution's case boiled down to nothing more than the fact that petitioner was present at the scene when police arrived (if only because he called them), and Detective Monsue's unreasonable claim that petitioner's

EXHIBIT 3                                                                                    133

initial statement "contradicted" the physical evidence at the house. The trial evidence demonstrated no such contradictions. Nevertheless, so long as a credulous, pre-Leslie White jury chose to believe Robert Hughes, the prosecution would not be required to present additional incriminating evidence. So long as petitioner's relationship with Mike Ryan, and the contents of the Ryan police interview, were kept from the jury, there would be no viable defense available. Petitioner was forced to defend the case as though there existed no plausible alternative to his guilt, a fact which made Robert Hughes' government-procured testimony all the more damning. Defense counsel's deficient performance, which also included an inexplicable failure to try to identify the unknown fingerprint found in the victim's purse, contributed to this result. In the absence of such deficient performance, there is amply demonstrated a reasonable probability, within the meaning of *Strickland*, that the outcome of petitioner's trial would have been different. Accordingly, petitioner's conviction must be vacated.

### D. Petitioner's Counsel Was Also Ineffective in His Appellate Representation of Petitioner.

Petitioner's trial counsel, Dennis Mulcahy, also represented petitioner on his direct appeal. That appeal did not include as an issue Mulcahy's ineffectiveness at trial -- his failure to competently present the evidence identifying Mike Ryan as the perpetrator of the murder of Dorka Lisker. See Exhibit 5 (E11), the Court of Appeal's unpublished decision affirming petitioner's conviction.

The right to competent counsel extends to the appellate process. (*Evitts v. Lucey* (1985) 469 U.S. 387; *In re Smith* (1970) 3 Cal.3d 192, 202-203; *People v. Harris* (1993) 19 Cal.App.4th 709, 713-714.) Appellate counsel who fails to raise crucial assignments

EXHIBIT 3                                                                 134

of error on behalf of his client deprives that client of effective assistance of appellate counsel. (*Smith, supra* at pp. 202-203.)

Further, the constitutional right to effective counsel contemplates more than mere competence. Lawyering may be constitutionally deficient when any "conflict of interest deprives the client of undivided loyalty and effort." (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 612.) Whenever counsel fails to avoid "any relation which would prevent him from devoting his entire energies to his client's interests," an impermissible conflict arises. (*People v. Barboza* (1981) 29 Cal.3d 375, 379.)

Certainly, any trial attorney who loses a case and then seeks to represent the same defendant on appeal enters into a relationship fraught with conflict of interest. Such an attorney is highly unlikely to argue that his client received constitutionally ineffective assistance at the trial level, no matter how apparent that ineffectiveness might be to a neutral observer reviewing the record. *See, e.g., People v. Bailey* (1992) 9 Cal.App.4th 1252, 1254-1255 ["We believe that there is an inherent conflict when appointed trial counsel in a criminal case is also appointed to act as counsel on appeal . . . Counsel is in the untenable position of urging his own incompetency"]. *See, also, In re Fountain* (1977) 74 Cal.App.3d 715, 719. This conflict of interest establishes that appellant received constitutionally ineffective assistance on his appeal.

For the reasons stated above, the claim that counsel was ineffective at trial because of his incompetent handling of the evidence implicating Mike Ryan is a meritorious issue, one that certainly should have been presented on petitioner's direct appeal. Petitioner has been prejudiced by this omission in at least three ways: (1) his direct appeal failed to

91

EXHIBIT 3                                                                                    135

include a crucial assignment of error which arguably could have resulted in a different result on appeal; (2) failure to present this issue on direct appeal could potentially bar consideration of the issue on collateral attack ["an unjustified failure to present an issue on appeal will generally preclude its consideration in a postconviction petition for a writ of habeas corpus"] (*In re Harris* (1993) 5 Cal.4th 813, 829)]; and, (3) if the California courts were to hold that Mulcahy's failure to argue on petitioner's direct appeal Mulcahy's own trial incompetence constituted waiver of the issue, petitioner could be barred from bringing the issue in a federal *habeas corpus* proceeding. (*Harris v. Reed* (1989) 489 U.S. 255 [103 L.Ed.2d 308, 109 S.Ct. 1038].)

Because the remedy for ineffective assistance on appeal is to have the Court of Appeal recall its remittitur and reinstate the direct appeal (*see, e.g., In re Smith, supra,* 3 Cal.3d at 203-204), the Superior Court would have no jurisdiction to grant petitioner relief on this basis. Nevertheless, the incompetence of Mulcahy's appellate representation of petitioner is relevant to the procedural strictures of *In re Clark, supra,* which, as pertinent to Claim II, are discussed in section E, below.

## E.    Claim II Presents a *Prima Facie* Case for Relief and is Not Procedurally Barred.

Petitioner has alleged that his trial counsel had in his possession persuasive circumstantial evidence of the guilt of a specific third party, and did not inform the court of the substance of the evidence during a hearing on its admissibility. Trial counsel's substandard performance in this regard caused the trial court to exclude the evidence as too marginal to the case, something it likely would not have done had it been made aware of the full extent and import of that evidence. Further, had the jury heard this evidence, it

92

EXHIBIT 3                                                                   136

is reasonably probable, within the meaning of *Strickland*, that petitioner could have received a better result at his trial, even in the face of Robert Hughes' testimony.

One of the attorneys helping petitioner with the preparation of this petition, David L. Bernstein, wrote to Mr. Mulcahy on August 31, 2002. A copy of that letter is attachment B to Exhibit 51, (declaration of David L. Bernstein, ¶ 5) (E737.) Bernstein enclosed a copy of the ineffective assistance claim presented in this petition, and asked if Mulcahy had any response to the arguments put forth in support of the claim. As of the date of the filing of this petition, Mulcahy has offered no response.

Claim II also passes procedural muster under *In re Clark, supra.*

    1.    Under the circumstances, Claim II could not have been raised on direct appeal.

Petitioner was unable to raise the issue of his trial counsel's incompetence in his handling of the Mike Ryan evidence because trial counsel was also appellate counsel. Due to this inherent conflict of interest, appellate counsel did not raise the question of his own incompetence at trial. Under these circumstances, appellant was unable to present Claim II on direct appeal.

    2.    Claim II was not raised in petitioner's previous *habeas corpus* application.

The desperate *habeas corpus* petition brought by petitioner's father after petitioner's conviction was affirmed did contain an ineffective assistance claim. (See Exhibit 6, pp. 4-6.) However, the claim had nothing to do with the present Claim II. The 1989 petition argued that petitioner's trial counsel was ineffective for allegedly failing to elicit certain facts from petitioner's father which would have contradicted the Court of Appeal's discussion of the facts elicited at trial. None of these facts pertained to Mike Ryan and trial counsel's inept

handling of that evidence. The 1989 petition also argued that trial counsel was ineffective for not obtaining appointment of a defense serology expert.[22]

       3.    The delay in filing a petition containing Claim II is justified by the fact that petitioner was unable to obtain counsel prior to 1996, and thereafter successively retained two attorneys who promised they would prepare a *habeas corpus* petition for him, strung him along, and then failed to produce any petition.

[See discussion at Argument I, section (C)(4).]

       4.    *Clark's* fundamental miscarriage of justice exception.

As discussed *ante*, even an untimely petition for *habeas corpus* must be considered on its merits if it alleges "facts, which, if proven, would establish that a fundamental miscarriage of justice occurred as a result of proceedings leading to conviction and/or sentence." (*In re Clark, supra*, 5 Cal.4th at 797.)

Petitioner has alleged in Claim II that his trial counsel, Dennis Mulcahy, had, literally in his hand, evidence which strongly implicated a third party, Michael Ryan, in the murder of petitioner's mother, but, due to incompetent presentation and argument, petitioner's jury never heard this evidence. If the jury had learned that strong evidence implicated someone other than petitioner, this, coupled with the lack of any substantial evidence other than Hughes' false testimony that petitioner was the guilty party, would have precluded conviction of petitioner by any reasonable juror. Thus, even if Claim II were found to be untimely, it should be adjudicated on the merits pursuant to *Clark's* fundamental miscarriage of justice exception to the timeliness requirements for *habeas corpus* petitions.

---

[22]   Trial counsel did in fact have a defense serology expert appointed. (CT 238-245.) However, because the prosecution's serology expert testified that his findings did not incriminate petitioner (RT 747-748; see ¶¶ 29, 89-90, *ante*), counsel had no occasion to call his own expert to the stand.

94

EXHIBIT 3                                                                                      138

III.   CERTAIN SUBSEQUENT PERJURIOUS CONDUCT BY HUGHES STRONGLY
SUGGESTS THAT HIS TESTIMONY AGAINST PETITIONER WAS FALSE.

A.   Petition (continued)

128.   Robert Donald Hughes testified at petitioner's preliminary hearing that he
lived in Big Bear, California, and had a mailing address of P.O. Box 1986, Sugarloaf,
California. (PHT 163, 175-176.)

129.   On March 12, 1993, Robert Donald Hughes filed a petition for bankruptcy in
federal district court in Los Angeles. The petition specified that Hughes' residence was in
Big Bear City, California, and that Hughes' mailing address was P.O. Box 1095, Sugarloaf,
California. Petitioner asserts that this Robert Donald Hughes, and the Robert Donald
Hughes who testified against him, are one-and-the-same. The petition was executed
under penalty of perjury. The bankruptcy proceeding was designated SB93-13505LR. A
certified copy of the court file in that case is attached to this petition as Exhibit 43. (E529 -
E611.)

130.   Hughes' petition resulted in an order discharging his debts. The order was
issued on July 23, 1993. On August 20, 1993, the court ordered the bankruptcy estate
closed. See Docket for bankruptcy petition # 93-13505 (E533 - E537), included in
Exhibit 43.

131.   On July 1, 1994, the bankruptcy trustee moved to reopen the case, based on
the contents of a declaration of the trustee's special counsel, Gary M. Wynn. (E542 -
E548.) Wynn's declaration offered evidence of seven different transactions which Hughes
was required to disclose, and which he deliberately and intentionally did not disclose,
during the bankruptcy proceedings. These transactions involved the unreported sale of

95

EXHIBIT 3

139

real and personal property within a year prior to filing his bankruptcy petition.

132.   On July 27, 1994, the trustee's motion to reopen Hughes' bankruptcy proceeding was granted. On May 19, 1995, Judgment was entered revoking Hughes' earlier discharge in bankruptcy. See docket sheet, p. 4., Exhibit 43. (E536.) The record does not reflect whether the trustee was successful in recovering any of the fraudulently withheld funds for the bankruptcy estate.

B.    **Hughes' False Declarations in His Bankruptcy Petition Were Perjurious.**

Robert Hughes executed his Voluntary Petition for Bankruptcy under Chapter 7 under penalty of perjury. See Exhibit 43, p. 2 (E530.) Based on the bankruptcy trustee's declaration, it is apparent that Robert Hughes perjured himself in executing his petition for bankruptcy by fraudulently concealing numerous transactions which he was required to report.

C.    **Applicable Law: Penal Code §1473, subd. (b)(1).**

Penal Code §1473, subdivision (b)(1) expressly authorizes a petition for *habeas corpus* as the appropriate remedy in a situation where "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration." Further, subdivision (c) of this same section provides that "[a]ny allegation that the prosecution knew or should have known of the false nature of the evidence referred to in subdivision (b) is immaterial to the prosecution of a writ of habeas corpus brought pursuant to subdivision (b)."

If a *habeas corpus* petitioner is able to prove, by a preponderance of evidence, that false evidence of a substantially material character was presented at his trial, he would be

96

EXHIBIT 3                                                                                    140

entitled to have his conviction vacated. (*In re Wright* (1978) 78 Cal.App.3d 788, 807-809.)

**D.     Hughes' Fraudulent Bankruptcy Petition and Demonstrated Willingness to Commit Perjury Strongly Suggest That He Was Also Committing Perjury When He Testified That Petitioner "Confessed" to Him.**

According to the trustee's complaint to revoke discharge (see Exhibit 43), Robert Hughes intentionally (*i.e.*, perjuriously) failed to disclose seven different transactions directly pertinent to his Chapter 7 bankruptcy petition. The transactions included the sale of a private aircraft, the sale of a Bayliner boat and trailer, two separate sales of real property, and the sale of two Harley-Davidson motorcycles. In addition, Hughes intentionally failed to disclose ownership interests in two separate businesses. The complaint cited code §§11 U.S.C. §727 (d)(1) and (d)(2) as grounds to revoke discharge. These sections provide:

> "(d)  On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if –
>
> (1)    such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;
>
> (2)  the debtor acquired property that is property of the estate or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee."

97

EXHIBIT 3                                                                                              141

As stated above, the motion to revoke Hughes' discharge in bankruptcy was granted

following a hearing.

The pervasive fraud committed by Hughes in connection with his Chapter 7

proceeding, and his execution of a perjurious petition in connection with that proceeding

demonstrate Hughes' basic dishonesty and willingness to commit perjury if he believes it

will gain him an advantage of some kind. His testimony in petitioner's case should be

considered in that light. Further, there can be no question that Hughes' testimony at

petitioner's trial was substantially material. It was virtually the only inculpatory "evidence."

Given the high likelihood that Hughes lied about the confession, Pen. Code §1473, subd.

(b)(1) provides grounds for relief that is independent of Claim I in the instant petition.

E.    Claim III Presents a *Prima Facie* Case for Relief and is Not Procedurally
      Barred.

      1.    Claim III could not have been brought in petitioner's first *habeas
            corpus* application.

Hughes's false statements in his Chapter 7 petition were made in 1993, and were

not discovered to be false until the following year. The statements obviously did not exist

at the time of petitioner's 1989 *habeas corpus* application.

      2.    The delay in filing a petition containing Claim III is justified by the fact
            that petitioner was unable to obtain counsel prior to 1996, and
            thereafter successively retained two attorneys who promised they
            would prepare a *habeas corpus* petition for him, strung him along, and
            then failed to produce any petition.

The discovery of Robert Hughes's false statements under oath was made in 1999

by Fred Marr's investigator. As previously discussed, *ante*, Marr never performed the work

he was retained and paid to do. Therefore, it has taken until now to bring Claim III before

98

EXHIBIT 3                                                                                    142

the court.

### 3.    *Clark's* fundamental miscarriage of justice exception.

As discussed *ante*, even an untimely petition for *habeas corpus* must be considered on its merits if it alleges "facts, which, if proven, would establish that a fundamental miscarriage of justice occurred as a result of proceedings leading to conviction and/or sentence." (*In re Clark, supra*, 5 Cal.4th at 797.)

Petitioner has alleged in Claim III that the fact that Robert Hughes made false statements under oath in his bankruptcy proceeding makes it more likely than not that Hughes has lied under oath at other times when he perceived it be to his advantage to do so, including petitioner's trial. If the alleged facts are true, then petitioner was convicted and sent to prison based almost exclusively on the false testimony of a jailhouse informant. However, this might be only a statutory violation (Pen. Code §1473), not a constitutional one. Given *Clark's* definition of a "fundamental miscarriage of justice" as requiring "error of constitutional magnitude," it is arguable that Claim III cannot qualify for the *Clark* exception.

Petitioner believes that nearly two decades of incarceration based on false testimony from a jailhouse informant who was given access to petitioner through the unlawful conduct of police agents implicates petitioner's Fifth and Fourteenth Amendment right to due process. On that basis, petitioner respectfully suggests that Claim III has a constitutional basis as well as a statutory one, and therefore qualifies for consideration on its merits under the *Clark* exception for claims alleging a fundamental miscarriage of justice (should this

99

EXHIBIT 3                                                                    143

court find that Claim III is not timely.)

## PRAYER

WHEREFORE, petitioner prays that this Honorable Court:

1.      Issue a Writ of *Habeas Corpus* vacating petitioner's conviction in Los Angeles Superior Court Case No. A804566 and order petitioner's release from custody; or, alternatively,

2.      Issue an Order to Show Cause to the California Attorney General requiring that office to demonstrate why petitioner is not entitled to the relief requested in paragraph 1 of this prayer, and,

3.      Grant such other and further relief as may be appropriate and dispose of the matter as law and justice require.

DATED: 7.9.03

BRUCE E. LISKER
*In Propria Persona*

100

EXHIBIT 3                                                                                          144

## VERIFICATION

I, Bruce E. Lisker, declare:

I am the petitioner in this *habeas corpus* action. All facts alleged in this petition are true and correct to the extent of my personal knowledge.

I declare under penalty of perjury that the foregoing is true, correct and complete under the laws of the United States and the State of California. This verification was executed on July ___, 2003, at Ione, California.

_____
BRUCE E. LISKER
Declarant

EXHIBIT 3                                                                                          145

### PROOF OF SERVICE
(Pursuant to CCP §1013A)

STATE OF CALIFORNIA    )
                             ) ss.

COUNTY OF LOS ANGELES  )

      I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 2550 No. Hollywood Way, Suite 502, Burbank, California 91505-1055.

      On July 28, 2003, I served the foregoing documents described as: **VERIFIED PETITION FOR WRIT OF *HABEAS CORPUS* AND SUPPORTING EXHIBITS VOLUME 1 - 5** (VOLUME 1 - Exhibits 1-11, VOLUME 2 - Exhibit 12, VOLUME 3 - Exhibits 13-42, VOLUME 4 - Exhibit 43, VOLUME 5 - Exhibits 44-64) on the following person(s):

Attorney General
300 S. Spring St.
Los Angeles, CA 90013

By the following applicable method(s) of service:

A.   XX   By Mail, Courier or Personal Service:
          BY PLACING [ ] ____ the original, [XXX] true and correct copy thereof in sealed envelopes and thereby serving said document upon the above-entitled persons as follows:

          [ XX ] BY COURIER. I caused to be deposited such envelope with PERSONAL ATTORNEY SERVICE for personal delivery TO THE ATTORNEY GENERAL.

___  STATE
_X_  FEDERAL

      I declare under penalty of perjury under the laws of the State of California that the above is true and correct. I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was effected. Executed on July 28, 2003, at Burbank, California.

JOSEPH A. LANE, Clerk of the Court of Appeal,
Second Appellate District, State of California,
do hereby certify that the preceding [Blanca E. Parks] is a
correct copy of the Original of this document on file in
this Court, as shown by the records of my office.
Witness my hand and the seal of this Court.

Dated ____

By ____
      Deputy Clerk

102

EXHIBIT 3                                         146

JOSEPH A. LANE, Clerk of the Court of Appeal, Second Appellate District, State of California, do hereby certify that the preceding is a true and correct copy of the original of this document on file in this Court, as shown by the records of my office.

Witness my hand and the seal of this Court.

Dated        MAR - 3 2008

By _____

Deputy Clerk

EXHIBIT 3                                                          147