1  **CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
   **GARY G. GEUSS**, Chief Assistant City Attorney
2  **CORY BRENTE**, Assistant City Attorney
   **AMY FIELD**, Deputy City Attorney - SBN 143827
3  **CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney **-SBN 192872**
   christian.bojorquez@lacity.org
4  amy.field@lacity.org
   200 North Main Street, 6th Floor, City Hall East
5  Los Angeles, CA  90012
   Phone No.: (213) 978-6900, Fax No.: (213) 978-8785
6
7  *Attorneys for Defendants* CITY OF LOS ANGELES, a municipal corporation, also
   named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW
   MONSUE and HOWARD LANDGREN
8

9              **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11  BRUCE E. LISKER,                    )   CASE NO.: CV09-09374 AHM (AJWx)
                                        )   [*The Hon. A. Howard Matz, Courtroom 14*]
12                                      )
                                        )   **EXHIBIT 11 IN SUPPORT OF**
13              Plaintiff,              )   **DEFENDANTS' REQUEST FOR**
                                        )   **JUDICIAL NOTICE IN SUPPORT OF**
14                                      )   **NOTICE OF MOTION AND MOTION**
                                        )   **FOR SUMMARY JUDGMENT OR IN**
15      vs.                             )   **THE ALTERNATIVE PARTIAL**
                                        )   **SUMMARY ADJUDICATION OF THE**
16                                      )   **ISSUES**
                                        )
17                                      )   **[Filed/Lodged Concurrently Herewith: (1) Notice of**
                                        )   **Motion and Motion for Summary Judgment, etc.; (2)**
18  CITY OF LOS ANGELES et al.,         )   **Statement of Uncontrovered Facts and Conclusions of**
                                        )   **Law; (3) Declarations; (4) Request for Judicial**
19                                      )   **Notice;  and (5) (Proposed) Judgment/Order]**
                                        )
20              Defendants             )   Date:      **July 25,** 2011
    _____)   Time: 10:00 a.m.
21  ___                                     Courtroom:  14
22
23
24
25
26
27
28

                                    1

# EXHIBIT 11

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE E. LISKER,<br><br>           Petitioner,<br><br>    vs.<br><br>MICHAEL KNOWLES, WARDEN,<br><br>           Respondent. | CASE NO. CV 04-02687 VAP (RZ)<br><br>SECOND REPORT AND<br>RECOMMENDATION OF UNITED<br>STATES MAGISTRATE JUDGE |

Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Second Report and Recommendation to the Honorable Virginia A. Phillips, United States District Judge. The undersigned recommends that the Court grant the Second Amended Petition for Writ of Habeas Corpus as to its second, third, and fourth claims if the State of California does not retry Petitioner. The undersigned recommends that the Second Amended Petition be denied as to its first claim for relief.

## I.
## PROCEDURAL BACKGROUND

On November 21, 1985, Petitioner Bruce E. Lisker was convicted of second degree murder. The court sentenced Petitioner to 16 years-to-life in State prison. (Clerk's

EXHIBIT 11                                                                    199

Case 2:09-cv-09374-ODW-AJW    Document 106    Filed 06/17/11    Page 4 of 29    Page ID
#:1578
Case 2:04-cv-02687-VAP-RZ    Document 211    Filed 03/02/09    Page 2 of 69    Page ID #:1063

1 | Transcript ("CT") 368, 378-79; Reporter's Transcript ("RT") 1221-23, 1237.)   The
2 | California Court of Appeal affirmed Petitioner's conviction on December 22, 1988.
3 | (Respondent's May 18, 2004 Motion to Dismiss the Petition ("Motion to Dismiss"),
4 | Exh. B.) Petitioner did not petition for review in the California Supreme Court on direct
5 | appeal, but instead filed a petition for writ of habeas corpus in that court in 1989. (Motion
6 | to Dismiss, Exh. F.)   The court denied habeas relief on April 25, 1989, finding that
7 | Petitioner failed to allege sufficient facts in support of his claims. (Motion to Dismiss,
8 | Exh. G.)

9 | Petitioner again sought collateral review in State court fourteen years later
10 | when, on January 31, 2003, he signed a petition for writ of habeas corpus for filing in the
11 | Los Angeles County Superior Court; the court denied the petition on March 6, 2003.
12 | (Motion to Dismiss, Exhs. H; I.)  On July 28, 2003, Petitioner filed a petition for writ of
13 | habeas corpus in the California Court of Appeal which the court denied on August 5, 2003.
14 | (Motion to Dismiss, Exhs. J; K.)  In both petitions, Petitioner argued that his delay in
15 | raising the claims therein should be excused pursuant to California's "fundamental
16 | miscarriage of justice" exception. (*See* Motion to Dismiss, Exhs. H, at 127-28; J, at 238-
17 | 40); *In re Clark*, 5 Cal. 4th 750, 797, 21 Cal. Rptr. 2d 509 (1993) (a petition's untimeliness
18 | may be excused where a petitioner presents facts showing that an error of constitutional
19 | magnitude led to a trial so unfair that, absent the error, no reasonable juror could have
20 | convicted the petitioner).  Neither petition was denied as untimely. On August 18, 2003,
21 | Petitioner filed in the California Supreme Court a petition for review of the appellate
22 | habeas denial; the court denied the petition without comment on October 29, 2003.
23 | (Motion to Dismiss, Exhs. L; M, at 304.)  Justices Werdegar and Kennard stated that the
24 | petition should have been granted. (*See* Motion to Dismiss, Exh. M, at 304.)

25 | On April 16, 2004, Petitioner filed the Petition for Writ of Habeas Corpus by
26 | a Person in State Custody pursuant to 28 U.S.C. § 2254 initiating the present action in this
27 | Court. Petitioner filed his First Amended Petition, deleting an unexhausted free-standing
28 | claim of actual innocence, on May 12, 2004. Also in May 2004, Respondent moved to

- 2 -

EXHIBIT 11                                                                                      200

1   dismiss the action as untimely. Prior to deciding the motion, the Court held an evidentiary
2   hearing over seven days from December 1 to December 9, 2005. Thereafter, the Court
3   recommended that the Motion to Dismiss be denied because Petitioner showed that it was
4   "more likely than not that no reasonable juror would have convicted him in the light of the
5   new evidence" and therefore that his failure to comply with the statute of limitations should
6   be excused. *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)
7   (developing rule in procedural default case); *see also House v. Bell*, 547 U.S. 518, 126
8   S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (applying *Schlup* standard in procedural default case).[1]
9   On October 10, 2006, the District Court accepted the Report, adopted its recommendation,
10  and denied Respondent's Motion to Dismiss. *See Lisker v. Knowles*, 463 F. Supp. 2d 1008
11  (C.D. Cal. 2006).

12          On October 16, 2006, this Court ordered Respondent to file an Answer to the
13  merits of the First Amended Petition. Before the Answer was filed, on November 3, 2006,
14  Petitioner requested leave to file a Second Amended Petition to add claims which had
15  arisen from the evidence adduced at the 2005 evidentiary hearing. Respondent opposed
16  the request and declined to waive the requirement that new claims must first be exhausted
17  in State court. On January 12, 2007, the Court granted Petitioner leave to file the Second
18  Amended Petition and also granted his request to stay the proceedings while he returned
19  to State court to exhaust the new claims. The proposed Second Amended Petition was
20  ordered filed the same day.

21          On February 13, 2007, Petitioner filed a petition for writ of habeas corpus in
22  the California Supreme Court. (*See* Petitioner's February 13, 2007 Notice of Filing of
23  State Petition for Writ of Habeas Corpus.) In a 106-page informal response, Respondent
24  argued at length that Petitioner's claims were successive and untimely raised and therefore
25  procedurally barred. (*See* Traverse, Exh. A, at 98-183.) The State court agreed and, on
26
27  _____

28      [1] The Court did not earlier, and does not now, make any factual finding about whether Petitioner
    did or did not commit the murder. *Schlup* requires no such finding for passage through its gateway.

- 3 -

EXHIBIT 11                                                                    201

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 6 of 29   Page ID
#:1580
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 4 of 69   Page ID #:1065

1  November 14, 2007, denied the petition as untimely. (*See* Petitioner's November 21, 2007
2  Application for Order Vacating Stay ("Petitioner's App. to Vacate Stay"), Exh. A.)

3      On December 4, 2007, this Court ordered Respondent to file an Answer to the
4  merits of the Second Amended Petition. Respondent filed his Answer on April 2, 2008.
5  Petitioner filed his Traverse on June 2, 2008.

6      On July 2, 2008, the Court ordered both parties to clarify by motion whether
7  they were requesting a further evidentiary hearing. Petitioner did not request a further
8  hearing on any claim of his own, but, in an unusual move, on July 28, 2008, Respondent
9  moved for an evidentiary hearing on Petitioner's second claim for relief, a claim alleging
10  that Petitioner received ineffective assistance of counsel. Petitioner opposed the motion,
11  asserting that the claim could be resolved on the existing record. After a hearing on August
12  18, 2008, the Court granted Respondent's motion. The second evidentiary hearing was
13  held on October 31, 2008. In late November 2008, the parties submitted post-hearing
14  briefing.

15

16                                    **II.**

17                      **PETITIONER'S CONVICTION**

18      The facts of Petitioner's conviction are recited in this Court's earlier Report.
19  *See Lisker v. Knowles*, 436 F. Supp. 2d 1008. A portion of the factual background is
20  repeated here to make the record complete.

21      At 11:26 a.m. on March 10, 1983, Petitioner telephoned paramedics to report
22  that his mother, Dorka Lisker, had been stabbed. The paramedics arrived shortly thereafter
23  and administered emergency care, then transported Mrs. Lisker to the hospital. There she
24  died around 3:00 that afternoon.

25      Mrs. Lisker had been stabbed multiple times, more than twice in the back,
26  with two knives which were recovered at the house. Also at the scene were a trophy and
27  an exercise bar, both of which police suspected were used to bludgeon Mrs. Lisker, who
28  had extensive injuries to her head and one arm.

- 4 -

EXHIBIT 11                                                    202

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 7 of 29   Page ID
#:1581
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 5 of 69   Page ID #:1066

1           Los Angeles Police transported Petitioner to jail where Detective Andrew
2   Monsue interviewed him at length. Petitioner was 17 years old at the time. He told police
3   that, from outside the house through the back windows, he saw his mother lying on the
4   floor in the front entryway. Detective Monsue did not believe this or other aspects of
5   Petitioner's account. Soon after the interview with Detective Monsue, Petitioner was
6   charged with murder.

7           Petitioner continued to assert his innocence to police, telling Detective
8   Monsue that he believed the actual killer was another juvenile named Michael Ryan.
9   Detective Monsue investigated Ryan's possible involvement and traveled to Mississippi
10  to interview Ryan. Monsue's notes state that Ryan was "convincingly cleared" by further
11  investigation. The case against Petitioner went forward.

12          Petitioner's murder trial began in November 1984, but was aborted on
13  December 4, 1984, when Petitioner agreed to plead guilty conditioned on his being placed
14  in the California Youth Authority ("CYA"). Such placement would have meant that
15  Petitioner could not be held beyond his 25th birthday. State officials determined, however,
16  that Petitioner was not amenable for CYA placement and, the condition to the plea having
17  failed, Petitioner withdrew his guilty plea.

18          Trial began anew in October 1985. The prosecution case against Petitioner
19  consisted of various pieces of circumstantial evidence, the first and most important of
20  which was Petitioner's critical and, in the prosecutor's words, "most condemning" lie that,
21  from outside his house, he saw his mother lying on the entryway floor. (RT 1081-82,
22  1092.) Petitioner did not testify at his trial. His statements were introduced to the jury by
23  way of his interrogation by Detective Monsue.[2] (*See* Exhibit from Federal Evidentiary
24

25      [2] *In fact, the California Court of Appeal found that the introduction of Petitioner's statements
26  from the police interrogation violated Petitioner's constitutional rights because Detective Monsue failed,
    until halfway through the interrogation, to inform Petitioner of his rights pursuant to *Miranda v. Arizona*,
27  384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). (*See* Motion to Dismiss, Exh. B, at 27.) The
    appellate court denied relief to Petitioner, however, because it found the error harmless. (*Id.*, at 28-29.)
28                                  (continued...)

EXHIBIT 11                                                                                          203

1   Hearings ("Exh.")[3] 86, at 158-209; RT 321.) The jury could tell Petitioner was lying, the
2   prosecutor said, because it was shown that the day of the murder was bright and sunny, and
3   therefore there was a severe glare on the back windows making it impossible to see into the
4   house, and also because the victim's body would not have been visible from the back
5   windows even absent the glare. (*See e.g.* RT 268, 272-73, 996-97.)

6           Second, there was no evidence that anyone other than Petitioner and his
7   mother had been inside the house at the time of the murder. (RT 1117-21.) Only
8   Petitioner's shoe prints and fingerprints were found in the house and there was no sign of
9   forced entry, just the louvers Petitioner said he had removed from the kitchen window.
10   (RT 248, 263, 274-75, 766.)

11           Third, Petitioner's statement to Detective Monsue was filled with
12   inconsistencies beyond the crucial lie about seeing his mother, and Petitioner's actions at
13   the scene were suspicious.[4] (RT 1072-81.)

14           Fourth, the blood on Petitioner's clothing demonstrated his guilt. Photographs
15   introduced at trial showed blood spatters on the walls, floor, carpet, and rug inside the
16   Lisker house. (*See* RT 295-311, 725-33.) Petitioner had seven small drops and a small

17

18      [2](...continued)
    The great majority of Petitioner's allegedly inculpatory statements from the Monsue interview were
19   made prior to when Petitioner was finally informed of his rights pursuant to *Miranda*, and therefore
    should not have been admitted against him. Petitioner does not raise a *Miranda* claim here.
20

21      [3] "Exh." standing alone refers to an exhibit from the two federal evidentiary hearings.

22      [4] The statements or actions which prosecutor Phillip Rabichow argued were suspicious, and
    therefore some additional proof of Petitioner's guilt, included the following: Petitioner took the knives
23   out of his mother's body to preserve evidence; Petitioner only described being in rooms where there were
    obvious signs of struggle; when Monsue asked Petitioner about a knife in his car, Petitioner responded,
24   "I wouldn't kill my mom"; Petitioner didn't want to get blood on himself; Petitioner's statements
    indicated he was concerned about how his actions would be interpreted by authorities; there was no mess
25   around the kitchen sink where Petitioner said he entered the house; Petitioner checked his mother's purse
26   to see if she had been robbed; Petitioner carefully removed the window panes when he entered the house;
    Petitioner did not break in immediately once he saw his mother lying on the floor; and Petitioner
27   mentioned the book about Charles Manson, Helter Skelter. (RT 1072-81, 1120.) Rabichow characterized
    Petitioner's lie about seeing his mother from outside as the only one of Petitioner's statements that
28   Rabichow could prove was false. (*See* RT 1081-82.)

1    number of smears of blood on his clothing. (RT 734-44, 767-68.) Police blood spatter

2    analyst Ronald Linhart testified that the blood on Petitioner's clothing was the result of

3    blunt force trauma or castoff, but that the spatters could have resulted from the acts

4    Petitioner described in tending to his mother. (RT 734-53.) Rabichow argued to the jury

5    that despite bludgeoning his mother with the trophy and the exercise bar, Petitioner did not

6    have more blood on his clothing because most of the victim's blood would spatter away

7    from Petitioner as he was "swinging away, obviously" when he hit the victim with the

8    weapons. (RT 1116-17.) Linhart, the blood spatter expert, did not testify to this effect,

9    however. Based on Petitioner's statement to Monsue that he hugged his bleeding mother,

10    and based on Monsue's description of how Petitioner physically showed him that he

11    hugged the victim, Rabichow argued that Petitioner should have had *more* blood on him

12    and that the lack of blood on Petitioner further demonstrated Petitioner's deceit and guilt.

13    (RT 345-46, 1093-95.)

14        Fifth, Petitioner had ongoing difficulties with his parents and was not living

15    at his parents' house. (Exh. 86, at 179, 203.) He did not have a key to the house and the

16    family members argued frequently. (*Id.*; *see also* RT 950-54.) Robbery and animosity

17    towards his mother were suggested as motives for the crime. Missing was $150 cash

18    Petitioner's father gave Petitioner's mother the evening before the murder; Monsue

19    testified the money never was found. (RT 224, 442.)

20        Sixth, Petitioner confessed to a jailhouse informant, Robert Hughes, who

21    repeated Petitioner's confession at trial. (RT 547-692.)

22        Seventh, the defense did not suggest anyone else who might have committed

23    the murder; it did not appear anyone else had either the motive or the opportunity to

24    commit the crime. (RT 1117-21.)

25        At the close of the prosecution case, the defense successfully moved to

26    dismiss the first degree murder charge. (RT 783-90.) On November 21, 1985, after nearly

27    three days of deliberation following a ten day trial, the jury convicted Petitioner of second

28    degree murder. The court sentenced Petitioner to 16 years-to-life in State prison (CT 255-

EXHIBIT 11        205

1  68, 368-69, 378-79; RT 1221-23, 1237), where Petitioner has remained incarcerated.
2  Petitioner has been in custody since his arrest in 1983.

3

4                                    **III.**

5                            **PROCEDURAL DEFAULT**

6          The AEDPA allows a State to waive the exhaustion requirement and, if the
7  requirement is waived, permits the federal court to adjudicate unexhausted claims. 28
8  U.S.C. § 2254(b)(3). Respondent declined to waive the exhaustion requirement in
9  connection with Petitioner's motion to amend his First Amended Petition to add new
10 claims which had arisen from the first evidentiary hearing. (Transcript of November 27,
11 2006 Court Hearing, at 18:7-9.) Respondent acknowledged that there were new facts, and
12 that the development of new facts in this Court also transformed the previously-adjudicated
13 claims into new claims. (*Id.*, at 17:23-18:2.) Respondent then argued that exhaustion
14 would not be futile; Respondent said that Petitioner could not cite any authority to show
15 that the claims "automatically [would be] reject[ed] as successive or as barred under
16 timeliness grounds." (*Id.*, at 18:9-21.) Respondent argued that the State courts were
17 "ready to consider, to analyze these new claims, to look at the newly developed facts,
18 predicate facts in support of the old claims. And they deserve under principles of comity
19 and federalism that opportunity." (*Id.*, at 18:11-16.) Stating that "[a] lot of evidence has
20 been developed here" (*Id.*, at 26:16), Respondent said that the state courts "will have that
21 opportunity either to issue an order to show case, to hold a hearing, to make a ruling. And
22 it is not beyond the realm of possibility." (*Id.*, at 26:18-20.) Counsel even told this Court,
23 "We suggest to this Court that this Court may never see this case again. That this case may
24 go to the State courts and it can be resolved there on the merits." (*Id.*, at 26:9-11.)
25 Respondent insisted that it was "certainly an insult to the State of California to claim that
26 the State courts are going to give short shrift and a blind eye and shrug off claims of false
27 evidence or claims of perjury . . ." (*Id.*, at 27:18-21.)
28 / / /

EXHIBIT 11                                                                          206

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 11 of 29   Page
ID #:1585
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 9 of 69   Page ID #:1070

1    When Petitioner returned to State court, however, Respondent did not
2  emphasize that "a lot of evidence ha[d] been developed" here or that Petitioner was raising
3  new claims. Respondent did not urge the State court to "issue an order to show cause" or
4  to "hold a hearing." Respondent did not urge serious State court consideration of perjury
5  or false evidence, or ask the court in any way to consider Petitioner's claims on their
6  merits. Instead, Respondent used the opportunity to re-argue many of the matters
7  previously rejected by this Court, and asserted vigorously not that the claims should be
8  considered, but rather that all four of Petitioner's claims were defaulted. (Traverse, Exh.
9  A, at 98-183.) Respondent took this position despite his earlier argument to this Court that
10  exhaustion was necessary so that the State courts could have the opportunity to review the
11  merits of the claims, and that, in the interests of comity and federalism, the State court
12  deserved that chance. The State court agreed with Respondent's State court position on
13  default and declined to reach the merits of Petitioner's claims. (Petitioner's App. to Vacate
14  Stay, Exh. A.)

15    In the end then, Respondent's insistence that Petitioner return to State court
16  so that the State court could have the opportunity to review the merits of the claims,
17  coupled with his subsequent entreaties to that court *not* to review the claims' merits,
18  resulted in a one-year delay in this Court's adjudication of Petitioner's claims. Now the
19  Court must review the claims having the benefit of no greater State court review than had
20  been conducted a year ago when Petitioner sought to add the new claims here. In fact,
21  counsel for Petitioner predicted just such a delay, a delay without purpose. (Transcript of
22  November 27, 2006 Court Hearing, at 37:18-38:6.)

23    Now, also, Respondent asks this Court to deny at least Petitioner's third and
24  fourth claims as defaulted. (Answer, at 63-67, 87.) Even setting aside Respondent's
25  previous statements to this Court that Petitioner's claims, conceded by Respondent to be
26  new claims, would not be given "short shrift" or "shrugged off" in State court, *see Whaley*
27  *v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (the State may not argue inconsistently in
28  State and federal court in ongoing habeas proceedings), this argument is not well taken.

- 9 -

EXHIBIT 11                                                                207

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 12 of 29   Page
ID #:1586
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 10 of 69   Page ID
#:1071

1   The Court already has found that Petitioner satisfied a miscarriage of justice exception to

2   the federal statute of limitations. *Lisker v. Knowles*, 463 F. Supp. 2d 1008; *Schlup*, 513

3   U.S. 298. That exception had its origin in procedural default cases, and thus clearly applies

4   to the procedural default argument asserted by Respondent here. *Coleman v. Thompson*,

5   501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Schlup*, 513 U.S. 298; *see*

6   *also House*, 547 U.S. at 536-37 (explaining development of rule). For the reasons

7   articulated in detail by the Court in denying the Motion to Dismiss, any State court default

8   by Petitioner is excused by his gateway actual innocence showing. *Lisker v. Knowles*, 463

9   F. Supp. 2d 1008; *Coleman*, 501 U.S. at 750. Petitioner's claims must be addressed on

10  their merits.

11

12                                     **IV.**

13                        **PETITIONER'S CLAIMS FOR RELIEF**

14          Petitioner presents four claims in his Second Amended Petition. They are:

15

16          1.    Petitioner's right to counsel was violated by the introduction of a

17  confession obtained by a police agent;

18          2.    Petitioner's right to effective counsel was violated when his trial

19  attorney failed to investigate and present a third-party culpability defense;

20          3.    Petitioner's due process rights were violated when he was convicted on

21  the basis of false evidence;

22          4.    Petitioner's due process rights were violated by the cumulative impact

23  of the above three constitutional violations.

24

25  (Second Amended Petition, at 5-6, att.; *see also* Traverse.)

26  ///

27  ///

28  ///

- 10 -

EXHIBIT 11                                                      208

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 13 of 29   Page
ID #:1587
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 11 of 69   Page ID
#:1072

# V.

## RIGHT TO COUNSEL

Petitioner contends that the State violated his right to counsel by introducing a confession obtained by placing him in a jail facility known for housing "jailhouse snitches," one of whom was Robert Hughes, the inmate who testified that Petitioner confessed the murder to him. (Second Amended Petition, at 5, att.; Traverse, at 48-55.) As Petitioner notes, the Government violates a defendant's Sixth Amendment right to counsel when it introduces statements which a Government agent deliberately elicited from the indicted defendant outside the presence of defense counsel. *See Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

## A.    The Claim is Not Forfeited

Petitioner maintains that he did not actually confess to Hughes but rather that Hughes manufactured a confession using information solicited from Petitioner. (*See e.g.* Traverse, at 52-53.) Petitioner nevertheless argues that it was a violation of his right to counsel to allow Hughes to testify about the supposed confession. Respondent argues that Petitioner cannot challenge the introduction of his confession while maintaining that he did not confess to Hughes. (Answer, at 27.)

In *Lee v. Mississippi*, 332 U.S. 742, 68 S. Ct. 300, 92 L. Ed. 330 (1948), the Supreme Court held to the contrary:

> A conviction resulting from such use of a coerced confession,
> however, is no less void because the accused testified at some
> point in the proceeding that he had never in fact confessed,
> voluntarily or involuntarily. Testimony of that nature can hardly
> legalize a procedure which conflicts with the accepted principles
> of due process. And since our constitutional system permits a
> conviction to be sanctioned only if in conformity with those

- 11 -

EXHIBIT 11                                                            209

1                    principles, inconsistent testimony as to the confession should not

2                    and cannot preclude the accused from raising the due process

3                    issue in an appropriate manner.

4

5 *Id.*, 332 U.S. at 745; *see also Beaty v. Schriro*, 509 F.3d 994, 997 n.2 (9th Cir. 2007)

6 ("Although Beaty contends he never confessed to Dr. O'Connor, he may still argue that the

7 confession, which was introduced at his trial, was coerced within the meaning of the Fifth

8 Amendment. *See Lee v. Mississippi*, 332 U.S. 742, 745, 68 S. Ct. 300, 92 L. Ed. 330

9 (1948)"), *cert. denied*, __ U.S. __, 129 S. Ct. 405, 172 L. Ed. 2d 295 (2008). Petitioner has

10 not forfeited this claim.

11

12 **B.**    **The Standard of Review**

13              In the usual case, a federal court would assess a State prisoner's habeas

14 petition pursuant to the AEDPA and could grant relief on a claim only where the State

15 court's denial of that claim either was "contrary to, or involved an unreasonable application

16 of, clearly established Federal law, as determined by the Supreme Court of the United

17 States, or resulted in a decision that was based on an unreasonable determination of the

18 facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

19 In this as in so many other ways, however, Petitioner's case is not the usual one. Given the

20 path of Petitioner's State court review, this Court must determine, separately for each of

21 Petitioner's four claims, which State court decision it should review and whether it should

22 conduct such review pursuant to the AEDPA.

23              Petitioner presented his right-to-counsel claim to the California Court of

24 Appeal on direct appeal. In denying relief in 1988, the appellate court found that

25 Petitioner's housing in an adult jail facility violated State law, but that Hughes was not a

26 police agent when he spoke with Petitioner because Hughes had not yet met with police

27 concerning Petitioner. (Motion to Dismiss, Exh. B, at 31-34.) Therefore, the court

28

- 12 -

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 15 of 29   Page
ID #:1589
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 13 of 69   Page ID
#:1074

1   determined, Petitioner's right to counsel was not violated by the introduction of Hughes'
2   testimony.  (*Id.*, at 34.)

3          In his 2003 series of State habeas petitions, Petitioner again argued that the
4   introduction of Hughes' testimony was a violation of his constitutional right to counsel.
5   (*See* Motion to Dismiss, Exhs. H, at 112-29; J, at 218-40.)  The Los Angeles County
6   Superior Court denied the petition filed there because Petitioner had been given "more than
7   his day in court" and because "[n]othing in the lengthy petition gives [the] court any reason
8   to grant the writ."  (Motion to Dismiss, Exh. I, at 162.)  The California Court of Appeal
9   denied without explanation the subsequent habeas petition containing this same claim.
10  (Motion to Dismiss, Exh. K.)  The California Supreme Court denied Petitioner's petition
11  for review in an unexplained one-line denial.  (Motion to Dismiss, Exh. M, at 304.)

12         During the 2005 evidentiary hearing in this Court, some evidence was taken
13  regarding Hughes.  Then, after Respondent's Motion to Dismiss was denied, Petitioner
14  obtained a stay from this Court to exhaust claims in State court.  When Petitioner returned
15  to the California Supreme Court in 2007 to file his habeas petition there, he included anew
16  his right-to-counsel claim.  (*See* Petitioner's July 27, 2007 Motion for Release on Bail
17  ("Petitioner's Bail Motion"), Exh. D, at 95-100.)  As noted, Respondent urged the
18  California Supreme Court to deny the petition on procedural grounds; when that court did
19  so, it did not reach the merits of any of the four claims raised therein.  (Petitioner's App.
20  to Vacate Stay, Exh. A.)

21         Given this procedural history, Petitioner argues that, under *Killian v. Poole*,
22  282 F.3d 1204 (9th Cir. 2002), his first claim should be reviewed *de novo*; he says that,
23  since 2003 when the State Supreme Court denied the claim on its merits, new supporting
24  facts emerged at the federal evidentiary hearing in 2005.  (*See* Traverse, at 6-7, 47-48;
25  Petitioner's Bail Motion, Exh. D, at 98.)  In *Killian*, the Ninth Circuit held that where new
26  facts underlying a constitutional claim are discovered in federal habeas proceedings, review
27  of a State court's denial of relief to the petitioner is *de novo* – even if an earlier State court
28  denial was on the merits.  *Id.*, 282 F.3d at 1208; *see also Monroe v. Angelone*, 323 F.3d

- 13 -

EXHIBIT 11                                                                    211

1   286, 297-98 (4th Cir. 2003) (a federal court should not defer to a State court judgment on

2   a constitutional claim where new evidence was disclosed for the first time in federal

3   court)[5]; *see also Lambert v. Blodgett*, 393 F.3d 943, 968 (9th Cir. 2004) ("In sum, our

4   opinions indicate that the decisive factor necessary to trigger AEDPA deference . . . is

5   whether the state court adjudicated the defendant's claims.  In each case we ask, did the

6   state court decide the claim on the merits?").  Petitioner contends that his first claim for

7   relief now is supported by new evidence which the California Supreme Court never has

8   reviewed and therefore that this claim never has been reviewed by the State court on its

9   merits.

10   Of course Petitioner also presented this claim to the California Supreme Court

11   in 2007, *after* the federal evidentiary hearing, and at that time included the new evidence

12   adduced at the federal proceedings. (*See* Petitioner's Bail Motion, Exh. D, at 98.)  Had the

13   State court denied the 2007 habeas petition on its merits, then the *Killian* rule would not

14   be relevant and this Court could look to that merits denial as the last reasoned State court

15   opinion concerning claim number one.  The California Supreme Court in 2007, however,

16   did not review the merits of this or any other claim presented then; it rejected the entire

17   petition on procedural grounds.

18   Where the California Supreme Court rejects a petitioner's claim for procedural

19   reasons, review is not conducted pursuant to the AEDPA, but must be conducted under pre-

20   AEDPA standards, as there is no State court decision to which the federal court may defer.

21   *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).  Review of legal determinations

22   and mixed questions of fact and law must be *de novo. Id.*; *accord Tanner v. McDaniel*, 493

23   F.3d 1135, 1139 (9th Cir.), *cert. denied*, _ U.S. _, 128 S. Ct. 722, 169 L. Ed. 2d 565

24   (2007).  In such a situation, however, State court factual determinations still are presumed

25

26

27

28   ⁵ In *Holland v. Jackson*, 542 U.S. 649, 653, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004), the Supreme Court noted the *Monroe* decision, but declined to address its standard of review determination.

- 14 -

EXHIBIT 11                                                                                         212

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 17 of 29   Page
ID #:1591
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 15 of 69   Page ID
#:1076

1   correct and can be rebutted only by clear and convincing evidence. *Pirtle*, 313 F.3d at
2   1167-68 (citing *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)).

3          In sum, with respect to claim number one, if in the State proceedings prior to
4   the 2007 proceedings the California Supreme Court was not able to consider the claim as
5   it stands now in this Court, *i.e.*, including pertinent facts adduced at the federal evidentiary
6   hearing, then review of claim number one should be *de novo*. *Killian*, 282 F.3d at 1208;
7   *Pirtle*, 313 F.3d at 1167-68.

8          The question for the Court then becomes:  Since its denial by the California
9   Supreme Court in 2003, was new evidence adduced in support of claim number one such
10  that the claim is now a new and different claim from the one decided by the State courts
11  in 2003?  The only new evidence suggested by Petitioner is a police interview of another
12  potential informant in which the police suggest surreptitiously that the informant continue
13  to question Petitioner. (Traverse, at 51; Transcript from December 2005 Evidentiary
14  Hearing ("EHT") II 167-68.)  Although this is new evidence, it does not involve Hughes
15  himself or show that Hughes had an ongoing relationship with police in April 1983.  It is
16  not by itself enough to transform this claim into one "for which no adjudication on the
17  merits in state court was possible." *Killian*, 282 F.3d at 1208.  For purposes of determining
18  the standard of this Court's review, Petitioner's right to counsel claim is unchanged by the
19  new evidence and the California Supreme Court in 2003 considered the same right to
20  counsel claim now presented to this Court.

21         Therefore, this Court is required to consider deferentially the 2003 State court
22  denial of claim number one under the AEDPA, which, as noted,  provides in relevant part:

23

24              (d)    An application for a writ of habeas corpus on behalf
25         of a person in custody pursuant to the judgment of a State court
26         shall not be granted with respect to any claim that was
27         adjudicated on the merits in State court proceedings unless the
28         adjudication of the claim –

- 15 -

EXHIBIT 11                                                                     213

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 18 of 29   Page
ID #:1592
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 16 of 69   Page ID
#:1077

1     (1) resulted in a decision that was contrary to, or

2    involved an unreasonable application of, clearly established

3    Federal law, as determined by the Supreme Court of the United

4    States; or

5     (2) resulted in a decision that was based on an

6    unreasonable determination of the facts in light of the evidence

7    presented in the State court proceeding.

8

9 28 U.S.C. § 2254.  Under the AEDPA, a federal court shall presume that a determination

10 of factual issues made by a State court is correct, and a petitioner has the burden of

11 rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

12    The Supreme Court has elaborated on the deferential standard of review of

13 legal determinations as follows:

14

15    Under the "contrary to" clause, a federal habeas court may grant

16    the writ if the state court arrives at a conclusion opposite to that

17    reached by [the Supreme Court] on a question of law or if the

18    state court decides a case differently than [the Supreme Court]

19    has on a set of materially indistinguishable facts.  Under the

20    "unreasonable application" clause, a federal habeas court may

21    grant the writ if the state court identifies the correct governing

22    legal principle from [the Supreme Court's] decisions but

23    unreasonably applies that principle to the facts of the prisoner's

24    case.

25

26 *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  A

27 State court's decision is an "unreasonable application" of Supreme Court precedent if it is

28 "objectively unreasonable" which "requires the state court decision to be more than

- 16 -

1  incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed.
2  2d 144 (2003).  Thus, "an unreasonable application is different from an incorrect one."
3  *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *accord Price*
4  *v. Vincent*, 538 U.S. 634, 643, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003) (even where
5  reviewing court might find that error occurred, habeas relief is not warranted where state
6  court denial of claim is "at least reasonable").

7      The Supreme Court has held, regarding State court factual findings:

8
9      Factual determinations by state courts are presumed correct
10      absent clear and convincing evidence to the contrary,
11      § 2254(e)(1), and a decision adjudicated on the merits in a state
12      court and based on a factual determination will not be
13      overturned on factual grounds unless objectively unreasonable
14      in light of the evidence presented in the state-court proceeding,
15      § 2254(d)(2).

16
17  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

18

19  **C.   The Introduction of the Confession**

20      At the time of his arrest, Petitioner was a 17 year old juvenile on suicide watch
21  in an adult jail unit, Module 7000 of the Los Angeles County Jail, known as the "Snitch
22  Tank." (*See* Augmented Reporter's Transcript ("ART") 357-59; Exh. 38.)  The cell into
23  which Petitioner was placed had holes in the walls to both adjoining cells; the inmates in
24  the cells on either side spoke to Petitioner through these holes. (*See* Motion to Dismiss,
25  Exh. B, at 33; Exh. 86, at 314.)  On one side was Robert Hughes and on the other side were
26  two inmates, Sherman Wallace and Michael Dowtu, both of whom also reported that
27  Petitioner confessed to them (one of them reported that Petitioner said he stabbed his
28  mother with a fork).  (EHT II 163-68; Exh. 86, at 311-21.)  Hughes was an experienced

- 17 -

EXHIBIT 11                                                                215

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 20 of 29   Page
ID #:1594
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 18 of 69   Page ID
#:1079

1  informant who had testified in two previous murder trials; he received the benefit of a
2  shortened prison stay in return for testifying against Petitioner. (*See* RT 571-74, 660-76;
3  ART 372; EHT III 90-91, 97, EHT IV 23-27; Exh. 86, at 685, 712-17.)

4          Hughes testified that he met Petitioner in April 1983, when he ministered to
5  Petitioner through the hole in the wall between their cells. (RT 547-50, 579-80, 646.)
6  According to Hughes, Petitioner immediately told Hughes that he wanted to confess to him.
7  (RT 549-50.) Petitioner told Hughes, "I killed my mother and I fucked up." (RT 550.)
8  According to Hughes, Petitioner's mistake was forgetting to get rid of his clothes which
9  were spattered with blood from beating the victim. (RT 550-51.) Hughes recounted to the
10 jury what he said was Petitioner's detailed account of the murder. (*See* RT 551-57.)

11

12 **D.     Analysis of Petitioner's Claim**

13          In *Massiah*, the Supreme Court held that a defendant's Sixth Amendment right
14 to counsel was violated "when there was used against him at his trial evidence of his own
15 incriminating words, which federal agents had deliberately elicited from him after he had
16 been indicted and in the absence of his counsel." *Id.*, 377 U.S. at 206. In that case, after
17 the defendant was indicted, retained a lawyer, pleaded not guilty, and was released on bail,
18 his co-defendant decided to cooperate with police and agreed to discuss with Massiah their
19 criminal activities while police listened via a radio transmitter placed in the co-defendant's
20 car. *Id.*, 377 U.S. at 201-03. The Court held that

21

22              it was entirely proper to continue an investigation of the
23              suspected criminal activities of the defendant . . . even though
24              the defendant had already been indicted. . . . [But] [d]efendant's
25              own incriminating statements, obtained by federal agents under
26              the circumstances here disclosed, could not constitutionally be
27              used by the prosecution as evidence against him at his trial.

28

EXHIBIT 11                                                216

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 21 of 29   Page
ID #:1595
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 19 of 69   Page ID
#:1080

1 | *Id.*, 377 U.S. at 207.

2 |      Subsequently, the Supreme Court decided *United States v. Henry*, 447 U.S.
3 | 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), in which it found the Government had
4 | violated Henry's Sixth Amendment right to counsel by "intentionally creating a situation
5 | likely to induce Henry to make incriminating statements without the assistance of counsel."
6 | *Id.*, 447 U.S. at 274. After Henry was arrested, arraigned and jailed for bank robbery,
7 | federal agents contacted Henry's cellmate, Nichols, and instructed him to "be alert" to
8 | Henry's statements regarding robbery, but not to initiate any conversation or to question
9 | Henry regarding the robbery. *Id.*, 447 U.S. at 265-66. The Court determined that "under
10 | the facts of this case a Government agent 'deliberately elicited' incriminating statements
11 | from Henry" because: (1) "Nichols was acting under instructions as a paid informant for
12 | the Government;" (2) Henry did not know Nichols was anything other than a cellmate; and
13 | (3) Henry was in custody when engaged in conversation by Nichols. *Id.*, 447 U.S. at 270.

14 |      Five years later, the Supreme Court decided *Maine v. Moulton*, 474 U.S. 159,
15 | 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). There, Moulton and his co-defendant Colson
16 | were indicted and pleaded not guilty to theft charges. *Id.*, 474 U.S. at 162. Colson
17 | confessed to police (and also told them Moulton had suggested killing a witness) and
18 | accepted a deal wherein no further charges would be filed against him if he cooperated in
19 | prosecuting Moulton. *Id.*, 474 U.S. at 162-63. Colson agreed to place a recording device
20 | on his phone and to record incoming calls from Moulton. *Id.*, 474 U.S. at 163. When
21 | Moulton and Colson planned a meeting to discuss defense strategies, Colson agreed to
22 | wear a recording device. *Id.*, 474 U.S. at 164-65. Although the police instructed Colson
23 | not to question Moulton, when the two met, Colson feigned forgetfulness and asked
24 | Moulton to recount details of their crimes. *Id.*, 474 U.S. at 164-66.

25 |      The Court held that the police violated Moulton's Sixth Amendment rights:

26 |

27 |      [T]he Sixth Amendment is not violated whenever – by luck or
28 |      happenstance – the State obtains incriminating statements from

EXHIBIT 11                                                          

1          the accused after the right to counsel has attached. However,

2          knowing exploitation by the State of an opportunity to confront

3          the accused without counsel being present is as much a breach

4          of the State's obligation not to circumvent the right to the

5          assistance of counsel as is the intentional creation of such an

6          opportunity. Accordingly, the Sixth Amendment is violated

7          when the State obtains incriminating statements by knowingly

8          circumventing the accused's right to have counsel present in a

9          confrontation between the accused and a state agent.

10

11 *Id.*, 474 U.S. at 176 (citation omitted). "[P]roof that the State 'must have known' that its

12 agent was likely to obtain incriminating statements from the accused in the absence of

13 counsel suffices to establish a Sixth Amendment violation." *Id.*, 474 U.S. at 176, n.12.

14       As the Court wrote, "[T]he Sixth Amendment also imposes on the State an

15 affirmative obligation to respect and preserve the accused's choice to seek . . . assistance

16 [of counsel;] . . . at the very least, the prosecutor and police have an affirmative obligation

17 not to act in a manner that circumvents and thereby dilutes the protection afforded by the

18 right to counsel." *Id.*, 474 U.S. at 170-71.

19       The main inquiry in Petitioner's case is whether Robert Hughes was a police

20 agent when he spoke to Petitioner. If not, then Petitioner's *Massiah* claim must fail; the

21 Sixth Amendment is violated only when the State or police, *through their agent,*

22 deliberately elicit incriminating statements, or create a situation likely to induce a

23 defendant to make such statements. *Henry,* 447 U.S. 264; *and see Randolph v. People of*

24 *the State of California,* 380 F.3d 1133, 1144 (9th Cir. 2004) (holding that it is the creation

25 of a cooperative relationship between the informant and the Government that creates an

26 agency relationship); *Creel v. Johnson,* 162 F.3d 385, 394 (5th Cir. 1998) ("Even if [the

27 informant] had 'deliberately elicited' incriminating statements from Creel, his right to

28 counsel was not violated because [the informant] was not an agent of the state."); *United*

- 20 -

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 23 of 29   Page
ID #:1597
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 21 of 69   Page ID
#:1082

1 *States v. Love*, 134 F.3d 595, 604 (4th Cir. 1998) ("The behavior of an informant who
2 initiates contact with an indicted defendant – whether because of conscience, curiosity, or
3 even potentially to curry an unpromised future favor from the government – cannot be
4 attributed to the government.").

5 　　　The trial and appellate courts found that Hughes was not a police agent when
6 he spoke to Petitioner. (ART 379-80; RT 12, 1227; Motion to Dismiss, Exh. B, at 33-34);
7 *Williams v. Woodford*, 384 F.3d 567, 599 (9th Cir. 2004) (whether informant is an agent
8 is a factual finding). The Supreme Court has not clearly identified the specific factors to
9 analyze to determine whether an informant is a government agent pursuant to *Massiah*; in
10 the Supreme Court cases interpreting *Massiah*, agency was not the central issue. *See*
11 *Matteo v. Superintendent*, 171 F.3d 877, 893 (3d Cir. 1999); *Creel*, 162 F.3d at 393.

12 　　　In *Henry*, the Supreme Court did find that the police, through their agent, had
13 "deliberately elicited" information from Henry because, among other facts, the
14 informant/agent was paid and acted pursuant to government instructions. *Henry*, 447 U.S.
15 at 270. The Ninth Circuit has relied on the absence of either of these two factors to
16 determine that an informant was *not* a government agent. *Brooks v. Kincheloe*, 848 F.2d
17 940, 945 (9th Cir. 1988). Other circuit courts have more expressly held that determining
18 the presence or absence of these two factors is a reasonable test for determining agency.
19 *See Creel*, 162 F.3d at 393 (finding that two-prong agency test of *quid pro quo* agreement
20 and instructions from police is consonant with Supreme Court authority); *Love*, 134 F.3d
21 at 604 (agreement with government and payment for information are "crucial indicia" of
22 agency); *cf. United States v. Chahia*, 544 F.3d 890, 900 (8th Cir. 2008) ("[A]n informant
23 becomes a government agent for purposes of [*Massiah*] only when the informant is
24 instructed by police to get information about the particular defendant.") (citation omitted).
25 On the other hand, there need not be an express agreement between police and the
26 informant for the informant to become an agent as "it is the relationship between the
27 informant and the State . . . that is the central and determinative issue." *Randolph*, 380
28 F.3d at 1144.

- 21 -

EXHIBIT 11                                                         219

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 24 of 29   Page
ID #:1598
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 22 of 69   Page ID
#:1083

1    The California Court of Appeal made a factual determination that Hughes
2  spoke to Petitioner on his own initiative and that he was not asked by police to question
3  Petitioner. (Motion to Dismiss, Exh. B, at 33.) From this determination, the court found
4  that Hughes was not a police agent in April 1983. (*Id.*, at 34.)

5    On the other hand, police records conflicted about when the police first met
6  with Hughes, although none specifically mentions a meeting as early as April 1983.[6]
7  Hughes testified that he immediately wrote notes of Petitioner's confession and had the
8  notes during his police interview, but he did not have the notes at trial and could not
9  remember anything about the physical appearance of the notes.[7] (RT 581-82, 631-32, 689-
10  90.) Hughes' testimony was inconsistent in numerous other respects as well.[8]  Hughes
11  previously had testified against at least two other defendants in murder cases and testified
12  that he "always" expected to get something in return for testifying against a defendant.
13  (RT 574, 584-85, 660-62.) Hughes was released early because of Rabichow's efforts on
14  his behalf. (RT 571-73, 663-76; *see also* ART 372.) Before Hughes approached the police
15  with information about Petitioner, police were contacted by two other inmates who

16

17

18

[6]  The police recorded only one contact with Hughes with respect to Petitioner's statements –
19  Hughes' July 6, 1983 interview with Monsue, but in that interview Hughes said he previously had spoken
20  with Detective Landgren. (EHT II 169-70; Exh. 99, at 8.) In the chronological record contained in the
     police "murder book," the first entry regarding Hughes is noted, out of chronological order in the record,
21  as having occurred on October 10, when a Beverly Hills Police Department sergeant reported that he had
     an informant to whom Petitioner had "copped out." (EHT II 170-72; Exh. 86, at 8.)

22
     [7]  Hughes testified he destroyed or threw away the notes. (RT 582, 632, 649, 683.) He also
23  testified that he either did give or may have given the notes to police. (RT 581-82, 632.) Hughes said
     he was sure he had the notes during his interview with police but there is no indication in the interview
24  transcript that Hughes had any notes. (RT 582, 633-34, 689.)

25
     [8]  Hughes both denied and admitted asking Petitioner for money and goods. (RT 580, 588, 591-
26  92, 606, *and see* RT 937.) Hughes denied, but prosecutor Rabichow agreed, that Hughes wrote letters
     to Petitioner acknowledging Petitioner's innocence. (RT 602-06, 620-21, 626-30, 644-45, 657-58.)
27  Hughes remembered minute details about Petitioner's confession, but remembered essentially nothing
     about how he "ministered" to Petitioner. (*See* RT 595-98.) Petitioner's father, Robert Lisker, testified
28  that Hughes told Petitioner and Mr. Lisker he knew Petitioner was innocent. (RT 936, 941.)

EXHIBIT 11                                                                                      220

1   reported that they also had solicited confessions from Petitioner.[9]  (Exh. 86, at 311-21.)
2   Finally, in 1990 the Los Angeles County Grand Jury issued a Report on police abuses in
3   the use of informants in the 7000 Module.  (*See* Exh. 38.)

4               The State courts reasonably could have decided that there was sufficient
5   circumstantial evidence to find an agency agreement between Hughes and the police prior
6   to April 1983. *See Moulton*, 474 U.S. at 176 n.12 (the Sixth Amendment is violated where
7   government "must have known" that the informant would take affirmative steps to procure
8   incriminating statements).  Nevertheless, under the AEDPA, this Court cannot determine
9   the evidence anew to review this factual determination; it must judge only whether the
10  State court's finding was so far afield as to be objectively unreasonable or, based on new
11  evidence, clearly in error. 28 U.S.C. § 2254(d)(2), (e). Because Petitioner does not present
12  any specific, compelling evidence that Hughes had an agreement with police *prior to April*
13  *1983*, it was neither. *Miller-El*, 537 U.S. at 340.  Petitioner's failure to make a sufficient
14  showing of an early relationship between Hughes and the police is fatal to his claim under
15  the AEDPA. 28 U.S.C. § 2254(d).
16  / / /
17  / / /
18  / / /
19
20
───────────────────
21      [9] *Detective Monsue and his partner Detective Landgren also interviewed, in April 1983, inmate
    Dowtu, who was housed in the cell on the other side of Petitioner's.* (EHT II 165-66; Exh. 86, at 314-
22  321.) That interview contains the following exchange between Dowtu and one of the detectives:

23              Dowtu: If this guy – I'd be talking to him. If he comes up with something else.
                Detective: Well, a, now if I was to tell you to go ahead and talk to him some more,
24          you'd be acting as my agent.
                Dowtu: Oh, I see.
25              Detective: And you can't do that, but we will be coming back up here to see you
26          again.

27  (EHT II 167-68.) To Los Angeles Police Department Internal Affairs Investigator James Gavin, this
    exchange showed the detective's telling Dowtu through a "wink and a nod" to question Petitioner.
28  (EHT II 168.) (This is the item of evidence not previously considered by the State courts.)

- 23 -

EXHIBIT 11                                                                    221

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 26 of 29   Page
ID #:1600
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 24 of 69   Page ID
#:1085

# VI.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's second claim is that his trial attorney, Dennis Mulcahy, was ineffective in failing to investigate and present evidence showing that Michael Ryan was responsible for the murder. (Second Amended Petition, at 5, att.; Traverse, at 55-66.) In the Second Amended Petition, Petitioner did not assert that counsel failed to investigate Ryan's involvement as separate from counsel's alleged failure to present the evidence already in his possession. (*See* Second Amended Petition, at 5, att.) Nevertheless, the parties have proceeded as if the failure to investigate allegation were included in the claim. Respondent answered the assertion in the Answer (*see* Answer, at 34, 37, 40-63), and Petitioner clarified in the Traverse that the claim does include an allegation that counsel failed to investigate Ryan adequately. (Traverse, at 55-66.) From their briefing and argument, it is clear that the parties have understood the failure to investigate allegation to be one of the two parts of the ineffective assistance of counsel claim. (*See* Respondent's Nov. 21, 2008 Post Evidentiary Hearing Brief ("Respondent's 11/21/08 Post-Hearing Brief"); Petitioner's November 22, 2008 Post-Hearing Memorandum; Respondent's July 28, 2008 Motion for Hearing; Petitioner's August 4, 2008 Opposition to Motion for Hearing; Respondent's August 11, 2008 Reply to Petitioner's Opposition to Motion for Hearing.)

Before the start of Petitioner's first trial, on November 15, 1984, prosecutor Rabichow moved to suppress any evidence suggesting that Michael Ryan, Petitioner's former roommate, was involved in the killing. (ART 389.) In opposing the prosecutor's motion, defense counsel told the court that he had a tape and transcript of an interview Detective Monsue had conducted with Ryan during which Ryan admitted going to the Liskers' house the day before the murder. (ART 390.) Counsel relayed that Ryan said he saw the victim that day and asked to use her phone and if she had any work for him to do. (*Id*.) Counsel summarized the rest of the Monsue interview as follows:

- 24 -

EXHIBIT 11                                                                                    222

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 27 of 29   Page
ID #:1601
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 25 of 69   Page ID
#:1086

1    [Ryan] talks about . . . that he had a knife. Detective
2    Monsue[,] and I don't remember where it was in here, asked him
3    about how he got all the way out of State only having so much
4    money, and it was impossible for him to have left basically with
5    just so much money and eating and where and how he explained
6    the scenario of events in this 41 pages to Detective Monsue.

7    Ryan never admitted being involved. Never admitted
8    having anything to do with this incident. But in reading this one
9    is under the distinct impression that Monsue at least believes it
10   is impossible for Ryan's story to fit that he had left the next day
11   and how he got to where he got with just the money. He could
12   be placed at the location. He can be placed in the neighborhood
13   of the location. He can be placed having some problems with
14   Dorka Lisker. He can be placed the day before by his own
15   statements.

16   . . . He had some problems with Dorka Lisker from
17   obtaining money from her. She apparently became a friend of
18   this Ryan through her son, Bruce.

19

20   (ART 390-91.)

21   Counsel told the court that he had a "private investigator also contact Ryan,
22   but by the time my private investigator contacted Ryan, he was out of state. He was in San
23   Francisco [*sic*]." (ART 391.) Finally, counsel referenced an interview of Ryan by two
24   private investigators, noting that in the interview, Ryan did not admit committing the
25   crime. (*Id.*) Contrary to the State's assertion here, the trial record does *not* indicate that
26
27
28

- 25 -

EXHIBIT 11                                                                    223

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 28 of 29   Page
ID #:1602
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 26 of 69   Page ID
#:1087

1    counsel provided the court with a copy of the Monsue interview, or any other interview

2    with Ryan.[10]

3

4              After a recess, the following colloquy occurred:

5

6              The Court: Okay. As I understand it then, the offer of

7         evidence basically is that this person was formerly a friend of

8         the defendant's. Was a roommate at some time previously at

9         that house, the victim's house. Was there the day before; is that

10        correct?

11             Mr. Mulcahy: That is correct.

12             The Court: I believe you said that he had tried to borrow

13        money from her that day?

14             Mr. Mulcahy: That's correct.

15             The Court: The day before and then there was some

16        reference to having a disagreement. Was that just that he didn't

17        get any money or what?

18

19

20   [10] Counsel testified here that he believed the trial transcript showed that the judge listened to the
     tape and had the transcript of the Monsue/Ryan interview, but counsel had no independent recollection
21   of providing the judge with either. (Transcript from October 2008 Evidentiary Hearing ("2 EHT") 23,
     29, 70-72.) (Counsel testified that he did not even remember whether *he* listened to the tape or read the
22   transcript. (2 EHT 22.)) Counsel's reading of the transcript is the basis for Respondent's assertion that
     the judge reviewed the interview himself; nowhere does Respondent offer any citation to the trial record
23   to support the argument. (*See* Respondent's Nov. 21, 2008 Post-Hearing Brief, at 5-6.)
              The record does not show that the trial judge reviewed either; it demonstrates to the contrary.
24   Regarding the evidence of Ryan's guilt, Judge Kolostian told counsel, "I got the impression the evidence
     is the tape that the prosecution gave you. Is there any other evidence?" (ART 397.) Counsel responded
25   that there was not. (ART 398.) The judge then summarized the evidence suggesting Ryan's guilt by
     referencing *only* the facts relayed by counsel in his argument. (*Id.*) (The court also did not reference any
26   facts from the Monsue interview in granting the prosecution's motion at the second trial. (RT 12-13.))
     As will be clear, it is inconceivable that the court would have agreed that these were the only relevant
27   facts to be gleaned from the Monsue interview. It is unreasonable to conclude that the judge reviewed
28   the interview himself.

- 26 -

EXHIBIT 11                                                                      224

Case 2:09-cv-09374-ODW-AJW   Document 106   Filed 06/17/11   Page 29 of 29   Page
ID #:1603
Case 2:04-cv-02687-VAP-RZ   Document 211   Filed 03/02/09   Page 27 of 69   Page ID
#:1088

1              Mr. Mulcahy:   There has been prior – I can produce

2            evidence that there were prior disagreements between Ryan and

3            Dorka Lisker about doing chores for money.

4            The Court: Okay.

5            Mr. Mulcahy: For whatever value that has.

6

7   (ART 398.)  Based on this showing by the defense, the court granted the prosecutor's

8   motion and ruled that evidence concerning Ryan was inadmissible. (ART 399.) The court

9   told counsel that if he had other evidence at a later time, "we will get into this again." (*Id*.)

10         On October 23, 1985, as the second trial began nearly a year later, prosecutor

11   Rabichow renewed his motion to exclude evidence of Ryan's involvement.  (RT 2.)

12   Mulcahy opposed the motion again and in opposition attempted to introduce a letter written

13   by Petitioner and/or an interview by Monsue of Petitioner in which Petitioner suggested

14   Ryan's guilt.  (RT 2-16.)  Counsel argued that the letter should be allowed in as an

15   admission under State law because the prosecution – the party opponent – was attempting

16   to keep it out.  (RT 3-4.)  The prosecutor correctly countered that under California's

17   hearsay rules, Petitioner could not introduce his own out-of-court exculpatory statement.

18   (RT 3, 8, 10-11.)  Counsel soon agreed, stating that the information in the letter is

19   "probably hearsay granted and it is not relevant." (RT 10.) After a lunch break, counsel

20   again argued for the admission of Petitioner's letter, this time as evidence of Petitioner's

21   state of mind. (RT 15-16.) The court found that the letter was "certainly not admissible."

22   (RT 16.) Counsel argued in sum that he should be able to introduce evidence that Ryan

23   was in the neighborhood the day before the murder and that the victim would have opened

24   the door for him because she knew him. (RT 10.) The court disagreed and again granted

25   the prosecution motion. (RT 12-13, 16.)

26   ///

27   ///

28   ///

- 27 -