**CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
**GARY G. GEUSS**, Chief Assistant City Attorney
**CORY BRENTE**, Assistant City Attorney
**AMY FIELD**, Deputy City Attorney - SBN 143827
**CHRISTIAN R. BOJORQUEZ**, Deputy City Attorney **-SBN 192872**
christian.bojorquez@lacity.org
amy.field@lacity.org
200 North Main Street, 6th Floor, City Hall East
Los Angeles, CA  90012
Phone No.: (213) 978-6900, Fax No.: (213) 978-8785

*Attorneys for Defendants* CITY OF LOS ANGELES, a municipal corporation, also named as the LOS ANGELES POLICE DEPARTMENT, a non-suable entity, ANDREW MONSUE and HOWARD LANDGREN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE E. LISKER, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF LOS ANGELES et al., <br><br> Defendants | CASE NO.: CV09-09374 AHM (AJWx) <br> [*The Hon. A. Howard Matz, Courtroom 14*] <br><br> **EXHIBIT 11 A IN SUPPORT OF DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY ADJUDICATION OF THE ISSUES** <br><br> [Filed/Lodged Concurrently Herewith: (1) Notice of Motion and Motion for Summary Judgment, etc.; (2) Statement of Uncontroverted Facts and Conclusions of Law; (3) Declarations; (4) Request for Judicial Notice;  and (5) (Proposed) Judgment/Order] <br><br> Date:     **July 25,** 2011 <br> Time: 10:00 a.m. <br> Courtroom:   14 |

1

A.  **State Court Review & the Standard of Review in this Court**

In his 2003 petitions for collateral review, Petitioner argued to the State courts that counsel was constitutionally ineffective in failing to present the jury with evidence suggesting Michael Ryan was responsible for the murder. (*See* Motion to Dismiss, Exhs. H, at 142-47; J, at 256-63.) In support of the claim, Petitioner presented new evidence, including the transcript of Monsue's 1983 interview with Ryan, a motel check-in receipt for the day of the murder showing that Ryan checked in under an assumed name and police notes showing he lied to Monsue about his check-in time, a phone record from the Lisker residence showing a call on the day of the murder to a number nearly identical to Ryan's mother's phone number, Ryan's lengthy and violent criminal record, and interviews of Ryan's parents. (Motion to Dismiss, Exh. H, at 129-40; J, at 240-68.) According to Petitioner, all of these materials either were in counsel's possession when he opposed the *in limine* motions or were easily obtainable at that time, and, had they been introduced, would have led to a denial of the *in limine* motion and a different result at trial. (*See id.*)

The State courts denied relief on this claim without supplying any reasoning beyond the Los Angeles County Superior Court's finding that in general Petitioner had been given "more than his day in court" and that his claims were speculative. (Motion to Dismiss, Exh. I.) The California Supreme Court denied Petitioner's 2003 petition for review without opinion, although two justices found that the petition should have been granted. (Motion to Dismiss, Exh. M, at 304.)

As with claim number one above, Petitioner argues that this claim should be reviewed *de novo* under *Killian* and *Pirtle* because, since the time that the State supreme court denied it on its merits in 2003, Petitioner discovered new facts in support of the claim and because the later State court denial, in 2007, was based on a procedural ground only. (*See* Traverse, at 6-7, 47-48.)

In fact, much of the evidence Petitioner proffers now in support of this claim *was* presented to the State courts in 2003. Importantly, however, Petitioner did not present

in 2003 the newly-developed shoe print evidence he offers in support of his claim now and which, by itself, could show that someone other than Petitioner was in the house at the time of the attack. (*See* Traverse, at 59.) In opposing Petitioner's motion to amend without exhaustion, Respondent seemed to concede that the ineffective assistance of counsel claim is a new one because new facts have "significantly altered that claim and created -- and formed it into a new posture." (Transcript of November 27, 2006 Court Hearing, at 17:24-18:2.)

The shoe print evidence is critical to the analysis of claim number two as it negates the prosecution's theory that only Petitioner could have been the killer; it made a third-party culpability defense far more plausible. Because it is critical to the analysis of the claim, the addition of the shoe print evidence thus renders the present claim one "for which no adjudication on the merits in state court [in 2003] was possible." *Killian*, 282 F.3d at 1208. Therefore, the State courts have not addressed the merits of the ineffective assistance of counsel claim now before this Court. *Killian*, 282 F.3d at 1208 (where new facts are discovered in federal habeas proceedings, review of a State court's denial is *de novo*); *Pirtle*, 313 F.3d at 1167-68 (where the California Supreme Court rejects a petitioner's claim for procedural reasons, AEDPA does not apply). For these reasons, Petitioner's ineffective assistance of counsel claim must be reviewed *de novo*.

B. Analysis of Petitioner's Claim

Petitioner claims here that counsel unreasonably failed to present to the trial court the compelling evidence he possessed of Ryan's involvement and that counsel unreasonably failed to further investigate Ryan's involvement by examining shoe prints at the Lisker house and autopsy photos and by obtaining the Lisker phone bill and Ryan's criminal record. (Second Amended Petition, at 5, att.; Traverse, at 55-66.)

In order to show a violation of the Sixth Amendment, Petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80

L. Ed. 2d 674 (1984). Petitioner bears the burden of establishing both components. *Id.* Deficient performance is performance which is objectively unreasonable under prevailing professional norms. *Id.*, 466 U.S. at 687-88. Under *Strickland*, counsel's deficient performance prejudices a petitioner where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the verdict." *Id.*

In sum, Petitioner must show: (1) that counsel performed deficiently by failing to argue the import of the evidence he possessed and/or by failing to obtain and present more compelling evidence of Ryan's involvement; and (2) that Petitioner's defense was prejudiced thereby, *i.e*, that, had counsel performed effectively, the court would have allowed the introduction of evidence of Ryan's guilt which then likely would have led to a different result at trial. More specifically, Petitioner must show that the evidence now proffered would have been admissible under the California law in effect at the time of his trials (1983-85) – the *Mendez-Arline* rule – which provided that evidence of third-party culpability was admissible "only if it constitutes substantial evidence tending to directly connect that person with the actual commission of the offense." *See People v. Hall*, 41 Cal. 3d 826, 831-32, 226 Cal. Rptr. 112 (1986) (explaining the rule and citing *People v. Mendez*, 193 Cal. 39 (1924) and *People v. Arline*, 13 Cal. App. 3d 200, 91 Cal. Rptr. 520 (1970)); *see also People v. Green*, 27 Cal. 3d 1, 22, 164 Cal. Rptr. 1 (1980) (citing rule); *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983) (same). The court applied this test

///
///
///
///
///
///

at Petitioner's trial to exclude evidence of Ryan's involvement.[11] (*See* ART 389-99, RT 2-16.)

The passage of nearly 25 years since Petitioner's trial necessarily dims memories. At various times during the second evidentiary hearing, counsel could not remember whether he did or said certain things. This is entirely natural, and not a basis for drawing adverse inferences. The Court also is aware that hindsight has a clarity rarely present in the hurly-burly of ongoing litigation. The Court has taken these things into consideration, and has given counsel the benefit of the doubt; the law in fact requires the Court to indulge presumptions in favor of the constitutionally effective assistance of counsel. *Strickland*, 466 U.S. at 689. The Court has done so here.

The passage of time also means that certain witnesses no longer are available. The Court has taken this fact into account also. However, the parties have not demonstrated that any witness, once but no longer available, would have given evidence which could affect the outcome of Petitioner's claim. Therefore, although Michael Ryan and Petitioner's father Robert Lisker both since have died, their presence or absence does not affect the outcome of this claim.[12]

---

[11] The California Supreme Court in 1986 (during the pendency of Petitioner's appeal) rejected the *Mendez-Arline* rule "to the extent that it create[d] a distinct and elevated standard for admitting" third-party culpability evidence. *People v. Hall*, 41 Cal. 3d 826, 834, 226 Cal. Rptr. 112 (1986). The court held that "[r]ather than speaking in terms of a *Mendez-Arline* 'rule,' courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion." *Hall*, 41 Cal. 3d at 834. In 1983, the Ninth Circuit noted the peculiarity of the *Mendez-Arline* rule and stated: "[W]e do not doubt that in some situations application of the *Mendez-Arline* rule would violate the Constitution." *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983) Petitioner did not challenge the application of the rule in his trial, only his attorney's failure to satisfy its requirements.

[12] Certainly it does not affect analysis of the claim in the way counsel for Respondent has so many times suggested, which is that Petitioner's allegation that Ryan was the killer must be entirely discounted because Petitioner did not make the assertion until after both Robert Lisker and Michael Ryan died. (*See e.g.* Answer, at 42; Traverse, Exh. A, at 131-32; Objections, at 25 ("Petitioner shrewdly waited until after Robert Lisker had died [and] Michael Ryan had died . . . before launching his brilliantly orchestrated campaign to assert his innocence.").) In fact, immediately upon his arrest in 1983, Petitioner proclaimed his innocence and soon thereafter urged the police to investigate Ryan; both Ryan and Robert

(continued...)

EXHIBIT 11    229

1. **Counsel Performed Deficiently When He Failed to Present Evidence Already in His Possession**

Monsue's interview with Ryan, combined with evidence contained in the police "murder book" – both of which were in counsel's possession before trial – contained more evidence implicating Ryan in the killing than Mulcahy suggested in his argument to the trial court. (*See* ART 390; Transcript from October 2008 Evidentiary Hearing ("2 EHT") 22-23, 41, 51, 61-63.) Counsel unreasonably ignored the most compelling of this evidence in his argument to the court.

For example, he did not tell the court that during the interview with Monsue, Ryan was inconsistent with respect to whether Mrs. Lisker was home when he said he went to the Lisker house on March 9, and the inconsistency appeared to depend on how Monsue framed questions to him, *i.e.*, whether Monsue was accusing Ryan of involvement in the murder. (EHT II 146-48; *see* Exh. 48, at 7 (victim was home), at 12 (victim was not home), at 14 (victim was home).) Counsel also did not tell the court that Ryan left California the day after the murder. (Exh. 48, at 9.)

Although in the first trial Mulcahy mentioned that Monsue told Ryan he appeared to have spent more money than he had, counsel did not explain the specifics or the significance of this observation, which was that money was missing from the victim's purse. (ART 390-91.) In fact, Monsue was correct that Ryan's explanations did not add up and Monsue pressed Ryan on this subject, at least to some degree. (Exh. 48, at 9-12, 16-17, 27-30.) But counsel did not explain this issue to the trial court in any helpful way (certainly he did not place it in context by noting that *Petitioner* did not possess any of the stolen money); the court was left with only a vague reference to money.[13]

---

[12](...continued)
Lisker were living at that time. (*See e.g.* Exhs. 42; 43.)

[13] At the first evidentiary hearing here, it developed that some of the missing money may have (continued...)

Counsel did not inform the court that Ryan lied about what time he checked into a motel on the day of the murder or that Ryan checked in under an assumed name. Even without being informed that the murder likely occurred around 11:00 that morning, Ryan told Monsue that he checked into a Hollywood motel at 11:00 a.m. on March 10. (Exh. 48, at 8.) Earlier, Ryan told Detective Landgren that he checked into the motel at 10:00 a.m. (Exh. 44.) In fact, included in the "murder book" were the police notes showing that Ryan did not check in until 3:00 p.m. that day. (Exh. 86, at 7.)

Counsel also did not tell the court that when Ryan checked into the motel on March 10, he did so under an alias, Mark Smith. (Exhs. 44; 45; 47; 48, at 25.) Ryan told Monsue he used the alias because he was scared after being in an altercation in which he stabbed a "colored guy." (Exhs. 45; 48, at 8-9, 25.) This explanation was not credible, however, as Ryan already had checked into the motel before he allegedly was involved in the knife fight. (Exhs. 45; 48, at 8-9, 25.) No innocent explanation for Ryan's lies was offered.[14]

Counsel therefore could have offered to the court, from the evidence already in his possession, a motive for Ryan to commit the crime (the theft of the money), his numerous lies indicating a consciousness of guilt (whether the victim was home when he visited, his false alibi of the motel check-in, his reason why he used an alias at the motel), and his flight out of State the day after the murder. And in conjunction with the few items counsel did point out to the court (that Ryan went to the victim's house and was granted entry by the victim), the unmentioned facts significantly linked Ryan to the crime. From the facts counsel possessed – but did not argue to the court – a jury could have determined

---

[13](...continued) remained inside the victim's purse. (EHT IV 44-48; Exh. 21.) But that money was not the full amount given to the victim the night prior by her husband, meaning some money still was missing from the Lisker residence. (*See* RT 223, 226.)

[14] Mulcahy testified here that he did not recall sending an investigator to look into the motel receipt but that he did remember reading in the "murder book" about the motel receipt. (2 EHT 30, 62.)

that Ryan had as much motive, means, and opportunity to commit the murder as did Petitioner. Yet counsel mentioned none of them.

Respondent argues that counsel's performance was nevertheless reasonable and strategic. As to the first trial, Respondent asserts that counsel did a proficient job of opposing the prosecution motion *in limine*. (Answer, at 37, 44; Respondent's 11/21/08 Post-Hearing Brief, at 5-6.) Specifically, Respondent says that Mulcahy provided the entire transcript and tape-recording of the Monsue/Ryan interview to the court and that the court read the transcript and listened to the tape. (Respondent's 11/21/08 Post-Hearing Brief, at 5-6.) As noted above, this assertion is unsupported by the record; the Court finds that counsel did not provide the judge with the Monsue interview. Instead, counsel told the court only about some of the information in the interview and did not mention or explain the most compelling evidence therein. By his failure to inform the trial court of the exculpatory evidence in his possession, Mulcahy lost his only opportunity to present the jury with a credible argument that someone other than Petitioner committed the murder. And, when the court said that it would take the matter up again if defense counsel had further evidence and defense counsel produced none, except as indicated below, he led the court to believe that he had provided *all* the evidence he possessed suggesting Ryan's involvement. This was not the case.

Of course, "[u]nder *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill," *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000), and in reviewing counsel's performance, this Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted). The Court acknowledges the difficulty of re-creating the atmosphere of 25 years ago, and the need to presume, absent strong evidence to the contrary, that counsel performed within constitutional limits.

Even judged under these strict standards, however, counsel's performance in opposing the *in limine* motion was objectively unreasonably under *Strickland*. His performance was inexplicable; no logical reason has been suggested or is apparent why counsel would not alert the court to the most compelling evidence of Ryan's guilt. Counsel possessed the information and its introduction carried no downside for Petitioner's defense. Counsel's defense strategy was to show that Petitioner did not commit the murder. Therefore, introducing compelling evidence that another person did commit the murder should have been Petitioner's strongest potential defense, but counsel did not proffer the evidence he possessed in support of this defense. Counsel's performance, given every benefit of the doubt, was objectively unreasonable and thus constitutionally deficient. *Rompilla v. Beard*, 545 U.S. 374, 387-89, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (counsel perform deficiently where they fail to examine and utilize critical, readily available evidence); *Belmontes v. Ayers*, 529 F.3d 834, 864-66 (9th Cir. 2008) (counsel performs deficiently where he fails to provide trier of fact with most compelling evidence in his possession, even if he offers some evidence and argument in defendant's favor); *Alcala v. Woodford*, 334 F.3d 862, 870-72 (9th Cir. 2003) (counsel performs deficiently where he possesses but does not present the strongest evidence to support his chosen defense theory); *Lord v. Wood*, 184 F.3d 1083, 1093-95 (9th Cir. 1999) (counsel performs deficiently where he fails to present the strongest evidence in his possession of the defendant's innocence based on counsel's unreasonable determination about the value of the testimony); *Hart v. Gomez*, 174 F.3d 1067, 1070-71 (9th Cir. 1999) (attorney performs deficiently where he fails to present known valuable exculpatory evidence); *and see Strickland*, 466 U.S. at 688 ("Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (counsel performs deficiently where there is "nothing in the record, apart from the fact of [his] incompetence, that suggests even a colorable explanation for his conduct.").

But Petitioner was not convicted at the first trial, so the Court also must examine counsel's performance at the second trial. As noted, at the second trial counsel did not restate the evidence he relied on to oppose the motion in the first trial, except to note that Ryan was in the neighborhood the day before the murder and that the victim would have opened the door for him. (RT 10.) The only other step counsel took was to attempt to introduce Petitioner's own letter and/or statements to Monsue in which Petitioner suggested Ryan's guilt, a predictably futile effort as the contents of both were inadmissible hearsay. (RT 2-16.)

Respondent now argues that counsel's performance was reasonable because, at the second trial, counsel made a tactical decision *not* to oppose the prosecutor's *in limine* motion. Counsel's testimony in this Court implied at one point that he did make such a decision. He testified that, after Petitioner pleaded guilty and admitted his guilt to CYA authorities in the period between the two trials, and, according to counsel, never denied committing the murder, counsel could not ethically suggest Ryan's guilt and Petitioner's innocence. (2 EHT 46-47.) In fact the record shows, however, that counsel *did* attempt to do just that by opposing Rabichow's motion *in limine* and asking the court to consider Petitioner's own letter suggesting Ryan was the killer. Counsel also testified here that he presented Petitioner's letter in hopes of arguing that Ryan committed the murder. (2 EHT 47-48.)

And, even if the Court were to disregard the record and presume, as Respondent and Mulcahy suggest, that Mulcahy made a tactical decision not to oppose the motion *in limine*, that underlying decision would have been unreasonable. Merely labeling a decision "strategic" does not insulate it from Sixth Amendment review. *Sanders*, 21 F.3d at 1456 (labeling counsel's decision "strategy" does not demonstrate by itself the reasonableness of his tactics under *Strickland*); *United States v. Tucker*, 716 F.2d 576, 586 (9th Cir. 1983) ("Certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective."). As Petitioner's defense attorney, Mulcahy had a duty to fully investigate and present a defense regardless of

whether Petitioner failed to proclaim his innocence, or pleaded guilty, or admitted his guilt to CYA authorities.

As the Ninth Circuit has explained:

> A defendant's admission of guilt to his lawyer does not absolve the lawyer of his duty to investigate the crime. The professional norms in existence [in the mid-1980's] and recognized by the Supreme Court clearly state that counsel must "explore all avenues leading to facts relevant to the merits of the case. . . . The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt. . . ." *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) (internal quotation marks omitted)).
>
> Strategic decisions based on information provided by the defendant are often reasonable and entitled to deference. *See, e.g., Strickland*, 466 U.S. at 691, 104 S. Ct. 2052 ("Counsel's actions are usually based, quite properly, . . . on information supplied by the defendant."). However, counsel must consider all of the defendant's statements, not just those that make his job easier. Even if we were to give credence to the State's dubious allegation that [the defendant] confessed to [counsel], which we do not, the glaring inconsistencies in [the defendant's] reported accounts of the murder made it unreasonable for [counsel] to rely on any one of [the defendant's] statements in isolation when making tactical decisions about investigating the crime.

*Duncan v. Ornoski*, 528 F.3d 1222, 1238-39 (9th Cir. 2008), *pet. for cert. filed* (Nov. 24, 2008) (No. 08-7440) (review sought by petitioner/prisoner); *and see* ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."); *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable..."); *Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1256 (W.D. Wash. 1994) ("The duty to investigate is not eliminated by the client's own conclusions or admissions of guilt, because the client's beliefs may not coincide with the necessary elements of proof to establish guilt in law.").

This is all the more true when, as here, Petitioner had an obvious and weighty strategic incentive to admit his guilt in order to obtain a placement in the Youth Authority for the limited time of approximately seven years, as compared to the 25 years-to-life sentence he faced if convicted of first degree murder (or the 16 years-to-life sentence he received for his second degree murder conviction). *See Lisker v. Knowles*, 463 F. Supp. 2d at 1029-30, 1040-41. Counsel even testified here that he would have informed Petitioner that a sentence of life with parole actually would have meant a lifetime in prison, as parole was rarely granted, further increasing Petitioner's incentive to plead guilty regardless of his actual guilt or innocence. (2 EHT 41, 78.) In addition, and as this Court also previously has found, Petitioner's admissions in conjunction with his strategic plea were anything but convincing evidence of his guilt: they were truncated or inconsistent descriptions of the crime and often contained no details at all about the murder, *Lisker v. Knowles*, 463 F. Supp. 2d at 1029-30, 1040-41, rendering them an unreliable barometer of what actually happened.

Despite all of this, counsel's testimony in this Court showed that he assumed Petitioner's statements to CYA authorities were truthful and that he therefore believed that any later suggestion that Petitioner was not the murderer – or apparently even any

investigation of a third party – would be unethical (although, as noted, apparently not to such an extent that it prevented him from presenting Petitioner's letter to argue that Ryan was the murderer). (2 EHT 46-47; *see also* Respondent's 11/21/08 Brief, at 18.) A defense attorney may not present evidence where counsel has a "firm factual basis" for concluding that it is false, *Lord*, 184 F.3d at 1095 n.9, but for all the reasons discussed above, Petitioner's statements did not by themselves provide a "firm, factual basis" to conclude that evidence of Ryan's involvement would have been false. A mere belief in Petitioner's "guilt certainly [could not] create an ethical bar against introduction of exculpatory evidence." *Id.* Therefore, a decision to abandon opposition to the prosecutor's motion, to the extent it even could be labeled "strategic," would have been so unreasonable as to constitute deficient performance.[15]

In fact, however, counsel did attempt to oppose the prosecution's motion *in limine*, but his efforts were inadequate. As noted, counsel ignored many pieces of compelling evidence already in his possession and instead made confusing and ineffective arguments based on unimportant, irrelevant, and/or inadmissible information. Importantly, his arguments rested on a basic misunderstanding of California evidentiary law, which precluded the admission of all of his newly proffered evidence. *Williams v. Taylor*, 529 U.S. at 395 (counsel performs deficiently where his actions are based on mistaken interpretation of State evidentiary law); *United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (defense counsel performs deficiently where his actions are based not on strategy, but on misunderstanding of the law); *Cheung v. Maddock*, 32 F. Supp. 2d 1150, 1161 (N.D. Cal. 1998) (counsel performs deficiently where, based on his misunderstanding of California evidentiary law, he does not introduce third party's inculpatory statement).

---

[15] In fact, counsel was nearly unwilling to admit that Petitioner actually *never* confessed his guilt to him. When asked directly by counsel for Respondent whether Petitioner ever admitted to counsel that "he did it," counsel evaded, "He never denied it." (2 EHT 43.) The Court told counsel that he had not answered the question put to him. (*Id.*) He responded, "I understand," then paused before eventually stating, "The answer is no." (*Id.*) There does not appear to this Court to be any good reason why counsel would hesitate to answer this question.

In sum, it is clear that counsel *did* attempt to present a third-party defense at the second trial. Therefore, Respondent's suggested explanation for why counsel decided *not* to present a defense – that Petitioner admitted his guilt– is irrelevant. And, even if the Court examines this rationale, it does not withstand any level of scrutiny in light of counsel's duty to defend his client. Finally, presenting an opposition to the prosecutor's motion in the way counsel did – based on a misunderstanding of State evidence law and with little to no support from the evidence in his possession – was deficient performance. For all these reasons, counsel performed deficiently with respect to his presentation of this potential defense, that someone else (Ryan) committed the murder. *Strickland*, 466 U.S. 668; *Belmontes*, 529 F.3d at 865-66; *Alcala*, 334 F.3d at 870-72.

## 2. Counsel Performed Deficiently by Failing to Further Investigate Ryan's Involvement

Petitioner also argues that counsel should have further investigated Ryan's involvement: counsel should have examined the shoe prints at the Lisker house and the autopsy photos and should have obtained the Lisker phone bill and Ryan's criminal record. Had he done so, counsel would have discovered further compelling evidence linking Ryan to the crime.

Had counsel obtained the Liskers' phone bill from Petitioner's father Robert Lisker, he would have discovered a critical link between Ryan and the scene of the crime. Although Ryan told Monsue that he went to the Liskers' house to use the telephone on March 9, 1983 (EHT II 143-44; Exhs. 45; 48, at 7), the Liskers' telephone bill showed that, at 10:22 a.m. on March 10, 1983, the date of the murder, a maximum one-minute call was placed to a phone number different by one digit (and without the area code) from Ryan's mother's number. (EHT II 145-46, 162; Exhs. 39; 40.) Ryan's mother had no memory of speaking on the phone with, or even meeting, Mrs. Lisker. (Exh. 107.) There was no call made to Ryan's mother on March 9, the day Ryan *said* he went to the Liskers' home to use the phone. (EHT II 144-45; Exhs. 39; 40.)

Counsel testified in this Court that he had sought a copy of the Lisker phone bill in order to challenge Robert Hughes' testimony regarding the order in which Petitioner placed calls after discovering his mother's body. (2 EHT 56.) Counsel also testified that a phone call placed at the time the one was made (nearly) to Ryan's mother's phone number would have been relevant to the defense and should have been investigated. (2 EHT 57.) It is entirely unclear to this Court why counsel would have had any difficulty in obtaining the bill, as he was in regular contact with Petitioner's father Robert Lisker, even discussing possible defenses with him, (*see* 2 EHT 27), and, of course, could have subpoenaed the bill from the phone company if Mr. Lisker did not have it.

Counsel also easily could have discovered and presented to the court, but did not, evidence that Ryan had a significant and violent criminal record both prior to and after 1982, including vicious crimes committed with knives. (EHT II 156-62; *see also* Exhs. 49-53; 59.) Counsel testified in this Court that after the trial court granted the first *in limine* motion, he investigated Ryan's criminal background. (2 EHT 32-33.) Whether he investigated it or not, counsel did not inform the court of Ryan's violent criminal past, which potentially could have been admitted at trial. CAL. EVID. CODE § 1101(b) (1985); *People v. Rivera*, 41 Cal. 3d 388, 392, 221 Cal. Rptr. 562 (1985); *People v. Brown*, 119 Cal. App. 3d 116, 134-35, 173 Cal. Rptr. 877 (1981).

If counsel had investigated Ryan's criminal record, he also could have discredited Ryan's statement to Monsue that he came to California in early March 1983 from Mississippi to join "Job Corps" and that he always planned to return to Mississippi. (EHT II 140-41; Exh. 48, at 5.) In fact, Ryan was on probation in Mississippi and that probation was transferred to California so that he could live with his mother here; Mississippi officials placed Ryan on a bus to California. (EHT II 141-42.) There was no reasonable explanation for why Ryan left California the day after the murder.

Finally, a new pivotal aspect of the claim arose from the 2005 evidentiary hearing in this Court: the shoe print evidence. At Petitioner's 1985 trial, the prosecution presented evidence that only Petitioner was in the house at the time of the murder; with the

exception of shoe prints left by the paramedics on the front porch, only Petitioner's shoe prints were found in or around the house. (RT 1121, 1195.) Detective Monsue testified that bloody shoe prints found in the guest bathroom and in front of and facing the kitchen sink, and shoe print impressions found outside in the dirt, "resembled quite closely" Petitioner's Pacer brand of shoes, which had a "similar pattern on them." (RT 278-79, 300-06, 326.) The jury was shown photographs of the prints in the guest bath and outside the house; no photographs were taken of the bloody print left in front of the kitchen sink. (*See* RT 304-05.) The shoe print found in front of the kitchen sink was important to the prosecution case because it discredited Petitioner's statement to Monsue that he had not approached the kitchen sink the morning of the murder. (RT 307, 326.) No shoe print expert was utilized by the police in the investigation or called as a witness by the prosecution; only Detective Monsue offered his opinion that the shoe prints were a match for Petitioner's Pacers. (*See* RT 326, 423-26, 468-69, 1121, 1195.) Prosecutor Rabichow stressed in closing that the prints were a match for Petitioner's shoes; he told the jury: "Only his footprint is in the blood."[16] (RT 1121.)

At the first evidentiary hearing here, Petitioner demonstrated conclusively that the shoe print evidence actually was exculpatory; Petitioner did not leave the bloody and muddy prints at the murder scene. *See Lisker v. Knowles*, 463 F. Supp. 2d at 1022-24. As this Court found, in 2004, Ronald Raquel, a criminalist with the Los Angeles Police Department for 19 years, analyzed photographs of the shoe impressions the prosecution argued were made by Petitioner's shoes.[17] (EHT I 185-88; Exhs. 6; 11; 65; 68.) Raquel concluded that the shoe impression left outside in the dirt ("print B") actually contained the

---

[16] At trial, the defense called two Los Angeles police officers to testify that Petitioner exhibited concern for his mother when they arrived at the scene. (*See* RT 829-35, 866-71.) Responding to one of the first questions from prosecutor Rabichow on cross-examination, each testified that he had been careful not to disturb the scene and had been careful not to step in blood. (RT 855-56, 874.) Rabichow suggested that the officers would not have left these shoe prints because "they preserved the scene." (RT 1121.)

[17] Obviously, no analysis was possible of the print allegedly left in the kitchen as it was never documented in a photograph or otherwise.

1  impressions of two different shoes. (EHT I 188-89; Exhs. 6; 11; 14; 65; 67.) One of these
2  prints, labeled by the parties "print B-1," was consistent with Petitioner's shoes, but the
3  other print, labeled "print B-2," was made by a shoe with a herringbone pattern and could
4  not have been made by Petitioner's Pacers, which had a wave pattern on the sole. (EHT I
5  188-90; Exhs. 6; 11; 14; 65; 67.) Raquel concluded that the bloody shoe print left in the
6  guest bathroom ("print G") was made by a shoe with a herringbone pattern and also could
7  not have been made by Petitioner's shoes. (EHT I 190; Exhs. 6; 11; 14; 65; 66.) Raquel
8  concluded that the shoes which left prints B-2 and G had a similar herringbone design; the
9  prints could have been made by the same shoes. (*Id.*) Raquel's supervisor concurred with
10 his findings. (EHT I 190.)

11         Called as a witness by Respondent, FBI Analyst Sandra Wiersema, an expert
12 working exclusively in shoe prints and tire tread evidence, agreed in a 2005 report with
13 Raquel's findings that print B-2 and G had characteristics similar to one another and could
14 not have been made by Petitioner's shoes. (EHT IV 54-64, 69-71; Exh. 15.)

15         To cast doubt on Petitioner's suggestion that the shoe impressions were left
16 by the perpetrator of the crime, Respondent introduced the testimony of former Los
17 Angeles police officers DeRousseau and Prado, the two officers who first responded to the
18 crime scene in 1983. (EHT III 9-22, 42-43.) Both claimed in 2005 to remember details not
19 contained in their 1983 written reports or mentioned in their 1985 trial testimony about
20 their two to three minute "protective sweep" of the Lisker house. (EHT III 52.)
21 Conversely, it appeared to the Court that neither officer remembered the victim's name
22 correctly or at all. (EHT III 6, 37.)

23         Both officers testified at the 2005 hearing, in accordance with their testimony
24 at trial, that they attempted not to disturb the crime scene or step in blood. (EHT III 10, 21,
25 44, 52.) DeRousseau testified here, however, that he could now see in crime scene
26 photographs blood stains on the carpeting in the house that he independently remembered
27 he did not see at the time. (EHT III 34-35; Exh. 64, at 93-95, 101, 103.) Prado did not go
28 this far, but did testify that many times, officers cannot see blood on the floor or in carpet.

(EHT III 44.) DeRousseau testified that during the initial protective sweep, he "probably" stepped in blood. (EHT III 10.) Prado reluctantly answered that he avoided stepping in that blood near the victim's body but also testified that it was possible he left the bloody shoe print in the guest bathroom even though he didn't notice himself leaving bloody shoe prints at the time. (EHT III 46, 54-56.)

Both officers testified here that in their March 10 protective sweep, they entered the guest bathroom where print G was found. (EHT III 12-13, 42-43.) In their reports written on March 10, 1983, however, neither officer indicated that he had entered the guest bathroom. (EHT III 28-29, 50-51; Exh. 86, at 365-365a, 366-67.) Nor did either officer testify at trial, when asked which rooms he searched, that he entered the guest bathroom. (*See* RT 838-39, 869, 874-75.) DeRousseau explained that he never said he entered that bathroom because nobody ever asked him specifically whether he searched that bathroom – even though he was asked which rooms he searched. (EHT 25-28.) He also testified here that he went outside to search, although Prado did not see him do so, and therefore that his shoes could have made the impression in print B-2. (EHT III 15-16; Exh. 67.)

The officers' testimony regarding their search was not credible for many reasons, not the least of which was their claimed ability to remember minute details such as whether they noticed specific blood stains during their quick search 20 years prior. This Court also was troubled by the fact that the officers' reports and trial testimony were at odds with their testimony here. (*See* EHT III 23-30.) Of course, neither officer remembered anything about the shoes he wore that day, so any suggestion that one of the two left the prints would be pure speculation. (EHT III 13-14, 45, 54-55.)

Petitioner demonstrated to this Court that the bloody shoe print in the guest bathroom and one of the shoe impressions in the dirt outside the house were left by someone other than himself, disproving the State's 1985 theory of his guilt. Moreover, given the officers' lack of credibility on this point, it appears likely that the shoe prints were not left by police personnel. There is no suggestion that any other official party might

have left the prints. The importance of the shoe print evidence, as conceded by prosecutor Rabichow, is that it is inconsistent with the prosecution's argument at trial that Petitioner committed the murder by himself. (*See e.g.* EHT I 39-42.)

Petitioner suggested one more shoe print has been found as well. In reviewing autopsy photographs as part of a recent investigation of Petitioner's case, Los Angeles police officer Albert James Gavin noticed what appeared to him to be a shoe impression on the victim's head. (EHT II 188.) He contacted Raquel with the information. Raquel reported to Gavin that the impression on the victim's head, which measured 1.5 inches by .5 inches, was made by a shoe. (EHT I 193, EHT II 23-24, 35-36; Exhs. 12; 14; 16, at 1, 3.) Raquel testified here, "I do foresee that there is a possibility out there in the world that there is a tool [that could make this impression]. I haven't seen it yet. But I do see shoe prints, and this is similar to what I see in shoe comparison." (EHT II 26.)

Respondent disputes that the impression on the victim's head was made by a shoe, and conjectured that the impression might have been made by another tool used to bludgeon the victim. However, Steven Dowell, a tool mark expert for the Los Angeles County Coroner's office, did not determine any specific tool that could have or did produce the impression; he was provided with no such implement by the State. (EHT V 37-43.)

Raquel concluded that the impression on the victim's head could not have been made by Petitioner's shoe; it had no characteristics in common with the Pacer shoe. (EHT I 193-96, EHT II 17-18, 38; Exhs. 12; 14.) The impression, however, had characteristics in common with prints B-2 and G; it appeared to be a herringbone pattern with similar spacing between the lines. (*Id.*)

While FBI analyst Wiersema did not find anything to suggest the mark was made by a shoe, presumably aside from the fact that it matched to a degree the known shoe prints in this case, she also could not conclude it was not a shoe print; she was provided with no implement by the State which might have made the impression. (EHT IV 77-78, 94-96.) In comparing prints B-2 and G with the impression on the head using one of the autopsy photographs, Wiersema concluded that the spacing between lines did not match.