**EXHIBIT 2**

**Terry A. Kupers, M.D., M.S.P.**
**8 Wildwood Avenue**
**Oakland, California 94610**
**510-654-8333**

May 25, 2011

I have been asked by attorneys William Genego and Barry Litt to meet with Mr. Bruce Lisker and provide opinions in Lisker v. City of Los Angeles, Case No: CV 09-9374-AHM (RCx). I have been asked what impact, if any, did his arrest, trial, conviction and 26 years of incarceration have on Mr. Lisker's life and emotional condition.

## I. Background

I am a board certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues. I have testified more than two dozen times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and the dynamics and psychiatric morbidity of prison sexual assault. I have served as a consultant to the U.S. Department of Justice and Human Rights Watch. I have served as a consultant in several jail departments of mental health. I testified in Toussaint v. McCarthy, Wilson v. Deukmejian, Gates v. Wilson and Coleman v. Wilson, all federal court cases involving the psychiatric effects of conditions in the California Depart of Corrections prisons as well the mental health treatment provided. In preparation for testimony in those cases, I toured many California prisons, for example I toured San Quentin State Prison on multiple occasions in the years between 1979 and 1993. I am

EXHIBIT 2                                         1 of 73

currently court-approved monitor of the Presley v. Epps consent decree
(federal court), involving prisoners with mental illness in isolated confinement
at Mississippi State Penitentiary.  I am the author of <u>Prison Madness: The
Mental Health Crisis Behind Bars and What We Must Do About It</u> (Jossey-
Bass/Wiley, 1998), co-editor of <u>Prison Masculinities</u> (Temple University Press,
2001), and a Contributing Editor of <u>Correctional Mental Health Report</u>.  I was
the recipient of the Exemplary Psychiatrist Award presented by the National
Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American
Psychiatric Association.  In 2009 I received the William Rossiter Award for
"global contributions made to the field of forensic mental health" from the
Forensic Mental Health Association of California.  My c.v. is attached to this
report as Exhibit A and a list of forensic cases of the past four years is
attached as Exhibit B.

     I have agreed to charge an hourly rate of $225 for all work except
testimony at deposition and trial, and $450 per hour for deposition and trial
testimony.  This report is preliminary in the sense that I remain very willing to
review more documents and consider more facts as the need arises.

## II. Preparation

     I have reviewed the complaint in this matter, the audio tape and
transcript of the 911 call Mr. Lisker made on March 10, 1983, Mr. Lisker's
CDCR file (031116-1667-03-18-11 Discovery) including copies of court
proceedings and parole assessments and hearings (BL-00556 - 00657), the
Declaration of Bruce Lisker with exhibits and letters of Robert Lisker, Fed
Evidence Hearing Exh 60, 61, 62, 96, 100, 101, 103 & 106, including post-
trial disavowal, retraction letter to the BPT, declaration of Joy Lisker,
Amenability Study, Probation Report, Life Prisoner Evaluation, Psych evaluation

EXHIBIT 2                                2 of 73

Ex. 131

for the BPT, and CYA documents; Transcript of the testimony of Robert Hughes, Juvenile Law Enforcement Contacts, a May 20, 2011 vocational report by Alessandro Anfuso, and a series of written statements by Mr. Lisker including "Account of Events, March 10, 1983."  On April 1, 2011, I met with Mr. Lisker for seven hours at my office in Oakland.  Subsequently I have spoken to him on the phone twice, for approximately 30 minutes a few days after our April 1 meeting, and then again for an hour on April 29, 2011.

## III.  Summary of Events

Mr. Lisker was 17 in March, 1983.  He was living in an apartment while being supported financially and emotionally by his adopted parents.  He was in a relationship with a woman.  He was struggling with a substance abuse problem.  On March 10, 1983, his mother, Dorka Lisker, was brutally murdered in her home.  Mr. Lisker discovered the body when he went to visit the home and called police.  He was arrested the same day and would remain in captivity until 26 years later, when he was 44 years old.  At first he was at Sylmar Juvenile Hall (3/11/83 - 4/3/83), then he was at Los Angeles County Jail and then, during the trial, in a juvenile facility.  In 1986 he was given a sixteen years to life prison sentence and sent to the California Youth Authority (CYA).  He was at the Reception Center for the CYA in Norwalk for a short time, and then at the Youth Training School in Ontario (March or April, 1986 to September, 1987).  He thought he was supposed to remain in the CYA until age 25, but it was decided that because he had a life sentence, he should go to the California Department of Corrections (CDC, more recently renamed California Department of Corrections and Rehabilitation or CDCR).  He was transferred to the adult Reception Center at the California Institution for Men (CIM) at Chino, and then to San Quentin State Prison, where he remained from late 1987 until late 1989.

EXHIBIT 2                                    3 of 73

Ex. 131

He received his G.E.D. while in prison, took college and vocational training courses including classes on computer programming and paralegal classes, and he held various relatively high level jobs while in prison. He was transferred to Mule Creek State Prison in 1989 and remained incarcerated there until his release from prison in 2009. He proclaimed his innocence and eventually prevailed on his efforts to be released. On August 13, 2009 he was released from prison. His father had died while he was incarcerated, as had his stepmother. So, upon release, he went to live with a family friend, applied for many jobs over a six month period, and eventually found work with help from family friends. He now works as a film handler and technical staff in a film restoration company and lives with his fiancee, Kara.

## IV. Pre-Incarceration History

Mr. Lisker was adopted at three days of age, to a 49 year old mother and 39 year old father. His dad was an attorney. A client had a pregnant daughter, and Mr. Lisker's parents had been trying to have children. He became their only child. His mom had been a filmcutter, but she quit work to raise Mr. Lisker. His adopted parents were caring but not demonstrative, and occasionally argued with each other. He remembers his childhood being "pretty happy." He loved riding his bike. He did well in school until the 3rd grade. He now thinks he had attention deficit disorder or ADD. He was prescribed Ritalin. It helped somewhat with his attention span. Mr. Lisker recalls playing the class clown in the 3rd grade. The teacher of that grade shamed the students, and acting the clown was his strategy for coping with the shaming. When he moved on to the 4th grade he had a better teacher, so he gave up that persona. Then he recalls becoming more of a wall-flower. But he stayed out of trouble. He was shy, and later his use of marijuana would

EXHIBIT 2                          4 of 73

make him even more self-conscious.  He was in a fight in the 5th grade, and lost a tooth from being hit in the mouth.

At approximately 11 or 12 years of age, Mr. Lisker started smoking marijuana.  The kids on his block who were considered the "cool kids" were smoking marijuana, so he started doing it.  Then he started not doing as well in school.  By 13 he was smoking marijuana as well as cigarettes.  His dad also smoked cigarettes.  He stayed in school until 1982, but he was in alternative schools.  He remembers doing OK in school, but he was not a particularly good student at the time.  He went with his dad to work on Saturdays.  He wanted to be a writer.

Until moving into his own apartment at 17, Mr. Lisker lived in a middle class Sherman Oaks neighborhood with his family.  He went to a few private schools.  He was sent to a Boys' Home in Susanville for 2 ½ years, from age 13 to 15.  He believes his parents sent him there to get him away from neighbors and marijuana.  He says with a certain sadness, "It didn't work, I was OK in school, but I came back to L.A. and started using pot again."  He used marijuana and alcohol.  He did some experimentation with other drugs, but does not think he ever really liked cocaine or "speed" (methamphetamine or "meth").  There is mention in Mr. Lisker's CDCR file of cocaine use through his teen years, and in psychological assessments for the Parole Board, as well as in a letter to the parole board from his father, that he had used methamphetamine on the day of the murder.[1]  Mr. Lisker believes that he emphasized his drug use so that he would be viewed as a good candidate for a

---

[1] In Mr. Lisker's written "account of events," he indicates that he used "crank" that day.  I usually employ the words "crank" and "meth" interchangeably, but the "crank" of the 80s was actually "slang for a low purity, crystallized methamphetamine" (http://www.urbandictionary.com/define.php?term=crank) that contained impurities and was less effective than today's "meth."

EXHIBIT 2                    5 of 73

Ex. 131

drug rehab program.  For a short while he attempted to emphasize the few times he had tried cocaine (he could not afford more frequent use) and methamphetamine (he was frightened of the physical side effects of using "meth").  Also, he explains, it was fashionable among juvenile offenders to use cocaine, it was a "classy drug," so he exaggerated his cocaine use to impress peers of that time.  In any case, he tells me, in summary, "The fact is that I used mainly pot and some alcohol, and only experimented occasionally with cocaine and speed."

Mr. Lisker finally dropped out of high school when he was almost 17 and in the 11th grade.  He was not in trouble with the law except for a "road rage incident."  Evidently he threw a screw-driver at another driver as the other driver drove away after a confrontation.  He was not charged with a crime, but he was counseled.  The police report mentioned "vandalism," and he made one visit to a probation officer.  He had no other criminal justice history.

Mr. Lisker went to a few other schools in the Susanville area.  He had been in gifted class in the first elementary grades, and when his performance lagged his parents first thought he was simply bored with school.  Then his grades fell, but he still received B's and C's.  He remembers one F in math in high school - he attributes that failure to marijuana use.  When he returned from Susanville he attended Birmingham high school.  He went to continuation school (Independence).  He was discovered under the influence of alcohol at school, and was transferred to Reseda for a few months.  Eventually he dropped out of school.  He spent a lot of time hunting for jobs, but he had long hair, and feels that is why he was relatively unsuccessful finding work.  He held various odd jobs for limited periods, but had no real long-term work record.  He had a car, his dad would help him, and he kept looking for work.

EXHIBIT 2                                    6 of 73

Ex. 131

In May, 1982 he moved out of his parents' home and into his own apartment. He lived there with support from his family. His mom did his laundry and shopped for him. He feels his parents just accepted that he had a drug problem, but he did a lot better when living on his own. Their relationship with each other improved when he moved out. He tells me: "They loved me and I loved them, they supported me in every way possible, but living with them kept leading to arguments about my marijuana use." He paid $210 per month for his apartment in Van Nuys.

Mr. Lisker was in the Palmer community outpatient 12-step program from age 15 to 17, approximately 1½ years, with regular attendance for 9 months. He had a period of sobriety, and met girls who were sober. He didn't think marijuana was that damaging. He did some experimenting with other drugs, but that was not as frequent as his marijuana use. Now he is convinced marijuana stunts one's growth.

Mike Ryan was someone Mr. Lisker met in the drug rehabilitation program. Mike was homeless and a year younger than Mr. Lisker. They knew each other for a few months. Then when Mr. Lisker moved to his apartment, he saw Mike at the program, and invited him to crash on his couch for a few days. Mike always wanted to get his way, and had a "short fuse." Mike stayed with Mr. Lisker for approximately 5 months. He would threaten Mr. Lisker with a knife. Finally Mr. Lisker told him he had to go, and was helping him move. Mike left. Mr. Lisker learned later that he went to Mississippi and got in trouble there, and by March he was on probation in Mississippi. Mike had his probation transferred to his own mother's area of the Valley in Los Angeles, and returned from Mississippi a few days before the murder of Mrs. Lisker. Mr. Lisker saw him briefly from a distance before his mom's murder. Mr. Lisker learned later from his father that Mike had shown up at his parents' house looking for work.

EXHIBIT 2                                    7 of 73

Ex. 131

At the time of the murder, Mr. Lisker was looking for work, and had broken up with Lisa, his girlfriend, the previous December.

A year and a half after his mother's death his father married Joy, who became Mr. Lisker's stepmother and would stay in touch with him while he was incarcerated. She died in 2007. His father passed away in 1995.

## V.  Arrest and Trial

Fear, grief and confusion fill the story Mr. Lisker tells of his arrest, experience in juvenile correctional facilities and the Los Angeles County Jail before and during his trial, and his experience in court. After being arrested he was taken to Juvenile Hall at Sylmar to await trial. He had just found his mother brutally murdered. He was racked with grief, but had no sympathetic person to support him at Juvenile Hall. He knew he was innocent, so he was confused by the fact that the police, especially Detective Monsue, and prosecutor thought he had murdered his mom. He kept thinking they would discover their error soon and release him. He knew his father and family did not believe he had killed his mother. He was grieving alone for his mother. His Dad told him about the memorial service for her that he could not attend because he was incarcerated. He was very upset he could not be there with his Dad and family.

He was in a single cell, he was upset and crying a lot and looking out the window, trying to keep his mind off of the jail setting where he was being held. He would look across the yard outside and try to imagine a shrine set up to honor his Mom. He was placed on suicide watch, with a staff person doing one-on-one observation in his cell. He tells me he never told the staff he was suicidal, in fact he denied it, but he must have said some irrational and emotional things that gave them the impression he was suicidal. He felt the

EXHIBIT 2                    8 of 73

Ex. 131

experience was devastating, and as a result he became increasingly infantile. He turned inward, he could barely speak, he was reduced to eating, sleeping, crying and praying for visits with his father and family.  He was prescribed the anti-psychotic medication, Mellaril, while in Observation, and he feels that very strong tranquilizer made him more withdrawn, more regressed and less capable of relating to others.

Because there was no way in the juvenile hall for him to grieve openly, he retreated into himself.  When he was taken to court, he felt bewildered.  He could not interact effectively with his attorney, he was too shocked by all the lies Detective Monsue and the other police officers told.  His father was in court, but his father was bewildered as well.  He was very disappointed in his attorney, who he feels did not put on an aggressive defense.  He remembers being very disappointed that the judge and his lawyer could not see what was going on, that the police officers were lying.  He was massively disappointed in the system, and says to me in an indignant and somewhat pleading tone:  "I thought you were supposed to be presumed innocent until proven guilty!"

Meanwhile, he was physically ill during the trial.  It was a very dark time. They forced him to take medications because he was "beyond upset," his mom had just been killed, "I was trying to deal with that, and then I'm wrongly accused of murdering her."  It was eerily quiet at the Sylmar juvenile hall.  He describes the entire situation as "very bizarre."  He was in acute grief and wanted to see his dad but was not permitted to call him.  He had lost everything, he was stripped naked (upon arrest), given jail garb, and he was in a cell with nothing.  "You don't know what time it is until the sun goes down.  I couldn't believe that my mom was gone, and until dad appeared for a visit, I was terrified he was gone.  It was awful and shook the foundation of my security. I was a new, different person, everything I knew was gone.  It made

EXHIBIT 2                                    9 of 73

Ex. 131

me despise the person I had been, that I could be so stupid as to meet someone like Mike Ryan."

Mr. Lisker had seen Mike Ryan (who had returned from Mississippi) from a distance on the street a few days prior to his mother's murder. After he was taken to Juvenile Hall and his father was permitted a visit, his father told him that he believed Mike Ryan had murdered his mother, after all Ryan had just returned to the Valley from Mississippi, and was always talking about violence.

Mr. Lisker assumed that when he eventually went to court, they would release him. "I always expected them to come in and say they'd gotten it wrong." He felt confident that the police would finally admit their mistake. In court, he heard Detective Monsue lie repeatedly, "It was so obvious!" Still the judge and attorneys gave the police the benefit of the doubt. "At first I kept thinking, 'Maybe I could show them where I was standing and how I could see my mom's body through the window,' but when Detective Monsue lied and got away with it, I knew I was dead." His attorney told him they could not raise the issue of the police lying. They never put Mr. Lisker on the stand to defend himself. He kept hoping the next court hearing would bring out the truth, he kept on hoping, but ultimately his hopes were dashed.

When it was decided to try him as an adult, he was transferred from the juvenile hall to Los Angeles County Jail, where he was put in a cell near four adult inmates. They were informants. He eventually knew that because they had "K-9 wrist bands," and K-9 was the area of the jail reserved for informants. (He would not find this out until much later). It was called the "snitch tank." At the time, he was very frightened, so he talked to the informants. He was frightened mostly about the possibility of assault or rape, so he did not even realize that these guys were "snitches." They disingenuously created rapport, he would find out later that they did that so that they could get information

EXHIBIT 2                    10 of 73

Ex 131 1

and snitch on him.  Then, when he stopped talking to them, they became abusive.  He was in a single cell by himself, the others were in neighboring cells, but there were holes in the walls between the cells.  He was terrified.  They were threatening that he'd be in trouble in prison.

Then he was moved into a cell with another juvenile.  He was functioning on the basis of what little he knew about the prison code, so, for example, he refused to accept cigarettes when they were offered out of fear the gift would involve required favors.   He felt his attorney was not effectively helping him. Mr. Lisker let an inmate named Hughes see the police reports about his mother's murder, thinking Hughes could help him with his case. Hughes was saying the other inmates would snitch on him, but he, Hughes, would help him. Of course, that turned out to be a lie, but for a moment it inspired hope.  "So much was going on, I couldn't really control my feelings, and fear led me to do stupid things." Hughes then claimed Mr. Lisker confessed to the murder of his mother, and used information in Mr. Lisker's police reports to support his claim that Mr. Lisker had confessed.

At one point, on the advice of his attorney and others that he was going to be convicted (given the evidence presented at the preliminary hearing) and a guilty plea would earn him a lighter sentence, and in spite of knowing he was entirely innocent, he pled guilty, in exchange for an agreement that he would be sentenced as a youth, he thought that meant he would be released when he was 25.  He was sent for a 90 day psychiatric evaluation.  As he understood it, the evaluation resulted in a conclusion he was not amenable to rehabilitation in juvenile programs because he lacked remorse (this was the first time he was confronted with the "no-win situation" wherein his truthfully claiming he had not committed the murder would be interpreted by authorities as a lack of remorse).  Therefore he would not be sent to the CYA.  The Judge permitted

EXHIBIT 2                              11 of 73

Ex. 1 31 1

him to rescind his guilty plea, he believes because the deal he had taken included programming at CYA.  He went to trial in 1985.  The trial lasted approximately two weeks and the jury was out several days.  By the time the trial occurred he had been transferred back from L.A. County Jail to the East Lake juvenile facility, where he would be incarcerated from approximately June, 1983 until March, 1986.

He would be waked at 4 AM on court days.  He found he was so terrified he could not eat until the end of the day in court, but then he would have a raging headache by 9 AM.  He was in a single cell, but transportation to court involved his waiting with adult defendants and being driven with them in a van to court.  The 45 minute or hour wait for the van and the time in transit would make his headache worse.  He would be dressed in a suit for court, and ordered to sit in the front of the van or bus because he was a juvenile.  He believes to this day that his clothes and placement led the adult inmates to assume he was being given special treatment because he was a "snitch."  (The prison code absolutely prohibits "snitching," and the penalty for snitching can be death - see below.)  So the adult inmates would pass him as they entered the van or bus and utter threats such as "Punk, I'm going to fix you when we get off this bus."  Officers were nearby while he waited on the van, but at the court, for example when he needed to use the restroom, he would be taken to the door of a large "holding cell" where 50 to 70 inmates awaiting court appearances would be crowded, and he had to traverse the entire room to get to the bathroom at the back of the room.  The adult inmates would swear and talk about doing violent things.  The officers would not accompany him through the room, so the other inmates would resume their threats, and he was terrified the entire time.

EXHIBIT 2                                    12 of 73

Ex. 131.1

Mr. Lisker felt like he was on a roller coaster, alternating between moments of great hope and repeated massive betrayals and disappointments. His Dad's visits gave him hope of getting out. There were multiple betrayals, first by the police, then by the informants/"snitches," including Hughes. That was a shock. He was becoming used to the betrayals, and whenever he began to experience hope he would start to expect the next betrayal, thinking, "It's just what I have coming." He reports: "That was depressing, disconcerting and nauseating. It was emotional vertigo. The ground beneath me kept falling away. I couldn't rest, I couldn't relax, I didn't know where the next blow would come from." He was not able to sleep much, he was always frightened.

All through the trial, he kept fantasizing getting out and being back with his dad. Other members of his family and his friends could not come visit him in juvenile hall. He had no contact with the others, and didn't know what they thought. But he was confident that his family knew he did not murder his mother. In June, 1985 he was found guilty of the murder of his mother (second degree, with deadly weapon). He was sentenced in January, 1986 to sixteen years to life.

## VI. In the California Youth Authority

After sentencing, in early 1986, Mr. Lisker was sent to the California Youth Authority (CYA), first to the Reception Center in Norwalk for approximately a week. The CYA was a crowded and violent place. Mr. Lisker had no real criminal experience, his illegal activities had mostly been limited to the use of marijuana. He was not used to fighting, was not especially angry, did not want to hurt anyone, and he was small. But most of the other inmates in the CYA had worked their way up from lesser to more serious crimes that would warrant placement in CYA, many were much larger than Mr. Lisker, they

EXHIBIT 2                    13 of 73

Ex. 131-1

lifted weights to "buff up," and they were very practiced at fighting.  Many were angry and set on hurting someone.  Gangs and violence were everywhere.  Fights were commonplace.  There were also rehabilitation programs and school.  But a new inmate had to prove himself in a hyper-masculine adolescent culture.

According to Mr. Lisker:  *"It was really scary, the youth authority was not juvenile hall.  In juvenile hall staff were watching you and you were relatively safe.  In the C.Y.A., there were 3 counselors for 300 kids.  There were pieces of metal for weapons, there were many fights.  I saw a lot of fights, mostly fistfights.  But I had never been in the kind of vicious fight I was seeing in the C.Y.A.  I looked around and thought, 'I'm going to have to do that!'  It was terrifying.  They test you.  One guy enlisted a tough Mexican guy, who came up and tested me.  I had to fight him, if I hadn't they'd have all jumped me.  I got knocked out several times, I had black eyes, and while I was getting beat up, all my stuff was stolen.  Then I had to go challenge the guy who stole my stuff.  I wasn't into fighting, but I was told that's what I had to do if I didn't want to get beat up every day and used as a sexual object.  Somehow I rose to the occasion.  I did OK in that fight, and I wasn't caught.  But then the staff asked me what happened that I had two black eyes, and they put me in containment (segregation) for fighting even though they hadn't seen the fight.  Eventually I got out of containment, and the other inmate gave me my stuff back.  That's how it was done.  After that, there wasn't a lot more testing.  And I was never really sexually assaulted - but sexual assaults did happen, and you had to ignore what was going on or you'd get attacked for 'snitching.'  Everybody settled into a routine, a community of incarceration, we were kids.  It was a twisted community.  You were rewarded for being a tough guy.  I wasn't an especially tough guy, but I had to find a role for myself.  I didn't need any status, so I just focused on my legal case."*

EXHIBIT 2                    14 of 73

After a few weeks in Reception, Mr. Lisker was sent to the Youth Training School in Ontario, where he remained from March or April, 1986 to September, 1987.  He was double-celled, and he was permitted to have a radio. There were less staff, more challenges, and more fights.  He had one more serious fight.  A year after his previous fight he was accused of having snitched.  He was terrified.  He was told he had to go "fight with Chewy."  He was assaulted by a group of wards, knocked down, and kicked.  After he was beaten, he was "OK with the guys."  He had made "a good showing."  In other words, while he was not a tough guy, and did not win the fights, he did not run away or 'chicken out,' and the other guys considered him OK.  Once again, the bottom fell out for him emotionally.  He continued to be always terrified it could happen again any time.  He learned to detach from his feelings, or keep his feelings to himself.  He resolved to always say he was happy, even when he was not.  He knew he was depressed and scared the entire time, but he had to "suck it up and go on."

Mr. Lisker earned a G.E.D soon after arriving in the CYA.  He was permitted recreation.  Mostly he spent time in the day room.  There was not much in the way of programming.  He had weekly group.  In group, he was always afraid the counselor might make him talk about his conviction crime.  He wouldn't be permitted to talk about his innocence.  If he said the wrong things, he would be stigmatized and attacked by the other wards (other youth offenders).  And if the counselor didn't like his answers, she could have him transferred to (adult) prison.  He decided that if she asked, he'd say he's on appeal and can't talk about it.  That did not happen, even though he remained frightened about it, and he did get some benefit from the group work.  For example, he worked on his relationship with his dad.  There was church on

EXHIBIT 2                              15 of 73

Sunday mornings, and visits on Sundays.  His father and Joy, his stepmother, would visit as often as they could.

Mr. Lisker avers that he knew about staff abusing wards.  The staff set up staged fights, where they put wards who were known enemies together and watched them fight viciously.  He knew about the cages where wards were placed on the yard or in classrooms, but he never really saw them.  He tells me: "If you were in a fight and staff intervened, the staff would beat you up even more when they broke up the fight."  That did not happen to him, but he saw it happen repeatedly.  He did not observe sexual assaults by staff or other wards, but knew that was going on.  A cellie of his was in a gladiator fight (a fight staged by officers), "going chests."  The phrase "Let's go chest" meant that two boys would take turns hitting each other in the chest.  He was a participant on many occasions, which resulted in severe chest pain.  He still suffers from pain in the chest, which has been diagnosed as costochondritis secondary to those hitting matches called "going chests."  He feels lucky he wasn't killed.

In fact, several years after Mr. Lisker left the CYA, the Prison Law Office initiated a class action lawsuit on behalf of the youth prisoner class claiming unconstitutional conditions, lack of educational and rehabilitative programming, excessive and unnecessary violence including staff-on-inmate violence and sexual assaults, and inadequate medical and mental health care (Farrell v. Harper, Sup Ct California, County of Alameda, No. RG 03079344).  The lawsuit placed a spotlight on the practice of confining youths in individual cages on the yard and in the classroom, physical and sexual abuse perpetrated by staff as well as peers, excessive involuntary psychiatric medication and a general lack of

EXHIBIT 2                                          16 of 73

adequate supervision for very troubled youths, one third of whom had been demonstrated to suffer from Posttraumatic Stress Disorder (PTSD).[2]

The September, 2003 Complaint in that action begins: "The CYA's illegal and inhumane conditions violate this statutory mandate and numerous other legal requirements. Rehabilitation is impossible when the classroom is a cage and wards live in constant fear of physical and sexual violence from CYA staff and other wards. Training is not possible while CYA programs are not available and CYA staff are inadequate in both numbers and experience. Treatment is impossible while forced administration of psychotropic medication is used as a tool to control behavior, and when psychologists and psychiatrists are not available to the vast majority of wards. The severe, unconstitutional and illegal problems and conditions in the CYA are not new and they are not a secret."

After the Farrell class action lawsuit was filed, quite a few California counties elected to remove sentenced juveniles from the CYA and confine them within the counties. Just about all of the conditions and program deficiencies identified in the Farrell v. Harper (original name of the case) Complaint were in effect during Mr. Lisker's tenure in the CYA. The Farrell v. Harper litigation led to a consent decree that included remedial plans regarding improved disability services, enhanced education programming, improved medical and mental health services, zero tolerance for sexual abuse perpetrated by staff or other offenders, and improvements in various safety procedures.

Subsequent to the Farrell litigation, administrative authority for CYA facilities has been assumed by the Division of Juvenile Justice within the

---

[2] Steiner, H., Garcia, I., & Matthews, Z. (1997), Posttraumatic stress disorder in incarcerated juvenile Delinquents, Journal of the Academy of Child and Adolescent Psychiatry, 36(3), 357–365.

EXHIBIT 2                    17 of 73

California Department of Corrections & Rehabilitation, and the population of the state's juvenile facilities has shrunk impressively as counties continue to sentence more juvenile offenders to programs within the counties.  But the fact remains that during Mr. Lisker's tenure in the CYA, the conditions, program deficiencies and abuses challenged in Farrell v. Harper were very much in place. Mr. Lisker believes he should have been retained in the CYA until he was 25, but he thinks because he had a life sentence he was transferred earlier to the adult system.  Mr. Lisker was transferred to the California Department of Corrections or CDC (since renamed the California Department of Corrections and Rehabilitation or CDCR) in 1987.

## VII.  In Prison

Entering prison can be quite traumatic.  According to Craig Haney,[3] "The process of prisonization involves the incorporation of the norms of prison life into one's habits of thinking, feeling and acting...  the longer persons are incarcerated, the more significant is the nature of their institutional transformation."[4]  The process includes all the phenomena sociologists have described as "institutionalization," where the institution is the prison.  The incarcerated individual is removed from family and community, loses daily contact with friends and loved ones, is removed from the job market and a career, and loses his freedom in almost every way.  There is loss of the identity one had in the community as one becomes an anonymous prisoner known by a number.  One's clothing choices are vastly restricted, one's grooming is proscribed,

---

[3] Craig Haney was a principle investigator in the "Stanford Mock Prison Experiment" in the early 1970s, and is a world-renowned expert on the psychological effects of prison conditions.  See his book, Haney, C. (2006). Reforming punishment: Psychological limits to the pains of imprisonment. Washington, DC: American Psychological Association.
[4] Craig Haney, "The Psychological Impact of Incarceration: Implications for Post-prison Adjustment," in J. Travis & M. Waul, Eds., Prisoners Once Removed, Washington, D.C.: The Urban Institute Press, 2003, pp. 33-65.

EXHIBIT 2                                    18 of 73

Ex. 131.1

there are rules governing just about every aspect of one's existence and there are officers who surveil, give orders, control one's life and mete punishments on a regular basis.

There is a large list of formal rules in prison, which can seem very petty, and there are frequent tickets (called '115s' in the CDC) for rule-breaking, where punishment can involve isolated confinement in a segregation cell. There are also unwritten rules, for example the "prison code" that, in men's prisons, requires one to act tough, not show feelings, definitely hide weakness and neediness, not trust anyone, not talk to officers, and never "snitch." I have written about the way the prison code and the institutional dynamics reinforce the most toxic aspects of masculinity, and ill-prepare an individual for successful re-integration into family and community upon release.[5] And then there is the shame of being a criminal, and the harsh treatment that is reserved for criminals in prison, all the more difficult to bear if one knows one has been falsely accused and convicted.

Chino Reception. Mr. Lisker entered the CDC through the Reception Center at Chino, where he spent two or three months. In a Reception Center, there is very little in the way of meaningful programming. The prisoners are awaiting classification, so they are mixed with many other prisoners whose violence potential is as yet unknown to the staff as well as to the prisoners themselves. Because of the murder conviction, Mr. Lisker was confined with relatively dangerous, high security prisoners in "maximum security." He was double-celled, and spent nearly 24 hours per day in his cell only to be released to go to the cafeteria for meals and to the yard every 2 or 3 days for a couple of hours. His cellmate was someone he had known in the CYA, so he felt relatively safe in his cell. But he knew there were a lot of violent people in the facility.

---

[5] Kupers, Terry, "Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," Journal of Clinical Psychology, 61,6, 2005, pp. 713-724.

EXHIBIT 2                              19 of 73

He was always very frightened, afraid he might be assaulted or raped.  He was young and in prison with adult men, where the image he had was of adults raping small, fair youths as they arrived in the adult prisons.  He was even more frightened because his small size and youth, combined with the conviction offense of killing his mother, made him a target.  To make matters worse, the showers were outside on "the yard," so the predators would be watching him shower.  And he knew there were predators, "booty bandits" or prison rapists, who he was warned to stay far away from.  He retreated into his cell as much as he could, reading <u>National Geographic</u>, smoking tobacco, and trying to talk to friendly prisoners to find out what prison would be like.  Luckily he was not assaulted, and though there were sexual propositions, he was not attacked at the Reception Center.

        <u>San Quentin State Prison</u>.  In addition to the stress of prison life in general, the years of Mr. Lisker's incarceration were an especially stressful time in the California Department of Corrections.  The prison population was multiplying rapidly.  By the time Mr. Lisker arrived at San Quentin (1987), the prison population was four times what it had been in the early 1970s.  But prison facilities and programs had not expanded accordingly, and prison life was filled with crowding and relative idleness. Overcrowding was always a central issue in the class action lawsuits brought against the California Department of Corrections for violations of the Eighth Amendment prohibiting "cruel and unusual punishment."  This writer testified as a psychiatric expert in several of those lawsuits, including Toussaint v. Enomoto, Wilson v. Deukmejian, Gates v. Deukmejian and Coleman v. Schwarzenneger.

        Mr. Lisker's time in California's prison system coincided with the worsening of an overcrowding crisis that eventually led to review in the U.S. Supreme Court.  A three federal judge panel ruled in January, 2010, that the CDCR must substantially reduce the population in its adult facilities because that

EXHIBIT 2                          20 of 73

would be the only way it would be possible to bring medical and mental health care up to constitutional standards.  The three judge panel oversees the Coleman v Schwarzenegger (re mental health issues) and Plata v Schwarzenegger (re medical care issues) litigations.  The state appealed the panel's ruling, the Supreme Court recently heard oral arguments on the issue of a population reduction, and a decision upholding the panel was announced by the U.S. Supreme Court on May 23, 2011.[6]  The U.S. Supreme Court agreed that:

> ....Crowding creates unsafe and unsanitary conditions that hamper effective delivery of medical and mental health care. It also promotes unrest and violence and can cause prisoners with latent mental illnesses to worsen and develop overt symptoms. Increased violence requires increased reliance on lockdowns to keep order, and lockdowns further impede the effective delivery of care.[7]

Meanwhile, rehabilitation programs, educational opportunities and jobs were quickly shrinking on account of the crowding and because there were concerns in the media, in the legislature and in public discussions about prisoners being "coddled." Thus, in the 1990s, federal Pell Grants for the education of prisoners were terminated. Weights and other athletic equipment were removed from prison yards.  There was a concerted effort to diminish rehabilitation programs, but the real diminution of the programs occurred because, as the prison population multiplied by leaps and bounds, funding for rehabilitation and education programs did not grow apace, and there were simply a growing number of idle prisoners crowded into every nook and cranny of the prisons.

---

[6] Brown v. Plata, No. 09-1233, Argued November 30, 2010—Decided May 23, 2011
[7] Ibid, p. 3.

EXHIBIT 2                              21 of 73

On 10/04/2006, Governor Arnold Schwarzenegger issued a Prison Overcrowding State of Emergency Proclamation describing the plight of California's prisons and previewing his proposals for reform. In that proclamation he outlined conditions that had prevailed for decades, including:

> WHEREAS, due to the record number of inmates currently housed in prison in California, all 33 CDCR prisons are now at or above maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks; and WHEREAS, the current severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them, because: With so many inmates housed in large common areas, there is an increased, substantial risk of violence, and greater difficulty controlling large inmate populations..... The triple-bunks and tight quarters create line-of-sight problems for correctional officers by blocking views, creating an increased, substantial security risk.

The California prisons were rife with violence in the late 1980s. There was crowding at every level. Most of the cells in older California prisons, including San Quentin, measure approximately 6' X 8,' and were built for one prisoner. But usually two prisoners were double-celled in them. If there are two prisoners in a 6'X8' cell, there is no room for one to get out of his bunk and walk to the toilet/sink appliance while the other is out of his bunk. The two inhabitants literally have to walk over each other. No wonder that when irritability levels rise, for example during a lockdown when the two cellmates are confined to that cell and idle for 24 hours per day, arguments

EXHIBIT 2                22 of 73

arise and fights occur between cellmates.   The American Correctional Association publishes minimum standards, including the amount of floor space that needs to be provided each prisoner.  The CDC was in violation of the ACA minimum standards in the eighties, and remains very far out of compliance with those standards.  Impromptu dormitories set up in gymnasiums violated the minimum standard, as did crowding two prisoners into a 6' X 8' cell.  The American Correctional Association standards include a provision for cells built before the standards were enacted, for example if the cell is too small *vis a vis* floor measurements, the prisoners must be released from their cell a greater number of hours during the day and thereby compensate for some of the crowding effects.

But instead of affording prisoners more out-of-cell time to compensate for the small cell size, very often precisely the opposite occurs in California prisons: the prisons are "locked down."  A lockdown is an administrative procedure whereby all prisoners are restricted to their cells or dorms.  A lockdown can last a day, a week, or months.  The two (or sometimes three) prisoners in the 6' X 8' cell would need to stay in that cell 24 hours per day.  Lockdowns are usually a response to deadly violence that has gotten out of control.  When there are confrontations between gangs, or merely a number of fights or murders, the prison is "locked down."  Prisoners do not go to the cafeteria nor the yard nor to their programs, and many do not go to their jobs (there are some exceptions, and prisoners who do essential jobs are released from their cells).  Lockdowns were pretty commonplace during the time Mr. Lisker spent at San Quentin and Mule Creek State Prisons.  In the early 1980s, while preparing for testimony as an expert witness in Toussaint v. Wilson, I added up all the days of the previous year when San Quentin was "locked down," and discovered the prison had been locked down 150 days the previous year - nearly half the days of the year!  And still the violence rate was extremely high.

EXHIBIT 2                                    23 of 73

Lockdowns are a drastic response to violence in correctional facilities.  But then the prisoners forced to stay in a small cell with a cellmate or are crowded into dormitories become angry at each other and violence erupts within the cells and dorms.  Then, in the days following the ending of the lockdown, there is usually a spike in violence, as if the prisoners were waiting to get out of their cells to get at each other.  There are many variations, but the bottom line is that in the late 80's, when Mr. Lisker spent two years at San Quentin, the violence rate was very high and lockdowns were frequent.  San Quentin at that time was a Maximum Security, Level IV prison - years later it would be converted to a Reception Center, largely a Medium Security facility, and the more dangerous prisoners would be transferred to a supermaximum security facility such as Pelican Bay State Prison or Corcoran State Prison.  But when Mr. Lisker was at San Quentin, it was the highest security prison in the CDC, and the most violent.

The 1980s were a time in the California Department of Corrections when overcrowding and other stressful conditions, along with the diminution in rehabilitation opportunities, made the prison milieu extremely stressful. There was convincing research at the time that prison crowding causes increased rates of violence, psychiatric breakdown and suicide in correctional facilities.[8]  I relied on that research in providing psychiatric expert opinions.  One had only to tour a prison to understand how violence and madness were bred by the crowding.  With tough men crowded into small spaces, with too few opportunities to participate in meaningful programs, and the men being forced to wait in long lines to use the telephone or put food on their trays, altercations are practically inevitable.  The next prisoner in line begins to harass the

---

[8] Paulus PB, McCain G and Cox VC (1978) Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding. *Environmental Psychology and Nonverbal Behavior*, 3, 107-117. 1978; Thornberry T and Call J (1983) Constitutional Challenges to Prison Overcrowding: the scientific evidence of harmful effects. *Hastings Law Journal*, 35, 313-353.

EXHIBIT 2                                      24 of 73

prisoner on the phone, saying he's been on too long, the man on the phone turns and takes a swing at the other, and there's a fight.  Of course, open expressions of rage and frequent eruptions of violence tend to push individuals prone to psychiatric breakdown over the edge.  Often they become preferred victims of the violence.  The more violence, the more madness, and the crowding exacerbates both.

Violation of the prison code in a crowded maximum security prison is almost certain to lead to violent retaliation or sexual assault.  It is very difficult for a prisoner to avoid trouble in this context.  Staff will say that the proper thing for a prisoner to do when threatened or assaulted is to report the perpetrator to the staff.  And that is what the official rules require.  But the staff is usually quite incapable of providing safety against retaliation, and the "no snitch" rule of the unofficial prison code is so strong, and so vengefully enforced by prisoners, that the prisoner who does "snitch" to staff puts himself in grave danger of deadly assault, and is at risk of being raped or killed.  The prisoner is in a "no win" situation.  This is why so many prisoners develop a mean stare, lift weights compulsively and walk around looking as if they mean to harm someone,.  The best way to stay safe in a maximum security prison is to make certain it looks like anyone who attacks one is going to get hurt.

There was always another factor that placed Mr. Lisker in harm's way inside prison: he was convicted of murdering his mother.  Prisoners are known to attack other prisoners who have molested children, who have served as police informants and who have worked as police.  Killing one's mother earns one a spot on this most-hated prisoner list, and the list of those most likely to be attacked.  While he was relatively unsophisticated about criminal ways and prison realities, Mr. Lisker knew that if other prisoners learned he had been convicted of killing his mother, he would be in grave danger.  And at various times, the other prisoners did learn of his crime of conviction.  He always felt

EXHIBIT 2                                      25 of 73

like a "mark."  "The prison was full of Mike Ryans," he tells me with tears in his
eyes.

Mr. Lisker is short, around 5'6"" now but he was 5'4" when he entered the
CYA.  He weighed 97 pounds when he was arrested, and 135 or 140 when he was at
San Quentin.  The very real objective danger of attack was everpresent.  Then there
was also the omnipresent subjective sense of terror Mr. Lisker felt all the time while in
prison that someone would assault or kill him because he had been convicted of killing
his mother.  He was young, and like everyone else, he believed that young new
prisoners, or "fish" as they are called, are targets for assault and rape, especially when,
like him, they are small, unschooled in criminal ways, not tough and menacing, and are
convicted of killing their mother.  He lived in dread of attack, and this meant he was
always anxious, always depressed, isolated from others and always hyper-vigilant in
order to maximize his safety.[9]

Meanwhile, rehabilitation programs had been downsized or dismantled in the
CDC.  Even if the budget for educational programs, job training and social skills
facilitation had remained constant, the fact that the prisoner population had grown so
rapidly would have meant that rehabilitation programs would be less available and less
intensive, on average.  But rehabilitation programs were at the same time being
relatively de-funded and dismantled.  There were demands by legislators to "stop
coddling" prisoners.  The weights were removed from the prison yards.  A growing
proportion of prisoners were being consigned to long-term solitary confinement or

---

[9] Continual states of anxiety are accompanied by physical changes in the body that can
become habitual and chronic.  Thus, there is the repetitive secretion of adrenaline and
cortisol by the adrenal glands and identifiable patterns of neuronal firings in the
temporal lobe region of the brain.  These physical changes in the brain have been
observed by utilizing some of the newer brain imaging technologies such as Photon-
Emission Tomography (PET Scans).   See, for example, Mirzaei, S., et al., Regional
cerebral blood flow in patients suffering from post-traumatic stress disorder,
*Neuropsychobiology*, 43, 4, pp. 260-264, 2001.  See also footnote #13, below.

EXHIBIT 2                              26 of 73

"segregation," where they would spend nearly 24 hours per day in a cell and take part in no rehabilitation programming.

In a January 25, 2007 cover letter to the Governor and Legislature accompanying its report titled "Solving California's Corrections Crisis: Time Is Running Out," the Little Hoover Commission described the conditions that had prevailed in California prisons over the last two decades:

> California's prisons are out of space and running out of time... The problem does not need further study. The State knows what the answers are, thanks to nearly two decades of work... The bare facts have earned California's Department of Corrections and Rehabilitation an ignoble distinction for systemic failure. Inmates have swelled prisons far past capacity. With cells already full, new inmates camp out in hallways, gyms and classrooms... The ranks of correctional officers have not kept pace with the rising prison population.  The department has thousands of openings, resulting in huge overtime bills and mounting stress for correctional officers....  The status quo is not acceptable... The choices are stark. The price of failure is unimaginable.[10]

We know quite a lot from litigation-related investigations into the conditions at San Quentin prison during the period when Mr. Lisker was confined there.  For example, a class action lawsuit was brought in Judge Beverly Savitt's Superior Court courtroom in Marin County, and experts, including this writer, testified about the extremely harsh conditions at San Quentin.  Judge Savitt summarized the conditions where Mr. Lisker was required to dwell, writing that they were "readily apparent and undisputed":

> The men imprisoned there live under conditions which fall

---

[10] Little Hoover Commission, "Solving California's Corrections Crisis: Time Is Running Out," January 25, 2007.

EXHIBIT 2                                         27 of 73

well below the basic standards of human decency. Double-celling in extremely small cells remains the rule on the mainline at San Quentin. Violence in the prison is at an unprecedented level and threatens to rage entirely out of control... San Quentin is one of California's oldest prisons, portions of which were constructed over 100 years ago. Inmates share cells of 48 square feet in area and 360 cubic feet of space. The cells lack adequate heat, proper lighting, sufficient ventilation, and hot water. The plumbing is badly deteriorated. The electrical system is in total violation of all relevant codes and has been aptly described as an "electrical nightmare." Fire hazards abound and the provision for fire safety is extremely inadequate. Food is prepared and served under unsanitary conditions by inadequately trained and improperly supervised food service workers, using outmoded and unsafe equipment. General sanitation, although improved in some respects since this suit was filed in June of 1981, remains deplorable. The physical plant deficiencies and inadequate sanitation practices at San Quentin expose the men confined there to constant, severe and unjustifiable threats to their health and safety.[11]

Harsh prison conditions compound each other.  For example, when there are many more inhabitants than an institution was designed to accommodate, the plumbing and sewer system are overstressed and there are shutdowns and back-ups; the rehabilitation, school and work programs are oversubscribed so a large proportion of the prisoner population is idle at any given time; and the noise becomes unbearable, secondarily causing huge sleep deficits.  The sheer number of people, two each in cells built for one, means that the noise level rises.  As the noise level rises, prisoners have great trouble sleeping.  And then the lack of sleep makes them more irritable, or more

---

[11] Wilson v. Deukmejian, Superior Court of Marin County, Tentative Decision and Proposed Statement of Decision, August 5,1981, at p. 2.

EXHIBIT 2                          28 of 73

Ex. 131.2

depressed, and then more fights break out among sleep-deprived and irritable prisoners.

When I testified before Judge Savitt as a psychiatric expert in Wilson v. Deukmejian, I described the very high noise level in a cellblock containing four or five floors of stacked cells sharing a common open air space, and how it caused prisoners to lose sleep, which then meant that they would be more irritable and less able to participate in programs. The state's psychiatric expert minimized the problem and testified that the prisoners get used to the noise and it does no harm. Judge Savitt recessed court and paid an unscheduled inspection visit to the nearby prison. When she re-opened the hearing she opined from the bench that she had found the noise level on the block I had described unbearably loud and found the state's expert's opinion that prisoners get accustomed to it simply not credible. This was the kind of cellblock where Mr. Lisker was confined while at San Quentin.

Mr. Lisker reports that for much of the time he was at San Quentin, between lockdowns of course, he was taking computer classes. He was often double-celled, and he would always be frightened when he had a new cellmate because he might attack him after he went to sleep. Because he was in those classes, or because he was given jobs that required technical skills, he was sometimes permitted a single-cell and did not have to have a cellmate. He remembers much violence all around him, and many lockdowns. There were violent gangs, and in the late 1980's many of their members were being transferred to long-term segregation at Pelican Bay or Corcoran, especially the leaders or "shot-callers." But that did not halt the violence. Far from it. With leaders of the gangs being shipped out, the younger toughs and "gang-bangers" would fight even more with each other to determine who would become "top dog" and step into the absent shot-caller's place.

Mr. Lisker reports his experience at San Quentin: *"It was very scary. San Quentin was Maximum Security, Level IV, the highest. The vibe was that*

EXHIBIT 2                    29 of 73

Ex 131 2

*this was a place where people lived and died, there was incalculable cruelty, lots of crime and violence happened here.  I was in general population the entire time.  I got minor write-ups for missing work, once I got a 115 (disciplinary infraction) for covering my cell door (he means covering the small window in a solid metal door, which was strictly forbidden for security reasons - TK).  I didn't actually have any fights.  But I saw lots of fights.  I saw stabbings. The prison code dictates you can't look, but you'd see it out of the corner of your eye, you'd be praying for this person not to die.  I can't understand how someone can be so detached as to stab another person.  I probably witnessed about five stabbings, at least one to death.  Chaos breaks out, there are alarms.  Always the possibility of violence is present.  You would never know if it was coming at you.  I was always hyper-vigilant. There was racial stuff.  You didn't associate with other races.  You would be attacked if you broke the (informal) rules about the separation of races.  There was a lot of racial tension.  You had to stick with your own, talking to prisoners of other races was frowned upon and could end in violence.  I was white, but I was viewed as Jewish.  My father was Jewish but I was raised in the Catholic Church.  Still, in prison I was called a 'kike.'  The skinheads and gangs such as the 'Aryan Brotherhood' threatened me repeatedly - they were very anti-semitic - but luckily they never really attacked."*

Of course, Mr. Lisker is right about the problem being identified as Jewish in prison.  The races segregate themselves, and the gangs dominate social relations in each racial group.  The white group of prisoners is at the mercy of gangs like the Aryan Brotherhood - gangs that identify with Nazis and practice virulent anti-semitism.  The prisoner identified as Jewish has no allies and is always at risk of attack.

EXHIBIT 2                                    30 of 73

Mr. Lisker told me about arguments that would arise between him and cellmates when they were locked down for any significant length of time. There would be no privacy in the very small cell.  He never really bought into posturing like a tough guy - he thought the whole game was "stupid."  But he could not convince other prisoners it was stupid, for example to get into a fight just because someone insulted you.  He says: "They couldn't see that, if they had seen how stupid it was, the time I spent in prison would have been much more tolerable for me."  He was frightened all of the time.  He cries while recalling the ongoing tensions and frequent violent episodes.  He sighs and says he is really glad he survived - he often wasn't certain he would.

Mr. Lisker avoided solitary confinement or segregation while at San Quentin.  Drugs are readily available in prison, as is alcohol.  And he used some of each in the first few years he was in prison.  But then he became and remained clean and sober, participated in AA, NA and other "12-step programs," and viewed himself as in recovery from substance abuse.  Of course he had some fights, he was forced into it by the situation.  As in the CYA, he had to make a good "showing" to gain the respect of the other prisoners.  His father had been in the military in WWII as a 16-year old.  He felt prison was his war.  Still he tried to stay away from tough guys, and also from timid guys because they could bring on assaults by the toughs.  He did what was smart, and avoided dangerous situations as best he could manage.

Prisoners who successfully participate in meaningful educational and rehabilitative pursuits in prison have a stunningly lower recidivism rate than those who are not able to prepare themselves for a life after prison.  They also suffer much less distress.  Human beings require meaningful activities and trusting relationships to maintain emotional stability. Mr. Lisker took advantage of all the courses and job possibilities that were available to him in prison.  But at San Quentin and later at Mule Creek, programs were

EXHIBIT 2                    31 of 73

often cancelled on account of "lockdowns," and the prisoners confined to their cells for significant periods.

Mule Creek State Prison.  In 1989, Mr. Lisker was transferred to Mule Creek State Prison, a medium security facility (Level III), where he remained until his release from prison in August, 2009.  Mule Creek State Prison was built in 1987 and designed for a maximum capacity of 1,700 prisoners.  However, during Mr. Lisker's tenure there, the actual population was in the neighborhood of 3,500 to 3,800 prisoners.  Thus there was massive overcrowding, and as at San Quentin, gymnasiums were converted into dormitories and all living spaces were crowded. Mule Creek is medium security, and had a lower violence rate than San Quentin when Mr. Lisker was there and San Quentin was a maximum security facility.  But there was quite a lot of violence.  There are three yards at Mule Creek; yards A, B & C; meaning the prison is divided into three sections.  According to Mr. Lisker, on a yard of more than 1,000 prisoners, there would be at least one fight per day, on average.  So he had to remain hyper-vigilant.

One of the concomitants of out-of-control crowding is the conversion of gymnasiums into dormitories.  This was going on at San Quentin when Mr. Lisker was there (but Mr. Lisker was not confined in a dorm at San Quentin), and at Mule Creek State Prison when he was in that facility (at Mule Creek Mr. Lisker was in a day room that had been converted into a dorm, and, at another time, in a gymnasium that had been converted into a dorm).  Typically between 100 and 300 bunk beds are placed in a gymnasium.  California is the only state in the country where dormitories contain bunks that are three beds high.  This means that the gymnasium is no longer an open space that permits of basketball and volleyball playing.  Also, dormitories of this kind essentially are not supervised.  I toured the gymnasiums-converted-to-dormitories at San Quentin and other California prisons in the 1980s and 1990s in preparation for

EXHIBIT 2                                   32 of 73

expert testimony in court, and I was appalled.  I did not visit Mule Creek State Prison,
but Mr. Lisker's description matches what I observed at other institutions. Urinals line
one wall, there are phone booths, and there are lines of prisoners to use both.  Then,
there are prisoners laying in their bunks, with one bunk near the ground, one about
waste high and one above eye level.  A prisoner cannot move more than a few feet
away from a neighbor, and lines form at the pay telephones and the urinals.

Of course with 150 or 250 bunks placed in a gymnasium, it is not possible to
view what is going on across the large, noisy room.  And whenever I walked into a
dormitory of this kind, I would observe the officers huddled near the doorway and only
rarely making "rounds" to see what the prisoners were up to.  It is as if the officers
were uncomfortable walking among the prisoners.  The dormitories were very loud with
talk, yelling and loud-speaker announcements, and I always wondered why there were
so many prisoners milling about in the middle of the day with no job or rehabilitation
program to attend.  Then, I have learned from interviews with prisoners that there
would be many fights in the dormitories, and more than a few sexual assaults and
rapes, but the officers would not know about them because the officers so rarely
walked through the dorm and prisoners would stand two or three deep and block the
officers' view of the violence from their station at the main doorway.

At Mule Creek Mr. Lisker continued doing jobs involving computer work,
or working in the kitchen when the prison was not in lockdown.  He took
courses.  He liked working with computers, it was a way to stay away from the
arguments. He helped automate tasks, he organized rosters for classes, and so
forth.  "Work was like a bubble," and he would work with computers 6 ½ hours
per day when he could.  He did that the whole time he was at San Quentin, and
then for 5 years at Mule Creek.   He also worked as an education clerk at Mule
Creek.  He learned about the law in the library, and pursued his own legal
appeals on the side.  Prisoners could only serve for 2 years in a job, so he also

EXHIBIT 2                          33 of 73

held porter and clerk jobs.  He also did all the training programs in computers and all the college classes he could qualify for.  He also took some classes on restaurant management and did some training as a paralegal, eventually receiving certification as a paralegal.

Massive crowding at Mule Creek meant that Mr. Lisker had to live in a gymnasium turned into a dorm where 180 prisoners slept in bunks, this time two-high (in contrast to three-high at San Quentin, but at San Quentin Mr. Lisker usually had a cell to himself or with a cellmate).  The dormitory was very violent.  He told me about one incident where he was in the shower and the prisoner using the next shower had the knob turned so that the shower was making noise.  He suggested the guy turn the knob a certain way to cut out the noise, but the other prisoner took umbrage and cussed him out in such a way that Mr. Lisker was required, by the prison code, to say something back or be considered a weakling and become a victim.  Mr. Lisker walked over to the other prisoner, who took a swing at him, and they both got written up for mutual combat.  Because Mr. Lisker was a "lifer," nothing really happened.   But being housed in the gym repeatedly put him in violent situations.  Mr. Lisker always tried to avoid fights by never "pissing guys off."

There was a row of toilets along the gym wall, there would be urine all over the floor, the shower would overflow and there would be water on the floor, and prisoners would track water out into the rest of the gym.  Mr. Lisker says:  "So you walked through the water to get to your bunk. The ability to stay clean - hygiene - was extremely important.  I was always afraid I'd get a staph infection.  There was a lack of oversight by the staff - they'd stay in their little corner of the gym.  The Correction Officers were afraid to circulate, but their fear made my situation much more dangerous."

EXHIBIT 2                                    34 of 73

Again, violence and madness increase with crowding.  There is less yard
time because there are relatively fewer resources, for example fewer officers to
accompany prisoners to the yard and supervise them.  Also, prisoners with
serious mental illness were mixed in with the rest, and they sometimes resorted
to irrational violence, and sometimes yelled or laughed all night.  Mr. Lisker
remembers one prisoner with serious mental illness who was in a nearby upper
bunk:  "He would laugh loudly, inappropriately, he should have been on psych
medications but the mental health care was poor, so he just laughed
inappropriately all the time."   There were fights about the phone or television,
prisoners would argue because they disagreed about whose turn it was or who
chose the station.  He would hear guys screaming at their wives on the phone.
He had to watch himself carefully, if he said something to the wrong guy, he
would be attacked.

Mr. Lisker's report of crowded conditions at Mule Creek State Prison are
corroborated by the Master's Quarterly Reports in Coleman v. Schwarzenegger
(I testified in this class action lawsuit about mental health care throughout the
CDC, and a Master was appointed to oversee the consent decree.)  For example,
the Master reports: "MCSP's inmate population stood at 3,660, about eight
percent fewer inmates than were reported in January 2007. Nonetheless,
chronic overcrowding required the operation of 1,000 'E Beds' (i.e., temporary
bunk beds located on dayroom floors) and the conversion of two gymnasiums
to triple-bunked dorms.....  Interviewed inmates reported, and many of the
higher quality progress notes documented, the underlying stress, anxiety and
frustration associated with inmate movement in and out of E Beds and triple-
bunked dorms.[12]

---

[12] Supplement, Doc 3029-3, Filed 9/12/2008, p. 65 & p. 68.

EXHIBIT 2                                    35 of 73

Over 500 of the prisoners at Mule Creek are on the mental health caseload at the EOP level of care.  EOP, or Enhanced Outpatient Program, is the highest level of mental health treatment short of hospitalization in the CDCR. In other words, prisoners with serious mental illness are selectively consigned to Mule Creek.  That means that all prisoners must interact with prisoners with serious mental illness on a daily basis.  Sometimes prisoners with serious mental illness can be unpredictable, assaultive, or disruptive.  For example, many are up at odd hours of the night or morning and make noise, keeping other prisoners awake.  This is especially true in a large gymnasium converted to a dormitory. Mr. Lisker reports he saw a lot of psychiatric dysfunction.[13]

About the staff, Mr. Lisker states:  "They always showed you that you were worth less than any staff member.  So if there was a medical emergency, and it wasn't clearly for a staff member having a medical crisis, they would just move very slowly (they would rush if it was a fellow staff member who needed help.)"  Once he saw a prisoner drop to the ground playing basketball, he was obviously suffering from something serious.  But the staff merely sauntered out to the court and slowly maneuvered him onto a gurney.  When Mr. Lisker was in "e-beds" (emergency overflow beds in the dayroom), a prisoner nearby him died of a ruptured appendix.  That prisoner had been to the infirmary where the medical staff told him "You probably have kidney stones, take Advil," and then he died. That frightened Mr. Lisker because he knew that if he had a medical emergency he would likewise be poorly cared for and disrespected.

Mr. Lisker received visits from his father while he was alive, and from his stepmother, Joy.  He also had pen pals, and in 1996 married a woman who he

---

[13] See the Amador County 2007-2008 Grand Jury Report, which reflects a 1700 design capacity for Mule Creek State Prison, an actual population of 3,600, 500 prisoners in EOP psychiatric care, and states: "The problem of overcrowding continues to be the major factor in problems with Mule Creek State Prison."

EXHIBIT 2                                   36 of 73

had known for a couple of years as a pen pal.  The marriage did not last very
long.

Sometimes the electric power would shut off, the water would be
contaminated, or the food would be rotten.  Mr. Lisker, like other prisoners, felt
very vulnerable because they only had one source of food.  As the food
manager's clerk for some of his time at Mule Creek, he knew of problems with
the food, but still had to eat it.  Sometimes the kitchen would wreak of bad
smells, he would tell the officers that the beans or some other food was rotten,
and the officers would still make him serve it.  In fact, a raw sewage spill was
recorded at Mule Creek Prison in December, 2002, as documented in the
January, 2003 Report of the California Regional Water Quality Control Board,
Central Valley Region 30/31.  Power outages are also documented in records
of Amador County.

During the time Mr. Lisker was there, Mule Creek was converted to a
Sensitive Needs facility. Terry Thornton, spokesperson for the CDCR, explains
that corrections officials use sensitive needs yards to safeguard inmates
convicted of child molestation (who are regular targets of prison violence), or
inmates whose high-profile makes them vulnerable.[14]  The CDCR also uses
Sensitive Needs facilities to house ex-gang members who are attempting to
leave their gangs, and thereby to gain exit from administrative segregation.
Mr. Lisker reports, "the whole place changed during the last 4 years I was
there."  He had to switch to protection status, and says he did that not so
much because he needed protection, but rather so he would not have to move
to another prison.  He says the prison had its share of problems because there

---

[14] <http://californiawatch.org/dailyreport/nunez-serving-shorter-sentence-sensitive-
needs-prison-7945> downloaded 4/27/11

EXHIBIT 2                                    37 of 73

were a lot of child molesters, gang drop-outs, liers, "snitches" and so forth in the sensitive needs program.

The conversion to a sensitive needs prison occurred in phases. For some time, one or two of the three "yards" (the three divisions within the prison) were converted to sensitive needs (protective custody for specific groups). Thus, for several years, Mr. Lisker remained in general population on Yard C while Yards A and B became sensitive needs units. During that time, approximately 2003 to 2005, the cafeteria service for the entire prison was located in the C Yard area, and Mr. Lisker was a supervisor in the food service. There were many allegations at the time that general population prisoners working in the kitchen service were "messing with" the food going to A and B yards as a way to harass the "snitches" and "child molesters" in the sensitive needs unit. Mr. Lisker was told by officers that meals his unit had sent out was discovered to contain spoiled food, razor blades or other pieces of metal. This was very upsetting to him. He had nothing to do with the harassment, but he took pride in his work.

Eventually, the C Yard was also converted to sensitive needs, and that is when Mr. Lisker had to decide whether to become a protected prisoner or be transferred to another prison. In other words, there were no longer units at Mule Creek for prisoners who were not in protection or sensitive needs status. He decided to enter the sensitive needs population rather than be transferred to still another prison where he would have to begin finding ways to remain safe and winning a prison job. Conditions on the sensitive needs yards at Mule Creek Prison became very harsh. Not only was there continuing overcrowding, but now that the CDCR decided to consign a large number of ex-gang members to the facility, and the nature of "protection" changed. Now prisoners who need protection because they molested children or are vulnerable on other

EXHIBIT 2                                      38 of 73

grounds are mixed with ex-gang members who have "de-briefed" or disavowed their gangs. When a prisoner who had been affiliated with a gang requests to "de-brief," investigators typically require him to inform them of the names and illegal actions of other gang members he knows. As a result, prisoners assume that anyone who has successfully "de-briefed" has "snitched," and the ex-gang member is subject to violent retaliation from gang members. Prisoners who have "de-briefed" need protection from the gangs, but they are otherwise very tough guys. The mixing of vulnerable prisoners such as child molesters and tough ex-gang members results in an often explosive situation, where the ex-gang members victimize more vulnerable prisoners. This is why conditions on the sensitive needs yards are so harsh.

Mr. Lisker, during a different time period, slept in an impromptu dormitory in the space that had been a dayroom. There were 20 bunks. At one point a child molester was in the next bunk, so he was forced to bunk next to him. Child molesters disgusted him, but he felt he had to endure it those last three years. Mr. Lisker tells me that after Mule Creek switched from general population to protection, the staff started to treat everyone badly because they assumed that if you were there you were a snitch or a child molester. The staff had less respect for the prisoners, and that made life much more uncomfortable.

There were other incidents of violence or the threat of violence. In 2008 his cellmate was threatened by another prisoner, and that put him in a very difficult spot. Whenever his cell door was opened by remote control, there was the possibility that a hostile prisoner would rush in and harm him, so he had to remain very vigilant. Sally ports are sections of hallway with remote-controlled doors on each end. Prisoners are permitted to enter through one door, but that door must be closed before the other door is opened. Sally

EXHIBIT 2                    39 of 73
Ex. 131 3

ports posed a certain amount of danger, and Mr. Lisker witnessed prisoners being attacked in them, because one would walk into a sally port and not know the other prisoner(s) who would be locked in at the same time. By the time the control officer opened the other door, a prisoner could attack and do some damage. Mr. Lisker tells me the officers would never be in a sally port with prisoners because it was not safe for them. So there would be nobody to help if a prisoner was attacked in a sally port. Again, he was always scared, always hyper-vigilant.

It was shortly before his release from prison in 2009 that "the bucket incident" occurred. Mr. Lisker tells a story that is consistent with documents in his CDCR file about an officer taking away the bucket that he used to wash his clothes. He picked up the bucket and received a disciplinary write-up (115) for disobeying an order. The officer also called it an assault because the officer claimed his finger was struck as Mr. Lisker took the bucket, but Mr. Lisker says there was no contact and he gave up the bucket and cooperated when the officer wrote the disciplinary ticket. He was found guilty of minor assault, but the charge was minor enough that he received a punishment of only one day in segregation - and that was the only time during his tenure in the CDC(R) when he was in segregation.

## VIII.  Innocence, False Confessions and the Appeals Process

Mr. Lisker knew he was innocent. It always troubled him greatly that others, especially others in positions of authority such as police officers and attorneys, would so readily distort the facts and make such blatant attempts to convict him at any cost. He heard police officers testify that he could not have seen his mother's body the way he described, and that only his shoe prints were found at the scene. He knew this was wrong but he felt overwhelmed and

EXHIBIT 2                                    40 of 73

Ex. 131.A

defenseless.  He was 17 when his mother was murdered.  He was confused by his perception of an absence of "justice" in the criminal justice proceedings, and frightened that if the truth could be so readily altered so as to convict him, he had no reason to expect fair treatment from his warders or from the criminal justice system in general.  And he was angry.

After his arrest for the murder of his mother, Mr. Lisker eventually pled guilty to avoid an insufferably long adult prison sentence.  He was in shock and experiencing deep grief.  He consulted his father, who believed all along that he was entirely innocent, but was in shock and deep grief himself.  An attorney friend of his father advised him to plead guilty.  He knew his father would continue to trust in him and love him whatever he decided.  Mr. Lisker did accept a plea bargain, even though he knew he was innocent.  He never felt he was guilty, but he was scared of a long prison term or the death penalty.  He felt he had to show remorse at sentencing or his lack of remorse would be a mark against him.  So he pled guilty in a desperate attempt to avoid a horrible sentence.  His understanding was that if he accepted a plea bargain he would be sent to the CYA and not to an adult prison, he would undergo rehabilitation programs in the CYA and he would be released at age 25.  But before sentencing he was sent to Norwalk for a 90-day evaluation, and that evaluation ended with a conclusion that he would not be amenable to programming in the CYA.  He felt betrayed anew.  The Judge permitted him to rescind his plea. (This was approximately 1985).

Again, with the parole board the first time he was considered for parole (in approximately 1991), he accepted responsibility for the murder of his mother.  He explains it was a lie, but he felt he was in a trap and had to lie - they would never grant him parole if he did not take responsibility.  I have written many psychiatric reports for the Board of Parole Hearings, and I have

EXHIBIT 2                    41 of 73

discovered first hand that the innocent prisoner is frequently in this bind: if he continues to assert his innocence in spite of a conviction or plea and the time he has served, the Board assumes he lacks sufficient remorse for the crime to be declared rehabilitated and safe to be returned to the community.  Thus it is not uncommon for prisoners who are actually innocent, in order to avoid being denied parole, to falsely accept responsibility for their crimes and express feigned remorse.  It is well known among prisoners that one has to express remorse in order to have a chance to win parole, so not infrequently prisoners express remorse even for crimes they did not commit.

Richard Leo has studied false confessions and categorized them by types.[15]  A plea bargain and acceptance of responsibility at a parole hearing are not exactly "false confessions" (that term tends to imply an occurrence at the time of police interrogation), but Leo includes among the causes of false confessions the promise of leniency if the individual confesses.  Certainly plea bargains and accepting responsibility in front of a parole board fit that template, since the defendant or prisoner avers guilt in exchange for some type of leniency having to do with the charges to be pressed or the sentence to be expected.  According to Leo:

> ...the logic of American police interrogation and that of plea bargaining are remarkably similar: both are based on creating resignation, fear, and the perception that the only way to mitigate punishment is by accepting the state's deal.  In both plea bargaining and interrogation, the state

---

[15] Leo, Richard A., False Confessions: Causes, Consequences and Implications (January 1, 2009). The Journal of the American Academy of Psychiatry and the Law, 2009; Univ. of San Francisco Law Research Paper No. 2009-11. Available at SSRN: http://ssrn.com/abstract=1328623; R. Leo & Ofshin, The Consequences of False Confessions: Deprivation of Liberty and Miscarriage of Justice.   Journal of Criminal Law and Criminology 88, 1998, p. 429;

EXHIBIT 2                    42 of 73

attempts to extract a confession to a crime scenario that it believes is at least partially untrue by persuading the suspect or defendant that the state already has strong enough evidence against him to win a conviction at trial; that if the state must take his case to trial, it will extract the maximum punishment possible, but that if the suspect or defendant spares the state the time and expense of proving his guilt at trial, it will reward him with reduced punishment. The logic of the interrogation process is, in effect, repeated at the plea bargaining stage.... American police interrogation is therefore a kind of 'pre-plea bargaining' because it resembles the potentially coercive psychology of plea bargaining but occurs prior in time.[16]

People who are unfairly punished, on average, do not tolerate the punishment well. I have interviewed thousands of prisoners in the course of my work as a forensic psychiatrist. I have uncovered a very clear contrast between those who believe they were punished fairly and those who believe they were unfairly punished: prisoners who are given a punishment for something they admit they did, if they feel the punishment is just, bear up relatively well while they serve their time. They figure, at least to a degree: "I did the crime, I'll do the time." On the other hand, prisoners who sincerely believe they were unfairly punished do not bear up as well while being punished. For example the prisoner who is given a disciplinary write-up in prison for something that someone else did, and is sent to segregation as punishment, does not handle the segregation punishment as well as someone who actually committed the act for which he is sent to segregation. The wrongly accused and punished individual tends to obsess about the unfairness and wrongness of it all. Anger and resentment well up inside him. He tends, more than those who think they "did the crime so they

---

[16]  Leo, Richard, Police Interrogation and American Justice, Harvard University Press, 2008, pp. 31-32.

EXHIBIT 2                    43 of 73

Ex. 131.4

can do the time," to have difficulty adjusting while in prison or in segregation, and in some cases this can lead to even more disciplinary repercussions (but this was not true in Bruce's case).  And then emotional symptoms multiply.  If the individual is prone to despair and suicide, he is likely to become more self-destructive.  If he is prone to psychosis he might experience an acute breakdown.  And if he is prone to temper outbursts or Posttraumatic Stress Disorder, those conditions are exacerbated by the strong sense of being unfairly treated.  The unfairness of it all actually exacerbates the harmful psychiatric consequences of the punishment.

The same pattern obtains for prisoners who are falsely convicted in the first place.  Matters are worse, and there is more cause for obsessing and resentment, if the authorities acted untruthfully - for example, if the individuals were prosecuted and convicted on the basis of aggressive police and prosecutorial efforts involving manipulation of evidence, withholding exculpatory evidence from the defense or possibly outright lying (as Mr. Lisker insists happened in his case).  And those who guard them in prison most likely do not believe they were wrongfully remanded to prison. So they are very isolated in their certainty that they are innocent and they are being unfairly punished.  Mr. Lisker tells me that he would tell other prisoners he was innocent, but they would tend not to believe him, or would think, "Oh sure, you and me both."

Then, if they have little criminal experience, falsely convicted prisoners are doubly alienated from their peers, the other prisoners.  First, they are innocent, so they cannot share in the stories prisoners tell each other about the crimes that led to their conviction. And further, they do not have a criminal career at all, so they are not savvy about the ways of criminals or the culture of prison.  Mr. Lisker had very little in the way of criminal background.  He abused marijuana.  He was not a thief and he had not been involved in fights growing

EXHIBIT 2                                44 of 73

Ex 131 A

up, and he had never harmed anyone and had no desire to hurt anybody.  His innocence and his lack of sophistication in criminal ways set him apart - and it can be very dangerous in prison to be set apart in these ways.

Mr. Lisker availed himself of paralegal courses, he went to the law library in prison, and he helped his attorneys with ongoing legal appeals. He analyzed evidence for the attorneys, but he did not do the legal work itself.  He analyzed discrepancies in his case.  Sometimes during his years in prison he had an attorney working on his case, sometimes not.  There was a "Free Bruce" website - he actually met his current fiancée through that website.  And Mr. Genego did an evidentiary hearing for him in 2005 and has since served as his attorney.  There were repeated setbacks and frustrations in his appeals and struggle to prove his innocence, and he often felt he was on "an emotional rollercoaster."

## VIII.  Life After Release from Prison

When Mr. Lisker was released from prison in August, 2009, he went to stay with Jerry, the man Joy had partnered with after Mr. Lisker's father died. He had some money, he had received insurance benefits from his father's death, and the state gave him $200 "gate money" upon his release.  He had not had much contact with the non-profit Innocence Project until just prior to his release.  He purchased his sister's used Mercedes.  He had family support from a cousin and an aunt who was living in a nursing home.  Joy's daughter is also in his life.  He had met Kara, his current fiancée, in 2005, and she helped with his transition back into the community.  She started writing to Mr. Lisker while he was in prison.  They have lived together since October, 2009.

Mr. Lisker describes his relationship with his fiancée as "great."  "She will stop on a dime to process things with me when we need to."  He says he is

EXHIBIT 2                                45 of 73

Ex. 1 3 1 4

trying very hard to deal with the many ways prison interferes with intimacy.
*"In prison you have to be vigilant about how you're being seen, you learn to hide your feelings, and you lose touch with being present in the moment. You learn to keep an internal dialogue going on rather than just being in the moment. And trust becomes a very big issue. Both Kara and I have trust issues. But I decided to take a plunge with her. I try my best to be transparent. I get scared, but I eventually try to find a way to trust her and open up."*

Finding work was very difficult at first. He thinks in his first six months back in the community he must have submitted applications for 50 jobs without success. It was very frustrating. He feels that employers simply don't want someone who has been in prison, even if they have been exonerated. He was home much of the time while job-searching. He always felt an unspoken requirement that he should be providing for the couple. Kara kept reassuring him, saying she was certain he would eventually find work. He always wished she didn't have to work, but that was not their reality. Finally his godparents found him a place in their film restoration company. He works as a film handler, he operates the data base, and he has been trained on printing and restoration processes. He programs the machines. He worked part-time for a while, but is now full-time. The business is doing better.

His daily activities mainly involve going to work and then home to Kara. They have a cat, they go to a certain amount of film events, and sometimes they go out to dinner. He finds himself thinking about the fact that people in prison can't see trees, and this makes him sad. He cries when he thinks about his past (and as he tells me his story). Memories of prison simply never go away. He says, *"I should have a lifetime of memories, instead I remember prison in my 20s and 30s. My sense of safety in the world is gone. I keep*

EXHIBIT 2                          46 of 73

being reminded by people and events of my mother's murder, my trial, and all those years in prison. I am always afraid something awful like that will happen again. I feel like a poser, I have a job, a great partner, a nice car - but I don't feel authentic because there's a huge gap, I spent all those years in prison, I should have been working and raising a family."

Mr. Lisker feels he never really had an opportunity to mourn for his mother. "She taught me how to read. The biggest regret I have is I never had a chance to relate to her on an adult level. I'd been having trouble. I wish she could have seen me doing well. She's been dead 28 years." He finds it really difficult to talk about not having children. He cries when I ask about that, and says through the tears: "I want to focus on what I have. I've been forced to live an unconventional life. I can't make Kara of child-bearing age again any more than I can make myself a 17 year old again, so I'm going to focus on what I can do."

Mr. Lisker describes "panic attacks" riding a bike on the street. For a while after his release from prison he had no car, and when he rode his bike he would get very frightened. "It's irrational, but it's all-pervasive, I become convinced there's someone out there looking at me. I know it's ridiculous, but I'm convinced, my mouth becomes dry, I hyperventilate. After the panic subsides, I get a headache. I rub my neck and close my eyes, I try to do Yoga breathing and positive self-talk." He avers an episode of panic like that every few months. It can be triggered when he drives in a rough area of town (or before he had a car, when he was riding his bike in a rough area). He repeatedly gets frightened that someone has a knife or gun. His mouth becomes dry and he gets a metallic taste - re-enactments of the feelings he had when he was in imminent danger in prison.

EXHIBIT 2                              47 of 73

He has been in psychotherapy for a while, and feels it helps.  He and Kara plan to marry in August.  He is attending Santa Monica Community College.  He already has college units.

## IX.  Psychiatric History

Mr. Lisker remembers being prescribed Ritalin for a year or two, in the 3rd and 4th grades.  His mom felt it helped a little, not a lot, with his problems paying attention at school.  He agrees Ritalin might have helped a little.  He saw a psychologist and psychiatrist for a short time as a child.  His family was in family therapy, weekly for a few years when he was in the 4th, 5th and 6th grades.  It helped a bit.  He thinks his mother felt blamed for a lot of the tensions in the family.  He had some individual psychotherapy sessions as a teen, but mainly the family saw a therapist together.  He also participated in 12-step groups at the Palmer center off and on for a few years, for his substance abuse problem.  Besides Ritalin, he took no psychiatric medications prior to his arrest.  He was never admitted to a psychiatric hospital, and never had any serious thoughts of suicide.  He does remember feeling depressed during his teen years, but did not seek additional treatment.

In prison, Mr. Lisker experienced ongoing depression, anxiety and other symptoms, as described in previous sections of this report.  He remembers feeling depressed off and on in youth facilities and prison between approximately 1984 and 2009.  His depression was reactive to events.  He always obsessed about the unfairness of what happened to him, but when he was depressed the obsessions intensified.  The depression was also triggered or worsened by negative turns in his legal struggle as well as when stressful events occurred, especially if the stress was caused by what he perceived as unfair treatment by staff.  He was prescribed Elavil for depression in

EXHIBIT 2                    48 of 73

approximately 1984 to 1986 in juvenile facilities, and it helped somewhat.  But Elavil caused weight gain and that was why he stopped taking it.   Many times in prison he would get depressed and not feel like going to work, but he was afraid he would be given a 115 (disciplinary write-up) for not showing up, so he went to work and tried to just get through the day.  Often he would simply go to the bathroom and cry.

He explains that he didn't seek mental health treatment in prison until after 2000 because he believes the parole board does not look kindly on mental health problems.  (In my opinion, he is correct about that.  I have done quite a few psychiatric assessments for the Board of Parole Hearings, and my conclusion has been that mental health problems are usually viewed by the Board as a mark against the prisoner seeking parole.)  He was in outpatient treatment while at Mule Creek State Prison, and for some time was prescribed Prozac.  He was in a "lifers' group" for a while, and feels he benefited from the opportunity to share his feelings with others facing a life sentence.

He now sees a psychotherapist in Encino, Dr. Susan Levine.  She volunteers services for people in re-entry from prison.  He has seen her weekly for the past 6 months.   That psychotherapy is going well.  He works on re-entry issues, depression and symptoms of PTSD.  For him, re-entry problems stem from feeling overwhelmed by a world that has continued to develop without him.  His therapist tells him he is doing a good job adjusting.  He is not yet able to support himself.  His fiancée pays a disproportionate part of their expenses.  He tends to be hyper-critical of himself because of his lack of financial status.  He is afraid of the dark (the lights were never off in prison).  He is always afraid bad people will harm him.  He isolated himself when he first got out of prison.  He says, "The script of prison is hard to turn off."  He had severe headaches the first days out of prison.  He was always computing

EXHIBIT 2                                    49 of 73

whether he was safe, whether someone coming near him could pose a danger, and so forth.  It was exhausting, and the obsessing and fear seemed to be causing the headaches.  He figured out he needs to relax, even though he had not ever been able to relax in prison.  He is prescribed Xanax (a minor tranquilizer) on an as-needed basis.  He thinks he has 0.25 mg. tablets (the smallest of three strengths of Xanax), and he takes half of a tablet when he gets anxious.

In explaining his feelings and coping style, he begins with an analogy about dead bodies in a casket and buried in a concrete gravesite:  "They seal the dead body off, it's encased in concrete, it's not in contact with nature.  Well, it's the same thing with my feelings.  My feelings are sealed in, not in touch with people around me.  I'm trying to deal with that now with my therapist.  In my prison cell, I would let out the feelings a tiny bit and cry.  But there's a great wall of sadness I feel beneath this smiling appearance.  I'm always afraid if I let it out the tears would never stop.  I feel like I'm dealing with it slowly now.  The losses were totally overwhelming.  Then when dad died, and he couldn't be with me, and then Joy died and again I couldn't be there with her or go to the funeral, I just got overwhelmed with grief."

Mr. Lisker avers a number of ongoing symptoms, including fear of flying, fear of the dark, panic episodes, and listlessness accompanied by a strong wish to do nothing, not even reading.  Sometimes he sits still, sometimes he curls himself up as if in a ball - he thinks that's a way of soothing himself.  His depressive episodes last for a few days up to a few weeks.  When he is depressed he feels as if there is a huge weight placed on him, he has crying jags, he does not get any enjoyment or pleasure from anything, and he is overwhelmed with self-criticism.  He criticizes himself for being fat, he thinks he looks ridiculous.  Then he starts feeling very guilty about his mother - if he

EXHIBIT 2                                    50 of 73

had not been using marijuana and had not been in a drug rehab program, he never would have met Mike Ryan and his mother would still be alive. He does not become overtly suicidal, the only suicide observation he was in was at the Sylmar juvenile facility, and he feels that was wrongly ordered.

A psychiatrist at Mule Creek told him he suffers from PTSD. (Dr. Robert Landry). He does have nightmares, he feels like he is re-living awful experiences in prison, he has anxiety, panic and a strong startle reaction. For example, he gets very frightened when he is around dogs that are getting angry as if they are about to attack or fight other dogs. He gets a dry mouth with that metallic taste and looks around for a place to hide. This never occurred before he was arrested, and he believes the possibility of dogs fighting reminds him of prison violence. At other times, when he is frightened he freezes and gets rigid - and he flashes back to the day his mother was murdered. He feels he is hyper-vigilant. When he gets anxious he experiences a metallic taste in his mouth, as well as dry mouth. The metallic taste always reminds him how he felt the day he discovered his mother dead.

In terms of constrictive symptoms, he feels cut off from childhood memories because recalling them reminds him of the house he grew up in with his parents, and then he thinks about his mother's death and gets upset. Each time he recalls a childhood memory he "flashes forward" to his mother's murder, and that ruins the memory. He tends to isolate himself, and stays away from any situation where he thinks angry feelings might erupt. For example, when he is near loud people in a restaurant it reminds him of prison and all the yelling. He is afraid the loud person could do something irrational, or attack. He explains that in prison, you must never let someone disrespect you. If you are seen being disrespected by another prisoner, you become a target for theft or sexual assault. He interprets people being loud or yelling nearby as

EXHIBIT 2                                  51 of 73

disrespectful, and for a moment, it is as if he is in prison again terrified that that could trigger trouble.

In terms of health concerns, Mr. Lisker did not consume alcohol in prison. He smoked marijuana a few times early in his prison tenure, but since the early 1990s he remained clean and sober and conscientiously took part in 12-step groups and other recovery programs. Since his return to the community he has had back pain, and he saw a physician for certification and started to use a little medical marijuana. But, he explains, as he grows older he does not like to feel out of control, so he does not like being "under the influence." After smoking marijuana he gets very self-critical and then afterwards he feels depressed. So he consumed marijuana with his medical marijuana card a few times since his release from prison, but has not used any marijuana since then.

I asked if he has hope for the future, and he responded that while he was in prison he kept trying to convince himself he would not die in prison. *"It's painful to hope, but you can't let hope die. I got advice to keep fostering hope. I tried to exercise and not isolate myself."*

A review of Mr. Lisker's CDCR custody records and psychological assessments for the Parole Board (which include review of the CDCR medical and mental health files) reflects outpatient mental health care over several years at Mule Creek for a condition variously described as Depressive Disorder NOS and Posttraumatic Stress Disorder (PTSD). Psychological assessment (testing) reflected low scores on the Hare checklist for psychopathy. Other diagnoses included polysubstance abuse in remission in a controlled environment and mixed personality disorder with antisocial and narcissistic features. I do not agree with either of those last two diagnostic impressions. In terms of substance abuse, Mr. Lisker is not in remission on account of a

EXHIBIT 2                    52 of 73

controlled environment. Drugs and alcohol are readily available in prison, and at the beginning of his prison term Mr. Lisker did occasionally abuse substances. In the final 15 years of his incarceration, he did not use illicit substances at all. It was not the controlled environment that led to his being free of addiction, rather it was a resolution on his part and a lot of hard work in recovery and 12-step programs. In terms of personality disorder, Mr. Lisker does not have a lifetime pattern that results in disabilities (a necessary element in the DSM IV definition of a personality disorder). Rather his current disabilities are obviously linked to his wrongful conviction and many years behind bars. Otherwise the CDCR and parole board documents are entirely consistent with and corroborate the history Mr. Lisker gave me.

## X.  Mental Status Exam

Mr. Lisker, a pleasant Caucasian man, is a little shorter than average, and appears in casual, neat clothes including a shirt with a flower pattern. He is well built, well-groomed and well-spoken. He uses reading glasses. He has blue eyes and a quick smile. He also cries appropriately, especially when talking about his mother's murder and his fears of attack in prison. He has a good range of appropriate affect. It is clear he feels a very deep well of sadness, a lot because of all the years he feels he lost being in prison. Anxiety is present as well, for example he avers fear of being in crowded places and the other fears I discussed in the previous section. He has self-esteem issues. He is self-critical, he feels that is on account of prison experiences where people try to cut others down in order to get ahead. He evidences no hallucinations and no real delusions. He is obviously hyper-aware and hyper-vigilant, but these tendencies are explained by a long prison experience where his safety and survival depended on his ability to sense danger before it erupted. He avers a

EXHIBIT 2                    53 of 73
Ex 131 5

strong startle response, especially to loud noises, and again this must be considered in the context of a long prison tenure. Cognition and memory are grossly intact. He has an above average general knowledge and interest in current events. He does get absent-minded.

He gets agitated and panicked, and there is some objective evidence of that as our discussion turns to painful subjects including his mother's murder and violent incidents in prison. He spends a lot of energy trying to control the panic, to "talk myself down." He sometimes intellectualizes, I assume that's to handle painful affect. He did that in prison, and avers being always afraid throughout his time in prison. He believes he survived only because he kept the big picture in mind. He tells me: *"If you're in a little argument, and get caught up in it, you can get yourself in deep trouble. If, instead, you raise yourself above it, realizing this person isn't really your enemy, and this argument isn't everything, then it's a little thing and you can handle it. You have to take a long range view and keep out of trouble."* This is an impressively healthy attitude that clearly made it possible for Mr. Lisker to survive his ordeal and emerge from prison a relatively functional and productive person.

## XI. Diagnostic Formulation[17]

Axis I:

1. Posttraumatic Stress Disorder, Complex (meaning there were multiple traumas, including the murder of his mother and violent incidents he witnessed or was involved in during his prison term), severe and chronic (DSM 309.81).
2. Depressive Disorder Not Otherwise Specified (Depressive Disorder NOS - DSM 311).

---

[17] Multi-axial format of the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, American Psychiatric Association, Fourth Edition (<u>DSM IV</u>).

EXHIBIT 2                     54 of 73

Ex 1 31 5

3.  Substance Abuse by distant history, not currently problematic because he has successfully participated in treatment and recovery programs (DSM 305.90).

Axis II:
No identifiable personality disorder.

Axis III:  General Medical Conditions
Chostochondritis secondary to trauma during his incarceration as a juvenile.  He suffers with a back ailment.

Axis IV: Psychosocial and Environmental Stressors
Severe trauma including his mother's murder, his wrongful conviction, violent incidents in prison, his entire criminal justice Involvement, the long interruption of educational and vocational pursuits, separation from family, and all other related losses and traumas.

Axis V: Global Assessment of Functioning (GAF)
Current and highest in past year: 65.  GAF is rated on a continuum wherein "0" signifies extreme dysfunction and self-harm, while "100" signifies superior functioning.  A GAF of 65 means Mr. Lisker has some symptoms and moderate difficulty in "psychological, social and occupational functioning."  Of course, with someone who has spent a significant proportion of his adult life incarcerated, we need to translate psychological, social and occupational functioning into a correctional and post-release context.

## XIII.  Discussion

Psychiatric diagnoses hardly begin to capture the extent of Mr. Lisker's losses, traumas, pain and suffering secondary to arrest, conviction and incarceration for 26 years.  He cannot even fathom the extent of his own losses.  His mom was murdered when he was 17.  He was falsely accused, he was locked in juvenile hall while in acute grief for his mother, he was forcibly medicated at juvenile hall, the police treated his father badly and there was nothing he could do about it, and he faced a very long prison sentence.  He had to endure incarceration for over two decades in very crowded, violent prisons, he was assaulted and witnessed murders but could not speak out about it.  Meanwhile, because he was incarcerated during the prime years of adult life, he

EXHIBIT 2                                    55 of 73

Ex 131 5

could not complete college nor enjoy a career.  He could not have a house nor financial security.  He still has no health insurance nor life insurance, nor retirement benefits.  And of course it is quite obvious that being in prison greatly reduces one's possibilities in terms of relationships.  Mr. Lisker's primary relationship ended before he entered prison in 1983.  While his family was close and supportive, they were not able to visit as often as he and they would have liked.  And then there is the most obvious loss of all:  when an unmarried man begins 26 years of incarceration in adolescence, he is deprived of those years of family life, of the experience of being married or in a long-term primary relationship, and of the possibility of having and raising children.  This constitutes a huge and irreparable loss for Mr. Lisker, and is a major causal factor in his continuing PTSD symptoms, depression and anxiety.

Additionally, he lost the opportunity to spend the final 12 years of his father's life with the man, who he loved dearly.  He could not be with him when his health deteriorated, he was denied attendance at his father's funeral (a cousin offered to pay his expenses but the CDCR would not permit it, he believes because he was a lifer).  He was unable to be with his stepmother when she was diagnosed with cancer in 2007 (he first shaved his head when she was diagnosed, in honor of her), and he was not permitted to go to her funeral in that same year.  He watched from prison as many people he knew while growing up, including high school friends, got off of drugs and did well in their careers.  Meanwhile, at any moment, the prison staff could come into his cell and rifle through his most intimate letters.  There was a huge loss of dignity and self-esteem.

In prison, besides the loss of all the things he would have been enjoying in the community, there was the violence, and even when he wasn't involved in violence, there was the constant threat of violence.  He had to learn to adapt to the "prison code," which meant keeping his feelings to himself, not talking

EXHIBIT 2                     56 of 73

Ex. 131 E

about the awful things he witnessed, not "snitching" nor being perceived as possibly "snitching," and therefore he had to distance himself from other prisoners and remain almost entirely isolated throughout his prison tenure. Then, when he was released from prison, the ways he had learned to think and behave in prison became disabling in the community. He was closed off to others, distrusting, unwilling to share his feelings and expose weakness, hyper-vigilant and so forth. These are precisely the opposite of the qualities required to be intimate with someone in the community, including being open and trusting and sharing feelings, admitting weakness and being open to new experiences. He attempts to summarize his situation: *"Can the bottom ever fall out of your world? Yes, my mother was killed, and when I was arrested for it, the bottom fell out of my world. The bottom can always fall out again, they can just walk through the door and arrest me."*

Still, psychiatric diagnoses are an important part of assessing damage from traumatic experiences and losses. I have assigned the diagnoses PTSD and Depressive Disorder NOS. Mr. Lisker's signs and symptoms qualify him for those two co-morbid diagnoses, those diagnoses best explain much of his experience and disability, and his records from the CDCR corroborate the presence of those two disorders. Certainly, in a correctional context, malingering has to be considered. Malingering is the exaggeration or feigning of symptoms to achieve secondary (non-treatment) gains. I have written about malingering.[18] I found no evidence of malingering in Mr. Lisker's presentation. In fact, Mr. Lisker tends to downplay emotional distress and symptoms. It is remarkable how much anxiety and depression he experiences, and yet how outwardly cheerful and buoyant he appears. He has remarkable

---

[18] Kupers, T., Malingering in Correctional Settings," <u>Correctional Mental Health Report</u>, 5, 6, 81-, March/April, 2004.

EXHIBIT 2                    57 of 73

Ex. 131.5

resilience and ability to function in the face of very severe traumas - witness his success at avoiding even more violence in prison and availing himself of training, relatively high level jobs, a GED and college courses.  He also gained the respect and admiration of many correctional staff members.[19]

PTSD was originally conceived in relationship to a single extraordinary traumatic event.  I have written about PTSD.[20]  Intrusive symptoms (such as flashbacks, re-living and panic attacks) alternate with constrictive symptoms (such as the numbing of feelings and the constriction of activities), giving the typical picture of re-living experiences, nightmares and startle reactions in an individual who is trying to constrict emotions and activities in order to minimize post-traumatic emotional flooding.  The third component of PTSD is hyper-arousal, which Mr. Lisker exhibits.

Mr. Lisker certainly has bona fide multiple traumas: his mother's murder, finding her body, being accused of her murder, incarcerated and convicted, and spending time in violent prisons where he was attacked or a witness to violence.  Over time, in the ideal case, where there is a single trauma, the intrusive and hyper-arousal symptoms become less intense as does the need to constrict emotions and activities.  But if a second traumatic event occurs before healing is complete, and then a third, and a fourth, the picture becomes much more complex.  The individual is unable to heal from the first trauma, and a symptom picture emerges that is much less circumscribed, as in Mr. Lisker's case. Mr. Lisker also suffers from significant depression and anxiety.  To a large extent, these are expectable concomitants of PTSD.  But when one or another symptom picture becomes severe enough it warrants a second diagnosis.

---

[19] See letters on his behalf to the parole board and court copied in the May 20, 2011 letter from Rehabilitation Consultant Alessandro Anfuso to attorney William Genego.
[20] Kupers, T., Posttraumatic Stress Disorder in Prisoners," Correctional Health Care Report, Vol. 9, Nos. 2 & 3, January/February, 2008.

EXHIBIT 2                    58 of 73

Depression is that severe in Mr. Lisker's case.  And his depression, like PTSD, causes suffering and disability.[21]

Mr. Lisker had a substance abuse problem as a teen, mainly the use of marijuana.  He underwent treatment, including over a year's stay at a program in Susanville as well as outpatient treatment at the Palmer Program in Van Nuys.  When he went to prison, drugs were readily available, and he tried using occasionally during the early part of his time in prison.  Then he began taking part in 12-step programs, including AA and NA.  Mr. Lisker reports that during his last  (approximately) 15 years in prison he did not use any drugs or alcohol.  Since his release, he lawfully used prescribed medical marijuana a few times but voluntarily ceased doing so.  There is the question what would have happened to Mr. Lisker's marijuana use had he not gone to prison.  The fact that he voluntarily participated in recovery programs in prison and halted use of illicit drugs is strong evidence he would have stopped abusing marijuana soon in the community had he not been arrested and incarcerated.  In fact, a 1996 study by the Center for Addiction and Substance Abuse (CASA) at Columbia University concluded that marijuana use peaks among 18 to 25 year olds and then the prevalence of marijuana use drops off impressively.[22]  The fact that

---

[21] PTSD, Depression and Anxiety are not only psychological conditions, they are also evidenced in physical changes in the body, including but not limited to the secretion of adrenaline and cortisol by the adrenal glands and identifiable patterns of neuronal firings in the temporal lobe region of the brain.  These physical changes in the brain have been observed by utilizing some of the newer brain imaging technologies such as Photon-Emission Tomography (PET Scans).   See, for example, Mirzaei, S., et al., Regional cerebral blood flow in patients suffering from post-traumatic stress disorder, *Neuropsychobiology*, 43, 4, pp. 260-264, 2001.  See also footnote #6.

[22] See Facts about Marijuana Use By Drew W. Edwards, Ed.D., MS, retrieved on 5/6/11 at <http://psychcentral.com/lib/2007/facts-about-marijuana-use/>

EXHIBIT 2                                59 of 73

the friends he knew as a marijuana-abusing teen cleaned up their habits and succeeded in the "straight" world is further indication that Mr. Lisker would have transcended his proclivity to use marijuana and would have gone on to further education and work success.

Then there is the question of what Mr. Lisker would have made of his life had he not gone to prison.  He was a teen when his mother was murdered and he was arrested.  He was very bright, but had not been doing well in school.  In the CYA and then in prison he excelled in classes, first to earn a GED, and then to train in welding, computers, restaurant management and paralegal work - and to earn college credits.  His success in classes and jobs throughout his prison tenure is very strong evidence that Mr. Lisker always had the initiative, drive, ambition, intelligence and social skills to succeed in a career of his choosing.  His success in school and in jobs, even within a very harsh prison context, proves that had he not been arrested and imprisoned he would have proceeded to complete his education - it is almost certain he would have graduated college, and likely he would have earned an advanced degree - and then, and here I entirely concur with the conclusions of vocational consultant Alessandro Anfuso,[23] he would have done very well in the world of work and advanced quickly.  That, in fact, is what he has done against the odds and very severe adversity in prison.  Anyone who could earn the kind of rave reviews from colleagues, teachers and employers in prison, as reflected in Mr. Lisker's parole board recommendations, would certainly have done very well in college and in the world of work and career had he not been diverted into a long stint in prison.

---

[23] See May 20, 2011 letter from Rehabilitation Consultant Alessandro Anfuso to attorney William Genego.

EXHIBIT 2                              60 of 73

As things have turned out, and considering the long and traumatic detour to prison, Mr. Lisker has done remarkably well for himself. He must not have been excessively bitter about the years of false imprisonment, and he is not a bitter man now. I have met and examined close to a dozen individuals who were innocent but served long terms in prison, and I have found that, on average, they are bitter, they have great difficulty forming intimate relationships after they are released, and they are not able to find work after returning to the community (for objective reasons such as stigma towards ex-prisoners even when they are exonerated, and for subjective reasons such as a lack of discipline and training). Mr. Lisker has been in a long-term committed relationship since soon after his release from prison, has performed well and advanced in a job that requires skilled technical work, and has entered psychotherapy and is working on issues that remain problematic for him. This is all quite remarkable, even inspiring. Mr. Lisker has experienced a huge amount of pain and suffering, has developed psychiatric damage and disability as I have discussed, and yet in spite of ongoing psychiatric symptoms and disability, he remains loving and optimistic. He has plans to advance in his work, and he wants to do some public speaking as his part of the struggle to prevent what happened to him happening to others. I certainly think he should go to college, and he concurs. He would like to enter the legal profession and try to make a difference.

Respectfully submitted,

*Terry A. Kupers*

Terry A. Kupers, M.D., M.S.P.

EXHIBIT 2

# Curriculum Vitae

## Terry Allen Kupers, M.D., M.S.P.

**Office Address:**
#8 Wildwood Avenue, Oakland, California 94610        phone: 510-654-8333

**Currently:**
Institute Professor, Graduate School of Psychology,  The Wright Institute, 2728 Durant
Avenue, Berkeley, California 94704
Private Practice of Psychiatry, Oakland

**Family:** Married to Arlene Shmaeff, Education Director at the Museum of Children's
Art (M.O.C.H.A.) in Oakland; father of three young adult sons

**Born:**  October 14, 1943, Philadelphia, Pennsylvania

**Education:**
B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

**Training:**
Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate
Medical Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A.
Residency) 1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute, 1972-
1974

**License:**  California, Physicians & Surgeons, #A23440, 1968-

**Certification:** American Board of Psychiatry and Neurology (Psychiatry, #13387),
1974-

**Honors:**
Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association; Fellow, American
Orthopsychiatric Association.
Listed: *Who's Who Among Human Services  Professionals (1995-); Who's Who in
California (1995-);  Who's Who in The United States  (1997-);  Who's Who in
America (1998-); International Who's Who in  Medicine (1995-);  Who's Who in
Medicine and Healthcare (1997-);  The National Registry of Who's Who (2000-*

EXHIBIT 2                                             62 of 73

); Strathmore's Millenial Edition, Who's Who; American Biographical Institute's International Directory of Distinguished Leadership; Marquis' Who's Who in the World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's Who Among American Teachers & Educators (2007-)

Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological Association, Affiliate of American Psychological Association, March 30, 2001.

Stephen Donaldson Award, Stop Prisoner Rape, 2002.

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005

William Rossiter Award for "global contributions made to the field of forensic mental health," Annual Meeting, Forensic Mental Health Association of California, March 18,2009, Monterey, California

**Clinical Practice:**

Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist, 1972-1974

Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles
      Staff Psychiatrist and Co-Director, Outpatient Department, 1974-1977.

Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist and Co-Director, Partial Hospital, 1977-1981

Private Practice of Psychiatry, Los Angeles and Oakland, 1972 to present

**Teaching:**

Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew Postgraduate Medical School, Los Angeles, and Assistant Director, Psychiatry Residency Education, 1974-1977.

Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley, 1981 to present

Courses Taught at: U.C.L.A. Social Science Extension, California School of Professional Psychology (Los Angeles), Goddard Graduate School (Los Angeles), Antioch-West (Los Angeles), New College Graduate School of Psychology (San Francisco).

**Prof'l Organizations:**

American Psychiatric Association (Distinguished Fellow); Northern California Psychiatric Society; East Bay Psychiatric Association (President, 1998-1999); American Orthopsychiatric Association (Fellow); American Association of Community Psychiatrists; Physicians for Social Responsibility; National Organization for Men Against Sexism; American Academy of Psychiatry and the Law.

**Committees and Offices:**

Task Force on the Study of Violence, Southern California Psychiatric Society, 1974-1975

Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976

California Department of Health Task Force to write "Health Standards for Local Detention                                    Facilities," 1976-77.

EXHIBIT 2                                    63 of 73

Ex 131 6

Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981; 1994-

Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994 (Chair, Subcommittee to Credential Licensed Clinical Social Workers)

President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999

Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American Association of Community Psychiatrists, 1998-2003

**Consultant/Staff Trainer:**

Contra Costa County Mental Health Services; Contra Costa County Merrithew Memorial Hospital Nursing Service; Bay Area Community Services, Oakland; Progress Foundation, San Francisco; Operation Concern, San Francisco; Marin County Mental Health Services; Berkeley Psychotherapy Institute; Berkeley Mental Health Clinic; Oregon Department of Mental Health; Kaiser Permanente Departments of Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek; Human Rights Watch, San Francisco Connections collaboration (Jail Psychiatric Services, Court Pre-Trial Diversion, CJCJ  and Progress Foundation); Contra County Sheriff's Department Jail Mental Health Program; Consultant to Protection & Advocacy, Inc., re Review of State Hospital Suicides

**Forensic Psychiatry (partial list):**

Testimony in Madrigal v. Quilligan, U.S. District  Court, Los Angeles, regarding informed consent  for surgical sterilization, 1977

Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles County Jail, 1977

Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions and mental health services in San Diego County Jail, 1979

Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding conditions and mental health services in Santa Clara County Jail, 1981

Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles Police Department Jail, 1982

Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions and mental health services in Marin County Jail, 1982

Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding conditions and mental health services in Santa Clara County Women's Detention Facility, 1982

Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and mental health services at San Quentin Prison, 1983

Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983

Consultant, United States Department of Justice, Civil Rights Division, regarding conditions and mental health services in Michigan State Prisons, 1983-4

Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding "Rubber Rooms" in Orange County Jail, 1988

EXHIBIT 2                    64 of 73

Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding
    conditions, quality of mental health services and segregation of inmates with
    HIV positivity or AIDS at California Medical Facility at Vacaville, 1989
Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality
    of mental health services in the California Department of Corrections' statewide
    prison system, 1993
Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims,
    regarding the effects on prisoners of a proposed policy regarding possessions,
    uniforms and classification, 1998
Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy
    and restriction of visits for substance abuse infractions, 2000
Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit,
    regarding cross-gender staffing in prison housing units, 2001
Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding
    confinement of prisoners suffering from severe  mental  illness in supermax,
    2002
Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding
    conditions of confinement and treatment prisoners with mental illness on Death
    Row at Parchman, 2003
Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding
    proposed transfer of Death Row into Ohio State Penitentiary (supermax),
    August, 2005
Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls,
    Texas, regarding staff responsibility in case of prison rape, September, 2005
Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006,
    regarding mental health care in NY Dept. of Correctional Services
Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the
    County of Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding
    custodial misconduct & sexual abuse of women prisoners
Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony, USDistCt,
    WDistMichigan, Grand Rapids, Michigan, regarding mental health care in prison, April 29,
    2008


**Hospital Staff:**  Alta Bates Medical Center, Berkeley

**Journal Editorial Positions:**
Free Associations, Editorial Advisory Board
Men and Masculinities, Editorial Advisory Panel
Psychology of Men and Masculinity, Consulting Editor
Juvenile Correctional Mental Health Report, Editorial Board
Correctional Mental Health Report, Contributing Editor

**Presentations and Lectures (partial list):**

EXHIBIT 2                                65 of 73

5

"Expert Testimony on Jail and Prison Conditions."  American  Orthopsychiatric
    Association Annual Meeting, San Francisco, March 30, 1988,  Panel 137: "How
    Expert are the Clinical Experts?

"The Termination of Psychotherapy."  Psychiatry Department Grand Rounds,
    Mills/Peninsula Hospitals, Burlingame, February 24, 1989.

"Big Ideas, and Little Ones."  American Psychiatric Association Annual Meeting, San
    Francisco, April, 1989.

"Men in Psychotherapy."  Psychiatry Department Grand Rounds, Mills/Peninsula
    Hospitals, Burlingame, September 29, 1989.

"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton Head
    Conference, Hilton Head Island, South Carolina, March 15, 1991.

Panelist:  "The Mentally Ill in Jails and Prisons," California Bar Association Annual
    Meeting, Annaheim, 1991.

"The State of the Sexes: One Man's Viewpoint."  The Commonwealth Club of
    California, San Mateo, March 25, 1992.

Keynote Address:  "Feminism and the Family."  17th National Conference on Men and
    Masculinity, Chicago, July 10, 1992.

Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual
    Meeting of the American Orthopsychiatric Association, San Francisco, May 22,
    1993.

Panel Chair and Contributor:  "Socioeconomic Class and Mental Illness." Annual
    Meeting of the American Psychiatric Association, San Francisco, May 26, 1993.

"Public Mental Health."  National Council of Community Mental Health Centers
    Training Conference, San Francisco, June 12, 1993.

Psychiatry Department Grand Rounds:  "Men's Issues in Psychotherapy." California
    Pacific Medical Center, San Francisco, February 24, 1993.

"The Effect of the Therapist's Gender on Male Clients in Couples and Family
    Therapy."  Lecture at Center for Psychological Studies, Albany, California, April
    15, 1994.

"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department Grand
    Rounds, Alta Bates Medical Center, June 7, 1993.

Roger Owens Memorial Lecture.  "Prisons and Mental Illness."  Department of
    Psychiatry, Alta Bates Medical Center, March 6, 1995.

Keynote Address:  "Understanding Our Audience: How People Identify with
    Movements and Organizations."   Annual Conference of the Western Labor
    Communications Association, San Francisco, April 24, 1998.

"Men in Groups and Other Intimacies."  44th Annual Group Therapy Symposium,
    University of California at San Francisco, November 6, 1998.

"Men in Prison."  Keynote, 24th Annual Conference on Men and Masculinity,
    Pasadena, July 10, 1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental
    Health Treatment in Punitive Segregation."  Staff Training Sessions at New
    York State Department of Mental Health, Corrections Division, at Albany,
    August 23, 1999, and at Central New York Psychiatric Institution at Utica,
    August 24.

EXHIBIT 2                                    66 of 73

Ex 131 6

"The Mental Health Crisis Behind Bars."  Keynote, Missouri Association for Social Welfare Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars."  Keynote, Annual Conference of the Association of Community Living Agencies in Mental Health of New York State, Bolton Landing, NY, November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justic Population."  Statewide Cultural Competence and Mental Health Summit VII, Oakland, CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium, University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners."  Keynote, California Criminal Justice Consortium Annual Symposium, San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit, Ann Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address,  Forensic Mental Health Association of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01. Commencement Address, The Wright Institute Graduate School of Psychology, June 2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising Practices Conference,  Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the Criminal Justice System,"  Annual Conference of the California Association of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and Prognosis," American Psychiatric Association Institute on Psychiatric Services, San Diego, October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital," Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19th Annual Conference, California Psychiatric Association, Huntington Beach, CA, October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental Health Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law Journal Symposium, Los Angeles, April 10, 2009

Panel: "Solitary Confinement in America's Prisons," Shaking the Foundations Conference, Stanford Law School, October 17, 2009.

EXHIBIT 2                    67 of 73

Commencement Address, San Francisco Behavioral Health Court Graduation
Ceremony, October 21, 2009.

Panel:  "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy
Support Center, Protection & Advocacy Annual Conference, Los Angeles, June
8, 2010.

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland
Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March
24, 2011.

**Books Published:**

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.
New York:  Free Press/ MacMillan, 1981.

Ending Therapy: The Meaning of Termination.   New York: New York University Press,
1988.

(Editor):  Using Psychodynamic Principles in Public Mental Health.    New Directions
for Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.

La Conclusione della Terapia: Problemi, metodi, consequenze.  Rome: Casa Editrice
Astrolabio, 1992. (trans. of Ending Therapy.)

Revisioning Men's Lives: Gender, Intimacy and Power.  New York: Guilford
Publications, 1993.  (trans. into Chinese, 2000).

Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About
It.  San Francisco: Jossey-Bass/Wiley, 1999.

(Co-Editor): Prison Masculinities.  Philadelphia: Temple University Press, 2001.


**Other Publications:**

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps
Virus," Journal of Pediatrics, 1970, 76, 716-721.

Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry,
the product of an NIMH Grant to the Department of  Psychiatry and Human
Behavior, Drew Medical School, 1973.

"Contact Between the Bars  -  A Rationale for Consultation in Prisons," Urban Health,
Vol. 5, No. 1, February, 1976.

"Schizophrenia and History,"  Free Associations, No. 5, 1986, 79-89.

"The Dual Potential of Brief Psychotherapy,"  Free Associations, No. 6, 1986, pp. 80-
99.

"Big Ideas, and Little Ones,"  Guest Editorial in Community Mental Health Journal,
1990, 26:3, 217-220.

"Feminist Men," Tikkun, July/August, 1990.

"Pathological Arrhythmicity in Men," Tikkun,  March/April, 1991.

"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." The
Psychiatric Times, 9,2, February, 1992.

"The State of the Sexes: One Man's Viewpoint,"  The Commonwealth, 86,16, April,
1992.

"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood.  Freedom, California: Crossing
Press, 1993; Univeristy of Wisconsin Press, 1998.

EXHIBIT 2                                    68 of 73

"Menfriends." Tikkun, March/April, 1993

"Psychotherapy, Neutrality and the Role of Activism." Community Mental Health Journal,1993.

"Review: Treating the Poor by Mathew Dumont." Community Mental Health Journal, 30(3),1994, 309-310.

"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional Space." Voices, 30(3), 1994, 57-62.

"Soft Males and Mama's Boys: A Critique of Bly." In Michael Kimmel, Ed., The Politics of Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement (And Mythopoetic Leaders Respond). Philadelphia: Temple University Press, 1995.

"Gender Bias, Countertransference and Couples Therapy." Journal of Couples Therapy, 1995.

"Jail and Prison Rape." TIE-Lines, February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." masculinities, 3,2, 1995, reprinted in Mary Roth Walsh, ed., Women, Men and Gender, Yale University Press, 1997.

"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings, 10, 4, 1995.

Guest Editor, issue on Men's Issues in Treatment, Psychiatric Annals,2,1, 1996.

"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners." American Journal of Orthopsychiatry, 66, 2, 1996, 189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies." Community Psychiatric Practice Section, Community Mental Health Journal, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly Epidemic and its Causes," Readings, Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," Fort/Da, 2,2,1996.

"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy, 7,1, 1997, 39-47. Published simultaneously in When One Partner is Willing and the Other is Not, ed. Barbara Jo Brothers, The Haworth Press, 1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings, December, 1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist, Summer, 1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?," Insight, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

EXHIBIT 2                                69 of 73

Ex 131 6

"The Men's Movement in the U.S.A.," in <u>Nouvelles Approches des Hommes et du Masculine,</u> ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," <u>Voices</u>, 36, 4, 2000.

"Psychotherapy with Men in Prison," in <u>A New Handbook of Counseling & Psychotherapy Approaches for Men</u>, eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," <u>Correctional Mental Health Report</u>, 5,3, 35-36, Sept./Oct, 2003.

"Review of William Roller's <u>The Dead are Dancing</u>," <u>Psychiatric Services</u>, 54,11,1660-1661, 2003.

"The Future of Correctional Mental Health," <u>Correctional Mental Health Report</u>, 6,1, May/June, 2004.

"Foreword," David Jones (ed.): <u>Working with Dangerous People: The Psychotherapy of Violence</u>, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," <u>Correctional Mental Health Report</u>, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), <u>Men & Masculinities: A Social, Cultural, and Historical Encyclopedia</u>, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), <u>Men & Masculinities: A Social, Cultural, and Historical Encyclopedia</u>, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison<u>," Journal of Clinical Psychology</u>, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue," <u>Correctional Mental Health Report</u>, 7,2, July/August, 2005.

"How to Create Madness in Prison," in <u>Humane Prisons</u>, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

"Conditions on death row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u> (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

"Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u>, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison," In <u>International Encyclopedia of Men and Masculinities</u>, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, <u>Journal of Offender Rehabilitation</u>, 45,3/4, 49-54, 2007.

EXHIBIT 2                    70 of 73

"Posttraumatic Stress Disorder in Prisoners," <u>Correctional Health Care Report</u>, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in <u>The Trauma of Psychological Torture</u>, Editor Almerindo E. Ojeda, Vol 5 of <u>Disaster and Trauma Psychology Series</u>, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." <u>Criminal Justice and Behavior,</u> Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., <u>Criminal Justice and Behavior</u>, October, 2009.

"Mutual Respect and Effective Prison Management," in <u>Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment</u>, Editors David Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report,"  <u>Correctional Mental Health Report</u>, 12,1, 2010.

"Treating Those Excluded from the SHU," <u>Correctional Mental Health Report</u>, 12,4, 2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," <u>UCLA Women's Law Journal</u>, 18,1, 2010.

EXHIBIT 2                    71 of 73

Ex 131 7

**Terry A. Kupers, M.D.**
**Depositions and Court Testimony in Past Four Years**

Testimony in DAI v. OMH, U.S. Dist. Court, Southern Distr. NY, regarding mental health treatment in NY DOCS, April, 2006.

Testimony in California v. Aaron Shank, CR03-2935, Yolo County, California, Sup. Ct., NGRI determination in felony case, April, 2006

Deposition (7/7/06) and trial Testimony (7/26/06) in Evans v. City of Chicago, U.S. Dist. Ct., Chicago, No. 04C3570, regarding psychiatric consequences of long prison term.

Deposition in Zimmerman v. City of Eau Claire, Oakland, CA, 8/18/06, regarding psychiatric consequences of incarceration.

Deposition (9/15/06) and Testimony (10/10/06) in Alejandro Dominquez v. Hendley, No. 04 2907 U.S. Dist. Ct., Chicago, Illinois, re psychiatric consequences of incarceration.

Testimony in Lorenzo Cobbs v. Joseph McGraff, U.S. Dist. Ct., San Francisco, C-01-02272 SI, 10/23/06, regarding competence to stand trial and mental state at time of offense.

Deposition in Gavira v. L.A. County, 12/28/06 in Oakland, regarding death in custody.

Deposition (2/2/07, Oakland, CA) and Testimony (2/6/07, in Madison, U.S. Dist. Ct WD Wisconsin) in Jones 'El v. Berge, No. 00-C-421-C, regarding adequacy of mental health screening to exclude prisoners with serious mental illness from Wisconsin Secure Program Facility.

Deposition (2/8/07, Fresno, CA) and Testimony (3/9/07, Hanford, CA Superior Court), in Rodriquez v. Kings County et al., Case No. 16967, regarding mental health care prior to suicide attempt of inmate in juvenile facility.

Testimony in Presley v. Epps, 4/4/07, U.S. Dist. Ct., ND Mississippi, Aberdeen, No. 4:05CV148-JAD, regarding conditions and Mental Health Care on Unit 32, Parchman, Mississippi.

Testimony in USA v. Simeon Velasquez, 4/30/07, No. 1:05-CR-393-RWS-JFK, U.S. Dist. Ct., Atlanta, Georgia, regarding Sentencing Phase of criminal trial involving federal prisoner.

Testimony in Aragon v. Liberty Life Insurance, 5/10/07, Alameda County Superior Court, Oakland, CA, regarding disability benefits.

Testimony in State of Mississippi v. Willie Russell, Cause No. 2001-0080 Sunflower County, Mississippi, Criminal Trial regarding assault in prison, June, 2007

Deposition and Testimony in A. Giraldo v. California Department of Corrections and Rehabilitation, Sup Ct of Calif., Co. of San Francisco, Case No. CGC-07-461473, July and August, 2007, regarding sexual assault in prison

Deposition in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichigan, by video from Emeryville, CA, Jan. 18, 2008, regarding mental health care at certain prisons

Testimony in Neal v. Michigan DOC, State of Mich, Circ. Ct for Co. of Washtenaw, Case No. 96-6986-CZ,  Ann Arbor, Michigan, Jan. 30, 2008, regarding custodial misconduct/sexual assault against women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichigan, Grand Rapids, Michigan, April 29, 2008, regarding mental health care at certain prisons

Deposition in Verdekel v. County of Los Angeles, No. CV 06-1518 JFW (PLAx), USDistCt, CentrDistCA, June, 2008 in Oakland, regarding death in custody

Deposition in Brandon v. Smith, US Dist Ct, Central Dist Illinois, No. 06-1316, 8/20/08 in Oakland, CA, regarding death in jail custody

Testimony in Neal v. Michigan DOC, State of Mich (second trial), Circ. Ct for Co. of Washtenaw, Case No. 96-6986-CZ,  Ann Arbor, Michigan, October 16, 2008, regarding custodial misconduct/sexual assault against women prisoners

EXHIBIT 2                                72 of 73
Ex. 131.7

Deposition in Jimmy Haws v. County of Monterey, Case No. C07 02599 JF, US
    Dist, NoCal, San Jose Div, in San Francisco, March 19, 2009, regarding
    double-celling and violence in jail.
Testimony in Verdekel v. County of Los Angeles, No. CV 06-1518 JFW (PLAx), USDistCt,
    CentrDistCA, in Los Angeles, Aug. 6-7, 2009, regarding death in custody.
Deposition in Kodimer v. City of Escondido, No. 07-CV-2221-BEN, re suicide attempt in jail,
    Orange County, October 2, 2009, regarding suicide attempt in custody.
Testimony in Westefer v. Snyder, No. 00-162-GPM, US Dist Ct So Dist IL, regarding due proces
    for confinement at Tamms Correctional Facility in Illinois, testimony via video from San
    Francisco, October 30, 2009, regarding psychiatric effects of isolated confinement.
Testimony in Estate of N. Bashaw v. State of Oregon, Sup Ct No. 08-08-6824-L, regarding
    suicide in prison, Vale, Oregon, December 17, 2009, regarding suicide in custody.
Deposition in Marcus Lyons vs. Village of Woodridge, No. 08CV05063, US Dist Ct No Dist ILL,
    Eastern Div, taken in Oakland, California, , May 24, 2010, regarding effects of prison term
    on an innocent individual.
Testimony in Katka v. Montana DOC, Superior Court, Helena, Montana, Cause No. BDV 2009-
    1163, July 20, 21, 2010, regarding treatment for prisoner with mental illness.
Deposition in Clarence Elkins v. Summit County, Ohio, USDistCtNoDistOhio, Case
    #5:06CV3004, Oakland, California by video, regarding effects of prison term on an
    innocent individual.
Deposition in Crawford v. Finley et al, USDistCtCntrlDistCA, Case No. CV09-3956-GHK-E,
    December 10, 2010, Oakland, California, regarding mental health care of a juvenile in
    corrections.
Testimony in Henry Kodimer v. City of Escondido, County of San Diego et al., USDistCt,
    SoDistCA, Case No. 07-CV2221, February 11, 2011, San Diego, regarding the quality of
    mental health care of a San Diego County jail inmate.

EXHIBIT 2                               73 of 73
Ex. 131.7