1  Barrett S. Litt, SBN 45527
   E-Mail: blitt@littlaw.com
2  Lindsay Battles. SBN 262862
3  Litt, Estuar & Kitson, LLP
   1055 Wilshire Boulevard, Suite 1880
4  Los Angeles, California 90017
   Telephone: (213) 386-3114
5  Facsimile: (213) 380-4585
6
7  William J. Genego, SBN. 103224
   E-Mail: wgenego@gmail.com
8  Vicki I. Podberesky, SBN. 123220
   Nasatir, Hirsch, Podberesky & Genego
9  2115 Main Street
   Santa Monica, California 90405
10 Telephone:  310-399-3259
11
   Attorneys for Plaintiff Bruce Lisker
12
13              UNITED STATES DISTRICT COURT
14            CENTRAL DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| 16 BRUCE LISKER, | CASE NO CV 09-9374 AHM (AJW) |
| 17 Plaintiff, | PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS, |
| 18 vs. | CONCLUSIONS OF LAW, AND CONCLUSIONS OF FACT AND LAW, |
| 19 | IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY |
| 20 CITY OF LOS ANGELES, et al., | JUDGMENT ON PLAINTIFF'S FABRICATION OF EVIDENCE CLAIM |
| 21 Defendants. | AS TO ELEMENTS OF FALSE EVIDENCE AND MATERIALITY , |
| 22 | [FILED CONCURRENTLY WITH MEMORANDUM OF LAW; |
| 23 | DECLARATIONS; EXHIBITS; (PROPOSED) ORDER] |
| 24 | |
| 25 | Date:           August 1, 2011 |
| 26 | Time:           10:00 A.M. |
| 27 | Courtroom:      14 |
| 28 | Trial Date:     October 17, 2011 |

# I.   PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 1.  At 11:26 a.m. on March 10, 1983, Bruce Lisker called paramedics and said his mother had been stabbed and brutally beaten and was near death. He pleaded for emergency help to be sent immediately to save her life. | Ex. 250, pp. 1-6 (transcript of emergency phone call); Ex. 157, pp. 176:20—177:8; 179:22—180:4, 192:18—193:5, 210:7—16  (Lovato trial testimony) |
| 2.  Mrs. Lisker was taken to the hospital, where she died around 3:00 that afternoon. | Ex. 23, p.1—2 (Death Investigation) |
| 3.  Mrs. Lisker had been stabbed multiple times, including more than twice in the back with two knives which were recovered at the house. | Ex.157, pp.182:17—183:6, 197:23—198:6, 211:24—212:9 (Lovato testimony) |
| 4.   When paramedics arrived at the scene, Mrs. Lisker's body was inside the foyer, lying in a pool of blood on an entryway rug. | Ex. 157, pp.179:3—180:4, 183:5—10, 183:25—184:16, 185:10—187:5, 195:22—196:8, 197:23—198:6 (Lovato testimony) |
| 5.  Also at the scene were a trophy and an exercise bar, both of which police suspected were used to bludgeon Mrs. Lisker, who had extensive injuries to her head and one arm. | Ex. 159, pp.244:16 – 19 (Monsue Testimony, 12/7/83, Preliminary Hearing) |
| 6.  The Los Angeles Police transported Bruce Lisker, then 17 years old, to jail where Detective Andrew Monsue interviewed him at length. | Ex. 159, pp.233:17 – 28 (Monsue Testimony, 12/7/83 Preliminary Hearing). |
| 7.  He said he went to his parents' house to fix his car. Concerned when his mother did not answer the front door, he looked first through a back living room window, and thought he saw his mother's feet on the floor. He then moved to the dining room sliding glass door, also in the back, where he definitely saw his mother lying on the floor. He tried to find a spare key, which was missing, went to his parked car to retrieve pliers so he could remove the kitchen screen, and then broke in through the south-facing kitchen window. | Ex. 16, pp.1 – 3 (Transcript of Bruce Lisker Interrogation). |
| 8.  Detective Monsue did not believe Mr. Lisker's account. | Ex. 159, pp.238:23 – 239:13; 243:28 – 247:1 (Monsue Testimony, 12/7/83 Preliminary Hearing). |
| 9.   Detective Monsue prepared a | Ex. 8, pp.101—124 ("Det. Monsue |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| comprehensive Follow-up Report three days after the murder. He set forth what he claimed were discrepancies between Mr. Lisker's explanation of his innocence and the crime scene facts, which were the basis of his arrest. | realized that the story that the subject told about how things occurred was not consistent with the evidence at the scene") (Follow-Up Investigation report, Section 10, Murder Book). |
| 10. The supposed incriminating contradictions, in the Follow-up Report, included that Plaintiff said he had walked in both directions on the dirt path on the east side of the house, but his shoeprints were all in the same direction (south). | Ex. 8, pp.101-124 ("Det. Monsue advices subject of the fact that the footprints in the mud only led toward the kitchen window and there was no footprints leading away from the side of the house.") (Follow-Up Investigation Report, Section 10, Murder Book). |
| 11. Plaintiff said he did not go in front of the kitchen sink, but the report said a bloody shoe print was found in front of the sink. | Ex.8, pp.101-124 ("I/O while at the scene recalled the bloody footprints leading from the hallway to the kitchen but noted that the footprints lead to the sink and not to the drawer where the knives were kept", "Detectives did note that the bloody footprints in the hallway on the carpet and the floor between the entry hallway and the kitchen were made by shoes with a wave-like design sole.") (Follow-Up Investigation Report, Section 10, Murder Book). |
| 12. According to the Follow-up Report, Monsue had looked in the windows (at about 12 p.m.) before taking Plaintiff in for questioning, and had determined he would not have been able to see his mother because the sun was very bright and would have blocked his view through the living room window, and his view through the dining room window would have been blocked by the sun as well as interior obstructions. | Ex. 8, pp.101-124 ("Detectives attempted to look into all the windows in the rear of the location, but could not see inside the house, without placing his face up against the glass", "The glare from the sun, coupled with the patio being partially covered with a roll-up canvas cover…would not have provided anyone with a view of the living room/dining room area of the house.") (Follow-Up Investigation Report, Section 10, Murder Book). |
| 13. According to Monsue's deposition testimony, Monsue did not look through the windows at any point during the first time that he was at the scene, as he "wasn't paying attention to whether you could see inside those windows at that point." | Ex. 172, pp.53:25 - 55:18 (Monsue Depo.). |
| 14. Landgren's deposition testimony states that on March 10, 1983, he did | Ex. 173, pp. 52:19-53:8  (Landgren Deposition Testimony). |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| not look into any windows until after 1 p.m. | |
| 15. The Follow Up Report also detailed other supposedly circumstantial incriminating evidence, including that all of the shoeprints on the east side of the house were from Plaintiff, bloody shoeprints inside the house matched the wave-like sole pattern of Plaintiff's sneakers, including shoe prints in the hallway and leading to the kitchen sink. | Ex. 8, pp.101-124 ("The footprints lead in the direction of the kitchen window subject used to enter the house", Detectives did note that the bloody footprints in the hallway on the carpet and the floor between the entry hallway and the kitchen were made by shoes with a wave-like design sole") (Follow-Up Investigation Report, Section 10, Murder Book). |
| 16. Monsue swore under penalty of perjury to the truthfulness of the report in obtaining a petition to detain Plaintiff. | Ex. 8, pp.89—92 ("I declare under the penalty of perjury that the foregoing is true and correct") (Arrest report and Juvenile Court Affidavit, 3/13/83). |
| 17. Soon after the interview, Mr. Lisker was charged with her murder. | Ex. 21, pp.1-5 (Juvenile detention report by Monsue) |
| 18. The following statements by Det. Monsue were originally made in his investigative reports: that Mrs. Lisker's body was positioned such that it would have been impossible to see her, even without a glare on the windows; when paramedics arrived at the scene; and her body would not have been visible from the back windows. | Ex. 8, pp.101—124 ("The window in the breakfast room would not have provided anyone with a view of the living room/dining room area", "Detectives entered the crime scene and observed a large area of blood on the floor at the end of the entry hallway. Detectives observed a blue/green bath towel lying on the floor…According to the officers, the victim's head had been resting on the towel when the paramedics arrived") (Follow Up Investigation Report, Section 10, Murder Book). |
| 19. A preliminary hearing was conducted in October -December, 1984, at which both Monsue and Landgren testified. Monsue testified to the incriminating facts in his report at both hearings, and Landgren testified to them at the preliminary hearing. | Ex. 33, pp. 4 – 80; Ex. 184, pp. 28 – 77; Ex. 184, 79 -136 (*see generally,* Monsue Prelim Testimony Nov. 5-6, 1984); Ex.186, pp.4 – 68 (*see generally*, Landgren Prelim Testimony Oct. 5-6, 1983). |
| 20. Monsue testified at the 4/4/83 Dennis H. hearing that the day of the murder was a bright, sunny day. | Ex. 158, pp.23:2—24:2 (Monsue testimony, Dennis H. hearing). |
| 21. Monsue testified at the 4/4/83 Dennis H. hearing that Dorka Lisker's body was not visible through the dining room window based on | Ex. 158, pp.24:28—25:15 (Monsue testimony, Dennis H. hearing). |

3

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| obstructions in the line of sight. | |
| 22. At Mr. Lisker's 4/4/83 Dennis H. hearing, Monsue testified that the shoe prints on the east side of the home traveled only in one direction. | Ex. 158, pp.10:19—11:20, 43:13—44:14 (Monsue testimony, Dennis H. hearing). |
| 23. Monsue testified at the 4/4/83 Dennis H. that the shoe print in front of the sink exhibited a wavy sole pattern. | Ex. 158, pp.17:7—23, 44:15—19 (Monsue testimony, Dennis H. hearing). |
| 24. At the December 1983, preliminary hearing, Monsue represented to the court that the day of the murder, it was a bright, sunny day. | Ex.159, pp.244:28—245:11 (Monsue testimony, Preliminary Hearing, 12/07/83) |
| 25. At the preliminary hearing, Monsue further testified that the body of Dorka Lisker would be impossible to view from the windows because of interior obstructions in the line of sight. | Ex. 159, p.245:15—21 (Monsue testimony, preliminary hearing, 12/07/83). |
| 26. At Mr. Lisker's preliminary hearing, Monsue represented to the court that the shoe prints found outside on the east side of the home traveled in only one direction. | Ex. 159, p. 246:9—17 (Monsue testimony, preliminary hearing, 12/07/83). |
| 27. At Mr. Lisker's preliminary hearing, Monsue testified that the shoe print found outside had the same sole pattern as the shoe print found inside, in blood, a wavy sole pattern. | Ex. 159, p. 256:18—21 (Monsue testimony, preliminary hearing, 12/07/83). |
| 28. Mr. Lisker's murder trial began in November 1984, but was aborted on December 4, 1984, when he agreed to plead guilty conditioned upon receiving California Youth Authority ("CYA") sentence. | Ex. 94, pp.1-14 ("But in exchange for this plea, based on the conversation I had with the court, the court has indicated that it would commit Bruce Lisker to the CA Youth Authority upon a plea to murder in the second degree with the enhancement; if for some reason the court could not live up with that part of the bargain…Bruce would then be able to withdraw his plea and proceed to trial") (Transcript of plea hearing, 12/4/84) |
| 29. The State asserted at the 1985 trial that Mr. Lisker lied to the police. | Ex. 161, pp. 1210:10 – 13 (Rabichow Argument) |
| 30. His "most condemning" lie, the State argued in closing, was that he could see his mother from outside the house, because there was no reason to lie about that unless Mr. Lisker was guilty. | Ex.148, pp. 1092:10 - 27 (Rabichow Argument). *See also*, Ex.148, 1081:24 – 1082:18, ("One thing which is important…Because it is so obviously devastating, is the view into the windows and whether he could see his |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| | mother or not. Because of all the lies, this is a crucial one and why look at it either way? If he is innocent, then there had – he obviously had to have a reason for getting into the house."); 1197:5 – 10 (Rabichow Argument) ("I notice that Mr. Mulcahy has tried real hard to show that for some reason Bruce would be able to see through and be ale to see his mother because I said that was a critical lie and he hasn't been able to do that). |
| 31. The state rested its case on the argument that if Mr. Lisker were innocent, then he had to have been able to see his mother, and if he were guilty, then he had to lie about seeing his mother. His statement that he could see his mother was a lie, and could be proven a lie. | Ex 148, pp.1082:12 – 22 (Rabichow Argument) ("…And I want to prove to you conclusively that there is no doubt that his statement cannot be true and it must be a lie."). |
| 32. The prosecution acknowledged that none of the purportedly guilty statements were proven lies except whether he could see his mother through the windows: "Like I said before, I can't prove to you that any one particular statement of those are lies. But he did lie and there are statements that I can prove he lied about." | Ex.148, pp.1074:2 – 1081:23 (Rabichow Argument) |
| 33. According to the prosecution, Mr. Lisker lied because he needed to create an explanation for how he could have known his mother was lying in the house in need of assistance unless he was the one who stabbed and bludgeoned her. | Ex.148, pp.1074:10 – 13; 1081:24 – 1082:18 ("One thing which is important…Because it is so obviously devastating, is the view into the windows and whether he could see his mother or not. Because of all the lies, this is a crucial one and why look at it either way? If he is innocent, then there had – he obviously had to have a reason for getting into the house..") (Rabichow Argument) |
| 34. The proof of the lie was police officers' testimony that (1) the day of the murder, March 10, 1983, was a bright, sunny day and the glare from the sun made it impossible to see into the house through the windows, and (2) the victim lay in such a position that | Ex. 162, pp. 272:28– 273:7 (Monsue Trial Testimony, 10/31/85); Ex.155, pp. 971:17 – 972:7, 996:10—997:22 (Wilson Testimony, 11/14/85) |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| she was not visible from either the living room or dining room windows as a result of obstructions to the line of sight. | |
| 35. Detective Monsue testified at the 1985 trial that the later morning of March 10, 1983, was bright and sunny. | Ex. 162, pp. 268:12 – 269:7 (Monsue Testimony, 1985 trial, 10/31/85) |
| 36. LAPD photographer Mike Wilson also testified about the sun and glare on March 10, stating that he took a series of pictures at approximately 11:30 a.m. on March 10, which the prosecution argued showed a bright, sunny morning. | Ex. 155, pp. 971:17 – 972:7 (Wilson Trial Testimony) |
| 37. On March 23, 1983, Detective Monsue and Detective Landgren returned to the Lisker residence to supposedly recreate the view into the house through the living and dining room windows, under the same conditions as existed on March 10. They directed a female officer to lie on the floor near the entryway and had photographs taken from the rear of the house looking at the living and dining room windows. | Ex.164, pp.73:18—25, 78:3—8, 80:25—81:20, 82:25—83:7, 83:15—84:21, 86:14—24 (Wilson Testimony, evidentiary hearing, 12/02/05). |
| 38. Wilson also took photos 13 days after the murder, on March 23, at 11:00 a.m. Monsue and Wilson both testified at the 1985 trial that March 23 was a bright, sunny day–just like March 10–and that the March 23 photos showed similar brightness and glare as March 10. | Ex. 164, pp.971:17 – 972:7; 972: 11-14; 976:3 – 8; 979:14 – 22 (Wilson Trial Testimony). |
| 39. The photographs made it appear as if the glare from the sun would have prevented Plaintiff from looking through the living room window, and that interior obstructions and the position of the body would have made it impossible for him to see his mother through the dining room window. | Ex. 155, pp.994:24 – 995:4, 996:17 – 23 (Wilson 11/14/85 Testimony); Ex. 162, pp. 267:9 – 269:7 (Monsue Testimony, 1985 trial, 10/31/85); Ex. 8, p.101—124 ("Detectives attempted to look into all the windows in the rear of the location, but could not see inside the house, without placing his face up against the glass", "The window in the breakfast room would not have provided anyone with a view of the living room/dining room area") (Follow-Up Investigation Report, Section 10, Murder Book); Ex. |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| | 184, pp. 1086:15—1087:6 (Rabichow argument, 11/15/85). |
| 40. The prosecution showed evidence that Mr. Lisker could not have seen the body as he described not only because it was not visible from the windows, but because the glare would have prevented him from doing so. | Ex. 162 pp. 267:9 – 268:20, 272:5—274:7,  272:9 – 273:7 (Monsue Testimony, 1985 trial, 10/31/85). |
| 41. The State argued, based solely on Monsue's testimony, that Mrs. Lisker's body was positioned such that it would have been impossible to see her, even without a glare on the windows. | Ex. 148, pp.1086:20 – 1091:4 (Rabichow Opening Argument 11/15/85); Ex. 162 pp. 272:5—274:7 (Monsue Testimony, 1985 trial, 10/31/85). |
| 42. Detective Monsue testified that her body would not have been visible from the back windows. | Ex. 162, pp. 267:9 – 268:20; 272:9 – 273:7 (Monsue Testimony, 1985 trial, 10/31/85). |
| 43. Detective Monsue, who did not see Mrs. Lisker in the house, based his assessment of her position on his interpretation of a sketch drawn by Mr. Lisker. | Ex.162, pp. 271:27 – 273:7 (Monsue 10/31/85 Trial Testimony). Ex. 163, 332:21—333:19, 338:15 – 28, 340:20 – 28, 341:25 – 342:14, 347:19 – 348:12, 352:2—355:9, 358:15 – 359:14, 407:11 – 408:4, 431:15 – 435:3, 451:12 – 14 (Monsue 11/04/85  Testimony); Ex. 159, pp. 255:18–20, 276:11—16 (Monsue prelim testimony). |
| 44. Charts and satellite images establish that it was overcast and cloudy. The weather changed sometime after 2:00 p.m. when the clouds moved away. | Ex. 255, pp.2 – 3; Ex. 256, p. 1; Ex.136, pp.157:3 – 161:25, 166:5 – 167:20 (Clark Testimony). |
| 45. Mr. Lisker and the State offered testimony at the habeas evidentiary hearing from reconstruction experts Frank Terrio (for Mr. Lisker) and Michael Varat (for the State) | Ex. 153, pp.106 – 149 (Terrio Testimony); Ex. 129, pp. 102 – 165 (Varat Testimony). |
| 46. Terrio and Varat agreed that they were able to reconstruct the scene as it existed on March 10, 1983, including the dining room table, the interior planter, the position of the blood stained rug and where Mrs. Lisker's body might have been lying. | Ex. 153, pp.115:15 – 21, 117:17 – 21, 118:20 – 119:4, 119:5 – 14, 139:22 – 140:6 (Terrio Testimony); Ex. 129, pp. 112:1 – 11, 118:24 – 120:19, 131:3 – 21 (Varat Testimony). |
| 47. Terrio and Varat also agreed, based on the theory presented at trial, Mr. Lisker would have been able to see his mother's head, a conclusion also reached by the habeas court. | Ex. 153, pp.126:21 – 130:17, 131:24 – 132:5, 133:24 – 134:8 (Terrio Testimony); Ex. 129, pp.137:2 – 14, 139:4 – 10, 161:4 – 162:3 (Varat Testimony). |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 48. Prosecutor Rabichow testified that from outside the dining room door at a 2005 scene reconstruction, he was able to see a person lying in the position in which he had argued Mrs. Lisker had lain. | Ex 285, pp. 61:4 – 62:22, 102:7 – 15 (Rabichow Testimony). |
| 49. Monsue testified that shoe prints found in the guest bathroom, facing the kitchen sink, and outside in the dirt all resembled quite closely Mr. Lisker's Pacer brand of shoes, which had a "similar pattern on them." | Ex. 163, pp. 300:19 – 306:26; 325:16 – 326:10 (Monsue Trial Testimony. 10/31/85, 11/4/85) |
| 50. INTENTIONALLY BLANK | INTENTIONALLY BLANK |
| 51. Similarly, the shoe print found in the bathroom was important because it discredited Mr. Lisker's statement to Monsue that he had only glanced in the bathroom. | *See* Ex. 148, pp.1076:7 – 12; 1080:2 – 5;  (Rabichow Argument) |
| 52. In closing, the State relied on Detective Monsue's testimony that Mr. Lisker left the only bloody and muddy shoe prints at the crime scene and on the east side of the house, and that only Mr. Lisker was in the house at the time of the murder. | Ex. 161, pp.1121:9 – 23; 1195:21 – 27 (…"you already have that blood footprint that is leading from the hallway into the living room." )(Rabichow Argument). |
| 53. The state argued in closing, based on Detective Monsue's testimony, that Mr. Lisker's shoe prints on the east side of the house led in only one direction, contrary to Mr. Lisker's statement that he walked in both directions on the east side of the house. | Ex. 148, pp.1096:24 – 1097:22 ("There are footprints only going in one direction and one only."); 1201:23 – 1202:16 (Rabichow Argument) ("There are footprints only going in one direction."). |
| 54. The State stressed in closing that the prints were a match for Mr. Lisker's shoes, arguing, inter alia, that the "only bloody footprint" was Mr. Lisker's; that, if someone else had done the murder, "why isn't there an intruder's footprint somewhere"; and that "only his [Mr. Lisker's] footprint is in the blood." | Ex.161, pp. 1121:9 – 23 (Rabichow Argument) |
| 55. The prosecution argued that all of the evidence was consistent with Mr. Lisker being alone in the house. | Ex. 148, pp.1117:12 – 1121:16 (summarizing evidence tending to disprove the presence of an unknown intruder: no forced entry, injuries evinced overkill and were not consistent with murder by a stranger caught during |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| | a burglary, missing $150.00 not enough money to explain this brutal of a robbery-murder, and Bruce Lisker left the only bloody footprints). |
| 56. The state offered no evidence that inside the house were made by police or paramedic personnel who responded to the scene. Instead, the state argued that police officers would not have left footprints because they preserved the scene. | Ex. 148, p.1121:9 – 23 (Rabichow Argument) |
| 57. The bloody shoe print in the guest bathroom and one of the shoe impressions in the dirt outside the house were left by someone other than Mr. Lisker. | Ex. 165, pp.188:9—14, 188:9—14, 190:6—18, 194:16—195:3 (Raquel testimony, 12/01/05, evidentiary hearing); Ex. 89, pp.1—15 (p.1 "shoe print labeled "D", "E", "F" [photographed outdoors by the entrance door] and "G" [photographed indoors] have different outsole patterns than and can be excluded as being made by the Pacer shoes" (Raquel 1/13/04 report); Ex. 154, pp.60:4—20, 63:17—64:3, 64:4—17, 84:17—85:1, 85:6—17, 86:1—8, 86:12—87:5, (Wiersema testimony, 12/06/05, evidentiary hearing); Ex. 140, pp.9:5—11:16, 15:4—16:9 (DeRousseau testimony, 12/03/05, evidentiary hearing); Ex. 147, pp.41:1—43:16, 44:16—25, 46:22—25, 48:14—17, 55:12—14 (Prado testimony, 12/05/05, evidentiary hearing) |
| 58.Forensic analysis established the pattern imprint on Dorka Lisker's head was possibly a shoe print that was inconsistent with the size and dimension of Bruce Lisker's pacer shoes, however it was consistent in size and dimension with other shoe prints found in the house. ' | Ex. 92 pp.1—20 (p.1 "The shoe impression on the decedent's head is similar in size and dimension to the shoeprint labeled G and is dissimilar in size and dimension to the Pacer shoes") (Raquel 2/15/05 report); Ex. 166, pp.193:8—194:5, 196:1—11 (Raquel testimony, 12/1/05, evidentiary hearing); Ex 166, pp.16:13—19:1, 19:15—25, 35:4—9, 35:10—37:5, 38:8—23, 39:23—40:10 (Raquel testimony, 12/02/05, evidentiary hearing); Ex. 154, pp.91:1—92:11, 94:5—21, 95:16—25 (Wiersema testimony, 12/06/05, evidentiary |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| | hearing) |
| 59. Marking on Mrs. Lisker's head could have been made by a tool but there was no tool that they were aware that could have made the print. | Ex.166, pp.25:17—26:21, (Raquel Testimony, 12/02/05, evidentiary hearing); Ex. 154, pp.79:5—81:8 (Wiersema testimony, 12/06/05, evidentiary hearing) |
| 60. LAPD criminalist Ronald Raquel analyzed photographs of the shoe impressions and concluded that the shoe impression left outside in the dirt showed two different shoes –one (the wavy pattern) was consistent with Mr. Lisker's shoes, but the other (the herringbone pattern) was not.' | Ex. 166, pp.188:5—189:7, 190:2—18, (Raquel Testimony, 12/01/05, evidentiary hearing); Ex.166 pp.33:20—34:10 (Raquel Testimony, 12/2/05, evidentiary hearing) |
| 61. Mr. Raquel's analysis showed that Pacer shoeprints outside found on the east side of the house led in both directions (north and south). Mr. Raquel indicated that the shoeprint created by the Pacer outsole (shoeprint B-1) was heading toward the side gate; the non-Pacer shoe headed away from the side gate (shoeprint B-2) | Ex. 166, pp. 188:5—189:22 (Raquel testimony, 12/01/05, evidentiary hearing). |
| 62. Footprint Peter Barnett concurred with Mr. Raquel's findings that the shoe prints B-1 and B-2 lead in both directions. | Ex. 134, pp 1—16 ("impression B-2 was not made by a shoe with the same sole pattern as made impression B-1", "The person wearing the shoes making these impressions must have walked in one direction along the path, then turned and walked in the opposite direction along the same path.") (Barnett Report, 6/9/11). |
| 63. The bloody print in the guest bathroom was not made by Mr. Lisker's shoes. The two herringbone pattern prints could have been made by the same shoes. According to his 1/13/04 report, Mr. Raquel concluded shoeprint G has a different outsole pattern as that of the Pacer shoe. The bathroom shoeprint more closely resembles the second shoeprint found outside the Lisker home. Raquel testified "that this print…is a different outsole pattern than the Pacer shoes, and that they look similar in outsole | Ex. 166, pp.190:2—18 (Raquel Testimony, 12/1/05, evidentiary hearing); Ex. 166, pp.8:24—9:25, 12:6—18, 14:20—23, 34:19—35:9 (Raquel Testimony, 12/2/05, evidentiary hearing); Ex. 154, pp.64:4—17, 87:18—88:8 (Wiersema Testimony, 12/06/05, evidentiary hearing) |

10

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| patter to the second show print identified as B."'' | |
| 64. FBI Criminalist Sandra Wiersema concluded the outsole in shoeprint "G" (located in the bathroom) was consistent with a herringbone pattern and concurred with Mr. Raquel's assessment that it was not made by the Pacer shoe. | Ex. 154, p. 84:4—27 (Wiersema Testimony, 12/06/05, evidentiary hearing). |
| 65. Raquel's supervisor, and the FBI shoeprint Analyst Sandra Wiersema, called by the State, concurred that the two herringbone prints could have been made by the same shoes.'' | Ex. 154 pp.69:29—73:2, 86:16—88:12, 93:10—94:21 (Weirsema Testimony, 12/06/05, evidentiary hearing). |
| 66. An impression on Mrs. Lisker's head that could not have been made by Mr. Lisker's shoe but had characteristics in common with the herringbone pattern of the shoe soles of the unknown intruder. | Ex.166, pp.193:8—196:11 (Raquel testimony, 12/01/05, evidentiary hearing); Ex.166 pp. 16:23—18:14, 38:2—23 (Raquel Testimony, 12/02/05, evidentiary hearing). |
| 67. Although forensic expert Ronald Raquel could not rule out that it was made by a tool of some kind, it was not by any tool of which he was aware.' | Ex. 166, pp.26:11—21 (Raquel testimony, 12/02/05, evidentiary hearing). |
| 68. A County Coroner's office tool mark expert testified he was unable to identify a tool that could have produced the impression. | Ex. 141, pp.39:9—41:16 (Dowell testimony, 12/07/05, evidentiary hearing) |
| 69. Monsue indicated footprints found in the hallway of the Lisker home exhibited a wave-like sole pattern similar to the pattern found on the shoeprint in the bathroom. | Ex. 8, p.101-124 ("As the Detectives stepped into this rear hallway, they observed a bloody footprint on the carpet. This footprint appeared to have a wave-like sole design", "Detectives did note that the bloody footprints in the hallway on the carpet and the floor between the entry hallway and the kitchen were made by shoes with a wave-like design sole. The bloody footprints led to the kitchen sink"); Ex. 162, p.256:18—21 (Monsue testimony, preliminary hearing, 12/07/83). |
| 70. Monsue indicated at Mr. Lisker's 1985 trial that a bloody footprint found near the kitchen sink exhibited the same wavy characteristics as the bloody shoe print found in the bathroom. | Ex. 163, p. 325:23—326:10 (Monsue testimony, 11/04/85). |

11

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 71. Evidence establishes that the shoe print in the kitchen could not have been left by the plaintiff's Pacer shoes. | Ex. 162, p.325:23—326:10 (Monsue testimony, 11/04/85); Ex. 165, pp.188:9—14, 188:9—14, 190:6—18, 194:16—195:3 (Raquel testimony, 12/02/05, evidentiary hearing); Ex. 89, p.1—15 (p.1 "shoe print labeled "D", "E", "F" [photographed outdoors by the entrance door] and "G" [photographed indoors] have different outsole patterns than and can be excluded as being made by the Pacer shoes" (Raquel 1/13/04 report); Ex. 154, pp.60:4—20, 63:17—64:3, 64:4—17, 84:17—85:1, 85:6—17, 86:1—8, 86:12—87:5, (Wiersema testimony, 12/06/05, evidentiary hearing); Ex. 149, pp.9:5—11:16, 15:4—16:9 (DeRousseau testimony, 12/03/05, evidentiary hearing); Ex. 147, pp.41:1—43:16, 44:16—25, 46:22—25, 48:14—17, 55:12—14 (Prado testimony, 12/05/05, evidentiary hearing) |
| 72. The state suggested two motives for the murder: robbery and animosity between Mr. Lisker and his mother. | Ex. 161, p. 1203:26 – 10 (Rabichow Argument). |
| 73. Robert Lisker testified at the criminal that he gave Mrs. Lisker $150 cash the night before the murder, while Bruce was present. | Ex. 144, pp.223:23 – 224:6; 225:26 – 226:7; 226:18 – 21 (Robert Lisker Testimony). |
| 74. Defendant Monsue testified that no cash was found in her purse, where she usually kept money; that the missing money never was recovered; and that he could not remember if Mr. Lisker had any cash when arrested. | Ex.163, pp. 411:24 – 412:18, 442:14 – 26 ("At no time have I ever found the $150.") (Monsue Testimony). |
| 75. A recent review of the Superior Court file disclosed a post-trial inventory of the contents of Mrs. Lisker's purse showing it contained $120 cash, discrediting the prosecution's theory that Mr. Lisker robbed his mother. | Ex. 259, p.7 (wallet contained five $20 bills, one $10 bill, one $5 bill, and five $1 bills). |
| 76. The state introduced evidence that Mr. Lisker had a poor relationship with his parents, particularly his mother. | Ex. 16, pp.4 – 5 ("we had problems in the past, alot of them"), p.41, p.46 ("We just didn't get along."). |
| 77. His parents had asked him to move out and were paying for his apartment. | Ex. 16, p.16; Ex.167, pp. 950:6 – 11, pp. 952:25 – 953:3, p. 955:9 – 13 (Robert |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| | Lisker Testimony). |
| 78. Bruce admitted to Detective Monsue that he used drugs, and on earlier occasions had stolen money from his parents. | Ex. 16, pp.3, 12, 22. |
| 79. The State argued at the 1985 trial that the blood on Mr. Lisker's clothing – which consisted of seven small drops and a small number of smears of blood – demonstrated his guilt. | Ex. 148, pp.1095:12 – 17, 1111:23 – 1112:27, 1115:2 – 1117:11 (Rabichow Opening Argument). |
| 80. Mr. Lisker had seven small drops, and a small number of smears of blood on his clothing. | Ex. 168, pp.731:1—744:14 (Linhart testimony, 1985 trial). |
| 81. Photographs showed blood spatters on the walls, floor, carpet, and rug. | Ex. 13, pp. 93, 95, 97, 103; Ex.162, p. 261:2 – 9 (Monsue '85 Testimony). |
| 82. Police blood spatter analyst Ronald Linhart testified at the 1985 trial that the blood on Mr. Lisker's clothing, although the result of blunt force trauma or castoff, could have resulted from the acts Mr. Lisker described in tending to his mother. | Ex. 168, pp.734:20 – 748:26 (Ronald Linhart Testimony). |
| 83. Mr. Linhart also testified at the federal habeas hearing, and again said the blood spatter evidence was equivocal. | Ex. 168, p.75:20—86:6, 87:4—22 (Linhart testimony, evidentiary hearing, 12/05/05). |
| 84. The prosecution argued that Mr. Lisker should have had more blood on his clothing had he been hugging and tending to his mother as he described to Monsue. | Ex. 148, pp. 1093:7 – 1095:17 (Rabichow Argument). |
| 85. Mr. Lisker, a juvenile, was transferred to the now infamous 7000 module of the County Jail within a few weeks after his arrest, in violation of the juvenile court judge's order that he remain at juvenile hall. | Ex. 260, pp.207:24 – 208:26; Ex. 174, pp. 148:27 – 149:27 (Hughes 10/06/83 Testimony). |
| 86. The prosecution introduced the testimony of Robert Hughes, a jailhouse informant, who testified that Mr. Lisker confessed to him in April 1983. | Ex. 142 pp. 547:13—550:9 (Hughes testimony, 11/06/85). |
| 87. According to Hughes, Mr. Lisker confessed to him the first time they talked. Mr. Lisker was depressed and upset about having killed his mother | Ex. 142, pp.549:8 – 550:9 575:24 – 576:6, 587:11-588:1, 595:23 – 597:20 (Hughes 1985 Testimony); Ex.170, pp. 211:4 – 20, 228:24 – 229:23, 234:20 – |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| and so he began to "minister" to him. | 237:4 (Hughes Prelim Testimony 11/14/83). |
| 88.  According to Hughes, Mr. Lisker said he needed money to buy PCP; Mrs. Lisker refused; Mr. Lisker looked through her purse for money; Mrs. Lisker caught Mr. Lisker, ripped his shirt and slapped him; Mr. Lisker then went to the kitchen, retrieved two steak knives, and stabbed Mrs. Lisker in the back, leaving the knives in her body; when Mrs. Lisker did not die, he hit her with the trophy and the exercise bar; finally, he put a rope around her neck. | Ex.142 pp.551:2—554:12, 557:1—16, 598:14—599:16, 606:10—607:19, 608:7—16,  650:22—651:16 (Hughes testimony) |
| 89. Hughes further testified that Mr. Lisker said his "alibi" was the false story he told police about having seen his mother from the rear of the house. | Ex. 142, pp.554:19—555:11 (Hughes testimony) |
| 90. Hughes said that Mr. Lisker "called [his] father, the paramedics and the police" in that order, about which order Mr. Hughes was very specific.  Mr. Lisker could have shared the police records from his case with Hughes. This order was contradicted by the records of the calls. | Ex. 142, pp. 556:12—23, 610:16—611:4 (Hughes testimony) |
| 91. This order was contradicted by the records of the calls. | Ex. 257, pp.1-3 (itemized listing of phone calls); Ex. 250, pp. 1—6 (phone call took place at 11:26am, on call-back Bruce tells paramedics "I don't know who did it. I'm trying to get the police right now.") |
| 92.Robert Lisker (Bruce's father) testified that the paramedics were called before Mr. Lisker called him at work. | Ex. 144, pp.232:5—233:2 (Robert Lisker testimony) |
| 93. Mr. Lisker could have shared the police records from his case with Hughes. | Ex.167, pp. 927:25 – 928:13 (Robert Lisker Testimony); Ex.152, p.793:3 – 20 (Dennis Riley Testimony). |
| 94. Robert Lisker testified that Hughes told him that he knew Bruce was innocent. | Ex. 167,  pp. 935:26 – 936:11 (Robert Lisker Testimony) |
| 95. Robert Lisker (Bruce's father) testified that the paramedics were called before Mr. Lisker called him at work. | Ex.144, pp. 232:9 – 27; 233:23 – 234:8 (Robert Lisker Testimony). |
| 96. Mr. Hughes denied and admitted | Ex. 142, pp.580:2 – 12 (denied asking |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| asking Mr. Robert Lisker and Bruce Lisker for money and goods; denied writing letters to Mr. Lisker acknowledging his innocence (although the State admitted he did so); and remembered minute details about Mr. Lisker's confession, but not how he "ministered" to Mr. Lisker. | Bruce for $), 588:8 – 22, 590:24 – 28 (admitted asking Bruce for $/goods), 595:20-22, 604:1-18, 606:7 – 9, 621:10-17, 625:11—627:3, 628:5-21 (denied letters), 639:28 – 640:10 (denied asking Robert Lisker for $), 657:26—658:4 (stip.) (Hughes testimony, 11/06/85); Ex. 142, pp. 551:9—557:6 (Hughes testimony, 11/06/85) (confession details); Ex. 142 pp. 549:20-550:9, 578:6—14, 578:28—580:1, 586:19—587:10, 595:23—597:17 (no memory of ministering) (Hughes testimony, 11/06/85). |
| 97. Robert Lisker testified that Hughes asked him for money and goods. | Ex.167, p.937:3 – 23 (Robert Lisker Testimony). |
| 98. Hughes already had offered jailhouse informant testimony in two other murder cases. | Ex. 142, pp.574:2-5, 584:19-585:11, 594:27-595:19 (Hughes testimony, 11/06/85) |
| 99. Hughes "always" expected to get something for testifying and was released early due to the prosecutor's efforts on his behalf. | Ex. 142, pp.584:23—27, 593:24-28, 660:3-662:21, 663:16-28, 665:20-666:4, 688:23-689:13, 691:9—15 (Hughes testimony, 11/06/85) |
| 100.    Hughes claimed he wrote notes of the confession, but they were not available at trial. | Ex.142, pp.581:25—582:21; 632:2-25 (Hughes testimony, 11/06/85). |
| 101.    Before Hughes, police were contacted by two other inmates who reported that they also had solicited confessions from Mr. Lisker. | Ex. 284, pp.163:21 – 164:25. |
| 102.    The transcript of those interviews suggested that the detectives communicated to one of them through a "wink and a nod" that he should question Mr. Lisker, adding "further doubt to the reliability of the already shaky testimony from Hughes, an experienced informant housed next to a juvenile on suicide watch. | Ex. 284, pp.167:19 – 168:15. |
| 103.    Police officer Douglas Johnson testified that Mr. Lisker was hysterical when police arrived at the scene. | Ex. 143, pp.812:8 – 814:15; 818:25 – 822:15 (Douglas Johnson Testimony) |
| 104.   The defense has submitted an expert report that disputes Mr. Linhart in one respect -- Mr. Linhart said the small drops on the cuff of Plaintiff's | |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| shirt could be from castoff or blunt force trauma and the defense expert maintains they could not be castoff. | |
| 105.   The shoeprint Monsue observed in the hallway, which resembled the pattern found in the bathroom, could not have been made by Plaintiff's shoe because the bathroom shoe did not match Plaintiff's shoe. | Ex. 8, p.101-124 ("As the Detectives stepped into this rear hallway, they observed a bloody footprint on the carpet. This footprint appeared to have a wave-like sole design", "Detectives did note that the bloody footprints in the hallway on the carpet and the floor between the entry hallway and the kitchen were made by shoes with a wave-like design sole. The bloody footprints led to the kitchen sink"); Ex. 162, p.325:23—326:10 (Monsue testimony, 11/04/85) (wavy pattern shoe prints leading to the kitchen sink); Ex. 162, p.256:18—21 (Monsue testimony, preliminary hearing, 12/07/83). <br><br> Bathroom shoe print does not match plaintiff's shoe: Ex. 165, pp.190:2—18 (Raquel Testimony, 12/1/05, evidentiary hearing); Ex. 166, pp.8:24—9:25, 12:6—18, 14:20—23, 34:19—35:9 (Raquel Testimony, 12/2/05, evidentiary hearing); Ex. 154, pp.64:4—17, 87:18—88:8 (Wiersema Testimony, 12/06/05, evidentiary hearing) |
| 106.   At Mr. Lisker's 1983 Preliminary Hearing, Detective Landgren testified that he looked into the window from outside of the house on March 10, 1983, at around 12:00 p.m. | Ex. 186, p.24:4 – 25 (Landgren Preliminary Hearing, 10/5/1983). |
| 107.   At Plaintiff's Dennis H. Hearing, Preliminary Hearing, and trial Detective Monsue testified to having looked in the window at about 12:00 pm., before transporting Mr. Lisker. | Ex. 158,p. 23:2 – 24:2 (Monsue Dennis. H. Hearing Testimony, 4/4/1983); Ex. 159, 243:28 – 247:1 (Preliminary Hearing Testimony, 12/7/1983); Ex. 146, 267:14 – 268:11 (Monsue Trial Testimony, 10/31/85). |
| 108.   Monsue's report described the bloody shoeprint in the hallway, leading to the kitchen, and on the (bathroom) floor between the entry hallway and the kitchen, as having a wave like sole design that matched | Ex. 8, pp.101-124 ("Det. Monsue advices subject of the fact that the footprints in the mud only led toward the kitchen window and there was no footprints leading away from the side of the house.") (Follow-Up Investigation |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| Bruce Lisker's Pacers. | Report, Section 10, Murder Book). |

## II.   PLAINTIFF'S CONCLUSIONS OF LAW

1.    Police officers are liable under §1983 where they deliberately fabricate evidence, thereby causing false evidence to be used for prosecution and/or conviction (i.e. causing a *Mooney-Napue* violation). *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 *(2d Cir. 1997) (citing, United States v. Agurs*, 427 U.S. 97, 104 (1976*)); Giglio v. United States*, 405 U.S. 150, 153 (1972); *Mooney v. Holohan,* 294 U.S. 103 (1935)*; Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) (internal citations omitted) ("those charged with upholding the law are prohibited from deliberately fabricating evidence"); *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (recognizing "…constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"); *Dominguez v. Hendley*, 545 F.3d 585, 589-90 (7th Cir. 2008); *Brewster v. Shasta County*, 27 F. App'x. 908, 913 (9th Cir. 2001) (It is clearly established that a suggestive procedure intended to produce a false identification would violate Brewster's constitutional rights, citing *Devereaux v. Abbey,* 263 F.3d 1070, 1074-75 (9th Cir.2001)); *Geter v. Fotenberry*, 882 F.2d 167 (5th Cir. 1989) (clearly established right not to be subjected to criminal charges on the basis of police officers' knowing efforts to fabricate evidence or otherwise unlawfully influence witnesses); *Good v. Curtis*, 601 F.3d 393, 398 (5th Cir. 2010), *cert. denied*, 131 S.Ct. 206 (U.S. 2010) (police officer's knowing efforts to secure false identification by fabricating evidence or otherwise unlawfully influencing witnesses violates the Fourteenth Amendment).

2.    To establish *police officer liability* for deprivation of liberty on the basis of false evidence, plaintiff must prove, *inter alia*, that (1) false evidence was presented in the reports or testimony; (2) defendant police officers knew or should

have known it was false; and (3) the false evidence was material within the meaning of *Napue*. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2nd Cir. 1997) (due process violation occurs where police deliberately forward false evidence likely to influence jury's decision); *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) (it is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (officer fabricated evidence and there was a reasonable likelihood it would have affected the judgment of the jury).

    a.  Testimony is "false" for *Napue* purposes if, taken as a whole, it creates a materially misleading impression of the facts. This rule dates to at least *Alcorta v. Texas*, 355 U.S. 28 (1957)—a decision upon which *Napue* expressly relied; *United States v. Ramirez*, 608 F.2d 1261, 1266 n.9 (9th Cir. 1979).

    b.  False evidence is material if there is "any reasonable likelihood" it "*could* have affected the judgment of the jury." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (emphasis supplied); *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008).

    c.  Plaintiffs may use circumstantial methods to prove an officer's deliberate fabrication of false evidence. *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001). *Costanich v. Department of Social and Health Services*, 627 F.3d 1101, 1111 (9th Cir. 2010).

    d.  Where police officers forward evidence to prosecutors or submit testimony *that a reasonable officer would or should know was false*,

then their actions meet the standard for deliberate fabrication of evidence. *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001). *Costanich v. Department of Social and Health Services*, 627 F.3d 1101, 1111 (9th Cir. 2010). *See also, e.g., Michaels v. City of New Jersey*, 222 F.3d 118 (3rd Cir. 2000) (suggesting that improper interview techniques would violate due process if the statements obtained through those techniques were used against Plaintiff in a criminal proceeding); *Wilson v. Lawrence County*, 260 F.3d 946, 954 (8th Cir. 2001) (evidence that police coerced a witness statement through abusive investigatory techniques, including tricking the witness into giving details about the crime he didn't know, threatening to put him into jail if he didn't implicate the suspect and promising rewards, constitutes a claim for the "[knowing use of] false or unreliable evidence."); *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) (evidence that forensic expert's findings were far a field of what any reasonable forensic examiner would find sufficient to support inference that forensic expert fabricated her report).

**III.    PLAINTIFF'S CONCLUSIONS OF MIXED FACT & LAW**

Under the legal standard set forth above, and based on the undisputed facts set forth above, the following statements in Defendants' investigative reports and testimony are both false and material:

(1) Plaintiff could not have seen his mother in the position she was lying on the entryway floor through the dining room window, and lied in claiming he did;

(2) Plaintiff did not travel in both directions along the east side of the house to come to his mother's aid and lied when he said he did;

(3) Plaintiff's bloody shoe print was in front of the kitchen sink and Plaintiff lied when he said he did not walk or step in front of the sink;

(4) All shoe prints on the east side of the house were from Plaintiff's shoes;

(5) There was a bloody shoe print in the guest bathroom that was from Plaintiff's shoes;

(6) All of the bloody shoe prints inside the house had the wave-like sole pattern of Plaintiff's shoes; and

(7) There were no shoe prints in blood inside the house from anyone other than Plaintiff.

DATED: June 20, 2011                Respectfully Submitted,

                                    LITT, ESTUAR & KITSON LLP
                                    NASATIR, HIRSCH, PODBERESKY &
                                    GENEGO PLC

                                    By:__/s/ Barrett S. Litt_____
                                     Barrett S. Litt

                                    By:__/s/ William J. Genego_____
                                     William J. Genego