1  Barrett S. Litt, SBN 45527
   E-Mail: blitt@littlaw.com
2  Lindsay Battles, SBN 262862
3  Litt, Estuar & Kitson, LLP
   1055 Wilshire Boulevard, Suite 1880
4  Los Angeles, California 90017
   Telephone: (213) 386-3114
5  Facsimile: (213) 380-4585

6
7  William J. Genego, SBN 103224
   E-Mail: bill@genegolaw.com
8  Law Office of William Genego
   2115 Main Street
9  Santa Monica, California 90405
   Telephone:  310-399-3259
10
11 Attorneys for Plaintiff Bruce Lisker

12
13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15
   BRUCE LISKER,                       CASE NO CV 09-9374 AHM (AJW)
16
17              Plaintiff,             PLAINTIFF'S STATEMENT OF
                                       GENUINE ISSUES IN
18        vs.                          OPPOSITION TO DEFENDANTS'
                                       MOTION FOR SUMMARY
19                                     JUDGMENT
   CITY OF LOS ANGELES, et al.,
20                                     Hearing Date:    August 6, 2012
21              Defendants.            Time:            2:00 P.M.
                                       Courtroom:       14
22
23                                     Trial Date:      September 25, 2012
                                       Time:            9:00 a.m.
24
25
26
27
28

Plaintiff submits this statement of genuine disputes pursuant to Central District of California Local Rule 56-2 in opposition to Defendants' motion for summary judgment. Facts 1 through 41 below correspond to the facts and supporting evidence presented in Defendants' Statement of Uncontroverted Facts. These facts are followed by additional material facts and supporting evidence showing genuine disputes.

| PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | | |
|---|---|---|
| | DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
| 1. | On November 21, 1985, a jury convicted Lisker of second-degree murder of his mother, Dorka Lisker. | Undisputed |
| 2. | Approximately 24 years later, in August 2009, Lisker was granted federal habeas relief and his conviction was set aside | Undisputed |
| 3. | Lisker was granted habeas relief on the grounds that Lisker's Fourteenth Amendment right to effective assistance of counsel was violated by his counsel's failure to investigate and present third-party culpability evidence at his criminal trial and his Fourteenth Amendment due process right to a fair trial was violated by the introduction of false testimony at his criminal trial. | Undisputed |
| 4. | Los Angeles Police Department Detectives Andrew Monsue and Howard Landgren investigated the murder and Monsue (but not Landgren) testified at the criminal trial. Mrs. Lisker was murdered in her home on March 10, 1983. | Undisputed |
| 5. | The police responded to the Lisker home at approximately 11:30 a.m. on March 10, 1983 and found 17-year-old Bruce Lisker outside the home, hysterical and screaming with blood on his hands. | Undisputed |

| | PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 6. | Monsue testified that by the time he arrived at the Lisker home, the paramedics had already transported Mrs. Lisker to the hospital | Undisputed that Monsue arrived after the paramedics had already transported Mrs. Lisker to the hospital. The cited evidence does not establish the content of Monsue's testimony. |
| 7. | Bruce was in a patrol car parked in front of the house. | Undisputed that Monsue testified that Plaintiff was detained in the back of a patrol car when he arrived. |
| 8. | Monsue said that he spent about 30 minutes at the scene, walking around both the interior and exterior of the house. | Undisputed that Monsue testified that he spent 30 minutes walking around the interior and exterior of the house and conversing with other officers. |
| 9. | After that, Monsue transported Lisker to the Van Nuys police station. | Undisputed |
| 10. | Monsue interviewed Lisker at the station and the interview was audio-recorded. Lisker's audio-recorded statements and a transcription of the audio-recording were introduced at the criminal trial. | Undisputed in part; an edited version of the audio tape was introduced at trial and a transcript of that edited version of the tape was provided to the jury; neither the original nor a copy of the unedited recording exists, or at least it has not been produced. See Genego Dec. ¶¶ 4, 5. |
| 11. | In this recorded statement, Lisker told Monsue that he went to his parents' house to fix his car and became suspicious that something was wrong when his mother did not answer his knock at the front door. | Disputed that Plaintiff said he became "suspicious," which is not supported by the cited evidence, but otherwise undisputed |

2

| PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 12. | Lisker told Monsue that he went to the back of the house to try to look inside. | Undisputed |
| 13. | Lisker said that he looked first through a back living room window, from which he thought he was able to see his mother's feet on the ground. | Undisputed |
| 14. | Not sure what he had seen, Lisker said that [sic] moved to the dining room sliding glass door, also on the back of the house, where he definitely saw his mother lying on the floor. | Undisputed except that Lisker stated he thought he saw his mother's feet. See Defendants' Undisputed Fact #13, above. |
| 15. | Lisker sketched out a diagram for Detective Monsue depicting the approximate location of Mrs. Lisker's body and where he was standing when she came into view. | Disputed. Ex. 319A:5-7. |
| 16. | Detective Monsue testified that he went back to the Lisker home to try to determine if Lisker could have seen his mother lying on the floor as he had diagramed in the sketch and described to Monsue.  Lisker's father, Robert Lisker, was with Detective Monsue. | Objection. Vague as to time.<br><br>Undisputed that the statement is a correct description of events on March 23, and the trial testimony so reflects. |
| 17. | Detective Monsue testified that he "stood as close as I could approximate it" to the same position where Bruce had described that he was standing in when he claimed to have looked through the window and to have seen his mother lying on the floor | Undisputed |
| 18. | "I tried to stand in front of the window on the sidewalk he said he stood on and I attempted to bend down in the manner in which he described to me that he had done." | Undisputed that Detective Monsue testified as quoted here. . |

| PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | | |
|---|---|---|
| | DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
| 19. | From this position, Monsue testified that was unable to see far enough into the house to have been able to see where Lisker described seeing his mother laying in the entryway. | Undisputed that Monsue testified as indicated. Disputed that this is an accurate statement of what Plaintiff told Monsue. See Defendants' Fact #13, above; see Ex. 319A-3 |
| 20. | Monsue explained the glare on the window prevented him from being able to see into the home: "The major consideration was the reflection that was coming off of that particular window.  Based upon the sun being very bright on those two particular days and the reflection that the sun was creating and reflecting back, . . ." | Undisputed that Monsue testified as quoted here. Objection to "explained" as it is a characterization. |
| 21. | Monsue testified he went back to the home on March 23, 1983 at 11:30 a.m. with a photographer and picked that particular day and time "because it was a Thursday and it was the time of the day in which Bruce Lisker had indicated that he had looked into that particular window.  The conditions of the sun the temperature, the environment in terms of the dampness on the ground were very similar on that particular day we took those photographs." | Undisputed that Monsue testified to having returned to the home on March 23, 1983; that he picked that day because it was a Thursday and conditions were very similar.<br><br>Disputed that Monsue testified to having returned at 11:30 a.m. (Ex. 320, p. 277:15 – 17; RT 265). |
| 22. | Monsue explained:  "The major consideration was the reflection that was coming off of that particular window.  Based upon the sun being very bright on those two particular days and the reflection that the sun was creating and reflecting back, . . ." | Undisputed that Monsue testified as quoted here. Objection to "explained" as it is a characterization. |

| | | |
|---|---|---|
| **PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | | |
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 23. | Detective Monsue testified that when he stood in the spot that Bruce told him that he was standing in when he "looked in that window and saw his mother's head and hair as she lay on the floor adjacent to the planter," and Monsue was unable to see "a number of things. The window itself because it has light reflecting on to it, the dining room table, the plants, the way they were arranged inside of the planter and the size and shape of the planter in relationship to where he had stated he observed his mother." | Undisputed, except that the items described (i.e., the window, dining room table, etc.) are not items he was unable to see, but items that he testified prevented him from seeing where Plaintiff said he had seen his mother's head |
| 24. | Crime scene photographs of the bloody shoes prints in the Lisker house and the muddy shoe prints outside the house were introduced at the criminal trial. | Undisputed |
| 25. | The shoes that Bruce Lisker was wearing when Monsue met him at the murder scene were offered as evidence at the criminal trial. | Undisputed |
| 26. | At trial, the prosecutor asked Detective Monsue: "Now, the footprints, the ones you could distinguish as footprints and that you noted, did you see any shoes that had a similar pattern on them?" | Undisputed |
| 27. | Detective Monsue did not offer his opinion that "the shoe prints were a match for Petitioner's Pacers," as stated in the Magistrate's report. | Objection. The accuracy of the Magistrate's opinion is immaterial |

| PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | | |
|---|---|---|
| | DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
| 28. | Instead, far more circumspect, Detective Monsue's response was: "I saw the shoes that were on Bruce Lisker's feet, the bottoms of the soles of those particular shoes resembled quite closely the patterns that were imprinted on the floor." | Objection. "[F]ar more circumspect" is a characterization, not a statement of fact.<br><br>Undisputed that Monsue testified as quoted here. |
| 29. | On February 7, 1986, the court sentenced Lisker to state prison for a term of 15 years to life, enhanced by one year for use of a deadly weapon, for a total term of 16 years to life. | Undisputed |
| 30. | On December 22, 1988, the California Court of Appeal, Second Appellate District affirmed Lisker's conviction, holding that  it was error to admit Lisker's pre-Miranda statements at trial, but that the error was harmless because "[t]he challenged statements pale in significance when considered with the remaining, overwhelming evidence connecting [Lisker] with the murder.  We conclude the error was harmless beyond a reasonable doubt." | Undisputed that that was the ruling of the California Court of Appeal |
| 31. | The California Supreme Court denied habeas relief on April 25, 1989, and Lisker's conviction became final. | Undisputed |
| 32. | Lisker did not file anything further in state or federal court attempting to set aside his criminal conviction for the next 14 years. | Undisputed |
| 33. | On February 24, 2003, Lisker signed a petition for writ of habeas corpus which then was filed in the Los Angeles County Superior Court; that court denied the petition on March 6, 2003. | Undisputed |

6

| PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 34. | On July 28, 2003, Lisker filed a petition for writ of habeas corpus in the California Court of Appeal; that petition was denied on August 5, 2003. | Undisputed |
| 35. | On August 18, 2003, Lisker filed a petition for review with the California Supreme Court; that petition was denied on October 29, 2003. | Undisputed |
| 36. | On April 16, 2004, Lisker filed a petition for writ of habeas corpus in federal district court. | Undisputed |
| 37. | Thereafter, Lisker filed a First, and then a Second Amended Petition. | Undisputed |
| 38. | In the Second Amended Petition, Lisker raised four claims:  (1)  Lisker's right to counsel was violated by the introduction of a confession obtained by a police agent; (2) Lisker's right to effective assistance of counsel was violated when his trial attorney failed to investigate and present a third-party culpability defense; (3)  Lisker's due process rights were violated when he was convicted on the basis of false evidence; and (4)  Lisker's due process rights were violated by the cumulative impact of the other three constitutional violations. | Undisputed |
| 39. | An evidentiary hearing was held over seven days from December 1 to December 9, 2005. | Undisputed to the extent this refers to the hearing held on Plaintiff's federal petition for a writ of habeas corpus. |
| 40. | Neither Monsue nor Langren was called as a witness at this hearing. | Objection, immaterial. Undisputed |

| | PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 41. | On August 6, 2009, the federal district court issued an order accepting the findings and recommendations of the magistrate judge and ordered and adjudged that the Second Amended Petition be denied as to Lisker's claim of a right of counsel violation, but be granted as to Lisker's claims that his Fourteenth Amendment right to effective assistance of counsel by his counsel's failure to investigate and present third-party culpability evidence at his criminal trial, and that his due process right to a fair trial were violated by the introduction of false evidence at his criminal trial. | Objection, immaterial. Undisputed |
| 42. | The court found that Lisker's Sixth amendment right to effective assistance of counsel at his trial was violated because counsel's performance was deficient and that deficient performance prejudiced the defense. | Objection, immaterial. Undisputed |
| 43. | Specifically, counsel failed to present compelling evidence he possessed of Ryan's involvement and unreasonably failed to further investigate Ryan's involvement by examining shoe prints at the Lisker house and autopsy photos and by obtaining the Lisker phone bill and Ryan's criminal record. | Objection, immaterial. Undisputed |
| 44. | With regard to the false evidence claim, the court found as follows: "March 10, 1983 was not a bright and sunny day as Monsue and Wilson [the photographer] had repeated many times at trial." | Objection, immaterial.<br><br>Undisputed that this language appears in *Lisker v. Knowles*, 651 F.Supp.2d. 1097, 1135 (C.D. Cal. 2009) |

8

| | PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 45. | "Whether [Lisker] could have seen his mother from the backyard windows also depended on the placement of her body and the lines of sight between the two windows." | Objection, immaterial.<br><br>Undisputed that this language appears in *Lisker v. Knowles*, 651 F.Supp.2d. 1097, 1137 (C.D. Cal. 2009) |
| 46. | The court never said that Monsue's testimony that the victim's body was not visible from the rear windows of the house as Lisker claimed it was, was false.  Instead, the court said:  "Detective Monuse drew his conclusions about the victim's placement from in interpretation of [Lisker's] statement to him during the first portion of the police interview, prior to when [Lisker] was given his Miranda rights.  (Citations.)  Therefore, none of the discussion about where Petitioner (as interpreted by Monsue) placed victim should have been admitted at trial." | Objection, immaterial.<br><br>Undisputed that the quoted language appears in *Lisker v. Knowles*, 651 F.Supp.2d. 1097, 1137, FN 22 (C.D. Cal. 2009). Disputed in that the court nevertheless characterized Monsue's testimony as false in light of substantial evidence establishing that Monsue's understanding of where the body was positioned was incorrect. *Id.* at 1137. |
| 47. | Finally, the court found that Monsue's testimony that  "only [Lisker] left bloody and muddy shoe prints at the crime scene," was false. | Undisputed |

9

| | PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 48. | The court further found that the prosecutor "knew or should have known the evidence was false," and that the "Napue" violations at Lisker's trial were material - that is that false evidence "led to a trial in which the court can no longer have confidence in the verdict." | Disputed that the court found or stated the "prosecutor" knew or should have known the evidence was false, and instead restated the principle due process is violated where the "prosecution" knew or should  evidence was false, and specifically found Monsue "understood the false nature of his testimony" and otherwise undisputed  *Lisker v. Knowles*, 651 F.Supp.2d. 1097, 1138 - 1140  (C.D. Cal. 2009). |
| 49. | On September 21, 2009, the Superior Court of the State of California, for the County of Los Angeles granted the prosecutor's motion to dismiss the criminal charges against Lisker without prejudice, pursuant to California Penal Code Section 1382 | Objection, immaterial. Undisputed |
| 50. | The prosecutor stated that following an extensive review of Lisker's case, the District Attorney's Office was "confident in the defendant's guilt in this case." | Objection, hearsay if offered for the truth, and also immaterial. Undisputed as to the fact that the statement was made |

10

| | PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | |
|---|---|---|
| | **DEFENDANTS' ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
| 51. | The prosecutor explained that due [sic] the passage of time, because witnesses have died, because memories have faded, and because evidence has been lost or destroyed, the prosecution was unable to proceed to trial. | Objection, hearsay if offered for the truth, and also immaterial.<br><br>Undisputed, except objection to the word "explained" because it is a characterization, not a fact, but the prosecutor did make such statements. |
| 52. | Lisker filed this lawsuit on December 22, 2009, pursuant to *42 U.S.C. § 1983*. | Undisputed |
| 53. | Defendants moved for summary judgment. | Undisputed |
| 54. | After defendants filed their motion for summary judgment, Lisker moved to voluntarily dismiss, without prejudice, the malicious prosecution claim and his violation of the privilege against self-incrimination claim. | Objection, immaterial.<br><br>Disputed. Plaintiff's motion to dismiss the malicious prosecution and privilege against self-incrimination claim was filed <u>before</u> defendants' Motion for Summary Judgment. Plaintiff's motion to dismiss was filed on March 18, 2011. See Docket 57. Defendants' motion was filed on June 17, 2011.  Docket 90. |
| 55. | This Court granted the motion on August 4, 2011, leaving only his due process denial of his right to a fair trial based on the false or fabricated evidence at his criminal trial (the "*Napue*" claim), the due process denial of his right to a fair trial based on the withholding of exculpatory evidence at his criminal trial (the "*Brady*" claim) and the *Monell* claim. | Undisputed |

| | PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | |
|---|---|---|
| | DEFENDANTS' ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
| 56. | On September 13, 2011, this court denied defendants' motion without prejudice, but allowed that defendants' could "renew that motion or file a different and presumably far more streamlined and focused motion, . . ." | Undisputed |

Plaintiff submits the following "Statement of Genuine Disputes of Material Fact," which lists the material facts that support and create a genuine dispute necessary to be litigated. Plaintiff's evidentiary sources for certain material facts is the opinion in Plaintiff's habeas action, *Lisker v. Knowles*, 463 F. Supp.2d 1008 (C.D.Cal. 2006) (hereafter *Lisker 1*). Plaintiff has simultaneously filed a request that the Court take judicial notice of that opinion. Plaintiff cites to the *Lisker* opinion to establish by judicial notice the existence of the evidence in the record before that Court, and establish by judicial notice the ultimate facts found by the *Lisker* Court. For example, the *Lisker* opinion states that in the state criminal trial, Det. Monsue testified that March 23, 1983, was a bright, sunny day, and the glare from the sun meant that one could not see into the house through windows in the rear of the house. Plaintiff seeks to have the Court take judicial notice that Det. Monsue so testified at the criminal trial. By relying on the files and records of the case as set forth in the opinions, Plaintiff has avoided having to submit lengthy transcripts from which certain facts are established. If the Court nonetheless wishes Plaintiff to provide the underlying documentary evidence, we will do so.

This document is 44 pages in length. Because the table has been set not to divide text in rows between pages, at times there are significant gaps between the end of one row and the beginning of the next.

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|
| PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |

| | FABRICATION FACTS | |
|---|---|---|
| 1. | Defendants Landgren and Monsue represented in reports, statements and testimony that on March 10, 1983, at or around noon to 12:15 p.m. they attempted to look into the Lisker house from the rear windows to the front entry way. | Ex.8, pp.104, 105 (Follow-Up Investigation Report); Ex.33, p.28:2-24 (Monsue, 4/4/1983, Juv. Detention Hearing); Ex.65, p.25:4-21 (Landgren, 10/5/83, Preliminary Hearing), Ex.65, pp.315:28 – 319:1 (Monsue, 12/7/1983, Preliminary Hearing). |
| 2. | Defendant Landgren was present at the juvenile detention (Dennis H.) hearing at which Defendant Monsue testified. | Ex.33, p.67:12,17 (Monsue, 4/4/1983, Juv. Detention Hearing, referring to presence of Landgren). |
| 3. | Defendant Monsue testified in his deposition that he did not attempt to look into the Lisker house from the rear windows to the front entry way on March 10, 1983. | Ex.172. pp.52:15 – 55:12 (Monsue Depo. Tr.). |
| 4. | Defendant Landgren testified in his deposition that he did not attempt to look into the Lisker house from the rear windows to the front entry way on March 10, 1983, until after 1:00 p.m. after receiving a call from Det. Monsue describing how Plaintiff said he saw his mother. | Ex.173, pp.50:8 – 53:5 (Landgren Depo. Tr.). |
| 5. | Defendants Monsue and Landgren failed to disclose that they did not attempt to look into the Lisker house from the rear windows to the front entry way at or around noon to 12:15 p.m. | Genego Decl., ¶6. |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|
| **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **FABRICATION FACTS** | |

| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
|---|---|---|
| 6. | Defendants Landgren and Monsue represented in reports, statements and testimony that Plaintiff could not have seen his mother on the entry way floor from the dining room window as he said he had on March 10, 1983. | Ex.8, p.104 (Follow-Up Investigation Report); Ex. 33, pp.40:19 – 41:16 (Monsue Testimony, 4/4/83, Juv. Detention Hearing); Ex.65, pp.315:28 – 319:1 (Monsue, 12/7/1983, Preliminary Hearing); Ex. 500 (*Lisker 1* at 1014, Rabichow argued to the jury, based solely on Monsue's observations, the victim's body was not in either of the lines of sight described by Petitioner). |
| 7. | A reconstruction of the view from the rear of the Lisker house in 2005 showed that Plaintiff would have been able to see his mother from the dining room window in the position and line of sight he described. | Ex.500 (*Lisker 1* at 1022). |
| 8. | Defendants Monsue and Landgren failed to disclose that they had falsified evidence when they represented Plaintiff could not have seen his mother through the dining room window as he had described | Ex.500, (*Lisker 1* at 1022); Genego Dec. ¶ 6. |
| 9. | Defendants Landgren and Monsue had photographs taken on March 23 of a model lying on the entryway floor, which they represented accurately depicted the position in which Dorka Lisker's body had been found, which the prosecution maintained was with her head "on top of the biggest bloodstains on the entryway rug." | Ex.8, p.4, Ex.500, (*Lisker 1* at 1014.) |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | FABRICATION FACTS | |
| 10. | Had the model in fact been lying in the same location as Dorka Lisker had been found the model's head, if not her entire upper body, would have been visible from outside the dining room/patio window. | Ex.500 (*Lisker 1* at 1021 – 1022.) |
| 11. | The investigative reports and other discovery material did not disclose that the March 23 photos did not accurately represent the position of the victim that the prosecution contended she was in when Mr. Lisker reported having seen her from the rear of the house. | Ex.500, (*Lisker 1* at 1014.); Genego Decl., ¶6. |
| 12. | Defendants Landgren and Monsue represented in reports, statements and testimony that March 10, 1983 was a bright and sunny day, and therefore, glare from the sun would have blocked the view into the house. | Ex.8, p.104 (Follow-Up Investigation Report); Ex. 33, pp.28:25-29:2 (Monsue, 4/4/83, Juv. Detention Hearing); Ex.65, pp.315:28 – 319:1 (Monsue, 12/7/1983, Preliminary Hearing); Ex.500 (*Lisker 1* at 1013). |
| 13. | March 10 was not a bright sunny day but was cloudy, overcast, and hazy until sometime after noon. | Ex.500 (*Lisker 1* at 1019). |
| 14. | Defendants Landgren and Monsue represented in statements and testimony that sun and sky conditions on March 23, 1983 were the same as on March 10, 1983 – bright and sunny. | Ex.500 (*Lisker 1* at 1014); Ex. 8-4. |
| 15. | Charts and satellite images establish that sun and sky conditions on March 23, 1983 were not the same as on March 10, 1983: whereas March 23 was a bright, sunny day, the morning of March 10 in the area of the Lisker home was overcast, cloudy and hazy. | Ex.500 (*Lisker 1* at 1020). |

15

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **FABRICATION FACTS** | |
| 16. | Detectives Monsue and Landgren represented in reports, statements and testimony that footprints on the east side of the home went in only one direction and that Plaintiff was not truthful when he said he traveled in both directions to come to his mother's aid. | Ex.8, p.108 (Follow-Up Investigation Report); Ex. 33 pp.15:6—16:20, 48:13—49:14 (Monsue testimony, 4/4/1983, Juv. Detention Hearing); Ex.65, pp.315:28 – 319:1 (Monsue, 12/7/1983, Preliminary Hearing); Ex.65, pp.21:20 – 22:11 (Landgren, 10/5/1983, Preliminary Hearing). |
| 17. | Detective Monsue stated during his interrogation of Plaintiff that footprints on the east side of the home matched Plaintiff's shoes and that they went in only one direction | Ex.8, pp.199 – 200 (Interrogation Tr., 3/10/1983). |
| 18. | The Rule 26 expert report of Peter Barnett establishes that Plaintiff's shoeprints on the east side of the home travel in both directions (north and south), as Plaintiff said he had done in coming to his mother's aid | Ex.134, pp.8, 12 (Barnett Report 6/9/2011). |
| 19. | Detectives Monsue and Landgren represented in reports, statements and testimony that the bloody shoe prints found inside the Lisker home had a wave-like sole pattern resembling Plaintiff's shoes. | Ex.8, p.104 (Follow-Up Investigation Report); Ex. 33, pp.22:6 – 23, 49:5 – 19 (Monsue, 4/4/1983, Juv. Detention Hearing); Ex.65, pp. 22:7 – 22 (Landgren, 10/5/1983, Preliminary Hearing), Ex.65, pp.315:28 – 319:1 (Monsue, 12/7/1983, Preliminary Hearing); Ex.500 (*Lisker 1* at 1014 – 1015). |
| 20. | None of the bloody shoeprints had a wave like sole pattern that resembled Plaintiff's shoes | Ex.500 (*Lisker 1* at 1023); Ex.134, p.13, 16 (Barnett Report) |

16

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **FABRICATION FACTS** | | |
| 21. | Defendants Monsue and Landgren represented in reports, statements and testimony that all of the shoe prints on the east side of the house had a wave-like sole pattern as did Plaintiff's shoes. | Ex.8, pp.198 (Tr. Lisker Interrogation, 3/10/1983); Ex.33, pp.15:16 – 16:20, 49:5 – 14 (Monsue, 4/4/1983, Juv. Detention Hearing); Ex.65, pp.21:20 – 22:11 (Landgren, 10/5/1983 Preliminary Hearing); Ex. 65, pp.315:28 – 319:1 (Monsue, 12/7/1983, Preliminary Hearing); Ex. 500 (*Lisker 1* at 1014 – 1015). |
| 22. | The shoeprints on the east side of the house were not all from Plaintiff's shoes, but instead included a herringbone pattern of an unknown intruder whose bloody shoe print ('G') was also found in the guest bathroom. | Ex.500 (*Lisker 1* at 1022); Ex.89, p.1 (Raquel Report); Ex.134, pp.8, 12, 13, 16 (Barnett Report) |
| 23. | Detectives Monsue and Landgren represented in reports, statements and testimony that the bloody shoe print found in the bathroom ( labeled "G") resembled and was consistent with the sole pattern on Plaintiff's shoes. | Ex.8, p.104 (Follow- Up Investigation Report)**;** Ex. 33, p.22:6 – 11, 49:5 – 19 (Monsue, 4/4/1983, Juv. Detention Hearing), Ex.65, pp.22:12 – 16 (Landgren, 10/5/1983, Preliminary Hearing); Ex.500 (*Lisker 1* at 1014 – 1015). |
| 24. | Footprint G did not resemble and could not have been made by Plaintiff's shoes, and was, instead, made by a shoe with a different outsole pattern than Plaintiff's shoes. | Ex.500 (*Lisker 1* at 1022). |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **FABRICATION FACTS** | | |
| 25. | Detectives Monsue and Landgren represented in reports, statements and testimony that Mr. Lisker's shoe print was found in front of the kitchen sink and had the same pattern of shoeprint 'G' in the bathroom and Plaintiff's sole pattern, demonstrating that he lied in stating that he did not step in front of the kitchen sink. | Ex.8, pp.104, 106 (Follow-Up Investigation Report), pp.106; Ex.33, pp.49:5 -50:1, 51:1 – 3 (Monsue, 4/4/1983, Juv. Detention Hearing); Ex.65, pp.19:14 – 20:12, 22:7 – 22, 47:2 – 4 (Landgren, 10/5/1983, Preliminary Hearing); Ex. 500 (*Lisker 1* at 1014 – 1015). |
| 26. | Because the footprint in front of the sink was the same as shoeprint 'G' in the bathroom, the footprint in front of the kitchen sink could not have come from Lisker's Pacer shoe. | Ex.89, p.1 (Report of Ronald Raquel, 1/13/04) (shoe print "G" has different outsole patterns than and can be excluded as being made by the Pacer shoes").; Ex.500 (*Lisker 1*, p. 1022, n.4). |
| 27. | Michael Ryan was a likely suspect for the murder of Dorka Lisker | Ex.500 (*Lisker 1* at1027-1028). |
| 28. | Michael Ryan had a prior conviction for assault with a deadly weapon, a knife. | Ex.500 (*Lisker 1* at 1027); Ex.90, p.16 (James Gavin PowerPoint Presentation) |
| 29. | Monsue reported that the alternative suspect, Michael Ryan, had no prior record. | Ex.8, p.793 ("No record") (Monsue's Office Memo re Notes on Michael Ryan) |
| 30. | Monsue admitted that he knew Michael Ryan had a prior criminal record. | Ex.172, pp.197:7—198:16 (Monsue Depo. Tr.). |
| 31. | The investigative reports and other discovery material did not disclose that Michael Ryan had a prior felony conviction in 1982, or that it was for assault with a deadly weapon (knife). | Genego Decl.¶6. |

18

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **FABRICATION FACTS** | | |
| 32. | At the conclusion of his interview with Michael Ryan, Monsue said he was "trying to eliminate Ryan as a suspect more than anything else." | Ex.500 (*Lisker 1* at 1028). |
| 33. | Defendant Monsue represented that the evidence convincingly cleared Michael Ryan as a suspect. | Ex.500 (*Lisker 1* at 1027); Ex.277, p.15:11-16 (Probation Officer's Report, 1/7/85) |
| 34. | Monsue told Rabichow that he had cleared Michael Ryan as a suspect. | Ex.120:50-51 |
| 35. | The evidence did not clear Michael Ryan as a suspect as Monsue had reported. | Ex.500 (*Lisker 1* at 1027) |
| 36. | Detective Monsue testified at the juvenile detention hearing that the blood spatters on Mr. Lisker's shirt resulted from Mr. Lisker standing over the victim while inflicting blows to her body. | Ex.33, p.60: 2 – 17 (Monsue Testimony, 4/4/1988, Juv. Detention Hearing). |
| 37. | In offering himself as qualified to render an opinion about blood spatter, Monsue testified at Mr. Lisker's juvenile detention hearing that he was an experienced homicide detective who had investigated in excess of 150 homicides | Ex.33, pp.58:14 – 59:6 (Monsue, 4/4/1983, Juv. Detention Hearing). |
| 38. | Monsue later admitted to the Attorney General that, at the time of the Lisker investigation, he was a "junior detective" with the LAPD homicide squad, having handled approx. 35-40 prior murder investigations. | Ex.172, pp.265:2 – 266:1 (Monsue Depo. Tr.). |
| 39. | LAPD Criminalist Linhart determined that the stains on the t-shirt "were not blood." | Ex.65, pp.130:24 – 131:9 (Linhart, 10/6/1983, Preliminary Hearing). |

GO TO NEXT PAGE

19

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **RATIFICATION FACTS** | |
| 40. | "The prosecution theory at [Plaintiff's] trial was that [Plaintiff], who said he went through his mother's purse, actually took the $150 cash from the purse. There is nothing to suggest that any money was found on Petitioner, although Monsue testified at trial he had no memory one way or the other." At the close of the prosecution case, the defense successfully moved to dismiss the first degree murder charge. The jury convicted Plaintiff of second degree murder. | *Lisker v. Knowles*, 463 F.Supp.2d at 1010, 1025 |
| 41. | In April, 1998, Det Monsue wrote the Board of Prison Terms ("BPT") opposing Plaintiff's parole, and represented that "[s]everal years after this crime occurred, I met with the new owners of the house where this crime occurred. They informed me they had found some money and several items hidden in the attic of Bruce Lisker's old bedroom. The amount of cash found by the new owner was approximately $150, which is the amount of money that was reported missing from the victim's purse the day of the murder. This revelation confirmed our initial theory that Mr. Lisker had in fact robbed his mother." | Ex.121, p.19; Ex.500 (*Lisker 1* at 1028-29) |
| 42. | Morton Borenstein, an attorney and the new owner who purchased the house from Robert Lisker, signed a declaration in January, 2001, stating that neither he nor his wife found any money in the attic and that they had never met with Det. Monsue. | Ex,121, pp.26-27. |

20

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **RATIFICATION FACTS** | |
| 43. | Russell Fischer retired after 33 years employment with the Miami-Dade Police Department, holding the rank of Chief at the conclusion of his service in 2008. He is the primary instructor for the International Association of Chiefs of Police in "Internal Affairs: Legal and Operational Issues," and "Advanced Internal Affairs." He also serves as a consultant/contractor for the U.S. Department of Justice in Colombia. Mr. Fischer has prepared a Rule 26 Expert Report in this matter which sets forth his additional qualifications and experience. Mr. Fischer reviewed documents produced by Defendants reflecting the investigation and adjudication of Plaintiff's complaint alleging Monsue's parole letter was false, that Monsue had committed perjury and other misconduct in his criminal case, including misrepresenting the view, clearing Michael Ryan and using false testimony from jailhouse informant Hughes Mr. Fischer prepared a report of the investigation, adjudication and re-adjudication of the complaint, setting forth the materials he reviewed, his experience and training that qualify him to render opinions as an expert on police department internal affairs matters, and the conclusions and opinions he reached concerning this matter and the facts supporting them. He has executed a declaration stating that the report sets forth the substance of the testimony he would provide if called as a witness in this case. | Fischer Report, Ex.137. |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| | RATIFICATION FACTS | |
| 44. | Internal Affairs Sergeant Albert James Gavin, who was assigned to investigate Lisker's complaint, interviewed Morton Borenstein in July, 2003. The interview was taped and later transcribed. Borenstein told Gavin he had absolutely no memory of finding any money in the house. Mr. Borenstein again signed his 2001 declaration for Sergeant Gavin. | Ex 82, p.2 (Chron Log); Ex 88, pp.8, 10 (transcript of interview); Fischer Report, Ex 137, p.12; Ex.500, (*Lisker 1* at 1028-29); Ex.120, p.21. |
| 45. | In January, 2004, in response to a request by Sergeant Gavin, LAPD Criminalist Raquel determined that the bloody shoeprint in the guest bathroom (labeled shoeprint 'G') of the Lisker residence were not made from Plaintiff's Pacer shoes | Ex.120, p.37, 40-44; Ex. 89, p.1 (Raquel 2004) |
| 46. | Sergeant Gavin and his supervisor from the IAG met for three hours with Cold Case and Robbery Homicide Detectives in February, 2004. At the conclusion of the meeting, it was determined that Sergeant Gavin's investigation had proven that a second suspect was in the house, and it was recommended that the matter be investigated as an open homicide. | Fischer Report, Ex 137, p. 3; Ex.120, pp.88-89 |
| 47. | Sergeant Gavin's investigation obtained data from the National Oceanographic and Air Administration that it was not bright and sunny the day Dorka Lisker was murdered, as Det. Monsue had reported. | Ex.82, p.8 (3/17/2004); Ex. 90, p.11 |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| | RATIFICATION FACTS | |
| 48. | In May, 2004, Gavin's IAG supervisor denied permission for Gavin to travel out of state to interview a witness in connection with Plaintiff's case, and further told Gavin in reference to Plaintiff, "Look that mother fucker is staying in prison. Do you understand me?" When Gavin asked what he was to do with Plaintiff's complaint, his IAG supervisor said "For all the allegations that [Plaintiff] wrote in regards to the trial, close them out as other judicial review. Only interview Detective Monsue in regards to did he write this letter to the Parole Board. | Fischer Report, Ex. 137, p.13; Ex.120. p.94 |
| 49. | Gavin interviewed Monsue about the parole letter in May, 2004. Monsue told Gavin that he received a phone call from a female, and the female stated that several years prior, she had discovered money in her house; and when talking to neighbors, they indicated to her that a murder had occurred in that house and money was missing. This is not what Monsue stated in his letter to the BPT. | Ex. 82, p.8; Ex. 500 (*Lisker* at 1029); Fischer Report, Ex. 137, p.13; Ex.120, p.95. |
| 50. | Monsue's Commanding Officer adjudicated Plaintiff's allegation that the parole letter was false to be "unfounded," meaning there was no evidence the allegation. | Fischer Report, Ex. 137, p.14-15, 25; Ex121, p.3 |
| 51. | The remaining allegations were all adjudicated as "Other Judicial Review" ("OJR") | Fischer Report, Ex.137, p.14; Ex121, p.3 |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **RATIFICATION FACTS** | | |
| 52. | LAPD Special Order 36 specifies in part that that an OJR adjudication is appropriate for a post-conviction criminal matter only where the facts alleged regarding the complaint have already been adjudicated in court. The OJR adjudication form included a series of questions that include "Is there a witness willing to support the allegations or provide new information that was not part of the original proceeding?" and "Did this complaint investigation discover any evidence of employee misconduct associated with this criminal proceeding?." | Fischer Report, Ex. 137, pp.30, 56; Ex. 121, pp.10:11-31 |
| 53. | The OJR adjudication form completed in Plaintiff's case answered "no" to the question of "Is there a witness willing to support the allegations or provide new information that was not part of the original proceeding?" and the question "Did this complaint investigation discover any evidence of employee misconduct associated with this criminal proceeding?." | Ex. 21, pp.10-11; Fischer Report, Ex 137, pp.14, 56. |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| | RATIFICATION FACTS | |
| 54. | The IA file of Plaintiff's complaint attributed statements to Borenstein which supported the adjudication but which Borenstein never made. Specifically, according to the IA file, Borenstein stated in his interview with Gavin "that it could have been during [the time that his wife was dying from cancer] that his wife might have found the money and did not tell him." Ex 21, p.8. The rationale for adjudicating Plaintiff's allegation regarding the parole letter as "unfounded" relied on this purported statement by Borenstein in which he had "acknowledged that his wife might have found the money without his knowledge." Ex 21, p.14. | Ex.121, pp.8, 14; Fischer Report, Ex.137, pp. 26-27, 55-56. |
| 55. | Borenstein never made such a statement in his interview with Gavin, and the evidence at Plaintiff's habeas hearing made it apparent that his wife "would not have found the money in the attic . . . and then called Monsue without [Borenstein's] knowledge." | Ex.88; Ex.500 (*Lisker 1* 1029). |

25

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **RATIFICATION FACTS** | |
| 56. | On July 7, 2004, Chief of Police ("COP") Bratton, under the signature of LAPD Captain Rubert, wrote Plaintiff telling him that his "allegations that the officer failed to conduct a proper investigation, submitted false police reports and provided false testimony" had "gone through several levels of review, including myself and the command staff of Internal Affairs Group," and that the allegations had been classified as Other Judicial Review." COP Bratton stated the "allegation the officer submitted a letter containing false information to the parole board was classified as Unfounded." | Ex. 121, p.28; Fischer Report, Ex.137, p.15 |
| 57. | In September, 2004, private investigator Paul Ingels wrote COP Bratton a letter in which he stated that the IAG investigation of Plaintiff's complaint had uncovered evidence of misconduct by Det Monsue, but that the investigation had been terminated prematurely as part of an attempted cover-up. Mr. Ingels requested that the investigation be reopened. | Ex 91, pp.1-2; Fischer Report, Ex.137, pp.15-16. |
| 58. | The Chief of Police of the LAPD is the final policy maker with respect to officer discipline for the City of Los Angeles. | Ex.176, p.7 (LAPD Management Guide) Fischer Report, Ex.137, p.32 |
| 59. | COP Bratton delegated the matter to the Deputy Chief of the Professional Standards Bureau, Michael Berkow, who had the authority to address the issues in Plaintiff's letter and decide how they should be handled. Deputy Chief Berkow received a copy of letter Ingels sent to COP Bratton. | Fischer Report, Ex.137, pp. 16, 32, citing trial testimony of COP Bratton |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| | RATIFICATION FACTS | |
| 60. | Deputy Chief Berkow assigned Captain Weinstein to conduct a complete review of all of Plaintiff's complaint allegations and the manner in which they had been handled previously. | Fischer Report, Ex.137, p.16; Weinstein Depo, Ex. 183, pp.135, 137, 138-39 |
| 61. | Sergeant Gavin provided Captain Weinstein with a PowerPoint presentation which identified the results of his investigation and further steps to be taken, that included: (1) "Monsue testified that the bloody shoe prints that were discovered in the residence belong to Lisker - FALSE; (2) "Monsue testified that it was impossible for Lisker to have viewed his mother from the walk-way due to the glare of the sun Monsue testified it was a clear day. Sergeant Gavin contacted the NOAA . . . It was overcast; (3) alternative suspect Mike Ryan, who had a serious criminal record for violent crimes, including two assaults with a knife, stated he made a phone call from the Lisker residence the day before the murder – False; (4) a list of facts regarding Ryan, and a statement that "None of these facts were followed up by Monsue" | Ex. 90 (Powerpoint); Ex.120, p.11; Fischer Report, Ex.137, pp.18-19 |
| 62. | Captain Weinstein and her staff at IAG prepared and presented a PowerPoint regarding the Lisker murder investigation that was provided to Deputy Chief Berkow as well as senior staff members of the LAPD including Chief Bratton, George Gascon, Jerry Chaleff, Sharon Papa, Andre Brotte, and Jim McDonnell. | Ex 137, p.19 (Fischer Report); Ex. 87, p.118 Weinstein Depo. Tr.); Ex 116 (PowerPoint). |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | RATIFICATION FACTS | |
| 63. | The PowerPoint presentation regarding the Lisker murder investigation presented by Captain Weinstein and her staff included slides (1) showing that there were two different shoeprints on the east side of the house, not one as Monsue had reported and testified, and that shoeprint 'G' in the guest bathroom were not from Plaintiff's shoes, and shoeprint 'G' was similar to and could have caused a patterned impression behind the victim's right ear; (2) showing Mike Ryan's mother's home number and a number called from the Lisker house shortly before the murder; and (3) showing that Borenstein contradicted Monsue's letter to the BPT | Ex .116, pp.14-16, 18, 43.(PowerPoint); Ex 137, pp. 19-20 (Fischer Report). |
| 64. | After the re-adjudication in April 2005, the previous adjudication was revisited. Because the description of what occurred relies on a document under seal, it is separately submitted as a fact under seal. | Fischer Report, Ex.137, p.20; Ex. 81, p.9 |
| 65. | After the re-investigation, Chief Bratton wrote the BPT regarding Monsue's 1998 letter stating the contents of the letter could not be determined to be true, and the LAPD could not guarantee the veracity of the facts Monsue stated. COP Bratton then that Plaintiff's conviction "was supported by credible evidence . . ." | Ex. 93, pp.1-2; Fischer Report, Ex.137, p.21 |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **RATIFICATION FACTS** | |
| 66. | Mr. Fischer concluded and expressed the that, "[b]ased upon the records examined including e-mails, deposition and Gavin trial testimony of COP Bratton," that COP Bratton "had knowledge of the allegations made by [Plaintiff] including the weather and the view issues, shoe print evidence, clearing Ryan as a suspect in the murder, and parole letter matters and their relationship to misconduct of Detective Monsue." | Fischer Report, Ex.137, p. 34 |
| 67. | It is Mr. Fischer's opinion "that COP Bratton approved and thereby ratified the actions of Detective Monsue in the Lisker murder investigation." | Fischer Report, Ex.137, p. 34 |
| 68. | Mr. Fischer concluded and expressed the opinion that, "Chief Berkow was aware of serious allegations of misconduct lodged against Detective Monsue, evidence obtained by Internal Affairs staff that false testimony was given by Monsue at trial, that serious investigative deficiencies were uncovered, that previously unknown physical evidence was discovered and that the truthfulness of information documented in a letter to the Parole Board was of questionable veracity, and that, despite this knowledge, Chief Berkow ratified and approved the foregoing actions of Det. Monsue in the Lisker investigation and criminal proceedings that followed." | Fischer Report, Ex.137, p. 36. |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **RATIFICATION FACTS** | |
| 69. | Mr. Fischer further opines that "the LAPD ratified the conduct of Detective Monsue at Bruce Lisker's trial by failing to take action to correct it after clear knowledge of false information and testimony came to light. Chief Bratton, the LAPD's final policy maker for discipline, was personally involved in several discussions. Deputy Chief Berkow was given the responsibility for the Lisker investigation by Chief Bratton and participated in numerous discussions about how it should be conducted. Other high level command staff were involved as well. All such officers have the responsibility and duty to support and enforce departmental policies. This official complaint was received, classified, investigated, and adjudicated improperly, utilizing an inadequate and results-oriented internal investigations process. In effect, the LAPD sanctioned a practice of tolerating and condoning the falsification of evidence and false testimony in the conviction of Bruce Lisker. The statements in the e-mails discussed earlier evince the perspective that the department's goal was to uphold the propriety of the conviction of Mr. Lisker, not to independently and objectively assess whether there had been misconduct by Detective Monsue that contributed or led to a wrongful conviction." | Ex.137, p.38 |

GO TO NEXT PAGE

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT** | | |
| 70. | Mr. Fischer also examines in his report the question of whether the LAPD had "a policy or custom of deliberate indifference regarding the need for an effective and complaint and discipline system with respect to the use of false evidence and reports, and whether that deliberate indifference was a substantial factor in causing the violation of the Plaintiff's constitutional rights?" | Fischer Report, Ex.137, p. 39 |
| 71. | An effective internal discipline system is critical in deterring misconduct by officers. LAPD's "Management Guide to Discipline" expressly recognizes the importance of an effective discipline in preventing officer misconduct. | Fischer Report, Ex.137, pp. 58-59; Ex.176 (Management Guide to Discipline), pp.7, 13-14 |
| 72. | Mr. Fischer reviewed reports, studies, evaluations and related materials regarding the LAPD disciplinary system which included: (1) the testimony of Professor James Fyfe regarding his report and analysis of the LAPD discipline system for the period June, 1979 through June 1981, which was reported in *Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (2) a report of Professor Candace McCoy evaluating the IA adjudications for the first nine months of 1983; (3) the Report of the Independent Commission on the Los Angeles Police Department (Christopher Commission), 1991; (4) Report of the Rampart Independent Review Panel, 2000; (5) Consent Decree, 2001; (6) Rampart Reconsidered, 2004. | Fischer Report, Ex.137, pp. 39-47 |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT | | |
| 73. | These studies and Commissions reported systemic deficiencies and improper practices in the LAPD disciplinary system, including that: (1) the process and adjudication was skewed against citizen complainants (Ex. 37, pp.41, 46, 47; and (2) inadequate and misleading information in complaint investigative files (Ex.137, p. 48; (3) classifying allegations of false statements and reports as "neglect of duty" and "unbecoming conduct" rather than using more specific categories of false reports or dishonesty (Ex.137, p.47). | Fischer Report, Ex.137, pp. 41, 46, 47, 48 |
| 74. | Mr. Fischer states in his Report that , "Professor McCoy's study adds evidence of a custom or practice of classifying allegations of specific types of conduct, including making false statements and similar acts of dishonesty, into general, broad categories that are not intended for that purpose," Mr. Fischer's states that Professor McCoy's conclusions "are of particular significance because they provide evidence of the operation of the discipline system at the time of the Lisker murder investigation." | Ex.137, 47; Ex.138, pp.2-4. |
| 75. | Professional standards recognize that "unbecoming conduct" and "neglect of duty" are "catch all" categories that are to be used only where a more specific category does not apply. | Fischer Report, Ex.137, pp. 51-52. |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT | | |
| 76. | Det. Monsue, when asked about Plaintiff's allegations of misconduct in 2005, responded: "It's mildly interesting to me that they're calling me a liar. Okay? What does it prove? We've got a lying, cheating, murdering son of a bitch in prison that's making these allegations. And you're sitting here questioning my credibility. That upsets me." | Ex. 72, p.277 (Monsue Deposition); Fischer Report, Ex.137, p.60 |
| 77. | Based on his review of these materials, and his experience and qualifications, Mr. Fischer is of the "opinion that, during the 1980's, and specifically during the time period 1983-1985, the LAPD lacked an effective complaint and discipline system with respect to the use of false evidence and reports; that this lack tolerated, allowed, condoned and therefore encouraged officers to present false reports and testimony because he/she would perceive no or slight likelihood that this behavior would be acknowledged, detected, and if complained about, would be investigated thoroughly, or adjudicated appropriately; [and] that this lack reflected a policy or custom of consciously ignoring the constitutional rights of accused persons . . ." | Fischer Report, Ex.137, p.51 |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT | | |
| 78. | Mr. Fischer concluded that "[t]he manner in which the Lisker complaint was handled by the LAPD in 2003-2005 reflects a continuation of those customs and policies which have allowed those inclined to engage in misconduct to do so with impunity." | Fischer Report, Ex.137, p.51 |
| 79. | Practices found to exist in and around the time of the Lisker murder investigation in 1983, which Mr. Fischer also found to be reflected in the handling of the Lisker complaint investigation and adjudication in 2003-2005, include the following:<br>(1) Classifying the Lisker IA complaint as "unbecoming conduct"<br>(2) Classifying the Lisker Complaint as a Short Form Compliant<br>(3) Falsifying information to protect the Department and officers | Ex. 86 (Lisker Complaint classified as "unbecoming conduct");<br>Fischer Report, Ex.137, pp.51-53, 52, 55-57; |

34

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT** | | |
| 80. | IA Expert Fischer states in conclusion that, "[b]ased upon my training, experience and a review of the materials provided, the conscious and deliberate acts and omissions as cited in the various panels, commissions and Dr. Fyfe's study that pertain to the investigation of police misconduct and the administration of discipline by LAPD in the period of time that the Lisker murder investigation was conducted, it is my opinion that officers inclined to falsify or distort evidence, or to make statements without ensuring that they are true and accurate, would have felt that doing so would not have professional or job consequences for them. In addition, the deficiencies in the IA system I have described in depth substantially influence the actions of such employees, consistent with the conduct of Monsue during the Lisker investigation that led to the conviction of Mr. Lisker. This opinion is given in consideration of the absence of the deterrent effect present when a law enforcement agency does not have an effective and efficient discipline system." | Fischer Report, Ex.137, pp.61-62. |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT | | |
| 81. | Steve Rothlein retired as the Deputy Director of the Miami-Dade Police Department, where he was employed for over 30 years. At retirement, he was the second highest ranking person in the department and was specifically in charge of all investigative functions within the agency, including homicide, robbery, sexual battery, narcotics, crime scene, crime lab, warrants, and all other centralized investigative units within the department. Mr. Rothlein has prepared a Rule 26 Report in this matter which sets forth his additional qualifications and experience as an expert witness. Mr. Rothlein has executed a declaration stating that the report sets forth the substance of the testimony he would provide if called as a witness in this case. | Rothlein Report, Ex.128, pp. 1, 42-48 |
| 82. | One of the questions addressed by Mr. Rothlein is "Did the City of Los Angeles and the LAPD fail to enact policies and procedures to prevent perjurious testimony and did it adopt customs and practices which resulted in their condoning and encouraging the fabrication of evidence, including but not limited to the filing of materially false police reports, the use of perjurious jailhouse informants, and/or making false statements to prosecution authorities to obtain the filing of false charges and the institution of false and malicious prosecutions against victims of misconduct by its officers? | Ex.128, p.30 (Rothlein Report). |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT** | |
| 83. | The Los Angeles County Grand Jury investigated the use of jail house informants in the LA County criminal justice system from the period of approximately 1979 to 1990. | Ex.128, pp.31 (Rothlein Report) |
| 84. | According to Mr. Rothlein's Report, in the 1980's, the LAPD was known for using informants in a manner in which they knew or should have known their testimony was unreliable and/or false, without communicating this information to the prosecution. | Ex.128, pp.30, 31 (Rothlein Report). |
| 85. | Plaintiff was ordered to be housed at Juvenile Hall during the pending of his case. | Ex. 260, p.2:15 – 26. |
| 86. | Plaintiff was transferred to the County Jail in April, 1983, and placed in the 7000 module. All three inmates in the two cells adjoin his, told Dets. Monsue and Landgren that Plaintiff had confessed to each of them., | Ex. 8, pp.315 – 319, 782, 783. |
| 87. | One of the informants told Detectives Monsue and Landgren that Plaintiff had stabbed his mother with a fork. | Ex.500 (*Lisker* 1, 1026, n. 7). |
| 88. | Detectives Monsue and Landgren told one of the informants that they could not tell him to solicit information from Plaintiff because that would make him their agent, but told the informant they would be returning to talk to him. | Ex.500 (*Lisker 1*, at. 1026) |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT** | |
| 89. | There is no evidence that Detective Monsue and Landgren, both of whom were in attendance at the April 4 hearing at which the court ordered Plaintiff to be held at juvenile hall, took any action to have him returned to juvenile hall after learning he was being held in the County Jail | Genego Decl., ¶3. |
| 90. | In July, Detective Monsue met with Robert Hughes, who claimed that Plaintiff had confessed to him in their first conversation months earlier, to which he later testified.. | Ex. 8, pp.782 – 783; Ex.500, (*Lisker* 1, p.1016-17) |
| 91. | Robert Hughes had previously claimed that two other inmates charged with murder had confessed to him. | Ex. 500, (*Lisker* 1, pp.1025, 1026) |
| 92. | There were multiple reasons why Hughes' claim that Plaintiff confessed to him was not credible. | Ex. 500, (*Lisker* 1, p.1025-26) |
| 93. | Plaintiff's transfer to the L.A. County Jail and his placement in the 7000 Module, and defendant detectives' use of Hughes' claim that Plaintiff supposedly confessed to him, mirrored the practices exposed by the Los Angeles County Grand Jury, which were commonplace during this time period. | Ex.128, p.31 |

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **CUSTOM/POLICY FACTS RE WHETHER THE LAPD INTERNAL AFFAIRS SYSTEM IN PLACE IN 1983 WAS INADEQUATE AND FUNCTIONALLY CONDONED MISCONDUCT** | | |
| 94. | Based on his experience and qualifications, and the materials he has reviewed, it Mr. Rothlein's opinion "that the LAPD did have a custom and practice in the 1980's of using informants in a manner in which they knew or should have known their informant's testimony was unreliable and false, without communicating this information fully to the prosecution. | Rothlein Report, Ex.128, p. 33 |

GO TO NEXT PAGE

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| | INVESTIGATIVE FACTS | |
| 95. | On March 11, 1983, one or both of the Defendants met with Deputy District Attorney Don Eastman regarding the Lisker case | Ex. 8, p.3 |
| 96. | On March 13, 1983, one or both of the Defendants wrote his original report on the Dorka Lisker murder | Ex. 8, p.101. |
| 97. | On March 14, 1983, LAPD fingerprint analyst Cynthia Slauson lifted latent prints from a knife blade from the Lisker home and paper from Dorka Lisker's purse | Ex. 8, pp.49, 51, 52. |
| 98. | On March 14, 1983, one or both of the Defendants requested that pliers and knives taken from the Lisker home be tested for blood | Ex. 8, p.46. |
| 99. | On March 14, 1983, one or both of the Defendants interviewed Lisker neighbors regarding the relationship between Dorka and Bruce Lisker | Ex. 8, p.3 |
| 100. | On March 14, 1983, one or both of the Defendants requested that the black leather purse, its contents, misc knives and exercise bar from the Lisker home be tested for fingerprints | Ex. 8, p.52 |
| 101. | On March 14, 1983, Deputy District Attorney Don Eastman filed a juvenile detention petition against Bruce Lisker on a charge of murder | Ex.8, p.124. |
| 102. | On March 14, 1983, one or both of the Defendants requested that clothing obtained from Bruce Lisker be examined for blood spatters and to measure stains size | Ex. 8, p.31 |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **INVESTIGATIVE FACTS** | |
| 103. | On March 14, 1983, one or both of the Defendants requested that hair from the trophy taken from the Lisker home be examined and described | Ex.008, p.43 |
| 104. | On March 14, 1983, one or both of the Defendants interviewed John Ryan, Michael Ryan's father, by telephone | Ex. 8, p.5. |
| 105. | On March 14, 1983, one or both of the Defendants checked Michael Ryan's criminal history and recorded that he had "no record." | Ex. 8, p.793. |
| 106. | On March 14, 1983, one or both of the Defendants talked to Robert Lisker at his residence | Ex. 8, p.3 |
| 107. | On March 15, 1983, one or both of the Defendants contacted Mark Lichterman, (Chimney sweep) and arranged for a meeting at a later time | Ex. 8, p.4 |
| 108. | On March 16, 1983, one or both of the Defendants submitted an affidavit in support of an application for a search warrant to search Bruce Lisker's car | Ex. 8, pp.659 – 661. |
| 109. | On March 17, 1983, one or both of the Defendants executed the search warrant on Bruce Lisker's car | Ex. 8, p.24. |
| 110. | On March 21, 1983, one or both of the Defendants made an appointment for March 23 with a surveyor to draw the Lisker house | Ex. 8, p.4 |
| 111. | On March 21, 1983, one or both of the Defendants ordered Bruce Lisker's records from juvenile records | Ex. 8, p.4 |
| 112. | On March 23, 1983, one or both of the Defendants had a police surveyor draw a floor plan of the Lisker house | Ex. 8, p.4 |

41

| | | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|---|
| | | PLAINTIFF'S ADDITIONAL FACTS | SUPPORTING EVIDENCE |
| | | INVESTIGATIVE FACTS | |
| | 113. | On March 23, 1983, one or both of the Defendants met with Robert Lisker at the Lisker home, where Robert Lisker provided him information about Bruce Lisker's ex-roommate, Michael Ryan | Ex. 8, p.4 |
| | 114. | On March 23, 1983, one or both of the Defendants had photos taken of the Lisker windows inside and out with a model lying on the floor where Mrs. Lisker was found; the photographer concurred that Bruce Lisker could not have seen his mother lying on the floor | Ex. 08, p.4 |
| | 115. | On April 1, 1983, one or both of the Defendants interviewed Bruce Lisker at juvenile facility about Michael Ryan | Ex. 8, pp.140 – 143. |
| | 116. | On April 4, 1983, the juvenile court found that a prima facie case had been established to detain Bruce Lisker, and he was ordered to continue to be held at juvenile hall | Ex.346 |
| | 117. | On April 12, 1983, one or both of the Defendants ordered latent prints analysis and blood typing | Ex. 8, p.5. |
| | 118. | On April 12, 1983, one or both of the Defendants interviewed Michael Ryan's mother regarding Michael Ryan | Ex. 8, p.5. |
| | 119. | On April 12, 1983, one or both of the Defendants interviewed Michael Ryan's father by phone regarding Michael Ryan | Ex. 8, p.5. |
| | 120. | On April 12, 1983, one or both of the Defendants interviewed Jim Zeilan, the counselor from the Palmer Drug Abuse Center regarding both Bruce Lisker and Michael Ryan | Ex. 8, pp.6, 343, 344 |

| | PLAINTIFF'S ADDITIONAL MATERIAL FACTS | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| | **INVESTIGATIVE FACTS** | |
| 121. | On April 12, 1983, one or both of the Defendants interviewed the mother of a former girlfriend (Lisa Randall) of Bruce Lisker's regarding the relationship between Bruce Lisker and his mother | Ex. 8, p.6. |
| 122. | On April 12, 1983, one or both of the Defendants contacted a sheriff in Gulfport, Miss., requesting that he interview Michael Ryan | Ex. 8, p.6. |
| 123. | On April 18, 1983, Gulfport sheriff Langford took a statement from Michael Ryan | Ex. 8, p.7. |
| 124. | On April 19, 1983, one or both of the Defendants went to the motel that Michael Ryan said he stayed at on March 10 | Ex. 8, p.7 |
| 125. | On April 19, 1983, one or both of the Defendants interviewed a prior girlfriend (Lisa Randall) of Bruce Lisker | Ex. 8, p.7 |
| 126. | On April 21, 1983, one or both of the Defendants interviewed two jailhouse informants, Dowtu and Wallace, claiming to have information about Plaintiff | Ex. 8, pp.315 – 319. |
| 127. | On May 4, 1983, one or both of the Defendants interviewed Michael Ryan in Mississippi | Ex. 8, p.933 |
| 128. | On May 10, 1983, one or both of the Defendants submitted shoes, socks, long sleeve shirt, t-shirt, pants and boxer shorts for blood spatter evaluation | Ex 8, p.29 |
| 129. | On June 27, 1983, one or both of the Defendants ordered fingernail scrapings of Bruce Lisker for skin of victim | Ex. 8, p.8 |
| 130. | On July 6, 1983, one or both of the Defendants interviewed jailhouse informant Robert Hughes regarding statements he claims Plaintiff made to him from an adjoining cell | Ex. 8, pp.782 – 783. |

43

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | | |
|---|---|---|
| | **PLAINTIFF'S ADDITIONAL FACTS** | **SUPPORTING EVIDENCE** |
| **INVESTIGATIVE FACTS** | | |
| 131. | On October 5, 1983, the Bruce Lisker preliminary hearing was held, and he was bound over for trial | Ex. 65-1, 358 |
| 132. | The attorney representing the People at the juvenile detention hearing was Sidney Trapp | Ex. 33-1 |
| 133. | The attorney representing the People at the preliminary hearing was Phillip Rabichow | Ex. 65-1 |
| 134. | The attorney representing the People at the criminal trial was Phillip Rabichow | Ex.500 (*Lisker 1* at 1013). |
| 135. | Based on the documents produced by the defendants in discovery, the only documented record of any meetings between any member of the Los Angeles District Attorney's Office and either Defendant Monsue or Landgren is that from March 11 with DDA Eastman | Genego Dec., ¶ 7. |
| 136. | There has not been a re-filing of a criminal complaint against Bruce Lisker, or a filing against anyone else for the murder of his mother. | Genego Dec., ¶ 8. |
| 137. | There was an extensive LAPD investigation in 2005 that attempted to find evidence against Mr. Lisker that would support a conviction | Ex.400 (under seal) |
| 138. | Plaintiff was arrested on March 10, 1983, by Defendant Monsue. | Ex.8: 112-113 |

////

////

////

////

////

////

44

1    DATED: July 6, 2012                  Respectfully Submitted,

2
                                          LITT, ESTUAR & KITSON LLP
3                                         LAW OFFICE OF WILLIAM J. GENEGO

4
                                          By:__/s/ Barrett S. Litt_____
5                                              Barrett S. Litt

6
                                          By:__/s/ William J. Genego_____
7                                              William J. Genego
8                                              Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28