**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRUCE E. LISKER,<br>    *Plaintiff-Appellee*,<br><br>v.<br><br>CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT,<br>    *Defendants*,<br><br>and<br><br>ANDREW MONSUE; HOWARD LANDGREN,<br>    *Defendants-Appellants*. | No. 13-55374<br><br>D.C. No.<br>2:09-cv-09374-AHM-AJW<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Alvin Howard Matz, District Judge, Presiding

Argued and Submitted
February 12, 2015—Pasadena, California

Filed March 20, 2015

2                    LISKER V. MONSUE

Before: David Bryan Sentelle,* Morgan Christen,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

### SUMMARY**

### Civil Rights

The panel affirmed the district court's order denying absolute witness immunity to two Los Angeles Police Department detectives in an action brought pursuant to 42 U.S.C. § 1983 by Bruce Lisker who alleged, among other things, that defendants fabricated police reports, investigative notes, and photographs of a crime scene during their homicide investigation.

Lisker was convicted of second-degree murder, served over twenty-six years in custody, and was released in 2009 after a federal judge determined falsified evidence had been introduced at trial and conditionally granted a writ of habeas corpus. The State then dismissed the charges against Lisker.

---

* The Honorable David Bryan Sentelle, Senior Circuit Judge for the U.S. Court of Appeals for the District of Columbia Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that defendants' notes, investigative reports and photographs of the crime scene were analogous to the sorts of documentary and physical evidence—such as falsified videotaped interviews and forensic reports—that fall outside the protection of absolute immunity. The panel held that the same conclusion applied to the allegedly falsified reconstruction of the crime scene. The panel held that the policy interests behind absolute immunity for testimony do not apply to the investigative materials in this case. The panel concluded that defendants plainly acted in an investigative capacity in producing the notes, reports and crime-scene photographs and that qualified immunity provided sufficient protection for these activities.

The panel held that it lacked jurisdiction to review the district court's denial of summary judgment on the merits, specifically the district court's findings regarding the detectives' mental states and the falsity of the notes, reports and photographs. The panel held that these determinations were not inextricably intertwined with, or necessary to ensure meaningful review of, the immunity issues properly before the panel in the interlocutory appeal.

## COUNSEL

Michael N. Feuer, City Attorney, Amy Jo Field (argued), Deputy City Attorney, Los Angeles, California, for Defendants-Appellants.

Barrett S. Litt (argued), Kaye, McLane, Bednarski & Litt, LLP, Pasadena, California; William J. Genego, Law Office of William J. Genego, Santa Monica, California; Vicki I.

Podberesky, Nasatir, Hirsch, Podberesky & Khero, Santa Monica, California, for Plaintiff-Appellee.

# OPINION

HURWITZ, Circuit Judge:

Plaintiff Bruce Lisker was convicted of second-degree murder, served over twenty-six years in custody, and was released in 2009 after a federal judge determined falsified evidence had been introduced at trial and conditionally granted a writ of habeas corpus. The State then dismissed the charges against Lisker.

In this 42 U.S.C. § 1983 action, Lisker seeks damages from two Los Angeles Police Department detectives for fabricating reports, investigative notes, and photographs of the crime scene during the homicide investigation. The detectives also testified during preliminary proceedings and at trial, and the issue before us is whether the doctrine of absolute witness immunity, which shields the detectives from suit for their testimony, also extends to their pre-trial actions. We hold that it does not.

## I.

### A.

Dorka Lisker was murdered in her home in Sherman Oaks, California sometime during the morning of March 10, 1983. She was stabbed multiple times in the back and suffered a blow to the head. Dorka's seventeen-year-old son Bruce was at the house when paramedics and police officers

LISKER V. MONSUE           5

arrived. He was taken to the Van Nuys station, where he was interviewed by Detective Andrew Monsue.

During the interview, Lisker claimed that he had arrived at his parents' house between 10:30 and 11:00 am. When no one answered the front door, Lisker walked through a muddy area into the backyard, looked through a living room window, and saw a pair of feet on the floor. He then went to a sliding glass door and saw that the feet belonged to his mother, who was lying motionless on the floor. After unsuccessfully searching for a spare key, Lisker attempted to enter the house through the kitchen window, but the screen on the window was nailed shut. He ran back around the house to his car to retrieve pliers, removed the screen, and entered the house. Inside, he found his mother on the living room floor with two knives in her back. Lisker removed the knives and searched for an intruder. He called the paramedics, who arrived with the police at approximately 11:35 am.

### B.

Detectives Monsue and Howard Landgren were assigned to investigate the Lisker homicide; they maintained a "Murder Book" containing their notes, investigative reports, and photographs of the crime scene. The Murder Book included a "Follow-Up Investigation Report" dated March 13, 1983 that was provided to the Los Angeles County District Attorney's Office. The report states that on the day of the murder, the detectives "attempted to look into all the windows in the rear of the location, but could not see inside the house" without putting their faces against the glass because of "glare from the sun, coupled with the patio being partially covered with a roll-up canvas cover."

6                  LISKER V. MONSUE

The "Chronological Record" section of the Murder Book documents that the detectives returned to the crime scene on the morning of March 23, 1983 with a photographer and a model. The model was directed to lie where Lisker's mother had been found. The notes state that the "photographer concurred that susp[ect] could not have seen mother lying on the floor."

The "Follow-Up Investigation Report" also states that the detectives "observed several footprints in the mud along the east side of the house. The footprints led in the direction of the kitchen window . . . ." It explains that "the footprints in the mud only led toward the kitchen window and there were no footprints leading away from the side of the house." The report also notes that bloody footprints were found throughout the house, and states that the prints had a "wave-like sole design."

### C.

On March 14, Lisker was charged with the murder of his mother. Monsue testified several weeks later at a juvenile detention hearing that the day of the murder "was a very bright, sunny day, clear skies; very bright, very, very bright," and that he was unable to see through the back windows because of the glare. Monsue also testified that the footprints along the side of the house only "pointed in a direction coming toward the rear of the residence," these prints matched the shoes Lisker was wearing, and the bloody prints in the house had a "zigzaggedy pattern" "very similar" to the prints in the mud.

Landgren and Monsue both later testified at a preliminary hearing. Each claimed to have been unable to see the floor of

the living room from outside the house on the day of the murder because of glare from the sun and other obstructions. Landgren testified that the footprints he saw inside and outside the house all had a "wavy type pattern."

Monsue also testified at trial.[1] He again stated that the day of the murder had been bright and sunny, and that glare on the windows made it impossible to see inside the house. Monsue confirmed that shoeprints inside and outside the house "resembled quite closely" the shoes Lisker had been wearing, and that the prints in the mud outside the house faced southwards. He also testified that "[t]he conditions of the sun, the temperature, the environment in terms of the dampness on the ground were very similar" during the March 23, 1983 photographic reenactment to the conditions on the day of the murder. The jury was shown photographs taken on the day of the crime of footprints inside and outside the house and photographs taken during the March 23 reconstruction.

The prosecution argued that Lisker was guilty because only his footprints were found in and around the house, and because Lisker had lied during his interview with Monsue, including a "most condemning" lie about seeing his mother through the windows in the back of the house. The jury found Lisker guilty of second-degree murder, and he was sentenced to sixteen years to life.

---

[1] Lisker's first trial was aborted when Lisker agreed to plead guilty on condition that he would be placed in the custody of the California Youth Authority. This agreement ultimately fell apart, and a second trial began in October 1985.

8                      LISKER V. MONSUE

### D.

Lisker undertook several unsuccessful attempts at post-conviction relief in the California courts. In 2004, he filed a federal habeas corpus petition in the Central District of California, alleging due process violations and ineffective assistance of counsel. *See Lisker v. Knowles* ("*Lisker II*"), 651 F. Supp. 2d 1097, 1107 (C.D. Cal. 2009) (adopting the recommendations of the magistrate judge); *Lisker v. Knowles* ("*Lisker I*"), 463 F. Supp. 2d 1008, 1010–11 (C.D. Cal. 2006) (same).

At an evidentiary hearing on the federal petition, Lisker presented meteorological charts and expert testimony demonstrating that it had been overcast on the morning of the murder. *Lisker II*, 651 F. Supp. 2d at 1135. The district court found that this evidence "overwhelmingly" showed that it had not been bright and sunny on the morning of the murder, and that the weather during the March 23 photographic reconstruction had been markedly different. *Id.* at 1136–37. The court also found, based on a 2005 reconstruction of the crime scene, that the view of Dorka Lisker's body from outside the house would have been unobstructed. *Id.* at 1137–38.

Lisker also presented witnesses who attested that there were two sets of footprints in the mud outside the house—one with a "wave" pattern, the other with a "herringbone" pattern—and that the herringbone pattern did not match Lisker's shoes. *Id.* at 1125–26. These witnesses also concluded that at least some of the bloody prints in the house matched the herringbone pattern and had not been left by Lisker. *Id.* The district court found Lisker had conclusively

LISKER V. MONSUE 9

proved that prosecution evidence regarding the shoeprints had been false. *Id.* at 1138.

On August 6, 2009, the district court found Lisker's due process rights had been violated because falsified evidence was admitted at trial, and conditionally granted the petition unless the State promptly retried Lisker.[2] *Id.* at 1101, 1140–41. On September 21, 2009, the State, although still asserting Lisker's guilt, sought dismissal of the information because the evidence was stale. Lisker was released after spending over twenty-six years in custody.

### E.

Lisker filed this action on December 22, 2009, asserting claims under 42 U.S.C. § 1983 against Monsue and Landgren for malicious prosecution, falsification of evidence, and *Miranda* and *Brady* violations; he also asserted a claim against the City of Los Angeles and the Los Angeles Police Department, alleging that policies and practices of the Department contributed to the constitutional violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978) (holding that liability can be imposed under 42 U.S.C. § 1983 if a municipal "policy or custom" causes a constitutional injury). After Lisker voluntarily dismissed the malicious prosecution and *Miranda* claims, the district court granted in part and denied in part a defense motion for summary judgment, dismissing the *Brady* claim but permitting the falsification-of-evidence and *Monell* claims to proceed to trial. With respect to the falsification claim, the court also rejected the defendants' claim to absolute witness immunity

---

[2] The court also concluded, for reasons not relevant to this opinion, that Lisker had received ineffective assistance of counsel. *Id.* at 1132, 1141.

10          LISKER V. MONSUE

for the alleged pre-trial fabrications. The defendants filed a timely Notice of Interlocutory Appeal from the denial of absolute immunity on March 4, 2013.

We have jurisdiction over this appeal because "the denial of a substantial claim of absolute immunity is an order appealable before final judgment" under the collateral order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). We review de novo the district court's denial of immunity. *Knox v. Sw. Airlines*, 124 F.3d 1103, 1105 (9th Cir. 1997).

**II.**

Witnesses, including police officers, are absolutely immune from liability for testimony at trial, *Briscoe v. LaHue*, 460 U.S. 325, 345–46 (1983), and before a grand jury, *Rehberg v. Paulk*, 132 S. Ct. 1497, 1510 (2012). Absolute witness immunity also extends to preparatory activities "inextricably tied" to testimony, such as conspiracies to testify falsely. *Franklin v. Terr*, 201 F.3d 1098, 1102 (9th Cir. 2000); *see also Rehberg*, 132 S. Ct. at 1506–07. "Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Rehberg*, 132 S. Ct. at 1506 (internal quotation marks omitted); *see also Cunningham v. Gates*, 229 F.3d 1271, 1291 (9th Cir. 2000) ("[D]efendants are . . . entitled to absolute immunity from damages liability for any alleged conspiracy to commit perjury.").

Immunity for pre-testimony conduct, however, "is not limitless." *Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001). In addressing claims of witness immunity, we have distinguished conspiracies to testify falsely from "non-

LISKER V. MONSUE 11

testimonial" acts, such as "tampering with documentary or physical evidence or preventing witnesses from coming forward." *Id.* at 981–82. Our sister Circuits have done the same. *See, e.g.*, *Keko v. Hingle*, 318 F.3d 639, 642–44 (5th Cir. 2003) (declining to extend absolute immunity to forensic examiner's report); *Spurlock v. Satterfield*, 167 F.3d 995, 1001–04 (6th Cir. 1999) (distinguishing between conspiracies to testify falsely, which are immune, and manufacturing a false tape-recorded interview and providing hush money to a would-be witness, which are not).

The detectives argue that the notes and reports in the Murder Book are "inextricably tied" to their testimony because these documents were not introduced at trial, and their purpose was to memorialize the substance of eventual testimony. We disagree. As the Sixth Circuit has recognized, police investigative materials have evidentiary value wholly apart from assisting trial testimony—they "comprise part of the documentary record before the prosecution and defense" and affect charging decisions, plea bargaining, and cross-examination of the investigating officers. *Gregory v. City of Louisville*, 444 F.3d 725, 741 (6th Cir. 2006); *see also Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 127, 130 (2d Cir. 1997) (recognizing a falsification-of-evidence claim for forwarding "false information likely to influence a jury's decision" to prosecutors, although the evidence was not admitted at trial). This non-testimonial evidentiary value distinguishes the materials in the Murder Book from pre-trial activity aimed exclusively at influencing testimony. *See Franklin*, 201 F.3d at 1102 (finding conspiracy immune because its "ostensible purpose . . . was to ensure that one person's testimony did not contradict the other's testimony"). The materials in the Murder Book are analogous to the sorts of documentary and physical evidence—such as falsified

videotaped interviews and forensic reports—that fall outside the protection of absolute immunity. *See Gregory*, 444 F.3d at 741–42; *Keko*, 318 F.3d at 642; *Paine*, 265 F.3d at 981–82; *Spurlock*, 167 F.3d at 1001–04.

The same conclusion applies to the allegedly falsified reconstruction of the crime scene. The photographs from the reconstruction were introduced at trial. *See Lisker I*, 463 F. Supp. 2d at 1014. They are therefore squarely governed by this Court's previous holding that "a pretrial, out-of-court effort to . . . fabricate physical evidence . . . is not 'inextricably tied'—or tied at all—to any witness' own testimony," even "[i]f a potential witness does happen to be involved." *Paine*, 265 F.3d at 982.

In addition, the policy interests behind absolute immunity for testimony do not apply to the investigative materials here. Absolute witness immunity is motivated by the recognition that "[a] witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." *Briscoe*, 460 U.S. at 333. That immunity extends to conspiracies to testify falsely for practical reasons, as a plaintiff could otherwise easily undermine the interest in witness candor by challenging the conspiracy rather than the testimony itself. *Rehberg*, 132 S. Ct. at 1506; *Paine*, 265 F.3d at 981. But when defendants have "dual roles as witness and fabricator," extending protection from the testimony to the fabricated evidence "would transform the immunity from a shield to ensure" candor into "a sword allowing them to trample the statutory and constitutional rights of others." *Paine*, 265 F.3d at 982–83 (internal

quotation marks omitted). The detectives' ultimate testimony "does not serve to cloak these actions with absolute testimonial immunity," *Spurlock*, 167 F.3d at 1001; if it did, they would be rewarded for "compound[ing] a constitutional wrong," *Gregory*, 444 F.3d at 739.

The Supreme Court has repeatedly declined to extend absolute immunity to prosecutors acting outside of their traditional roles. *See, e.g.*, *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997) (prosecutor as "complaining witness"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 275–76 (1993) (prosecutor acting in investigative capacity). These cases confirm that absolute immunity is reserved for conduct "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), and that outside of this context, qualified immunity is presumed "sufficient to protect government officials in the exercise of their duties," *Burns v. Reed*, 500 U.S. 478, 486–87 (1991). Landgren and Monsue plainly acted in an investigative capacity in producing the Murder Book and crime-scene photographs. Qualified immunity provides sufficient protection for these activities.

Contrary to the detectives' arguments, *Rehberg v. Paulk* does not compel a different result. In that case, the Supreme Court held that grand jury witnesses are entitled to absolute immunity, even if acting as "complaining witnesses."[3] *See*

---

[3] A "complaining witness" is one "whose allegations serve to bring about a prosecution." *Paine*, 265 F.3d at 981 n.2. Witnesses who may otherwise receive absolute immunity for their actions are sometimes accorded only qualified immunity when serving as a complaining witness. *See, e.g.*, *Kalina*, 522 U.S. at 131. Lisker argues that Landgren and Monsue are complaining witnesses. In light of our holding, we need not decide this question. We note, however, that the exception sometimes

132 S. Ct. at 1507, 1510. The Court also confirmed that witness immunity extends to conspiracies to testify falsely. *Id.* at 1506–07, 1510. In doing so, the Court was careful to emphasize that witness immunity does not extend to "*all* activity that a witness conducts" before testifying, and noted in particular that it had "accorded only qualified immunity to law enforcement officials who falsify affidavits." *Id.* at 1507 n.1 (citing *Kalina*, 522 U.S. at 129–131, and *Malley v. Briggs*, 475 U.S. 335, 340–45 (1986)). The circumstances presented here fall squarely outside the carefully limited holding of *Rehberg*.

## III.

The defendants also seek review, under the doctrine of pendent appellate jurisdiction, of the denial of their motion for summary judgment on the merits. *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 50–51 (1995) (explaining pendent appellate jurisdiction). In particular, they challenge the district court's findings regarding the detectives' mental states and the falsity of the Murder Book and photographs. These determinations, however, are not "inextricably intertwined with, or necessary to ensure meaningful review of," the immunity issues properly before us in this interlocutory appeal. *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 (9th Cir. 2007). We therefore

---

drawn for complaining witnesses because of their role in initiating proceedings further underscores the significance of the Murder Book in initiating proceedings against Lisker.

| LISKER V. MONSUE | 15 |
|---|---|

lack jurisdiction to review the district court's denial of summary judgment on the merits.[4]

## IV.

For the reasons explained above, we **AFFIRM** the district court's denial of summary judgment on witness immunity grounds.

---

[4] To the extent we have jurisdiction to determine "at least whether there is *any*—'an iota'—of evidence supporting" the claims, *Paine*, 265 F.3d at 985, the district court's thorough summary judgment order convincingly demonstrates that the evidence here surmounts this threshold.